# No. 13-2467-cv

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

ERIC GLATT, ALEXANDER FOOTMAN, EDEN ANTALIK, and
KANENE GRATTS, on behalf of themselves and all others similarly situated,

*Plaintiffs-Respondents,*

-against-

FOX SEARCHLIGHT PICTURES, INC., and
FOX ENTERTAINMENT GROUP, INC.,

*Defendants-Petitioners.*

## PLAINTIFFS-RESPONDENTS' OPPOSITION TO PETITION FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

ADAM T. KLEIN
RACHEL BIEN
JUNO TURNER
OUTTEN & GOLDEN LLP
3 PARK AVENUE
NEW YORK, NEW YORK 10016
TELEPHONE: (212) 245-1000

**Attorneys for the
Plaintiffs-Respondents**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................1

QUESTIONS PRESENTED...............................................................1

STATEMENT OF THE CASE...............................................................2

    I.    The "Trainee" Exception to the FLSA and NYLL ..............................2

    II.    Proceedings Below ...............................................................4

ARGUMENT ...............................................................6

    I.    Petitioners' Request for Interlocutory Review Should Be Denied Because It Does Not Meet the Standard for Review under Rule 23(f) ...............................................................6

        A.    The Class Certification Order Will Not Effectively Terminate the Litigation, and Petitioners Failed to Make a Substantial Showing that the District Court's Decision is Questionable ......8

            1.    The Court's Order Will Not Terminate the Litigation...............................................................8

            2.    The Court's Commonality Determination is Not Questionable ...............................................................9

            3.    The Court's Predominance Analysis is Not Questionable ...............................................................12

        B.    The Class Certification Order Does Not Implicate a Legal Question About Class Action Law and There is No Compelling Need for Immediate Resolution ...........................14

CONCLUSION ...............................................................17

## TABLE OF AUTHORITIES

PAGE(S)

### CASES

*Alvarez v. IBP, Inc.,*
339 F.3d 894 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005) ....................................2

*Archie v. Grand Cent. P'ship, Inc.*,
997 F. Supp. 504 (S.D.N.Y. 1998) .....................................................................4

*Clougher v. Home Depot U.S.A., Inc.*,
696 F. Supp. 2d 285 (E.D.N.Y. 2010) ................................................................3

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ...............................................................................12, 13

*Cuevas v. Citizens Financial Group, Inc.*,
No. 12 Civ. 2832, 2013 WL 2321426 (2d Cir. May 29, 2013) .........................10

*Glatt v. Fox Searchlight Pictures Inc.*,
No. 11 Civ. 6784, --F. Supp. 2d.--, 2013 WL 2495140
(S.D.N.Y. June 11, 2013) .............................................................................9, 11

*Hevesi v. Citigroup Inc.*,
366 F.3d 70 (2d Cir. 2004) ....................................................................7, 8, 15

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) .....................................................................12, 13

*Martins v. 3PD, Inc.*,
No. 11 Civ. 11313, 2013 WL 1320454 (D. Mass. Mar. 28, 2013) ....................14

*Moore v. PaineWebber, Inc.*,
306 F.3d 1247 (2d Cir. 2001) ..........................................................................14

*Munoz v. PHH Corp.*,
No. 08 Civ. 0759, 2013 WL 2146925 (E.D. Cal. May 15, 2013) ......................13

*Parra v. Bashas' Inc.*,
-- F.R.D.--, 2013 WL 2407204 (D. Ariz. May 31, 2013) ..................................13

*In re Sumitomo Copper Litig.*,
    262 F.3d 134 (2d Cir. 2001) ...................................................................1, 6, 7, 9

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
    471 U.S. 290 (1985) ...................................................................................2, 3

*In re Urethane Antitrust Litig.*,
    No. 04 Civ. 1616, 2013 WL 2097346 (D. Kan. May 15, 2013) ........................13

*Wallace v. Powell*,
    No. 09 Civ. 286, 2013 WL 2042369 (M.D. Pa. May 14, 2013) ........................13

*Walling v. Portland Terminal Co.*,
    330 U.S. 148 (1947) ........................................................................................3

*Wang v. Hearst Corp.*,
    No. 12 Civ. 793, 2013 WL 1903787 (S.D.N.Y. May 8, 2013) ........................16

*Zheng v. Liberty Apparel Co.*,
    355 F.3d 61 (2d Cir. 2003) ...............................................................................2

**Statutes**

28 U.S.C. § 1292 .............................................................................................15, 16

29 U.S.C. § 202 .....................................................................................................2

29 U.S.C. § 203 .....................................................................................................2

N.Y. Lab. Law § 651 ..............................................................................................3

## PRELIMINARY STATEMENT

Petitioners Fox Searchlight Pictures Inc. and Fox Entertainment Group Inc.'s request for interlocutory review of the district court's grant of class certification fails to meet the high standard for review under Fed. R. Civ. P. 23(f). *In re Sumitomo Copper Litig.*, 262 F.3d 134, 140 (2d Cir. 2001) (noting that "the standards of Rule 23(f) will rarely be met").   Notably, the district court's decision will neither "effectively terminate the litigation," nor "implicate[] a legal question about which there is a compelling need for immediate resolution." *Sumitomo*, 262 F.3d at 139.  Accordingly, the petition should be denied.

## QUESTIONS PRESENTED

1)    Whether Petitioners met their burden of proving that the district court's decision granting class certification is questionable and will terminate the litigation.

2)    Whether Petitioners met their burden of proving that the district court's decision granting class certification implicates a legal question about which there is a compelling need for immediate resolution.

## STATEMENT OF THE CASE

**I.     The "Trainee" Exception to the FLSA and NYLL.**

The FLSA requires employers to pay for all work they "suffer or permit."

29 U.S.C. § 203(g).  To further its remedial and humanitarian goals, the FLSA

broadly defines an "employee" as "any individual employed by an employer."  29

U.S.C. § 203(e)(1); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003).

"Employer" is also defined expansively as "any person acting directly or indirectly

in the interest of an employer in relation to an employee[.]"  29 U.S.C. § 203(d).

"Work" is any "physical or mental exertion (whether burdensome or not)

controlled or required by the employer and pursued necessarily and primarily for

the benefit of the employer."  *Alvarez v. IBP, Inc.,* 339 F.3d 894, 902 (9th Cir.

2003) (internal quotation marks omitted), *aff'd*, 546 U.S. 21 (2005).

The FLSA's broad definitions of employ, employee, and employer are

meant to ensure that commercial businesses do not obtain an unfair competitive

advantage in the marketplace by employing individuals who voluntarily work for

no wage.  *See* 29 U.S.C. § 202(a)(3) (declaring Congress's intention to correct

"detrimental" labor conditions that create "an unfair method of competition in

commerce" through passage of the FLSA); *see also Tony & Susan Alamo Found.*

*v. Sec'y of Labor*, 471 U.S. 290, 302 (1985) ("[E]xceptions to [FLSA] coverage . . .

exert a general downward pressure on wages in competing businesses[.]").  "If an

exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." *Alamo Found.*, 471 U.S. at 302.

The NYLL is an equally protective "remedial" statute. *Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 289 n.4 (E.D.N.Y. 2010). Its definitions of "employee" and "employer" are nearly identical to the FLSA's. *See* N.Y. Lab. Law § 651(5) (an employee is "any individual employed or permitted to work by an employer in any occupation"); § 651(6) (an employer "includes any individual, partnership, association, corporation, limited liability company . . . or any organized group of persons acting as employer").

Although the FLSA does not define the word "intern" and there is no exception for "interns" anywhere in the statute, in 1947, the U.S. Supreme Court carved out a narrow exception to the definition of an employee for "trainees" participating in short-term training programs that provide "the same kind of instruction" offered by a "public or private vocational school." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152-53 (1947). Where it is undisputed that the alleged employer "receive[d] *no* 'immediate advantage' from any work done by the trainees," the trainees worked "*solely* for [their own] personal purpose or pleasure," and their "work serve[d] *only* [their] own interest," it has not "suffered

3

or permitted" work and therefore does not owe the trainees compensation. *Id*.

(emphasis added). The U.S. Department of Labor ("DOL") later developed a six-

factor test intended to codify *Walling*, which courts – including the district court

here – have applied to workers alleged to be trainees,[1] and which the DOL recently

adapted, with little change, to interns who work for private sector employers, like

Petitioners. *See* U.S. Dep't of Labor, Fact Sheet #71: Internship Programs Under

the FLSA ("DOL Fact Sheet"), at A0002-0003.[2]

## II.    Proceedings Below

On February 15, 2013, Respondent Eden Antalik moved to certify a class of

"All individuals who had unpaid internships in New York between September 28,

2005 and September 1, 2010 with one or more of the following divisions of

[Petitioner Fox Entertainment Group ("FEG")]: Fox Filmed Entertainment, Fox

Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp.

Digital Media)." On June 11, 2013, the district court granted her motion, finding

that she met all of the criteria of Rule 23(a) and Rule 23(b)(3). In support of the

motion, Antalik submitted substantial evidence that she and other interns worked

in New York, participated in FEG's centralized internship program, performed

---

[1]    *See, e.g., Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 531-32
(S.D.N.Y. 1998).

[2]    The New York Department of Labor has adopted the DOL's test and added
more factors. *See* N.Y. Dep't of Labor, Fact Sheet, Wage Requirements for Interns
in For-Profit Businesses, at A0004-0005.

4

productive work, were classified as employees under the same FEG personnel policies, and were uniformly classified as non-employees with respect to Petitioners' wage and hour policies.  In determining that Antalik met Rule 23(a)'s commonality requirement, the Court cited common evidence that FEG departments requested interns based on their needs, and requested more interns when they were busier and that, throughout FEG, the number of unpaid interns spiked following the elimination of paid internships and other payroll reductions.  (Opinion dated June 11, 2013 ("Op.") at 30 (A0035)).  The district court also determined that FEG's decision to begin paying interns in all departments following the release of a U.S. Department of Labor Fact Sheet relating to unpaid internships was common evidence of Petitioners' liability.  (Op. at 31 (A0036)).

Although Petitioners argued that certain evidence demonstrated that individualized issues would predominate over common questions such that class certification would not be appropriate, their arguments were unavailing because the individualized issues, to the extent there were any, relate to interns' duties – but what is material for purposes of the test adopted by the district court is that interns performed the day-to-day work of the company, not the particular tasks they performed.  (*See* Op. at 24-25 (A0029-30)).

Furthermore, the only evidence that Petitioners submitted to attempt to rebut Respondents' substantial common evidence was a single declaration from an intern

5

supervisor in New York, Bruce Shirley.  Respondents argued – and repeat here – that the declaration should have been struck for failure to previously disclose the witness during discovery.  (*See* Plaintiffs' Reply Memorandum of Law In Support of Motion for Class and Collective Certification ("Pls.' Reply Mem.") at A0010).  The other declarations submitted by Defendant failed to raise individualized issues as to the material questions in this litigation.

Ultimately, the district court correctly concluded that common issues predominate over individualized ones, and that resolution of those common issues would drive the merits inquiry.  (Op. at 31, 33 (A0036, 38)).

## ARGUMENT

### I.   Petitioners' Request for Interlocutory Review Should Be Denied Because It Does Not Meet the Standard for Review under Rule 23(f).

Immediate review of a Rule 23 decision is a rare exception to the longstanding policy that appeals must await the conclusion of litigation.  *See Sumitomo*, 262 F.3d at 140.  In order to avoid the "needless erosion of the final judgment rule and the policy values it ensures, including efficiency and deference," Rule 23(f) affords a strictly limited opportunity for interlocutory appeal.  *See id.*  In *Sumitomo*, this Court, after extensive review of other circuit case law, crafted a two-prong test that permits review *only* where the petitioner can prove either "(1) that the certification order will effectively terminate the litigation *and* there has been a substantial showing that the district court's decision is questionable, or (2)

6

that the certification order implicates a legal question about which there is a

compelling need for immediate resolution." *Sumitomo*, 262 F.3d at 139 (emphasis

added). The *Sumitomo* court drew a deliberately narrow standard, which

"anticipate[d] . . . that the standards of 23(f) will rarely be met." *Id.* A successful

petitioner must show either that the certification grant is a "death knell" *and* make

a "substantial showing" that the certification order is problematic, or that there is a

legal question about class action law for which there is a "compelling need" for

immediate resolution. *See Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004)

(emphasis added) (citing *Sumitomo*, 262 F.3d at 140). This Petition fails to meet

either of these requirements.

Because they cannot meet the actual review standard, Petitioners choose

instead to make two arguments inappropriate for interlocutory appeal of a class

certification order:  first, that the district court erred in finding commonality and

predominance; and second, that the district court applied the wrong legal standard

in granting summary judgment to two Plaintiffs (Plaintiffs Glatt and Footman) on

the issue of whether they were "employees" covered by the FLSA and NYLL.

(*See* Defs.' Petition for Permission to Appeal Pursuant to Rule 23(f) (the

"Petition") at 3-4).  Petitioners make little effort to show that this Court need take

the extraordinary step of intervening *now* to resolve these issues.

7

The Court should decline to review the Petition, which presents routine arguments raised by unsuccessful class defendants and if granted, would make Rule 23(f) appeals commonplace after successful motions for class certification.

**A.    The Class Certification Order Will Not Effectively Terminate the Litigation, and Petitioners Failed to Make a Substantial Showing That the District Court's Decision is Questionable.**

1.    <u>The Court's Order Will Not Terminate the Litigation.</u>

Because this case presents no risk that the grant of class certification will effectively terminate the litigation, the "death knell" element is not met. *See Hevesi*, 366 F.3d at 77.  Petitioners make no argument or showing that they meet this requirement except for a short statement at the end of their brief that the prospect of "potentially massive damages" puts "insurmountable pressure on defendants to settle."  (Petition at 20).  Petitioners cite one Fifth Circuit case for this "settlement pressure" argument, and make no showing on how "massive" the damages are or could be.  Instead, Petitioners expect this Court to take their word on how much pressure they might feel.

Petitioners' credibility is undermined by the reality that this argument directly contradicts their previous arguments to the district court on the numerosity of the class.  As part of their opposition to Respondents' motion for class certification, Petitioners argued that numerosity was not met and that Respondents' proof of more than 45 class members was not reliable because the company's

8

personnel database can "not be relied upon for its accuracy." (*See* Op. at 28 (A0033)). For a multi-billion dollar company to feel "insurmountable" pressure of "massive damages" from a class that it contends has less than 45 members and who seek to recoup only minimum wages is absurd. This argument illustrates the larger point that Petitioners are simply grasping at straws and are willing to make any argument to advance their interests in this case.

Because Petitioners cannot show that granting class certification will effectively terminate the litigation, this element is not met and the inquiry on this element stops here. *See Sumitomo*, 262 F.3d at 139.

### 2. The Court's Commonality Determination Is Not Questionable.

Even if the Court were to find that the litigation is effectively terminated, the petition also fails to make the requisite "substantial" showing that the district court's order is "questionable." Judge Pauley's 36-page opinion is far from "questionable," and instead, carefully and thoroughly analyzes the correct class certification standards. *See Glatt v. Fox Searchlight Pictures Inc.*, No. 11 Civ. 6784, --F. Supp. 2d.--, 2013 WL 2495140 (S.D.N.Y. June 11, 2013).

Petitioners first argue that the district court's commonality determination was "deeply flawed" because it did not credit *their* testimony and evidence over that submitted by Respondents. In their petition, Petitioners mined their evidence to paint a one-sided picture of individualized internship experiences and ignored

9

the overwhelming evidence of common questions and answers to that will drive the liability determination.

This Court's summary order in *Cuevas v. Citizens Financial Group, Inc.*, No. 12 Civ. 2832, 2013 WL 2321426 (2d Cir. May 29, 2013), is inapposite. In *Cuevas*, the Court remanded a class certification ruling because the district court failed to resolve material disputes about the class members' duties – disputes that, in a wage and hour misclassification case, go to the very heart of the exemption analysis. *Id.* at *2.

Here, Judge Pauley resolved factual disputes to the extent necessary to support his certification order. The fact that Judge Pauley credited Respondents' showing of common questions and evidence that "*is* capable of answering common questions on a classwide basis" does not make it questionable. (Op. at 29-31 (A0034-0036) (emphasis in original) (citing *Wal-Mart Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). Judge Pauley made a careful determination after examination of a well-documented record of common issues. The record encompassed a variety of evidence that supports class certification: extensive deposition testimony; corporate documents demonstrating the standardized internship program and class-wide "intern guidelines"; evidence of company-wide reactions to changing economies and publicized 2010 regulations; and a uniform corporate policy change in response to concerns over the potential illegality of continuing to employ

unpaid interns.  (*See id.* at 30-31 (A0035-0036); Court Tr. dated May 10, 2012[3]

("Court Tr.") at 22:2-14 (A0106)).  As the district court found after making that

examination: "Evidence that interns were recruited to help with busy periods, that

they displaced paid employees, and that those who oversaw the internships did not

believe they complied with applicable law is evidence capable of generating

common answers to questions of liability."  (*Id.* at 31).

      The district court did not ignore the evidence submitted by Petitioners, but

rather considered it and determined that it was insufficient to defeat commonality.

The district court weighed evidence of small differences among class members in

the types of training and supervision they received.  (Court Tr. at 9:8-10:6

(A0103)).  The district court similarly considered – and rejected – Respondents'

contention that Petitioners' internship request forms constituted common proof, yet

nevertheless concluded that the other common evidence identified would drive the

resolution of the litigation.  (Op. at 30 (A0035)).

      At oral argument, the court demonstrated a close familiarity with the

documents submitted by the parties, questioning counsel for both sides about

internship guidelines, Petitioners' decision to eliminate unpaid internships, and the

terminology used in the parties' papers.  (Court Tr. at 4:13-15 (A0101); 20:15-16

---

[3]    Although the transcript is dated May 10, 2012, the Oral Argument was held
on May 10, 2013.  *See Glatt v. Fox Searchlight Pictures, Inc.*, No. 11 Civ. 6784,
ECF No. 164.

(A0105); 35:10-11 (A0109); 38:16-39:10 (A0110); 44:14-18 (A00111)).  The

court's ruling simply cannot be called questionable in light of its obvious

familiarity with the evidence and the degree to which it weighed that evidence in

certifying the class.

### 3.    The Court's Predominance Analysis Is Not Questionable.

Petitioners next argue that the district court's analysis of predominance is

"woefully inadequate" because it did not cite or analyze the *Comcast Corp. v.

Behrend*, 133 S. Ct. 1426 (2013) decision, which they argue "thoroughly

refashioned the approach to analyzing predominance."  (Petition at 15).

The district court's choice not to cite *Comcast* does not render its

predominance determination faulty.  *Comcast* did not alter this Court's

longstanding predominance analysis.  (*See* Petition at 15); *see Comcast*, 133 S. Ct.

at 1433 ("[t]his case thus turns on the straightforward application of class-

certification principles . . . ."); *id*. at 1436 (Ginsburg and Breyer, JJ., dissenting)

("[T]he opinion breaks no new ground on the standard for certifying a class

action[.]").  Nor did it change the principle that "individual damages calculations

do not preclude class certification under Rule 23(b)(3)."  *Id.* (Ginsburg and Breyer,

JJ., dissenting) (*Comcast* "should not be read to require, as a prerequisite to

certification, that damages attributable to a classwide injury be measurable 'on a

class-wide basis.'"); *see also Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th

12

Cir. 2013) (reaffirming, post-*Comcast*, that "damage calculations alone cannot defeat certification") (internal quotation marks and citations omitted).

Moreover, here, unlike in *Comcast* (an antitrust case), Respondents' theory of liability is directly tethered to their damages theory. "If putative class members prove [Petitioners'] liability, damages will be calculated based on the wages each employee lost due to [Petitioners'] unlawful practices. *Leyva*, 716 F.3d at 514. Respondents need not prove damages with precision to satisfy Rule 23(b)(3). *See Comcast*, 133 S. Ct. at 1433 ("Calculations need not be exact" to establish predominance).

Since *Comcast*, district courts around the country have properly certified classes and declined to decertify existing classes by refusing to extend *Comcast* beyond its facts and narrow holding. *See, e.g., Parra v. Bashas' Inc.*, -- F.R.D.--, 2013 WL 2407204, at *32 (D. Ariz. May 31, 2013) (certifying a class of grocery workers on their pay discrimination claims after careful examination of the 23(b)(3) factors); *In re Urethane Antitrust Litig.*, No. 04 Civ. 1616, 2013 WL 2097346 (D. Kan. May 15, 2013) (denying defendant's decertification motion); *Munoz v. PHH Corp.*, No. 08 Civ. 0759, 2013 WL 2146925 (E.D. Cal. May 15, 2013) (granting class certification in part); *Wallace v. Powell*, No. 09 Civ. 286, 2013 WL 2042369, at *19 (M.D. Pa. May 14, 2013) (granting class certification; holding that "I am not inclined to extend *Comcast* beyond its facts and holding.");

13

*Martins v. 3PD, Inc.*, No. 11 Civ. 11313, 2013 WL 1320454, at *8 n.3 (D. Mass. Mar. 28, 2013) (granting class certification in part; holding that "I interpret [*Comcast*] not to foreclose the possibility of class certification where some individual issues of the calculation of damages might remain, as in the current case, but those determinations will neither be particularly complicated nor overwhelmingly numerous").

Here, the district court cited a controlling current Second Circuit case on predominance, *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2001), and determined that Respondents' proof on liability predominates over any individualized damages issues.  (Op. at 33 (A0038)).  Nothing in this ruling presents a special issue justifying immediate interlocutory appeal.

> **B.    The Class Certification Order Does Not Implicate a Legal Question About Class Action Law and There Is No Compelling Need for Immediate Resolution.**

Petitioners next argue that the test for "whether interns are covered under the FLSA" is a question about which there is a compelling need for resolution. Petitioners argue that "the circuits have disagreed about the proper test" of whether unpaid interns are covered under the FLSA and there is a "pressing need" to resolve this question because three new unpaid intern cases have been filed. (Petition at 18, 19).  Neither of these arguments presents a compelling need for this Court to grant immediate interlocutory review under Rule 23(f).

14

A legal question "will not compel immediate review unless it is of fundamental importance to the development of the *law of class actions and* it is likely to escape effective review after entry of final judgment." *Hevesi*, 366 F.3d at 77 (emphasis added) (citing *Sumitomo*, 262 F.3d at 140).  Accordingly, a successful Rule 23(f) petitioner in this circuit must show both that the important question pertains to class action law, and that such an examination is likely to evade review after entry of final judgment. *Id.*  Petitioners have done neither.

Petitioners' argument fails because the question of the proper legal standard for evaluating the claims of unpaid interns is *not* a question important to the development of *class action* law—the determinative element of this rule. *See id*. The question raised by Petitioners regards employee status under the FLSA and NYLL, not class action law under Rule 23.  Moreover, it is an issue that will not evade review because there is no evidence of disappearing claims or claimants, and, as noted *infra*, the "massive settlement pressure" alluded to by Petitioners is a fiction.  In fact, Petitioners have already filed a request for a pre-motion conference in advance of their anticipated motion for interlocutory appeal under 28 U.S.C. § 1292(b), which seeks review of the very same question.  (A0127-A0129).

Even if the challenged legal standard pertained to class action law, the district court's analysis was far from inadequate and does not compel review at this juncture under Rule 23(f).  The district court analyzed the issue of employee status

15

under the FLSA and NYLL in over seven pages, making a careful examination of the Supreme Court's decision in *Walling*, as well as other circuit decisions and guidance provided by the Department of Labor.  (*See* Op. at 19-26 (A0024-0031)). Petitioners' challenge to the legal standard is more properly resolved after final judgment or, if at all, through their proposed interlocutory appeal under 28 U.S.C. § 1292(b)[4] or after resolution of the district court proceedings.  However, it is inappropriate for interlocutory review under Rule 23(f).

---

[4]   Petitioners make much of the fact that another unpaid intern case was decided against the plaintiffs, *Wang v. Hearst Corp.*, No. 12 Civ. 793, 2013 WL 1903787 (S.D.N.Y. May 8, 2013).  The plaintiffs who lost class certification and summary judgment in that case moved under 28 U.S.C. **§**1292(b) for leave to appeal the court's ruling on legal issue of what is the correct legal standard for examining employee status of unpaid interns under the FLSA.  *See Wang v. Hearst Corp.*, No. 12 Civ. 0793, ECF No. 150 (S.D.N.Y. May 29, 2013).  In that case, the parties agreed that interlocutory appeal was appropriate because the case was set to be tried shortly.  In this case, Respondents oppose Petitioners' request to move for interlocutory appeal because the purpose of 28 U.S.C. § 1292 would not be served because no trial is scheduled.  Respondents were granted summary judgment and anticipate that the claims of the class and collective will similarly be resolved in summary fashion.

## CONCLUSION

For the foregoing reasons, the Petition should be denied.

Dated:       July 8, 2013
              New York, New York

                            Respectfully submitted,

                            **OUTTEN & GOLDEN LLP**
                            By:

                            /s/ Adam T. Klein
                            Adam T. Klein

                            Adam T. Klein
                            Rachel Bien
                            Juno Turner
                            3 Park Avenue, 29th Floor
                            New York, New York 10016
                            Telephone:   (212) 245-1000
                            Facsimile:   (212) 977-4005

**APPENDIX**
**TABLE OF CONTENTS**

U.S. Dep't of Labor, Fact Sheet #71: Internship Programs Under
the Fair Labor Standard Act..........................................................A0002

N.Y. Dep't of Labor Fact Sheet: Wage Requirements for Interns
in For-Profit Businesses...............................................................A0004

Memorandum and Order, June 11, 2013 ..........................................A0006

Plaintiffs-Respondents' Memorandum of Law in Support of Plaintiffs'
Motion for Class Certification and Court-Authorized Notice,
February 15, 2013 .....................................................................A0042

Plaintiffs-Respondents' Reply Memorandum of Law in Support of Plaintiffs'
Motion for Class Certification and Court-Authorized Notice,
April 12, 2013 ...........................................................................A0080

Court Transcript of Oral Argument held May 10, 2013 ...................A0100

Defendants-Petitioners' Pre-motion Conference Letter regarding Anticipated
Motion for Interlocutory Appeal, June 25, 2013 .........................A0127

**U.S. Department of Labor**
**Wage and Hour Division**



(April 2010)

# Fact Sheet #71:  Internship Programs Under The Fair Labor Standards Act

This fact sheet provides general information to help determine whether interns must be paid the minimum wage and overtime under the Fair Labor Standards Act for the services that they provide to "for-profit" private sector employers.

**Background**
The Fair Labor Standards Act (FLSA) defines the term "employ" very broadly as including to "suffer or permit to work."  Covered and non-exempt individuals who are "suffered or permitted" to work must be compensated under the law for the services they perform for an employer.  Internships in the "for-profit" private sector will most often be viewed as employment, unless the test described below relating to trainees is met.  Interns in the "for-profit" private sector who qualify as employees rather than trainees typically must be paid at least the minimum wage and overtime compensation for hours worked over forty in a workweek.[*]

**The Test For Unpaid Interns**
There are some circumstances under which individuals who participate in "for-profit" private sector internships or training programs may do so without compensation.  The Supreme Court has held that the term "suffer or permit to work" cannot be interpreted so as to make a person whose work serves only his or her own interest an employee of another who provides aid or instruction.  This may apply to interns who receive training for their own educational benefit if the training meets certain criteria.  The determination of whether an internship or training program meets this exclusion depends upon all of the facts and circumstances of each such program.

The following six criteria must be applied when making this determination:

1.  The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

2.  The internship experience is for the benefit of the intern;

3.  The intern does not displace regular employees, but works under close supervision of existing staff;

4.  The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

5.  The intern is not necessarily entitled to a job at the conclusion of the internship; and

6.  The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

If all of the factors listed above are met, an employment relationship does not exist under the FLSA, and the Act's minimum wage and overtime provisions do not apply to the intern.  This exclusion from the definition of employment is necessarily quite narrow because the FLSA's definition of "employ" is very broad.  Some of the most commonly discussed factors for "for-profit" private sector internship programs are considered below.

**Similar To An Education Environment And The Primary Beneficiary Of The Activity**
In general, the more an internship program is structured around a classroom or academic experience as opposed to the employer's actual operations, the more likely the internship will be viewed as an extension of the individual's educational experience (this often occurs where a college or university exercises oversight over the internship program and provides educational credit).  The more the internship provides the individual with skills that can be used in multiple employment settings, as opposed to skills particular to one employer's operation, the more likely the intern would be viewed as receiving training.  Under these circumstances the intern does not perform the routine work of the business on a regular and recurring basis, and the business is not dependent upon the work of the intern.  On the other hand, if the interns are engaged in the operations of the employer or are performing productive work (for example, filing, performing other clerical work, or assisting customers), then the fact that they may be receiving some benefits in the form of a new skill or improved work habits will not exclude them from the FLSA's minimum wage and overtime requirements because the employer benefits from the interns' work.

**Displacement And Supervision Issues**
If an employer uses interns as substitutes for regular workers or to augment its existing workforce during specific time periods, these interns should be paid at least the minimum wage and overtime compensation for hours worked over forty in a workweek.  If the employer would have hired additional employees or required existing staff to work additional hours had the interns not performed the work, then the interns will be viewed as employees and entitled compensation under the FLSA.  Conversely, if the employer is providing job shadowing opportunities that allow an intern to learn certain functions under the close and constant supervision of regular employees, but the intern performs no or minimal work, the activity is more likely to be viewed as a bona fide education experience.  On the other hand, if the intern receives the same level of supervision as the employer's regular workforce, this would suggest an employment relationship, rather than training.

**Job Entitlement**
The internship should be of a fixed duration, established prior to the outset of the internship.  Further, unpaid internships generally should not be used by the employer as a trial period for individuals seeking employment at the conclusion of the internship period.  If an intern is placed with the employer for a trial period with the expectation that he or she will then be hired on a permanent basis, that individual generally would be considered an employee under the FLSA.

**Where to Obtain Additional Information**
This publication is for general information and is not to be considered in the same light as official statements of position contained in the regulations.

**For additional information, visit our Wage and Hour Division Website: http://www.wagehour.dol.gov and/or call our toll-free information and helpline, available 8 a.m. to 5 p.m. in your time zone, 1-866-4USWAGE (1-866-487-9243).**

**U.S. Department of Labor**                                    **1-866-4-USWAGE**
Frances Perkins Building                                    TTY: 1-866-487-9243
200 Constitution Avenue, NW                                    **Contact Us**
Washington, DC 20210

---

[*] The FLSA makes a special exception under certain circumstances for individuals who volunteer to perform services for a state or local government agency and for individuals who volunteer for humanitarian purposes for private non-profit food banks.  WHD also recognizes an exception for individuals who volunteer their time, freely and without anticipation of compensation for religious, charitable, civic, or humanitarian purposes to non-profit organizations.  Unpaid internships in the public sector and for non-profit charitable organizations, where the intern volunteers without expectation of compensation, are generally permissible.  WHD is reviewing the need for additional guidance on internships in the public and non-profit sectors.



**LABOR STANDARDS**

# Fact SHEET

# Wage Requirements for Interns in For-Profit Businesses

The New York State Minimum Wage Act and Wage Orders contain the state's rules for pay and overtime. These rules are in addition to those required by federal law, including the Fair Labor Standards Act. This is a guideline to help decide if a for-profit business that has interns must pay them according to the state minimum wage and overtime rules. This only applies to the State Minimum Wage Act and Orders. It does not apply to Unemployment Insurance, Workers' Compensation, and/or any other law.

*\* Not-for-profit organizations and institutions of any type also may have unpaid interns, if they meet all the criteria for an intern who is not in an employment relationship.*

**In general, an intern is only exempt from the requirements of the Minimum Wage Act and Orders if the intern is not in an employment relationship.** To determine whether an employment relationship exists, the department uses six criteria from the U.S. Department of Labor and five criteria of its own to evaluate the situation.

**An employment relationship does not exist only if the situation meets ALL of these criteria:**

1. **The training, even though it includes actual operation of the employer's facilities, is similar to training provided in an educational program.**
   For example:
   - The internship program builds on a classroom or academic experience -- NOT the employer's operations.
   - A college, university, secondary school, specialist, technical, vocational or trade school oversees the program and awards educational credit.
   - The internship teaches skills that are useful in other jobs (not skills specific to one employer's operation).
   - The intern does not perform the routine work of the business on a regular basis, and the business does not depend upon the work of the intern.
   - The intern is not engaged in the operations of the employer and does not perform productive work (such as filing, other clerical work or helping customers).
   - The intern gains a new skill, advanced knowledge or better work habits.

2. **The training is for the benefit of the intern.**

   The intern must be the primary beneficiary of the training. Any benefit to the employer must be merely incidental. If the academic institution gives credit for the internship, it is considered some evidence of the beneficial nature of the program.

3. **The intern does not displace regular employees, and works under close supervision.**

   Interns do not function in ways that replace or augment regular staff.

   If interns do job shadowing to learn certain functions under the close and constant supervision of regular employees (but perform no or minimal work), then this is likely to be considered a true educational experience.

   However, if interns receive the same level of supervision as the employer's regular workers, it suggests an employment relationship, rather than training.

   Interns are considered employees if they substitute for regular workers or add to an existing workforce during specific time periods.

   Interns are viewed as employees if the company would need to hire additional employees or require existing staff to work more hours to do the interns' work.

4. **The activities of trainees or students do not provide an immediate advantage to the employer. On occasion, operations may actually be impeded.**

   The essence of a traineeship is that an employer provides a benefit to the trainees by developing their work skills or knowledge; the trainees do not benefit the employer.

   In a true traineeship, the employer cannot gain an immediate advantage from the intern's presence. In fact, in most circumstances, interns will require employers to dedicate resources (in the form of training, supervision, etc.) that may actually detract from the productivity of the worksite for some period.



**NYS DEPARTMENT OF LABOR**

PROTECT | ASSIST | CONNECT

5. **The trainees or students are not necessarily entitled to a job at the conclusion of the training period and are free to take jobs elsewhere in the same field.**

The internship runs for a fixed period, set before the internship begins. It has no connection with any offer of employment or promise to stay with the employer.

Employers should not use unpaid internships as a trial period for those seeking employment.

Interns who are placed with the employer for a trial period, with the expectation that afterwards they will be hired as permanent employees, would generally be considered employees.

The longer an internship lasts, the more likely it will be considered an employment relationship.

6. **The trainees or students are notified, in writing, that they will not receive any wages and are not considered employees for minimum wage purposes.**

Such written notice must be clear and be given to the trainees or students before the internship or traineeship starts.

7. **Any clinical training is performed under the supervision and direction of people who are knowledgeable and experienced in the activity.**

The persons who supervise or direct any clinical, hands-on work performed by the trainees must have sufficient experience and knowledge in that industry.

Persons have "sufficient" experience and knowledge in the industry if they are proficient in the area and in all activities performed by the trainee. They must have adequate background, education, and experience to fulfill the educational goals and requirements of the training program. In addition, the persons must be competent to provide such training, with previous experience training employees or students.

8. **The trainees or students do not receive employee benefits.**

Examples of such benefits include, but are not limited to:
- Health and dental insurance
- Pension or retirement credit and
- Discounted or free goods and services from the employer

9. **The training is general, and qualifies trainees or students to work in any similar business. It is not designed specifically for a job with the employer that offers the program.**

Skills offered through the training must be:
- Useful
- Transferable to any employer in the field and
- Not specific to the for-profit employer offering the training

Any training that is specific to the employer and its operations is conclusive evidence that an employment relationship exists.

10. **The screening process for the internship program is not the same as for employment, and does not appear to be for that purpose. The screening only uses criteria relevant for admission to an independent educational program.**

This helps to ensure that employers do not mix recruiting of employees and interns. These searches must run independently from one another.

Educational institutions or other organizations should not consider employment-related factors when they place students with for-profit employers. They should only consider the needs of the student and the educational program.

11. **Advertisements, postings, or solicitations for the program clearly discuss education or training, rather than employment, although employers may indicate that qualified graduates may be considered for employment.**

This relates to the requirement that the employer tell trainees, in writing, that they are not entitled to wages for the training. This is to avoid a trainee's misunderstanding of the nature of the program, and/or an employer's misrepresentation of its nature, purposes and entitlements.

PROTECT *all Workers*
ASSIST *the Unemployed*
CONNECT *Employers and Workers*



**www.labor.ny.gov**

**NYS DEPARTMENT OF LABOR**
PROTECT | ASSIST | CONNECT

P725 (4/11)     The New York State Department of Labor is an Equal Opportunity Employer/Program.  Auxiliary aids and services are available upon request to individuals with disabilities.

A0005

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                     :

ERIC GLATT, *et al.*,                           11 Civ. 6784 (WHP)

                   Plaintiffs,            MEMORANDUM & ORDER

         -against-

FOX SEARCHLIGHT PICTURES
INC., *et ano.*,

                Defendants      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

          Plaintiffs Eric Glatt, Alexander Footman, Kanene Gratts, and Eden Antalik bring

this putative class action under the Fair Labor Standards Act ("FLSA"), New York Labor Law

("NYLL"), and California Unfair Competition Law ("CAUCL") against Defendants Fox

Searchlight Pictures Inc. ("Searchlight") and Fox Entertainment Group, Inc. ("FEG"). Plaintiffs

contend that Searchlight and FEG violated federal and state labor laws by classifying them as

unpaid interns instead of paid employees.

          Glatt, Footman, and Gratts move for summary judgment that (1) they were

"employees" covered by the FLSA and NYLL and (2) Searchlight was their employer. Antalik

moves for class certification of her NYLL claims and conditional certification of a collective

action for her FLSA claims. Defendants move for summary judgment that (1) Gratts's claims

are time-barred; (2) Searchlight did not employ Glatt, Footman, or Gratts; (3) FEG did not

employ Antalik; and (4) Searchlight did not employ any of the production interns on five films

financed by Searchlight. For the following reasons, Plaintiffs' summary judgment motion is

granted in part and denied in part, Defendants' summary judgment motion is granted in part and

denied in part, and Antalik's motions for class certification of her NYLL claims and conditional

certification of an FLSA collective action are granted.

## **BACKGROUND**

The Parties

Glatt and Footman were unpaid interns who worked on production of the film Black Swan in New York.  After production ended, Glatt took a second unpaid internship relating to Black Swan's post-production.  Gratts was an unpaid intern who worked on production of the film 500 Days of Summer in California.  Antalik was an unpaid intern at Searchlight's corporate offices in New York.

FEG is the parent corporation of approximately 800 subsidiaries, including co-defendant Searchlight.  Searchlight produces and distributes feature films.  Searchlight does not produce the films itself.  Rather, it enters into Production-Distribution-Finance Agreements ("Production Agreements") with corporations created for the sole purpose of producing particular films.

The Film Productions

Black Swan began as a collaboration between director Darren Aronofsky and producer Scott Franklin.  Aronofsky and Franklin incorporated Lake of Tears, Inc. for the purpose of producing Black Swan.  On November 2, 2009, Searchlight and Lake of Tears entered into a Production Agreement for Black Swan.

500 Days of Summer was produced by 500 DS Films, Inc., a corporation created solely to produce that film.  Searchlight entered into a Production Agreement with 500 DS Films for 500 Days of Summer.  The Production Agreements for Black Swan and 500 Days of Summer

2

do not differ materially from one another.[1]  They gave Searchlight the power to hire and fire

production personnel, set budgets, and monitor the progress of films.

### FEG's Internship Program

      Antalik claims she was part of a "centralized unpaid internship program" in which

unpaid interns at FEG's subsidiaries were subject to a single set of policies administered by a

small team of intern recruiters.  She maintains that two employees oversaw FEG's internship

program during the relevant periods and their responsibilities included soliciting "intern request

forms" from supervisors at subsidiaries interested in hiring interns, approving those requests,

screening internship applicants, and processing interns' paperwork.  According to Antalik, she

and the members of her proposed class and collective action were victims of a common policy of

using unpaid interns to perform work that required them to be paid.

      Defendants deny there was any "centralized" internship program.  They argue

internships varied considerably among various FEG subsidiaries and departments, and interns'

experiences were shaped by the particular supervisors they were matched with.

### DISCUSSION

### Summary Judgment Motions

I.    Legal Standard

      Summary judgment should be granted if the record shows that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

The burden of demonstrating the absence of any genuine dispute as to a material fact rests with

the moving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving

---

[1] May 10, 2013 Tr. at 52:23-53:4.

party has made an initial showing that there is no genuine dispute of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment, Liberty Lobby, 477 U.S. at 252, but must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original); see also Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citation omitted). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita, 475 U.S. at 586-87).

The Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party. See Liberty Lobby, 477 U.S. at 255; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). A party opposing summary judgment "is not entitled to rely solely on the allegations of her pleading, but must show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion." Fitzgerald v. Henderson, 251 F.3d 345, 361 (2d Cir. 2001). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998).

II.   Statute of Limitations for Gratts's CAUCL Claim

Defendants argue Gratts's CAUCL claim is time-barred. The CAUCL has a four-year statute of limitations. Cal. Bus. & Prof. Code § 17208. Gratts was not a plaintiff when the

4

action was filed in September 2011.[2]  Pursuant to this Court's individual practices, Plaintiffs filed a pre-motion letter on August 2, 2012 requesting leave to move to file an amended complaint.[3]  The pre-motion letter attached a proposed amended complaint, adding Gratts as a plaintiff.  On September 5, 2012, Plaintiffs filed a motion to amend the complaint.[4]  On October 19, 2012, Plaintiffs filed their amended complaint.

Gratts's claims do not relate back to the filing of the original complaint.[5] Defendants contend that Gratts's action was "commenced" on September 5, 2012 because "the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes."  Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir. 2000); see also Nw. Nat'l Ins. Co. v. Alberts, 769 F. Supp. 498, 510 (S.D.N.Y. 1991).  But "[t]he theory underlying this rule is that a . . . defendant is on notice at the time a plaintiff files its motion because the plaintiff attached the proposed amended complaint to the motion."  In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., MDL No. 1358 (SAS), 2007 WL 2979642, at *4 (S.D.N.Y. Oct. 10, 2007).  Here, Defendants were on notice of Gratts's claims when Plaintiffs submitted their pre-motion letter and included a draft amended complaint.  See Reza v. Khatun, No. 09 Civ. 233 (MKB), 2013 WL 596600, at *4 (E.D.N.Y. Feb. 15, 2013); Lekic v. 222 E. 8th St. LLC, No. 11 Civ. 1242, 2012 WL 4447625, at *1, 4 (E.D.N.Y. Sept. 25, 2012).  Thus, Gratts commenced her claim on August 2, 2012.

Accordingly, Gratts's claim is timely only if she worked on the 500 Days of Summer production on or after August 2, 2008.  The amended complaint alleges, somewhat

---

[2] Compl. (Docket Entry #1).
[3] Docket Entry #24.
[4] Docket Entry #27.
[5] Oct. 9, 2012 Tr. at 14:17-15:4 (Docket Entry # 51).

5

unconfidently, that Gratts's internship lasted from May 1, 2008 "through approximately August 2008."[6]  The only evidence that Gratts's internship in fact continued into August is her testimony that when she performed her last internship task, taking down movie sets, "the weather was really hot.  It was warm and it was at the end of summer.  It was in August."[7]  When asked whether she would have any basis to dispute records indicating her internship ended earlier, she conceded "I'm just going by what I remember, so if your records say one thing, I'm going by . . . the way I remember it . . . It was in the first week of August."[8]

Defendants have produced records demonstrating Gratts's internship ended before August.  Gratts testified there were approximately six weeks of shooting followed by a "wrap party," about a two week break, and then about five days of taking down sets.[9]  Charles Varga, the art director for 500 Days of Summer, maintains that shooting wrapped on June 21, 2008.[10]  And the invitation to the wrap party announces June 22, 2008 as the event date.[11]  Giving full credit to Gratts's testimony that she worked for five days two weeks after shooting wrapped, her internship would have ended July 9, 2008.

But there is reason to believe Gratts's internship may have ended even sooner.  Steven Fox, head of the construction department for 500 Days of Summer, claims that his involvement with the film did not end until the sets were dismantled.[12]  His time sheets show that June 25, 2008 was the last date he worked on the film.[13]  And Varga moved to other projects in

---

[6] Am. Compl. ¶ 148 (Docket Entry #58).
[7] Dep. of Kanene Gratts dated Dec. 5, 2012 ("Gratts Tr.") at 45:7-9.
[8] Gratts Tr. 45:19-23.
[9] Gratts Tr. 93:19-22, 95:17-97:6.
[10] Declaration of Charles Varga ("Varga Decl."), dated Feb. 13, 2013 ¶ 5 (Docket Entry #100).
[11] Varga Decl. Ex. A.
[12] Declaration of Steven Fox ("Fox Decl."), dated Feb. 14, 2013 ¶ 9 (Docket Entry #101).
[13] Fox Decl. ¶ 5, Ex. A.

6

July 2008.[14]  As art director, all set work—including dismantling sets—was completed before he moved on.[15]

Moreover, Gratts testified that she only worked at one film location during her internship, where she helped to build sets and then dismantle them.[16]  She recalled that they built cubicles and other rooms to create an office for a greeting card company and built an apartment upstairs.[17]  That construction occurred at the historic Fenton Building, at 833 South Spring Street in Los Angeles.[18]  The call sheets for 500 Days of Summer show that filming at the Fenton Building was completed on May 17, 2008.[19]  The location rental agreement shows that the building was rented by the production only until May 23, 2008.[20]

In sum, the only evidence that Gratts worked in August 2008 is her recollection, four years later, that when her internship ended, "the weather was really hot . . . it was in August."[21]  This "scintilla of evidence" is not "evidence on which the jury could reasonably find for the plaintiff."  Liberty Lobby, 477 U.S. at 252.  This conclusion does not require a credibility determination, given her concession that she could be persuaded by documentary evidence.[22]

Plaintiffs argue that even if Gratts's internship ended before August 2008, her claims should be saved by the doctrine of equitable tolling.  "[E]quitable tolling is only appropriate 'in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising [her] rights."  Zerilli-Edelglass v. N.Y.C. Transit Auth., 333

---

[14] Varga Decl. ¶ 7, Exs. B-C.
[15] Varga Decl. ¶ 6.
[16] Gratts Tr. 74:24-78:3.
[17] Gratts. Tr. 76:1-10.
[18] Fox Decl. ¶¶ 6-7.
[19] Decl. of Elise M. Bloom, Esq. ("Bloom SJ Decl.") dated Feb. 15, 2013 (Docket Entry #109), Ex. DD.
[20] Decl. of Steven Wolfe ("Wolfe Decl."), dated Feb. 13, 2013 (Docket Entry #99), Ex. A.
[21] Gratts Tr. 45:7-9.
[22] Gratts Tr. 45:19-23.

F.3d 74, 80 (2d Cir. 2003) (internal quotations and alterations omitted).  Equitable tolling is appropriate when the plaintiff (1) filed a defective pleading that otherwise would have been timely, (2) was unaware of her cause of action due to the misleading conduct of the defendant, or (3) has a medical or mental condition preventing her from proceeding in a timely fashion.  Zerilli-Edelglass, 333 F.3d at 80.  If one of those conditions applies, the plaintiff must show she "(1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply."  Zerilli-Edelglass, 333 F.3d at 80-81 (internal quotation omitted).

Gratts has a weaker claim to equitable tolling than her co-plaintiffs because she is the only plaintiff who was aware of her potential wage claim nearly from the day it accrued.  Gratts testified that she understood she would earn minimum wage at her internship.[23]  After her internship, she left several messages at the production office and even went to the Fox Studios lot to try to get her paycheck.[24]  Unlike an unpaid intern who does not realize she may be entitled to compensation, Gratts was aware of her claim since 2008 and did not act with reasonable diligence in the time period she seeks to have tolled.

Gratts's CAUCL claim is time-barred because her internship ended before August 2008 and she is not entitled to equitable tolling.

III.    Was Searchlight the Employer of Glatt and Footman?

Plaintiffs and Defendants each move for summary judgment on the issue of whether Searchlight was the "employer" of Glatt and Footman as that term is defined in the FLSA and NYLL.  The FLSA defines "employ" as "to suffer or permit to work."  29 U.S.C. §

---

[23] Gratts Tr. at 66:12-19; 69:12-70:8; 149:19-25.
[24] Gratts Tr. 74:6-19; 185:6-186:5.

8

A0013

203(g). The law allows for the possibility of joint employers, and "all joint employers are responsible, both individually and jointly, with all the applicable provisions of the [FLSA]." 29 C.F.R. § 791.2(a).

"[T]he 'striking breadth' of the FLSA's definition of 'employ' 'stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles.'" Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992)). "[W]hether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'" Barfield, 537 F.3d at 141 (quoting Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961)). "Employment" under the FLSA is "to be determined on a case-by-case basis by review of the totality of the circumstances." Barfield, 537 F.3d at 141-42. "Above and beyond the plain language, moreover, the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact in the national economy.'" Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (quoting Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984)).

"When it comes to 'employer' status under the FLSA, control is key." Lopez v. Acme Am. Envtl. Co., No. 12 Civ. 511(WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012). The Second Circuit has set out different tests to aid in determining whether an employment relationship exists under the FLSA. Carter adopted a four-factor test to determine whether an alleged joint employer exercised "formal control" over an employee: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of

9

payment, and (4) maintained employment records." 735 F.2d at 12 (quoting Bonnette v. Cal.

Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983)).

       Zheng v. Liberty Apparel Co., 355 F.3d 61 (2d Cir. 2003) articulated another set

of factors for determining whether an alleged employer exercised "functional control" over an

employee even if it lacked formal control: "(1) whether the [alleged employer's] premises and

equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business

that could or did shift as a unit from one putative joint employer to another; (3) the extent to

which plaintiffs performed a discrete line-job that was integral to [the alleged employer's]

process of production; (4) whether responsibility under the contracts could pass from one

subcontractor to another without material changes; (5) the degree to which the [alleged

employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked

exclusively or predominantly for the [alleged employer]." 355 F.3d at 72.

       The NYLL's definitions are nearly identical to the FLSA's. See N.Y. Lab. Law §

2(7); see also Garcia v. La Revise Assocs. LLC, No. 08 Civ. 9356 (LTS) (THK), 2011 WL

135009, at *5 (S.D.N.Y. Jan. 13, 2011). Courts use the same tests to determine joint

employment under both the NYLL and the FLSA. See Paz v. Piedra, No. 09 Civ. 03977 (LAK)

(GWG), 2012 WL 121103, at *5 (S.D.N.Y. Jan. 12, 2012); Ansoumana v. Gristede's Operating

Corp., 255 F. Supp. 2d 184, 189 (S.D.N.Y. 2003).

    A. Formal Control Test

     1. Hiring and Firing Power

       This factor focuses on the "the power to hire and fire," not whether that power

was exercised. See Carter, 735 F.2d at 12. The Black Swan Production Agreement required

Searchlight's approval to hire key production staff, including the department heads where Glatt

10

and Footman interned.[25]  Though Searchlight did not hire the line producers or department heads

on Black Swan, it often did on other films with similar Production Agreements.[26]  Searchlight's

ability to hire managerial staff is enough to satisfy this factor.  See Herman, 172 F.3d at 140

(Although Defendant's "hiring involved mainly managerial staff, the fact that [Defendant] hired

individuals who were in charge of the [Plaintiffs] is a strong indication of control."); Torres v.

Gristede's Operating Corp., No. 04 Civ. 3316 (PAC), 2011 WL 4571792, at *2 (S.D.N.Y. Sept.

23, 2011) ("There is no evidence that [Defendant] hired any class member, but there does not

have to be.  It stands uncontradicted that he hired managerial employees.").

Searchlight's power to fire Black Swan production staff was unbridled.

Searchlight reserved the right, "in its sole reasonable discretion," to "require [Lake of Tears] to

dispense with the services of any person rendering services with respect to [Black Swan]."[27]

Because Searchlight acquired the power to fire, it is irrelevant that Glatt was offered his

internship and Footman began his before Searchlight became involved with Black Swan.  Glatt's

supervisor told Glatt he needed "to clear with the Fox production executive for interns to be

working for free and getting no college credits."[28]

Defendants argue that Searchlight had the right to fire employees "only if certain

conditions were met."[29]  But Searchlight had the right to require Lake of Tears to fire any worker

---

[25] Decl. of Rachel Bien in Supp. of Pls.' Mot. For Partial Summ. J., dated Feb. 15, 2013, ("Bien SJ Decl.") (Docket Entry #92), Ex. 22 ("Production Agreement").

[26] Dep. of Elizabeth Sayre dated Aug. 15, 2012 ("Sayre Tr.") 22:5-11; 53:5-55:12.  The Court may consider evidence of Searchlight's control over the productions of films other than Black Swan, because as Defendants conceded, Searchlight's rights with respect to the films did not differ materially.  May 10, 2013 Tr. at 52:23-53:4; see also Herman, 172 F.3d at 139 ("Since economic reality is determined based upon all the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." (emphasis in original)).

[27] Production Agreement (emphasis added).

[28] Bien SJ Decl. Ex. 14.

[29] Mem. of Law in Opp. to Pls.' Mot. for Partial Summ. J. ("Defs.' SJ Opp. Br.") (Docket Entry #118) at 11.

11

at Searchlight's "sole reasonable discretion."[30]  Regardless, "[c]ontrol may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence." Herman, 172 F.3d at 139.

        2.   Searchlight's Ability to Supervise or Control Work Schedules or Conditions

        Searchlight closely supervised work on Black Swan.  The production sent Searchlight "crew lists" with the contact information for all staff, including interns.[31] Searchlight required them to send daily "call sheets" listing the scenes to be filmed the next day and the work schedules for all personnel.[32]  The production also sent Searchlight daily "wrap reports" listing scenes scheduled to be filmed that day, scenes actually filmed, and the hours worked by production employees.[33]  Searchlight Executive Vice President Elizabeth Sayre required production employees to call her each morning to let her know what time filming began and again each evening to let her know what time shooting wrapped.[34]  The production sent Searchlight weekly schedules and cost reports detailing expenses.[35]  It needed Searchlight's permission to incur cost overruns.[36]

        Status as a joint employer "does not require continuous monitoring of employees, looking over their shoulders at all times."  Herman, 172 F.3d at 139.  In Herman, the Second Circuit affirmed the district court's finding that the defendant supervised and controlled employee work schedules where he "kept himself apprised of [] operations by receiving periodic

---

[30] Production Agreement.
[31] Sayre Tr. 78:1-79:1.
[32] Sayre Tr. 46:21-48:10.
[33] Sayre Tr. 50:11-51:1, 81:15-82:16.
[34] Sayre Tr. 82:3-22.
[35] Sayre Tr. 125:1-22; Production Agreement; Bien SJ Decl. Ex. 6 Ex. B, Ex. 27.
[36] Sayre Tr. 177:22-179:5.

reports from employees," including phoning managerial employees "reasonably frequently."
Herman, 172 F.3d at 137.

      3.  Whether Searchlight Determined the Rate and Method of Payment

      Searchlight set the overall budget for Black Swan and set the allocations for each line item.[37] Glatt and Footman argue that through its control of the budget, Searchlight "de facto" set wages for all production workers.[38] In Rutherford Food Corp. v. McComb, 331 U.S. 722 (1947), the Supreme Court held that a slaughterhouse jointly employed meat de-boners even though they were directly controlled by a boning supervisor who contracted with the slaughterhouse. In Zheng, the Second Circuit discussed Rutherford and noted that "the slaughterhouse de facto set the workers' wages, because the boners did no meat boning for any other firm and shared equally in the funds paid to the boning supervisor." Zheng, 355 F.3d at 72. Here, the crucial factor of equally sharing wages is absent. An increase in the wages budget would not necessarily result in across the board raises; the production might have hired additional workers or increased pay to particular employees.

      But even though Lake of Tears hired Glatt, it needed Searchlight's permission to have an unpaid intern who was not receiving college credit.[39] Moreover, Searchlight withheld employees' pay until they signed Searchlight-approved employment agreements.[40] While Searchlight may not have had the power to set employees' rate of pay, it was involved in their method of pay. Cf. Herman, 172 F.3d at 140 ("little evidence" showed defendant determined plaintiffs' rate of payment, "[b]ut he did participate in the method of payment").

---

[37] Sayre Tr. 17:11-18:12.
[38] Mem. of Law in Support of Pls.' Mot. For Partial Summ J. ("Pls.' SJ Br.") (Docket Entry #90) at 26 (citing Zheng, 355 F.3d at 72).
[39] Bien SJ Decl. Ex. 14.
[40] Sayre Tr. 75:24-76:11; Bien Decl. Ex. 19.

### 4.    Whether Searchlight Maintained Employment Records

Searchlight required production staff to sign confidentiality agreements and employment agreements known as "deal memos." Moreover, Searchlight insisted that <u>Black Swan</u> employees sign revised deal memos it drafted even if they had signed memos before Searchlight's involvement.[41] Searchlight did not allow production employees to be paid until they signed one of Searchlight's deal memos.[42] After shooting wrapped, Searchlight required Lake of Tears to send it the signed memos.[43]

Searchlight takes a narrow view, pointing out there is no evidence that Glatt, Footman, or any other unpaid intern signed a deal memo.[44] But the fact that Searchlight required memos from the paid employees who oversaw the unpaid interns is evidence of control over the interns.

### B.    Functional Control Test

A district court must "look beyond an entity's formal right to control the physical performance of another's work before declaring that the entity is not an employer under the FLSA." <u>Zheng</u>, 355 F.3d at 69.  "[A]n entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them." <u>Zheng</u>, 355 F.3d at 70.

### 1.    Whether Searchlight's Premises and Equipment Were Used for Plaintiffs' Work

Glatt and Footman's internships were based at Lake of Tears' offices, which it leased before signing the Production Agreement with Searchlight.[45] There is no evidence either

---

[41] Bien SJ Decl. Ex. 21; Sayre Tr. 172:9-74:4, 115:8-23.
[42] Sayre Tr. 75:24-76:11; Bien Decl. Ex. 19.
[43] Bien Decl. Ex. 42.
[44] Defs.' SJ Opp. Br. at 17.
[45] Dep. of Alexander Footman, dated May 7, 2012 ("Footman Tr.") at 198:2-4.

Glatt or Footman ever visited Searchlight offices or used its equipment. The fact that Lake of Tears' office space and equipment may have been rented or purchased in part by funds from Searchlight does not transform them into Searchlight's premises or equipment.

    2. <u>Whether Lake of Tears Could Shift From One Putative Joint Employer to Another</u>

        This factor is derived from <u>Rutherford</u>, where the plaintiff meat boners "had no business organization that could or did shift as a unit from one slaughterhouse to another." <u>Rutherford</u>, 331 U.S. at 730. The Second Circuit observed this is relevant to joint employment "because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client." <u>Zheng</u>, 355 F.3d at 72.

        The <u>Black Swan</u> production could not shift from one film studio to another. The Production Agreement prohibited Lake of Tears from taking <u>Black Swan</u> elsewhere unless Searchlight abandoned the project or failed to advance funds.[46] It is irrelevant that the Production Agreement did not prohibit Lake of Tears from working on other projects. This ignores economic reality in the film industry, where a film is produced by a single-purpose entity whose operations cease after the film is made.[47]

    3. <u>Extent to Which Plaintiffs Performed a Discrete Line-Job That Was Integral to Searchlight's Process of Production</u>

        In <u>Rutherford</u>, the meat boners' work was "a part of the integrated unit of production" at the slaughterhouse. <u>Rutherford</u>, 331 U.S. at 729. "Interpreted broadly, this factor could be said to be implicated in <u>every</u> subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service." <u>Zheng</u>,

---

[46] Production Agreement.
[47] <u>See</u> Franklin Tr. 16:5-14.

15

A0020

355 F.3d at 73 (emphasis in original). But the Second Circuit has held this factor "to mean that work on a production line occupies a special status under the FLSA." Zheng, 355 F.3d at 73. Glatt and Footman's work was not part of an "integrated production unit" comparable to a production line. Zheng, 355 F.3d at 73.

    4.   Whether Responsibility Could Pass From One Subcontractor to Another Without Material Changes

In Rutherford, "even when the boning supervisor abandoned his position and another supervisor took his place . . . the same employees would continue to do the same work in the same place." Zheng, 355 F.3d at 74 (emphasis in the original). "[T]his factor weighs in favor of a determination of joint employment when employees are tied to an entity such as the slaughterhouse rather than to an ostensible direct employer such as the boning supervisor." Zheng, 355 F.3d at 74.

The crew of Black Swan was tied to Searchlight, not Lake of Tears. Searchlight, in its "sole reasonable discretion," had the power to replace key production personnel without material changes to those underneath them.[48] Searchlight could even have dismissed Lake of Tears and taken over the production.[49] The crew was not tied to Lake of Tears, which everyone knew would cease operations after delivering Black Swan to Searchlight.

    5.   Degree to Which Searchlight Supervised the Plaintiffs' Work

Supervision "weighs in favor of joint employment only if it demonstrates effective control of the terms and conditions of the plaintiff's employment." Zheng, 355 F.3d at 75 (citing Rutherford, 331 U.S. at 726)). "By contrast, supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry."

---

[48] Production Agreement.
[49] Production Agreement.

16

A0021

Zheng, 355 F.3d at 75. As discussed above, Searchlight closely monitored work on the Black Swan production and exercised effective control over it.

6.   Whether Plaintiffs Worked Exclusively or Predominantly for Searchlight

As Defendants concede, Footman and Glatt worked exclusively on Black Swan, which weighs in favor of finding joint employment.[50]

In sum, the formal and functional control tests "state no rigid rule" and "provide 'a nonexclusive and overlapping set of factors' to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." Barfield, 537 F.3d at 143 (quoting Zheng , 355 F.3d at 75-76). Summary judgment may be granted to the plaintiffs "even when isolated factors point against imposing joint liability." Zheng, 355 F.3d at 77. Searchlight emphasizes the lack of evidence that Glatt or Footman themselves were ever "controlled" by Searchlight, but "[s]uch a contention ignores the relevance of the totality of the circumstances." Herman, 172 F.3d at 140 (rejecting argument that overall operational control is irrelevant "and that only evidence indicating [] direct control over [Plaintiffs] should be considered").

The fact that all four formal control factors weigh in favor of finding Searchlight was a joint employer is sufficient to find Searchlight was Plaintiffs' employer even if no functional control factors were satisfied. That conclusion is bolstered by the finding that Searchlight also exercised significant functional control. And, in the end, it is all about control. Lopez, 2012 WL 6062501, at *3.

---

[50] Defs.' SJ Opp. Br. at 22.

17

IV.    Was Searchlight the Employer of All Production Interns?

Discovery in this putative class action has been limited to interns on the productions of five representative Searchlight films: Black Swan, 500 Days of Summer, Our Family Wedding, Cedar Rapids, and The Savages. Defendants move for summary judgment finding that none of the production interns on any of these films were employed by Searchlight. But Glatt, Footman, and Gratts are the only production interns who are plaintiffs in this action. There is no proposed class containing any other production interns. As previously discussed, Gratts's claim is time-barred, and Searchlight was the employer of Glatt and Footman. Summary judgment is denied as moot as to any other production interns, as there are none in this action.

V.    Was FEG Antalik's Employer?

Defendants move for summary judgment holding that FEG was not a joint employer of Antalik under the FLSA or NYLL. Defendants argue that FEG is not liable for its subsidiary's acts except in extraordinary circumstances because of the "strong presumption that a parent is not the employer of its subsidiary's employees."[51] But that standard relates to piercing the corporate veil, not finding joint employment under the FLSA. Cf. Flemming v. REM Conn. Cmty. Servs. Inc., No. 11 Civ. 689 (JBA), 2012 WL 6681862, at *4-5 (D. Conn. Dec. 21, 2012). When a parent is held to be a joint employer under the FLSA, it is not being held liable for the acts of its subsidiary, rather, it is liable for its own acts of control over an employee. The same formal and functional control tests discussed earlier apply in determining whether FEG was Antalik's employer.

Antalik asserts that she was part of a centralized internship program run by FEG. Interns received offer letters welcoming them to "Fox Entertainment Group's internship

---

[51] Defs.' SJ Br. at 26 (quoting Balut v. Loral Elec. Sys., 988 F. Supp. 339, 344 (S.D.N.Y. 1997)).

program."[52]  Intern recruiters Aimee Hoffman and Laura Wiggins oversaw internships at various

FEG companies.[53]  Hoffman did not recruit Antalik, but when Hoffman became aware of

Antalik's internship, she required Antalik to submit paperwork to continue her internship.[54]

Hoffman sent internship guidelines applicable to all FEG interns to Antalik's supervisor at

Searchlight.[55]  Hoffman provided training to intern supervisors at FEG.[56]  FEG exercised some

control over interns' schedules at its subsidiaries by requiring interns to work between 16 and 24

hours per week, or 40 hours in the summer.[57]  And FEG maintained employment records and a

personnel file for Antalik.[58]

     This evidence raises factual disputes that preclude summary judgment in favor of

the Defendants.

    VI.    <u>Were Glatt and Footman "Employees" Covered by the FLSA and NYLL?</u>

     Glatt and Footman move for summary judgment holding they were "employees"

covered by the FLSA and NYLL and do not fall under the "trainee" exception established by

<u>Walling v. Portland Terminal Co.</u>, 330 U.S. 148 (1947).

     In <u>Walling</u>, a case involving a railroad that held a week-long training course for

prospective brakemen, the Supreme Court determined that "trainees" were not covered

employees under the FLSA.  The trainees "[did] not displace any of the regular employees, who

---

[52] Decl. of Rachel Bien in Opp. to Defs.' Mot. for Summ. J, dated Mar. 29, 2013 ("Bien SJ Opp. Decl.") (Docket Entry #140) Exs. 87, 99.

[53] Dep. of Aimee Hoffman, dated Aug. 16, 2012 ("Hoffman Tr.") at 265:2-268:22. Defendants emphasize Hoffman was employed by Fox Group, New America Inc. and not by FEG. Decl. of Aimee Hoffman, dated Mar. 26, 2013 ¶2 (Docket Entry #128). However, this does not preclude the possibility she administered a centralized FEG internship program. Her email signature lists her position as "FEG intern recruiter." Bien Class Cert. Decl. Ex. 22.

[54] Bien SJ Opp. Decl. Ex. 63.

[55] Bien SJ Opp. Decl. Ex. 95.

[56] Bien SJ Opp. Decl. Ex. 86.

[57] Bien SJ Opp. Decl. Exs. 65, 78.

[58] Bien SJ Opp. Decl. Exs. 68, 69.

[did] most of the work themselves, and must stand immediately by to supervise whatever the trainees do." Walling, 330 U.S. at 149-50. The trainees' work "[did] not expedite the company business, but may, and sometimes [did], actually impede and retard it." Walling, 330 U.S. at 150. The Court held that the FLSA "cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction . . . the [FLSA] was not intended to penalize [employers] for providing, free of charge, the same kind of instruction [as a vocational school] at a place and in a manner which would most greatly benefit the trainee." Walling, 330 U.S. at 153. The Court concluded that "[a]ccepting the unchallenged findings here that the railroads receive no 'immediate advantage' from any work done by the trainees, we hold that they are not employees within the Act's meaning." Walling, 330 U.S. at 153.

        A Department of Labor fact sheet helps to determine whether interns at for-profit businesses fall within this exception. See U.S. Dep't of Labor Fact Sheet #71 (April 2010) ("DOL Intern Fact Sheet"). The Fact Sheet notes that "[t]he Supreme Court has held that the term 'suffer or permit to work' cannot be interpreted so as to make a person whose work serves only his or her own interest an employee of another who provides aid or instruction." It enumerates six criteria for determining whether an internship may be unpaid:

> 1. The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;
>
> 2. The internship experience is for the benefit of the intern;
>
> 3. The intern does not displace regular employees, but works under close supervision of existing staff;
>
> 4. The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

20

A0025

5. The intern is not necessarily entitled to a job at the conclusion of the internship; and

6. The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

"This exclusion from the definition of employment is necessarily quite narrow because the FLSA's definition of 'employ' is very broad." DOL Intern Fact Sheet.

The Second Circuit has not addressed the "trainee" exception to the FLSA. Defendants urge that the DOL factors are not the applicable standard and that this Court should apply a "primary benefit test" by determining whether "the internship's benefits to the intern outweigh the benefits to the engaging entity."[59]

While some Circuits have applied a "primary beneficiary" test, it has little support in Walling. The Supreme Court did not weigh the benefits to the trainees against those of the railroad, but relied on findings that the training program served only the trainees' interests and that the employer received "no 'immediate advantage' from any work done by the trainees." Walling, 330 U.S. at 153 (emphasis added).

Thus, Walling created a narrow exception to an expansive definition. "A broader or more comprehensive coverage of employees . . . would be difficult to frame." United States v. Rosenwasser, 323 U.S. 360, 362 (1945). There is "no doubt as to the Congressional intention to

---

[59] Defs.' SJ Opp. Br. at 23. (citing Solis v. Laurelbrook Sanitarium & Sch., Inc., 642 F.3d 518, 525 (6th Cir. 2011) ("[T]he ultimate inquiry in a learning or training situation is whether the employee is the primary beneficiary of the work performed."); Blair v. Wills, 420 F.3d 823, 829 (8th Cir. 2005) (finding students' chores at boarding school were not work where they "were primarily for the students' . . . benefit"); McLaughlin v. Ensley, 877 F.2d 1207, 1209 (4th Cir. 1989) ("[T]he general test used to determine if an employee is entitled to the protections of the Act is whether the employee or the employer is the primary beneficiary of the trainees' labor.")); see also Velez v. Sanchez, 693 F.3d 308, 330 (2d Cir. 2012) (in determining whether a plaintiff is a domestic service worker covered by the FLSA, "[a] court should also consider who is the primary recipient of benefits from the relationship").

21

include all employees within the scope of the Act unless specifically excluded." Courts should be cautious in expanding the "trainee" exception established in <u>Walling</u>.

Moreover, a "primary beneficiary" test is subjective and unpredictable. Defendants' counsel argued the very same internship position might be compensable as to one intern, who took little from the experience, and not compensable as to another, who learned a lot.[60] Under this test, an employer could never know in advance whether it would be required to pay its interns. Such a standard is unmanageable.

By contrast, the DOL factors have support in <u>Walling</u>. Because they were promulgated by the agency charged with administering the FLSA and are a reasonable application of it, they are entitled to deference.[61] <u>Wang v. Hearst Corp.</u>, --- F.Supp.2d ----, 2013 WL 1903787, at *5 (S.D.N.Y. May 8, 2013) (citing <u>United States v. Mead Corp.</u>, 533 U.S. 218, 234 (2001). No single factor is controlling; the test "requires consideration of all the circumstances." <u>Archie v. Grand Cent. P'ship</u>, 997 F. Supp. 504, 532 (S.D.N.Y. 1998); <u>see also</u> <u>Wang</u>, 2013 WL 1903787, at *4 ("[T]he prevailing view is the totality of the circumstances test.").

As noted above, "since the NYLL's definition of employment is nearly identical to the FLSA's[,] courts in this circuit have held that the New York Labor Law embodies the same standard for employment as the FLSA." <u>Cano v. DPNY, Inc.</u>, 287 F.R.D. 251, 260 n.2 (S.D.N.Y. 2012) (internal quotation and alterations omitted). The analysis for the trainee

---

[60] May 10, 2013 Tr. 42:23-43:8.

[61] Defendants argue the DOL factors do not deserve deference because DOL opinion letters, which do not stem from "formal agency adjudication or notice-and-comment rulemaking, are not binding authority." Defs.' SJ Opp. Br. at 25 n.14. (quoting <u>Barfield</u>, 537 F.3d at 149). But even if not binding, "such agency letters represent 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" <u>Barfield</u>, 537 F.3d at 149 (quoting <u>Gualandi v. Adams</u>, 385 F.3d 236, 243 (2d Cir. 2004)). The DOL Intern Fact Sheet was issued in 2010, but the same six factors "have appeared in Wage and Hour Administrator opinions since at least 1967." <u>Reich v. Parker Fire Prot. Dist.</u>, 992 F.2d 1023, 1027 (10th Cir. 1993).

exception to the NYLL is the same as that for the FLSA.[62]  See Wang, 2013 WL 1903787, at *3 n.3.

1.  Training Similar to an Educational Environment

While classroom training is not a prerequisite, internships must provide something beyond on-the-job training that employees receive.  "A training program that emphasizes the prospective employer's particular policies is nonetheless comparable to vocational school if the program teaches skills that are fungible within the industry."  Reich v. Parker Fire Prot. Dist., 992 F.2d 1023, 1028 (10th Cir. 1993).

Footman did not receive any formal training or education during his internship.[63] He did not acquire any new skills aside from those specific to Black Swan's back office, such as how it watermarked scripts or how the photocopier or coffee maker operated.[64]  It is not enough that Footman "learned what the function of a production office was through experience."[65]  He accomplished that simply by being there, just as his paid co-workers did, and not because his internship was engineered to be more educational than a paid position.

The record for Glatt is inconclusive on this factor.  Plaintiffs argue he "did not receive any training on Black Swan."[66]  But Glatt claimed only that he didn't learn much.[67] Whether someone learned anything does not answer the question of whether training or useful knowledge was offered.  As any student knows, even a classic educational environment sometimes results in surprisingly little learning.

_____

[62] The New York State Department of Labor has its own fact sheet for unpaid internships incorporating the six DOL factors and adding five additional considerations.  See Bien SJ Decl. Ex. 35.
[63] Footman Tr. 140:4-10; 221:18-222:8.
[64] Footman Tr. 36:22-27:16; 93:12-21; 96:9-97:5.
[65] Footman Tr. 97:6-14.
[66] Pls. SJ Br. at 4,
[67] See Glatt Tr. 121:4-11; 305:25-306:6.

23

2.  Whether the Internship Experience is for the Benefit of the Intern

        Undoubtedly, Glatt and Footman received some benefits from their internships, such as resume listings, job references, and an understanding of how a production office works.[68] But those benefits were incidental to working in the office like any other employee and were not the result of internships intentionally structured to benefit them.  Resume listings and job references result from any work relationship, paid or unpaid, and are not the academic or vocational training benefits envisioned by this factor.

        On the other hand, Searchlight received the benefits of their unpaid work, which otherwise would have required paid employees.  Even under Defendants' preferred test, the Defendants were the "primary beneficiaries" of the relationship, not Glatt and Footman.

3.  Whether the Plaintiffs Displaced Regular Employees

        Glatt and Footman performed routine tasks that would otherwise have been performed by regular employees. In his first internship, Glatt obtained documents for personnel files, picked up paychecks for coworkers, tracked and reconciled purchase orders and invoices, and traveled to the set to get managers' signatures.[69]  His supervisor stated that "[i]f Mr. Glatt had not performed this work, another member of my staff would have been required to work longer hours to perform it, or we would have needed a paid production assistant or another intern to do it."[70]  At his post-production internship, Glatt performed basic administrative work such as drafting cover letters, organizing filing cabinets, making photocopies, and running errands.[71] This is work that otherwise would have been done by a paid employee.

---

[68] Footman Tr. 97:6-14, 212:24-213:10.
[69] Bien SJ Decl. Ex. 9 ¶ 16.
[70] Bien SJ Decl. Ex. 9 ¶ 16.
[71] Bien SJ Decl. Ex. 6 ¶ 7-8.

24

Footman performed similar chores, including assembling office furniture, arranging travel plans, taking out trash, taking lunch orders, answering phones, watermarking scripts, and making deliveries.[72]  Again, if Footman had not performed these tasks for free, a paid employee would have been needed.  When Footman went from five to three days a week, Black Swan hired another part-time intern.[73]

### 4.  Whether Searchlight Obtained an Immediate Advantage From Plaintiffs' Work

Searchlight does not dispute that it obtained an immediate advantage from Glatt and Footman's work.  They performed tasks that would have required paid employees.  There is no evidence they ever impeded work at their internships.  Menial as it was, their work was essential.  The fact they were beginners is irrelevant.  The FLSA recognizes this by authorizing the Secretary of Labor to issue certificates allowing "learners" and "apprentices" to be paid less than minimum wage.  See 29 U.S.C. § 214(a).  "An employee is entitled to compensation for the hours he or she actually worked, whether or not someone else could have performed the duties better or in less time."  Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 471 n.3 (11th Cir. 1982).

### 5.  Whether Plaintiffs Were Entitled to a Job at the End of Their Internships

There is no evidence Glatt or Footman were entitled to jobs at the end of their internships or thought they would be.

### 6.  Whether Searchlight and the Plaintiffs Understood They Were Not Entitled to Wages

Glatt and Footman understood they would not be paid.[74]  But this factor adds little, because the FLSA does not allow employees to waive their entitlement to wages.  "[T]he

---

[72] Pls.' Rule 56.1 Statement (Docket Entry #91) ¶ 223.
[73] Footman Tr. 43:3-9.
[74] Glatt Tr. 77:5-18; Footman Tr. 20:24-21:3.

purposes of the Act require that it be applied even to those who would decline its protections.  If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act."  Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 299, 301 (1985).  This protects more than the Plaintiffs themselves, because "[s]uch exceptions to coverage would . . . exert a general downward pressure on wages in competing businesses."  Tony & Susan Alamo Found., 471 U.S. at 302.  It also protects businesses by preventing anticompetitive behavior.  "An employer is not to be allowed to gain a competitive advantage by reason of the fact that his employees are more willing to waive [FLSA claims] than are those of his competitor."  Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 710 (1945).

Considering the totality of the circumstances, Glatt and Footman were classified improperly as unpaid interns and are "employees" covered by the FLSA and NYLL.  They worked as paid employees work, providing an immediate advantage to their employer and performing low-level tasks not requiring specialized training.  The benefits they may have received—such as knowledge of how a production or accounting office functions or references for future jobs—are the results of simply having worked as any other employee works, not of internships designed to be uniquely educational to the interns and of little utility to the employer.  They received nothing approximating the education they would receive in an academic setting or vocational school.  This is a far cry from Walling, where trainees impeded the regular business of the employer, worked only in their own interest, and provided no advantage to the employer.  Glatt and Footman do not fall within the narrow "trainee" exception to the FLSA's broad coverage.

26

<u>Class Certification of Antalik's NYLL Claims</u>

Antalik moves to certify a class consisting of

[a]ll individuals who had unpaid internships in New York between September 28, 2005 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

She asserts Defendants violated the NYLL with respect to the proposed class.

I.     <u>Legal Standard</u>

A party seeking class certification must first satisfy Federal Rule of Civil Procedure 23(a), which "requires that a proposed class action (1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class." <u>Myers v. Hertz Corp.</u>, 624 F.3d 537, 547 (2d Cir. 2010) (citing Fed. R. Civ. P. 23(a)). In addition, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2548 (2011). Here, Antalik relies on Rule 23(b)(3), which "requires the party seeking certification to show that 'questions of law or fact common to class members predominate over any questions affecting only individual members' and that class treatment would be superior to individual litigation." <u>Myers</u>, 624 F.3d at 547 (quoting Fed. R. Civ. P. 23(b)(3)).

Rule 23 "does not set forth a mere pleading standard." <u>Wal-Mart</u>, 131 S. Ct. at 2551. Rather, "[t]he party seeking class certification must affirmatively demonstrate compliance with the Rule, and a district court may only certify a class if it is satisfied, after a rigorous analysis, that the requirements of Rule 23 are met." <u>In re Am. Int'l Grp., Inc. Sec. Litig.</u>, 689 F.3d 229, 237-38 (2d Cir. 2012).

27

A0032

II.    <u>Numerosity</u>

The numerosity requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of 40 members." <u>Consol. Rail Corp. v. Town of Hyde Park</u>, 47 F.3d 473, 483 (2d Cir. 2005). While a party seeking class certification must prove "there are <u>in fact</u> sufficiently numerous parties," <u>Wal-Mart</u>, 131 S. Ct. at 2551 (emphasis in original), "[c]ourts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." <u>Robidoux v. Celani</u>, 987 F.2d 931, 935 (2d Cir. 1993).

Antalik offers Defendants' intern personnel database as proof there were at least 45 class members who interned between 2007 and 2010.[75] But Defendants argue that their database can "<u>not</u> be relied upon for its accuracy."[76] If anything, the proposed class is likely to be larger than the database indicates.   The proposed class period dates to 2005, but 36 of the 45 interns in the database were hired in 2009, and none before 2007.[77] Based on this, the Court is permitted to draw a "reasonable inference" that there are at least 40 class members. <u>See Alcantara v. CAN Mgmt., Inc.</u>, 264 F.R.D. 61, 64-65 (S.D.N.Y. 2009).  Moreover, the Defendants cannot argue that the class size "is far too indefinite and speculative"[78] and thereby capitalize on their own inability to produce accurate information. <u>See McNeill v. N.Y.C. Hous. Auth.</u>, 719 F. Supp. 233, 252 (S.D.N.Y. 1989) ("[T]he lack of knowledge as to the exact number

---

[75] Decl. of Rachel Bien in Support of Pls.' Mot. for Class Certification and Court-Authorized Notice, dated Feb. 15, 2013 ("Bien Class Cert. Decl.") (Docket Entry #105) ¶ 12, Ex. 74.
[76] Mem. of Law in Opp. to Pl. Eden Antalik's Mot. for NYLL and FLSA Certification ("Defs.' Class Cert. Opp. Br.") at 13 (Docket Entry #138) (emphasis in original).
[77] Bien Class Cert. Decl. Ex. 74; <u>see also</u> Dep. of David Johnson, dated Dec. 13, 2012 111:11-19 (People Soft was only used to track interns for "a relatively short period of time").
[78] Defs.' Class Cert. Opp. Br. at 14.

28

A0033

of affected persons is not a bar to maintaining a class action where the defendants alone have access to such data.")

Nor have Defendants rebutted the presumption of numerosity. Joinder is impracticable here because Plaintiffs do not have accurate information regarding potential class members. Thus they cannot invite them to join as plaintiffs. A class action serves judicial economy and makes recovery economically feasible for class members who would otherwise need to retain lawyers for individual actions seeking relatively small recoveries. See Robidoux, 987 F.2d at 936 (citing Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980)).

III.    Commonality

A party seeking certification must show "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "That language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" Wal-Mart, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. Law Rev. 97, 131-32 (2009)). Class claims "must depend upon a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Wal-Mart, 131 S. Ct. at 2551 (emphasis in original) (quoting Nagareda, supra, at 132).

Antalik has identified several common questions relevant to determining NYLL violations, including: (1) whether Defendants derived an immediate advantage from interns'

29

A0034

work, (2) whether interns displaced regular employees, and (3) whether FEG's internship program was for the benefit of interns.[79]  Some evidence Antalik claims may answer these questions is either individualized proof or of little evidentiary value.  For example, there is nothing facially unlawful about the FEG internship guidelines that might generate common answers to drive the litigation.[80]  She also claims FEG's internship request forms, which describe various internship positions, constitute classwide evidence that interns provided an immediate advantage to Defendants.  A completed request form may be evidence that a particular internship did not fall within the NYLL's "trainee" exception, but that is individualized proof.  Only the blank request form is common to the class, and it is not capable of resolving any question.[81]

But Antalik also identifies evidence that is capable of answering common questions on a classwide basis.  Departments at FEG companies requested interns based on their "needs," and they requested more when they were busier, the opposite of what one would expect if interns provided little advantage to the company and sometimes impeded its work.[82]  An internal memo reports that because paid internships were eliminated and overtime pay and temporary employees scaled back, "the size of our [unpaid] intern program more than doubled."[83]  Using unpaid interns to fill the interstices created by eliminating paid positions is a clear violation of the NYLL.

The April 2010 release of the DOL Intern Fact Sheet did not represent a change in applicable law.  See, e.g., Reich, 992 F.2d at 1027 (The six DOL criteria "were derived almost directly from [Walling] and have appeared in Wage and Hour Administrator opinions since at

---

[79] See Mem. of Law in Support of Pls.' Mot. for Class Certification and Court-Authorized Notice ("Pls.' Class Cert. Br.") at 22-24 (Docket Entry #104).
[80] See Bien Class Cert. Decl. Ex. 30.
[81] See, e.g., Bien Class Cert. Decl. Ex. 50.
[82] Hoffman Tr. 31:17-33:3.
[83] Bien Class Cert. Decl. Ex. 38.

least 1967."). But the reactions to the fact sheet indicate FEG's internship overseers believed "the regulations have been changed significantly creating a lot more risk going forward."[84] Antalik's supervisor, John Maybee, asked intern recruiter Aimee Hoffman "[w]hy would an office have an intern that provides no immediate advantage from said intern's activities?"[85] Hoffman responded, "That is the question! . . . If we give them work to benefit the company, we really should pay them . . . these DOL guidelines really make you think about whether it's worth it or not to have [an unpaid intern]."[86]

At least one FEG department bowed out of the internship program, believing it could not comply with the DOL criteria.[87] Hoffman informed internship supervisors that "internships will be changing considerably" and "we are tightening up our guidelines due to the department of labor's definition of a [sic] unpaid intern."[88] An internal memo in August 2008 states that "[s]tarting with the Fall 2010 internship program . . . Fox will only provide paid internships unless a manager can comply with the six criteria provided by the DOL."[89] Ultimately, FEG eliminated unpaid internships altogether because of "the new regulation on [unpaid] interns."[90]

Evidence that interns were recruited to help with busy periods, that they displaced paid employees, and that those who oversaw the internships did not believe they complied with applicable law is evidence capable of generating common answers to questions of liability.

---

[84] Bien Class Cert. Decl. Ex. 46; see also Ex. 21 ("the 'suggested' guidelines and the former reality [sic] differ quite drastically"); Ex. 24 (DOL factors "indicate[] that [interns'] duties and participation here may change substantially").
[85] Bien Class Cert. Decl. Ex. 22.
[86] Bien Class Cert. Decl. Ex. 22.
[87] Bien Class Cert. Decl. Ex. 32.
[88] Bien Class Cert. Decl. Ex. 26.
[89] Bien Class Cert. Decl. Ex. 38.
[90] Bien Class Cert. Decl. Ex. 27.

IV.    Typicality

        Typicality "requires that the claims of the class representative[] be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)). "The commonality and typicality requirements tend to merge into one another." Marisol, 126 F.3d at 376. "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 155 (S.D.N.Y. 2002). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux, 987 F.2d at 936-37. Antalik participated in the same internship program administered by the same set of recruiters as all class members, was classified as an unpaid intern like all class members, and brings an NYLL wage claim like all class members. She satisfies the typicality requirement.

        Defendants argue vigorously that Antalik has not met this requirement because she did not receive academic credit for her internship and Aimee Hoffman did not recruit her.[91] Receipt of academic credit is of little moment. A university's decision to grant academic credit is not a determination that an unpaid internship complies with the NYLL. Universities may add additional requirements or coursework for students receiving internship credit, but the focus of the NYLL is on the requirements and training provided by the alleged employer.

_____

[91] Defs.' Class Cert Opp. Br. at 17-21.

32

A0037

That Hoffman did not recruit Antalik does not defeat typicality because Antalik still worked in the same FEG internship program supervised by Hoffman. The potential liability arises from the operation of the program, not recruitment of the interns. And though Hoffman did not hire Antalik, she required Antalik to send her the same paperwork as all other interns.[92]

V.    Adequacy

Adequacy requires determining whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000). "The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class." Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 158 (S.D.N.Y. 2008). Defendants do not dispute either point. Antalik has no known conflicts with the class. Her counsel are experienced in prosecuting employment class actions. See Capsolas v. Pasta Res., Inc., No. 10 Civ. 5595 (RLE), 2012 WL 4760910, at *3 (S.D.N.Y. Oct. 5, 2012).

VI.    Predominance

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).

As discussed above, Antalik submitted generalized proof on the issue of Defendants' liability. In an FLSA class, common questions of liability predominate over

---

[92] Bien SJ Opp. Decl. Ex. 63.

33

individual calculations of damages. See Torres v. Gristede's Operating Corp., No. 04 Civ. 3316

(PAC), 2006 WL 2819730, at *15 (S.D.N.Y. Sept. 29, 2006); Noble v. 93 Univ. Place Corp., 224

F.R.D. 330, 345 (S.D.N.Y. 2004).

VII.     Superiority

In determining whether "a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy," the Court must consider

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Here, the relatively small recoveries available to individual plaintiffs

make a class action a more efficient mechanism. There are no known litigations raising the same

issues. This Court is a desirable forum because the proposed class worked in New York. And

there is no reason to expect manageability difficulties.

For the foregoing reasons, the Court certifies Antalik's proposed class under Rule

23(b)(3) with Antalik as class representative. The Court appoints Outten & Golden LLP as class

counsel under Rule 23(g).

### Conditional Certification of Antalik's FLSA Claims

The FLSA allows plaintiffs to bring claims on behalf of "other employees

similarly situated." 29 U.S.C. § 216(b). "Although they are not required to do so by [the] FLSA,

district courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating

notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as

represented plaintiffs." Myers, 624 F.3d at 554 (quoting Hoffmann-La Roche Inc. v. Sperling,

493 U.S. 165, 169 (1989)). To be entitled to notice, Plaintiffs must make a "'modest factual

showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" Myers, 624 F.3d at 555 (quoting Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).

Courts apply "heightened scrutiny" to motions for court-authorized notice made after discovery. Torres, 2006 WL 2819730, at *9. For post-discovery motions, courts consider whether the plaintiff and proposed class members are "similarly situated" by considering "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." Torres, 2006 WL 2819730, at *9 (internal alteration omitted) (quoting Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001)).

Antalik moves for authorization to send notice of this action to

> all individuals who had unpaid internships between September 28, 2008 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

As discussed above, Antalik has put forth generalized proof that interns were victims of a common policy to replace paid workers with unpaid interns. Though there are disparate factual and employment settings, the common issues of liability predominate over individual issues and defenses. See Torres, 2006 WL 2819730, at *10. And the same fairness and procedural considerations that make a class action a superior mechanism for the NYLL claims make a collective action a superior mechanism for the FLSA claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment that Gratts's CAUCL claim is time-barred is granted, and the remainder of its summary judgment

35

motion is denied.  Glatt and Footman's motion for summary judgment that they are "employees"

covered by the FLSA and NYLL and that Searchlight is their joint employer is granted.  Gratts's

motion for summary judgment is denied.  Antalik's motions for class certification of her NYLL

claims and conditional certification of an FLSA collective action are granted and the law firm of

Outten & Golden LLP is appointed as class counsel.  The Clerk of Court is directed to terminate

the motions pending at ECF Nos. 89, 93, and 103.

Dated:  June 11, 2013
         New York, New York

                              SO ORDERED:



                              WILLIAM H. PAULEY III
                                    U.S.D.J.

*Counsel of Record:*

Adam T. Klein, Esq.
Rachel M. Bien, Esq.
Jennifer L. Liu, Esq.
Juno E. Turner, Esq.
Sally J. Abrahamson, Esq.
Outten & Golden, LLP
3 Park Avenue, 29th Floor
New York, NY 10016
*Counsel for Plaintiffs*

Elise M. Bloom, Esq.
Amy F. Melican, Esq.
Proskauer Rose LLP
11 Times Square
New York, NY 10036
*Counsel for Defendant*

**OUTTEN & GOLDEN LLP**
Adam T. Klein
Rachel Bien
Elizabeth Wagoner
Reena Arora
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC GLATT, ALEXANDER FOOTMAN, EDEN ANTALIK, and KANENE GRATTS, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> FOX SEARCHLIGHT PICTURES INC. and FOX ENTERTAINMENT GROUP, INC., <br><br> Defendants. | No. 11 Civ. 6784 (WHP) (AJP) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND COURT-AUTHORIZED NOTICE

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................... 1

PROCEDURAL HISTORY.............................................................................. 2

FACTUAL BACKGROUND ........................................................................... 2

    I.    The Parties ...................................................................................... 2

        A.    Defendants ...................................................................... 2

        B.    Plaintiff and Opt-In Plaintiffs .......................................... 3

              1.    Eden Antalik ...................................................... 3

              2.    Brian Nichols ..................................................... 4

              3.    David Stevenson ................................................ 4

    II.    All Interns Participated in FEG's Centralized Unpaid Internship Program ........... 5

        A.    A Small Team of Recruiters Oversaw the Internship Program and Implemented a Uniform Set of Internship Policies................................... 5

        B.    Defendants Applied the Same Policies to FEG Interns ............................ 6

        C.    Defendants Applied the Same Compensation Policies to All FEG Interns ........................................................................ 7

    III.    FEG Interns Uniformly Performed the Routine Work of the Company................. 7

        A.    Interns Performed Administrative and Clerical Duties.............................. 8

        B.    Interns Maintained Records and Databases ................................. 8

        C.    Interns Compiled Information and Did Research ...................... 9

        D.    Interns Provided Feedback on Potential Projects..................... 10

        E.    Interns Performed Other Productive Work ............................... 11

        F.    Defendants Relied on Interns to Get More Work Done .......................... 11

    IV.    FEG Structured its Internship Program Around its Actual Operations ............... 12

ii

A0043

V.    FEG Treated Interns as Employees with Respect to Key Personnel Policies ........................................................................................................... 13

    A.    Offer Letter ............................................................................................ 14

    B.    Workers' Compensation Agreement ...................................................... 14

    C.    Corporate Policy Acknowledgment ....................................................... 15

    D.    Affirmative Action Self-Identification Form .......................................... 15

VI.    FEG Changed its Internship Program from an Unpaid to a Paid Program in Response to the Risk that the Program Was Noncompliant ............................... 16

ARGUMENT ............................................................................................................................ 17

I.    The FLSA and NYLL Protect Plaintiff and the Proposed Class ......................... 17

II.    Plaintiff Meets All of the Rule 23 Requirements .............................................. 19

    A.    Plaintiff Meets Each Rule 23(a) Requirement ........................................ 21

        1.    Numerosity ................................................................................. 21

        2.    Commonality ............................................................................... 21

            a.    Whether Defendants Derived an Immediate Advantage From Interns' Work ......................................... 22

            b.    Whether Interns Displaced Regular Employees ............... 23

            c.    Whether FEG Structured its Internship Program Around its Actual Operations as Opposed to a Classroom or Academic Experience ....................................................... 23

            d.    Whether FEG's Internship Program Was for the Benefit of Interns ........................................................................... 23

            e.    Whether Interns Were Employees as a Matter of "Economic Reality." ........................................................... 24

        3.    Typicality ..................................................................................... 25

        4.    Adequacy ..................................................................................... 26

    B.    Plaintiff Meets Rule 23(b)(3) ................................................................. 26

1. Common Questions Predominate ................................................... 26

2. A Class Action Is the Superior Mechanism................................ 27

III. The Court Should Appoint Plaintiff's Counsel as Class Counsel......................... 28

IV. Plaintiff Meets the Burden for Court-Authorized FLSA Notice ......................... 28

CONCLUSION............................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alvarez v. IBP, Inc.,*
    339 F.3d 894 (9th Cir. 2003) .................................................................17

*Ansoumana v. Gristede's Operating Corp.,*
    201 F.R.D. 81 (S.D.N.Y. 2001) ...........................................................20

*Aponte v. Comprehensive Health Mgmt., Inc.,*
    No. 10 Civ. 4825, 2011 WL 2207586 (S.D.N.Y. June 2, 2011)............20

*Archie v. Grand Cent. P'ship, Inc.,*
    997 F. Supp. 504 (S.D.N.Y. 1998).........................................18, 22, 23, 24

*Baffa v. Donaldson, Lufkin & Jenrett Sec. Corp.,*
    222 F. 3d 52 (2d Cir. 2000)....................................................................26

*Capsolas v. Pasta Res., Inc.,*
    No. 10 Civ. 5595, 2012 WL 4760910 (S.D.N.Y. Oct. 5, 2012) .......................26, 28

*Clougher v. Home Depot U.S.A., Inc.,*
    696 F. Supp. 2d 285 (E.D.N.Y. 2010) ..................................................18

*Consol. Rail Corp. v. Town of Hyde Park,*
    47 F.3d 473 (2d Cir. 2005).....................................................................21

*Cuevas v. Citizens Fin. Grp., Inc.,*
    No. 10 Civ. 5582, 2012 WL 1865564 (E.D.N.Y. May 22, 2012)..........20

*Cuzco v. Orion Builders, Inc.,*
    477 F. Supp. 2d 628 (S.D.N.Y. 2007)...................................................28

*Damassia v. Duane Reade Inc.,*
    250 F.R.D. 152 (S.D.N.Y. 2008) .................................................20, 25, 26

*Donovan v. New Floridian Hotel, Inc.,*
    676 F.2d 468 (11th Cir. 1982) ..............................................................22

*Han v. Sterling Nat'l Mortg. Co.,*
    No. 09 Civ. 5589, 2011 WL 4344235 (E.D.N.Y. Sept. 14, 2011)...................20, 28

*Hart v. Rick's Cabaret Int'l Inc.,*
    No. 09 Civ. 3043, 2010 WL 5297221 (S.D.N.Y. Dec. 20, 2010)...........20

v

*Herman v. RSR Sec. Servs., Ltd.,*
    172 F.3d 132 (2d Cir. 1999)..................................................................24

*Iglesias-Mendoza v. La Belle Farm, Inc.,*
    239 F.R.D. 363 (S.D.N.Y. 2007) ...........................................................20

*In re Initial Pub. Offering Sec. Lit.,*
    471 F.3d 24 (2d Cir. 2006).....................................................................20

*Lee v. ABC Carpet & Home,*
    236 F.R.D. 193 (S.D.N.Y. 2006) ...........................................................20

*Marisol A. v. Guiliani,*
    126 F.3d 372 (2d Cir. 1997)........................................................19, 21, 25

*Moore v. PaineWebber, Inc.,*
    306 F.3d 1247 (2d Cir. 2002)..................................................................27

*Myers v. Hertz Corp.,*
    624 F.3d 539 (2d Cir. 2010)............................................19, 21, 27, 29

*Okoro v. Pyramid 4 Aegis,*
    No. 11 Civ. 267, 2012 WL 1410025 (E.D. Wis. Apr. 23, 2012) ............22

*Robidoux v. Celani,*
    987 F.2d 931 (2d Cir. 1993)....................................................................25

*Ruggles v. WellPoint, Inc.,*
    591 F. Supp. 2d 150 (N.D.N.Y. 2008) ....................................................29

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.,*
    659 F.3d 234 (2d Cir. 2011)..............................................................20, 26

*Silverstein v. AllianceBernstein L.P.,*
    No. 09 Civ. 5904 (S.D.N.Y. Aug. 24, 2011) ..........................................29

*Tony & Susan Alamo Found. v. Sec'y of Labor,*
    471 U.S. 290 (1985)...........................................................................17, 18

*Torres v. Gristede's Operating Corp.,*
    No. 06 Civ. 3316, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) .........27, 28, 29, 30

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011)................................................................19, 21, 22

*Walling v. Portland Terminal Co.,*
    330 U.S. 148 (1947)......................................................................18, 24, 27

*Wang v. Hearst Corp.*,
   No. 12 Civ. 793, 2012 WL 2864524 (S.D.N.Y. July 12, 2012) ...............................................20

*Wirtz v. Wardlaw*,
   339 F.2d 785 (4th Cir. 1964) ...........................................................................................22

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) .....................................................................................28

*Zheng v. Liberty Apparel Co.*,
   355 F.3d 61 (2d Cir. 2003)...............................................................................................17

## STATUTES

29 U.S.C. § 202 .................................................................................................................17

29 U.S.C. § 203 .................................................................................................................17

N.Y. Lab. Law § 651 ........................................................................................................18

## RULES

Fed. R. Civ. P. 23 ..................................................................................................21, 26, 27, 28

## PRELIMINARY STATEMENT

Plaintiff Eden Antalik ("Plaintiff") worked as an intern in the corporate offices of Defendants Fox Entertainment Group, Inc. ("FEG" or "the Company") and Fox Searchlight Pictures, Inc. ("Searchlight") compiling information, researching, assisting at screenings, and doing other work for free. Plaintiff seeks to certify a class and collective of unpaid interns who also worked for no pay and whom FEG uniformly classified as non-employee "trainees" exempt from the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").

Plaintiff and the proposed class and collective all participated in the same centrally administered "Fox Entertainment Group Internship Program." They were all subject to the same internship policies implemented by a small team of intern recruiters. They were all unpaid pursuant to the same policy not to pay them and received little training because FEG structured its internship program around its operations. The nature of Interns' work, which included clerical duties, record and database maintenance, research, compiling information, providing feedback on projects, and other productive work, was beneficial to FEG. FEG also accepted their work and relied on it to make up for "cost containment initiatives" that limited overtime, reduced FEG's temporary paid workforce, and increased the unpaid internship program twofold.

FEG also treated Plaintiff and class and collective members like employees in a number of significant ways. FEG issued them offer letters, labeled them "at will" employees, checked their immigration status, required them to sign workers' compensation agreements, designated them as "special employees" under the Company's workers' compensation insurance policy, and required them to submit to personnel policies that applied to employees.

## PROCEDURAL HISTORY

Plaintiffs Eric Glatt and Alexander Footman filed a Class Action Complaint on September 28, 2011 on behalf of themselves and all other unpaid interns who worked for Searchlight.  ECF No. 1.  The Court granted Plaintiffs leave to amend their Complaint to add Eden Antalik as a named Plaintiff and Fox Entertainment Group, Inc. as a Defendant, and to expand the class of unpaid interns to include all interns who worked in Defendants' corporate offices, ECF No. 46, which Plaintiffs did on October 19, 2012.  ECF No. 58.

The parties have completed merits discovery, except with respect to damages and Defendants' good faith affirmative defense.  *See* ECF No. 27.  Plaintiffs have moved for summary judgment for Glatt, Footman, and Gratts.  Following the completion of discovery, Plaintiffs anticipate moving for summary judgment with respect to the corporate interns.

## FACTUAL BACKGROUND

I.    **The Parties**

A.    **Defendants**

Defendant Fox Entertainment Group, Inc. ("FEG" or "the Company") is a wholly-owned subsidiary of News Corporation.[1]  FEG's subsidiaries include Fox's film and television studios, including Twentieth Century Fox Television and Twentieth Century Fox Film and its broadcast and cable networks.[2]  Defendant Fox Searchlight Pictures, Inc. ("Searchlight") is a FEG subsidiary that acquires, produces, markets, and distributes films.[3]

---

[1]    *See* ECF No. 62.
[2]    All exhibits are attached to the Declaration of Rachel Bien in Support of Class Certification and Court-Authorized Notice ("Bien Decl.").  Ex. 37 (News Corp. Press Release).
[3]    Ans. to 1st Am. Compl. ¶ 1, ECF No. 60.

### B.     Plaintiff and Opt-In Plaintiffs

#### 1.     Eden Antalik

Plaintiff, Eden Antalik, interned at Searchlight in the News Corp. building located in New York City from approximately May 2009 through August 2009.[4]  Antalik worked approximately three days a week from approximately 8:30 a.m. to 5 p.m.[5]  Her job duties included "doing breaks," which involving searching for mentions of Searchlight films on the internet and in other media and compiling the information into a document to be circulated to Searchlight executives;[6] assisting with film screenings in the News Corp. building, including set up, starting the screening, and directing journalists;[7] doing errands for supervisors;[8] doing online research;[9] doing mailings;[10] and making travel arrangements.[11]  Antalik sometimes performed tasks for another FEG subsidiary, Twentieth Century Fox Film Corporation, which was located in the same office building, including setting up and taking down the red carpet at film premieres, checking in attendees, and working in the theater.[12]  Antalik worked with four other interns who performed the same duties that she performed.[13]  During her internship, Antalik did not attend any formal training sessions and learned how to perform her duties on the job.[14]

---

[4]      Ex. 7 (Antalik Tr.) 36:13-23; 1st Am. Compl. ¶ 17.
[5]      Ex. 7 (Antalik Tr.) 204:9-17.
[6]      *Id*. at 89:4-24; 142:14-143:16.
[7]      *Id*. at 143:17-144:7.
[8]      *Id*. at 110:3-11; 112:17-113:2.
[9]      *Id*. at 145:2-146:4; 193:19-195:13.
[10]     *Id*. at 155:3-157:2.
[11]     *Id*. at 146:16-149:15; 150:21-151:12.
[12]     *Id*. at 98:10-20.
[13]     *Id*. at 69:22-70:6; 143:17-144:25; 148:21-149:15; 152:15-153:20.
[14]     *Id*. at 143:5-16; 145:18-146:15; 146:22-147:9; 157:13-16; 179:21-180:18; 197:23-198:5.

A0051

### 2.    Brian Nichols

Opt-In Plaintiff, Brian Nichols, interned at Fox Sports on the Fox Studios Lot in Century City, California from approximately January 11, 2010 through May 6, 2010.[15]  Nichols interned approximately two days a week from approximately 9 a.m. to 5 p.m.[16]  His job duties included reviewing video footage of sports events in Fox's video library to locate highlights and noting the time the highlights occurred on a spreadsheet.[17]  The spreadsheet was used to locate video clips for Fox Sports broadcasts.[18]  Nichols worked alongside three to four other interns who performed generally the same duties.[19]  Nichols also went on errands approximately every other day, including dropping off films.[20]

### 3.    David Stevenson

Opt-In Plaintiff, David Stevenson at Fox Television Studios from approximately August 2007 to approximately December 2007 and at Fox Networks Group from approximately December 2007 to approximately April 2008.[21]  During his first internship, Stevenson's duties included filing documents, inputting information into contracts, and research.[22]  He worked two full days a week during the first part of his internship and then one full day and two half days during the second part of his internship.[23]  Stevenson worked with other interns who did similar work.[24]  During his second internship, Stevenson's duties included filing, inputting information

---

[15]    Ex. 78 (Nichols Decl.) ¶ 2.
[16]    *Id.* ¶ 8.
[17]    *Id.* ¶ 9.
[18]    *Id.*
[19]    *Id.* ¶ 13.
[20]    *Id.* ¶ 11.
[21]    Ex. 8 (Stevenson Tr.) 12:11-13; 27:15-19.
[22]    *Id.* at 31:8-32:4.
[23]    *Id.* at 32:9-20.
[24]    *Id.* at 35:21-36:7; 36:20-37:3; 43:4-45:16.

about job applicants into the recruitment tracking system, creating new hire gift bags,[25] doing mailings,[26] screening intern applicants by reviewing their resumes,[27] and sending intern resumes to hiring managers.[28]  He worked two full days a week.[29]

**II.     All Interns Participated in FEG's Centralized Unpaid Internship Program.**

Plaintiff, Opt-In Plaintiffs, and class and collective members were subject to the same internship policies that were centrally administered by a small team of intern recruiters, performed productive work that benefited Defendants, received little or no training other than what they gained on the job, and were treated as employees under key personnel policies.

**A.     A Small Team of Recruiters Oversaw the Internship Program and Implemented a Uniform Set of Internship Policies.**

Defendants' internship program was centrally administered by a small team of intern recruiters.  The recruiters' duties included: (1) obtaining intern requests from employees who needed interns; (2) reviewing and approving the requests; (3) screening applicants who had applied through the "Fox Careers" website[30] and submitting screened applicants to employees to review; (4) processing interns' new hire paperwork; and (5) overseeing the intern program.[31]

Aimee Hoffman and Laura Wiggins served as Defendants' primary intern recruiters during the relevant class and collective periods.[32]  Aimee Hoffman recruited and oversaw interns

---

[25]     *Id.* at 47:17-48:5.
[26]     *Id.* at 50:17-51:5.
[27]     *Id.* at 53:8-19.
[28]     *Id.* at 55:25-56:16.
[29]     *Id.* at 41:11-13.
[30]     *See* Ex. 39 (Fox Careers Website).
[31]     Exs. 1 & 2 (Hoffman Tr.) 15:2-13, 22:6-17, 297:3-280:17, 281:7-18, 283:16-284:20, 285:14-286:12, 288:16-21; Ex. 4 (Wiggins Tr.) 19:6-18; 20:18-21:6; 21:24-22:4; 22:9-14; 22:23-23:1; 26:2-9; 32:16-33:14; 35:15-36:3; 36:22-37:3; 36:13-22; Ex. 47 (Wiggins Profile).
[32]     Ex. 2 (Hoffman Tr.) 265:14-266:6, 270:23-271:272:1, 308:20-5; Ex. 29 (Hoffman Resume); Ex. 4 (Wiggins Tr.) 57:22-58:5; Ex. 47 (Wiggins Profile).

for particular groups of FEG subsidiaries and Laura Wiggins had similar responsibilities with respect to other groups of FEG subsidiaries.[33]  These subsidiaries included:

(1)    Film and television subsidiaries that the Company grouped under the heading, "Fox Filmed Entertainment" or "FFE;"[34]

(2)    Cable and broadcast subsidiaries that the Company grouped under the heading, "Fox Networks Group," or "FNG;"[35]

(3)    Corporate departments grouped under the heading, "Fox Group;"[36] and

(4)    FEG subsidiaries grouped under the heading "Fox Interactive Media" or "FIM," which is now called News Corp. Digital Media.[37]

Plaintiff and the members of the proposed class and collective interned for one or more of the FEG subsidiaries that Hoffman and Wiggins oversaw ("FEG Interns").

**B.    Defendants Applied the Same Policies to FEG Interns.**

FEG's internship program was tied to its "overall recruitment for the company."[38] The program sought to "identify talent early and build a diverse and trained pipeline" of future employees for the Company, as well as to provide students with "practical experience" related to

---

[33]    Ex. 2 (Hoffman Tr.) 265:14-266:6, 267:3-268:22, 308:20-5; Ex. 4 (Wiggins Tr.) 13:19-14:6.

[34]    Ex. 3 (Johnson Tr.) 18:5-7.  FFE included Defendant Fox Searchlight Pictures, Inc., Twentieth Century Fox Film Corporation, Twentieth Century Fox Home Entertainment, LLC, Fox Television Studios, Inc., TVM Productions, Inc., Fox 21, Inc., Fox International Productions, Inc., Fox Music, Inc., and Fox Atomic, Inc./Fox Digital Entertainment, Inc.  Ex. 2 (Hoffman Tr.) 272:2-11; Ex. 36 (FEG Entities); Ex. 3 (Johnson Tr.) 22:3-7.  A list of the subsidiaries and/or divisions of FFE that had interns between 2009 and 2010 is set forth in Ex. 38 (Email, dated Aug. 13, 2010) at D0093800-06.

[35]    Ex. 3 (Johnson Tr.) 47:5-9; Ex. 4 (Wiggins Tr.) 13:19-14:25; 72:1-16; Ex. 48 (FEG Organizational Charts).

[36]    Ex. 2 (Hoffman Tr.) 267:3-268:22; Ex. 43 (Intern Training), at D0094135.  *See* Ex. 5 (Johns Tr.) 40:19-25; 100:16-101:3.

[37]    Ex. 2 (Hoffman Tr.) 266:7-267:4; 268:5-11, 20-22.

[38]    Ex. 1 (Hoffman Tr.) 52:20-24; Ex. 31 (Email, dated Mar. 2, 2010) at D0093202 ("Our intern program is meant to build a pipeline of talent for full time openings.")

their education.[39]  FEG issued internship guidelines to all intern supervisors.[40]  It instructed

supervisors that interns should be: (1) "Fresh new energy to your team bringing new ideas and

different perspectives;" (2) "Useful assistance on key projects and day-to-day operations;" (3)

"Viewed as trainees here to learn more about the business;" (4) "Given professional feedback to

help him/her grow;" and (5) "Coached on do's and don'ts in your office."[41]

> ### C.    Defendants Applied the Same Compensation Policies to All FEG Interns.

All FEG Interns were subject to the same policy not to pay them any wages.[42]  Beginning

in September 2010, FEG changed this policy and instituted a paid internship program.[43]  FEG

started paying undergraduate interns $8 per hour and graduate interns $10 per hour.[44]  FEG did

not pay backpay to interns who interned prior to September 2010 even though there were no

changes made to the program other than making it a paid program.[45]

## III.    FEG Interns Uniformly Performed the Routine Work of the Company.

FEG expected interns to be "immersed in . . . day-to-day operations[.]"[46]  FEG's Intern

Request Forms that listed the projects and tasks that interns performed,[47] and other Company

documents, demonstrate that interns regularly performed productive work for FEG.

---

[39]    Ex. 30 (Email, dated Feb. 8, 2010) at D0093190.
[40]    Ex. 2 (Hoffman Tr.) 291:5-8; Ex. 30 (Email, dated Feb. 8, 2010) at D0093190; Ex. 4 (Wiggins Tr.) 64:6-18; 66:6-10; 78:11-79:13.
[41]    Ex. 2 (Hoffman Tr.) 292:9-23; Ex. 30 (Email, dated Feb. 8, 2010, attaching Intern Supervisor Guidelines) at D0093190.
[42]    Exs. 1 & 2 (Hoffman Tr.) 28:1-4, 275:5-9, 277:21-278:6-279:2, 304:10-20; Ex. 4 (Wiggins Tr.) 23:9-20; 24:4-6.
[43]    Ex. 2 (Hoffman Tr.) 278:21:24; 303:4-304:20; Ex. 3 (Johnson Tr.) 119:4-17.
[44]    *See* Ex. 1 (Hoffman Tr.) 90:2-7.
[45]    Ex. 3 (Johnson Tr.) 180:23-182:10.
[46]    Ex. 1 (Hoffman Tr.) 54:11-15.
[47]    Ex. 2 (Hoffman Tr.) 331:24-332:20.  The Intern Request Forms are admissible under the Federal Rules of Evidence as business records under Rule 803(6) and as statements of an opposing party under Rule 801(d)(2)(D).

### A.    Interns Performed Administrative and Clerical Duties.

Defendants regularly assigned interns administrative tasks.  These tasks included: answering phones;[48] calling messengers;[49] making coffee runs;[50] general office work, such as making copies, shredding, and doing mailings;[51] opening mail;[52] making travel arrangements;[53] restocking the office refrigerator;[54] and running errands.[55]

### B.    Interns Maintained Records and Databases.

Interns' duties regularly included maintaining Company records and keeping them up to date.  Examples of such tasks included:

- Tracking information, such as studio and network information;[56] box office performance;[57] film festivals, actors, directors, and other "talent,"[58] and cable programming;[59]

---

[48]    Ex. 50 (TV Music Production and Admin. Internship); Ex. 52 (Publicity – Photo Department Internship); Ex. 62 (Post Production Service Internship); Ex. 1 (Hoffman Tr.) 64:16-24; Ex. 70 (In Theatre Marking Internship).

[49]    Ex. 52 (Publicity – Photo Department Internship).

[50]    Ex. 62 (Post Production Service Internship); Ex. 25 (Email, dated June 19, 2010).

[51]    Ex. 63 (International Theatrical Sales Internship); Ex. 14 (Searchlight Production Internship); Ex. 19 (Searchlight New York Publicity Internship); Ex. 18 (Intern Responsibilities); Ex. 25 (Email, dated June 19, 2010); Ex. 57 (Fox 2000); Ex. 65 (Fox International Productions Internship); Ex. 80 (Home Entertainment Publicity Internship); Ex. 70 (In Theatre Marking Internship).

[52]    Ex. 67 (Fox Music Internship).

[53]    Ex. 19 (Searchlight New York Publicity Internship).

[54]    Ex. 1 (Hoffman Tr.) 124:1-11; Ex. 25 (Email, dated June 19, 2010); Ex. 20 (Email, dated July 7, 2010).

[55]    Ex. 3 (Johnson Tr.) 159:2-22; Ex. 45 (Email, dated May 13, 2009) at D0051511; Ex. 25 (Email, dated June 19, 2010); Ex. 1 (Hoffman Tr.) 122:19-24.

[56]    Ex. 34 (TCFTV Comedy Development Internship).

[57]    Ex. 13 (Searchlight Finance & Operations Internship).

[58]    Ex. 35 (MPD Feature Production Internship) at D0093979.

[59]    Ex. 64 (Research & Marketing Internship).

- Organizing information, such as music department files and deal memos;[60] photos;[61] marketing materials;[62] books and DVDs;[63] and press clippings;[64]

- Updating information, including status reports;[65] publicity materials;[66] contact lists;[67] calendars of key dates and events;[68]

- Populating databases;[69] and

- Reviewing and logging videos.[70]

### C.    Interns Compiled Information and Did Research.

Interns' duties routinely included compiling and researching various types of information for Defendants' use.  For example, Twentieth Century Fox Television interns helped compile information for executives in multiple departments.[71]  Fox Television Studios interns created lists of online platforms and digital production companies and scoured the Internet for new talent and ideas.[72]  Interns in Twentieth Century Fox Television's Brand Management and Strategy Department researched online marketing and distribution opportunities and assisted in compiling reports and presentations on these opportunities.[73]  Interns in Fox's Retail Marketing Department

---

[60]    Ex. 50 (TV Music Production and Admin. Internship); Ex. 51 (Fox TV Music Internship).
[61]    Ex. 52 (Publicity – Photo Department Internship).
[62]    Ex. 58 (TCFTVD Photography Internship).
[63]    Ex. 61 (Research Library Internship).
[64]    Ex. 69 (Marketing, Publicity & Promotions Internship).
[65]    Ex. 19 (Searchlight New York Publicity Internship).
[66]    Ex. 35 (TCF Publicity Internship) at D0093983.
[67]    Ex. 19 (Searchlight New York Publicity Internship); Ex. 70 (In Theatre Marking Internship).
[68]    Ex. 71 (TCFTV Brand Management & Strategy Internship); Ex. 17 (Searchlight Marketing Internship); Ex. 69 (Marketing, Publicity & Promotions Internship).
[69]    Ex. 58 (TCFTVD Photography Internship); Ex. 64 (Research & Marketing Internship).
[70]    Ex. 59 (FTVS Internship); Ex. 67 (Fox Music Internship).
[71]    Ex. 34 (TCFTV Comedy Development Internship).
[72]    Ex. 59 (FTVS Internship).
[73]    Ex. 71 (TCFTV Brand Management & Strategy Internship).

compiled retail price and other sales information for sales presentations.[74]  Fox Searchlight

interns researched and analyzed changes in market trends,[75] charted press coverage of

Searchlight films,[76] conducted research on event venues and sponsors,[77] and compiled and

circulated "breaks" (newspaper and online press clippings of Searchlight films).[78]  Interns in

FEG's Research & Marketing department "research[ed] television blogs and wr[o]te reports

based on the feedback from fans."[79]

> **D.     Interns Provided Feedback on Potential Projects.**

FEG frequently asked interns to provide feedback on its ongoing or potential projects.

This included reading scripts and other creative materials and providing feedback;[80]

brainstorming new ideas;[81] evaluating the effectiveness of strategies;[82] assisting in

conceptualizing projects;[83] researching and coming up with presentations;[84] updating executives

on trends;[85] and helping to develop better systems for cataloging and coordinating projects.[86]

---

[74]     Ex. 72 (Retail Marketing Internship).
[75]     Ex. 15 (Searchlight Distribution Internship).
[76]     Ex. 16 (Searchlight Publicity Internship).
[77]     Ex. 17 (Searchlight Marketing Internship).
[78]     Ex. 19 (Searchlight New York Publicity Internship).
[79]     Ex. 64 (Research & Marketing Internship).
[80]     Ex. 19 (Searchlight New York Publicity Internship); Ex. 65 (Fox International Productions Internship); Ex. 67 (Fox Music Internship); Ex. 14 (Searchlight Production Internship); Ex. 68 (Fox Digital Studio Internship); Ex. 70 (In Theatre Marking Internship).
[81]     Ex. 54 (Digital Marketing Internship); Ex. 71 (TCFTV Brand Management & Strategy Internship); Ex. 19 (Searchlight New York Publicity Internship); Ex. 35 (TCF Publicity Internship); Ex. 66 (Promotions Internship); Ex. 70 (In Theatre Marking Internship).
[82]     Ex. 54 (Digital Marketing Internship).
[83]     Ex. 53 (TVD/MPP/Creative Department Internship).
[84]     Ex. 59 (FTVS Internship).
[85]     *See* Ex. 59 (FTVS Internship); Ex. 53 (TVD/MPP/Creative Department Internship); Ex. 54 (Digital Marketing Internship); Ex. 63 (International Theatrical Sales Internship).
[86]     Ex. 71 (TCFTV Brand Management & Strategy Internship).

### E.     Interns Performed Other Productive Work.

Interns performed other duties that helped the Company operate.   For example, interns in

Fox's Publicity – Photo Department placed orders with the Studio's photo labs.[87]  Interns in

Fox's Television Distribution department assisted in designing web page content and print

material.[88]  Interns in Fox Television Studio's Business and Legal Affairs Department worked on

legal rights and clearance and drafted agreements relating to the production of television

shows.[89]  Interns in Fox Television Studio's Post Production department created DVDs of

television "dailies" and helped distribute them.[90]  Interns in Fox's Network Finance Department

reconciled balance sheets, ran reports, and recorded information in personnel software.[91]  Interns

in FEG's Human Resources department assisted in evaluating employee training materials,

helped conduct trainings, and helped set up the Company's internal SharePoint website.[92]

### F.     Defendants Relied on Interns to Get More Work Done.

Defendants used interns to fill gaps that resulted from their "cost containment initiatives"

in or around 2008.  FEG ordered a hiring freeze and limited the amount of overtime that

employees could work.[93]  Paid internships were eliminated and temporary workers were

"significantly scaled back."[94]  "As a result, the number of [unpaid] internships increased and the

---

[87]     Ex. 52 (Publicity – Photo Department Internship).
[88]     Ex. 53 (TVD/MPP/Creative Department Internship).
[89]     Ex. 55 (Business and Legal Affairs Internship).
[90]     Ex. 56 (FTVS Post Production Internship).
[91]     Ex. 60 (Network Finance Internship).
[92]     Ex. 35 (TCFFC Human Resources Internship) at D0093983; Ex. 4 (Wiggins Tr.) 81:17-23.
[93]     Ex. 3 (Johnson Tr.) 123:22-124:3; Ex. 42 (Email, dated Jan. 26, 2009).
[94]     Ex. 38 (Email, dated Aug. 13, 2010) at D0093799; Ex. 44 (Email, dated July 9, 2013) at D0093818.

size of [FEG's] intern program more than doubled."[95]

FEG believed that the tasks and projects that interns performed benefitted it.[96]  FEG typically hired interns based on each department's "needs" – the more projects a department had, the more interns it hired.[97]  When a department was not busy, it typically would not have a need to hire many interns.[98]  When a department was busier, more interns were requested.[99]  More interns were needed because employees relied on interns to assist them with their work.[100]

## IV.    FEG Structured its Internship Program Around its Actual Operations.

FEG provided interns with little or no classroom training and structured its internship program around its actual operations.  The only formal training FEG provided were periodic "lunch & learns" and networking events that focused on how to get a job.[101]

FEG's on-the-job approach is reflected in the "learning objectives" of its internships as set forth in Intern Request Forms.  For example, Eden Antalik's supervisor stated that the "learning objectives" of an internship in Searchlight's Publicity Department in New York were: "To receive a hands-on, real world experience working in a film studio's national publicity office, and understanding the details that go in to preparing and executing a successful film

---

[95]    *Id.*
[96]    Ex. 1 (Hoffman Tr.) 75:16-76:10; 139:7-13; 210:19-21; 212:19-213:16; 213:19-23; 215:4-13; 217:19-218:7.
[97]    Ex. 1 (Hoffman Tr.) 31:17-32:13.
[98]    *Id.* 32:14-33:3.
[99]    *Id.* 63:12-16; *see* Ex. 16 (Intern Request Form) ("I would like someone interested in going above and beyond and learning in a real work environment as we're going to have a busy Spring!"); Ex. 28 (Email, dated Apr. 9, 2010) ("If we could even have two interns per day, this would be a big help as we are often understaffed the busier it becomes.") at D0050906; Ex. 73 (Email, dated Dec. 11, 2009) at D0093183 ("We are in need of an intern over here in the Publicity department.").
[100]    Ex. 1 (Hoffman Tr.) 63:24-64:11; 239:2-18.
[101]    Ex. 1 (Hoffman Tr.) 107:6-110:13; Ex. 4 (Wiggins Tr.) 47:2-9; 52:4-54:15; Ex. 33 (Orientation Agenda).

publicity campaign."[102]  An intern supervisor in the Comedy Development department of

Twentieth Century Fox Television stated that interns would "come away with an understanding

of how our department functions within the larger company and how we contribute to the

television process.[103]  An intern supervisor in the Publicity – Photo department stated that interns

would "have a better understanding of how a still photography department works" and a "better

understanding of a professional environment and how a marketing department is structured[.]"[104]

An intern supervisor in the Fox Television Studio Postproduction department stated that interns

would learn to "understand the post production work flow[,]" "[i]dentify the post production

personnel and vendors[,]" and "[e]xperience firsthand, how the post department is involved . . .

on a show."[105]  An intern supervisor in Fox 2000 stated that interns would "witness[] the synergy

between departments" and "become creatively linked and bonded with our projects."[106]  An

intern supervisor in Network Finance stated that interns would "apply[] accounting concepts

learned in school to 'real world' work experience."[107]

**V.    FEG Treated Interns as Employees with Respect to Key Personnel Policies.**

Although FEG uniformly classified interns as non-employees for purposes of its wage

and hour obligations, it treated interns as employees when it benefited from doing so.

---

[102]    Ex. 49 (Searchlight New York Publicity Internship).
[103]    Ex. 34 (TCFTV Comedy Development Internship).
[104]    Ex. 52 (Publicity – Photo Department Internship).
[105]    Ex. 56 (FTVS Post Production Internship).
[106]    Ex. 57 (Fox 2000 Internship).
[107]    Ex. 60 (Network Finance Internship).

A0061

### A.    Offer Letter

FEG issued offer letters to new interns.[108]  Offer letters informed interns that their offers were "contingent" on background checks and proof of eligibility to work in the United States.[109]  FEG required interns to fill out I-9 Employment Eligibility Verification forms.[110]  Offer letters explained that if "any of these contingencies [were] not satisfied[,] the Company reserve[d] its right to revoke the offer of employment."[111]  Offer letters also advised interns that their "employment" with the Company was "at will," and that, therefore, both the intern and "the Company ha[d] the right to terminate the employment relationship at any time[.]"[112]

### B.    Workers' Compensation Agreement

FEG required interns to sign Workers' Compensation agreements.[113]  The agreements provided that interns would "be considered employee[s], as defined by Labor Code Section 3351, for the purposes of worker's compensation coverage" and that the "Company's Workers' Compensation Insurance w[ould] be the sole remedy if [sic] Intern sustains an injury arising out of and in the course of Intern's employment."[114]

A News Corporation worker's compensation insurance policy applied to all FEG employees and interns.[115]  Interns were called "special employees," who "in every way other

---

[108]    Ex. 11 (Offer Letter); Ex. 3 (Johnson Tr.) 79:6-9; Ex. 4 (Wiggins Tr.) 45:10-19; Ex. 77 (Offer Letters).

[109]    Ex. 11 (Offer Letter); Ex. 77 (Offer Letters).

[110]    Ex. 1 & 2 (Hoffman Tr.) 79:1-13; 286:13-24; Ex. 3 (Johnson Tr.) 79:10-13; Ex. 4 (Wiggins Tr.) 39:14-40:11.

[111]    Exs. 1 & 2 (Hoffman Tr.) 79:1-13; 286:13-24; Ex. 3 (Johnson Tr.) 79:10-13; Ex. 11 (Offer Letter); Ex. 77 (Offer Letters).

[112]    Ex. 11 (Offer Letter); Ex. 77 (Offer Letters).

[113]    Exs. 1 & 2 (Hoffman Tr.) 79:11-17, 286:13-24; Ex. 3 (Johnson Tr.) 80:11-15; Ex. 4 (Wiggins Tr.) 41:16-42:6; Ex. 12 (Worker's Compensation Agreement).

[114]    *Id.*

[115]    Ex. 6 (Karn Tr.) 14:23-25; 17:7-13; 18-24-19:7; 21:3-10.

than the fact they are not issued a paycheck, are employees of the company."[116]

### C.   Corporate Policy Acknowledgment

FEG required interns to sign a form acknowledging that they had reviewed and would adhere to FEG's corporate personnel policies.[117]  In particular, FEG required interns to sign a confidentiality agreement that acknowledged that they would "become aware of or have access to proprietary information," and prohibited them from disclosing such information both during their internships and after their internships had ended.[118]  The confidentiality agreement also required interns to agree that, "in consideration of [their] continued employment with and compensation by the Company," they agreed that "the Company [would be] entitled to not less than \$10,000 in liquidated damages per breach of th[e] Policy[.]"[119]

FEG also required interns to acknowledge that they had read and adhered to unlawful harassment and discrimination policies and policies on electronic communications, insider trading, standards of business conduct, conflicts of interest, security, and records management.[120]

### D.   Affirmative Action Self-Identification Form

FEG asked interns to self-identify by race, gender, and other protected categories as part of its Affirmative Action Plan and to meet its obligations to maintain information regarding the number of protected individuals who applied for positions at the Company.[121]

---

[116]   *Id.* at 19:9-22; 21:3-22:19; 23:14-18; 25:2-7.
[117]   Ex. 1 (Hoffman Tr.) 78:5-16; Ex. 3 (Johnson Tr.) 79:14-80:3; 102:22-103:7; Ex. 41 (Intern Personnel File) at D0091079.
[118]   Ex. 10 (Confidentiality Obligations of Employees Policy) ¶¶ 1-2, 4.
[119]   *Id.* ¶ 5.
[120]   Ex. 3 (Johnson Tr.) 79:14-80:3; Ex. 41 (Intern Personnel File) at D0091079.
[121]   Ex. 1 (Hoffman Tr.) 77:8-15; 80:21-81:5; Ex. 9 (Self-Identification Form).

VI.    **FEG Changed its Internship Program from an Unpaid to a Paid Program in Response to the Risk that the Program Was Noncompliant.**

FEG changed from an unpaid to paid program in or about September 2010 in response to the U.S. Department of Labor's Fact Sheet #71: Internship Programs Under the Fair Labor Standards Act ("DOL Factors"), which sets forth six factors that private sector employers must meet in order to maintain a lawful unpaid internship program.[122]  In particular, there was concern that the fourth factor – which prohibits employers from deriving an "immediate advantage from the activities of the intern" – "creat[ed] a lot more risk going forward."[123]  According to FEG's corporate representative on its internship policies, before the program changed, interns "may have" provided value to the Company.[124]  For example, after reviewing the DOL Factors, which FEG circulated to intern supervisors before the program changed to a paid program, one supervisor noted that, "the 'suggested' guidelines and the former reality differ quite drastically."[125]  Another stated that the DOL Factors "indicate[] that [interns'] duties and participation here may change substantially."[126]  Antalik's supervisor asked Ms. Hoffman, "Why would an office have an intern that provides no immediate advantage from said intern's activities?"[127]  An intern supervisor told Ms. Hoffman that she did not believe that her department should participate in the program until it became paid.[128]  In response to the DOL

---

[122]    Ex. 1 (Hoffman Tr.) 190:14-191:3; Ex. 27 (Email, dated July 14, 2010); Ex. 3 (Johnson Tr.) 171:18-172:2; 173:18-25; Ex. 46 (Email, dated July 15, 2010) at D0053834.
[123]    Ex. 3 (Johnson Tr.) 171:18-173:13; Ex. 46 (Email, dated July 15, 2010) at D0053834.
[124]    Ex. 3 (Johnson Tr.) 174:1-13; *see also* Ex. 1 (Hoffman Tr.) 139:7-13 (A: "Did the interns ever do work that provided immediate advantage?  I would say: Yes, that could have happened. Q: Do you think what the interns did provided the company with value? A: I think in some cases, yes, they did contribute and add value.")
[125]    Ex. 21 (Email, dated May 19, 2010) at D0059390.
[126]    Ex. 24 (Email, dated June 18, 2010) at D0075177.
[127]    Ex. 22 (Hoffman Email, dated May 19, 2010).
[128]    Ex. 32 (Email, dated May 27, 2010).

Factors, FEG attempted to "tighten[] up [its] guidelines" before ultimately changing its program from an unpaid to paid program.[129]  FEG had no policy preventing interns from doing work that provided value to the Company during the period when it had an unpaid program.[130]

## ARGUMENT

### I.    The FLSA and NYLL Protect Plaintiff and the Proposed Class.

The FLSA requires employers to pay for all work they "suffer or permit."  29 U.S.C. § 203(g).  To further its remedial and humanitarian goals, the FLSA broadly defines an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003).  "Employer" is also defined expansively as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"  29 U.S.C. § 203(d).  "Work" is any "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer."  *Alvarez v. IBP, Inc.,* 339 F.3d 894, 902 (9th Cir. 2003) (internal quotation marks omitted), *aff'd*, 546 U.S. 21 (2005).

The FLSA's broad definitions of employ, employee, and employer are meant to ensure that commercial businesses do not obtain an unfair competitive advantage in the marketplace by employing individuals who voluntarily work for no wage.  *See* 29 U.S.C. § 202(a)(3) (declaring Congress's intention to correct "detrimental" labor conditions that create "an unfair method of competition in commerce" through passage of the FLSA); *see also Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985) ("[E]xceptions to [FLSA] coverage . . . exert a general downward pressure on wages in competing businesses[.]").  "If an exception to the Act

---

[129]    Ex. 26 (Email, dated July 13, 2013).
[130]    Ex. 3 (Johnson Tr.) 174:14-19; *see* Ex. 4 (Wiggins Tr.) 30:8-13; Ex. 1 (Hoffman Tr.) 75:2-15; 137:7-10.

were carved out for employees willing to testify that they performed work 'voluntarily,'

employers might be able to use superior bargaining power to coerce employees to make such

assertions, or to waive their protections under the Act." *Alamo Found.*, 471 U.S. at 302.

The NYLL is an equally protective "remedial" statute. *Clougher v. Home Depot U.S.A.,

Inc.*, 696 F. Supp. 2d 285, 289 n.4 (E.D.N.Y. 2010). Its definitions of "employee" and

"employer" are nearly identical to the FLSA's. *See* N.Y. Lab. Law § 651(5) (an employee is

"any individual employed or permitted to work by an employer in any occupation"); § 651(6) (an

employer "includes any individual, partnership, association, corporation, limited liability

company . . . or any organized group of persons acting as employer").

Although the FLSA does not define the word "intern" and there is no exception for

"interns" anywhere in the statute, in 1947, the U.S. Supreme Court carved out a narrow

exception to the definition of an employee for "trainees" participating in short-term training

programs that provide "the same kind of instruction" offered by a "public or private vocational

school." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152-53 (1947). Where it is

undisputed that the alleged employer "receive[d] *no* 'immediate advantage' from any work done

by the trainees," the trainees worked "*solely* for [their own] personal purpose or pleasure," and

their "work serve[d] *only* [their] own interest," it has not "suffered or permitted" work and

therefore does not owe the trainees compensation. *Id.* (emphasis added). The U.S. Department

of Labor ("DOL") later developed a six-factor test intended to codify *Walling*, which courts have

applied to workers alleged to be trainees,[131] and which the DOL recently adapted, with little

change, to interns who work for private sector employers, like Defendants. *See* U.S. Dep't of

---

[131]    *See, e.g., Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 531-32 (S.D.N.Y. 1998).

Labor, Fact Sheet #71: Internship Programs Under the FLSA (Ex. 75).[132]

## II.     Plaintiff Meets All of the Rule 23 Requirements.

Plaintiff's minimum wage claim is well suited for class certification.  All of the members of the proposed class worked in New York as unpaid interns, participated in FEG's centralized internship program, performed productive work, were classified as employees under the same FEG personnel policies, and were uniformly classified as non-employees with respect to Defendants' wage and hour policies.  These circumstances, which were the same across the class, will drive the resolution of the key questions in this case: whether interns were covered "employees" or fell under *Walling*'s narrow exception for "trainees."  *See Myers v. Hertz Corp.*, 624 F.3d 539, 549 (2d Cir. 2010) (class certification is appropriate where "evidence generally applicable to the class" may answer the key issues in the case); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (certification is warranted where the evidence is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation").

Plaintiff Eden Antalik seeks to certify the following class under Rule 23 for violations of Article 19 of the NYLL:

> All individuals who had unpaid internships in New York between September 28, 2005 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

Courts in this Circuit give Rule 23 a "liberal rather than restrictive construction," and "adopt a standard of flexibility" when they apply it.  *Marisol A. v. Guiliani*, 126 F.3d 372, 377 (2d Cir. 1997) (internal quotation marks omitted).  The Court "must receive enough evidence, by

---

[132]     The New York Department of Labor has adopted the DOL's test and added more factors. *See* N.Y. Dep't of Labor, Fact Sheet, Wage Requirements for Interns in For-Profit Businesses (Ex. 76).

affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *In re Initial Pub. Offering Sec. Lit.*, 471 F.3d 24, 41 (2d Cir. 2006). "[I]n making such determinations, [the Court] should not assess any aspect of the merits unrelated to a Rule 23 requirement;" however, where a Rule 23 requirement and a merits issue overlap, the Court must resolve those disputes that are necessary to determining whether Rule 23 has been met. *Shahriar v. Smith & Wollensky Rest. Grp.*, *Inc.*, 659 F.3d 234, 251 (2d Cir. 2011).

Although this is the first case in which a court has been asked to certify a class of interns, the Honorable Harold Baer, Jr. granted conditional certification of an intern collective under 29 U.S.C. § 216(b) last year based on evidence that the defendant "made a uniform determination that interns were not employees," "required interns to submit college credit letters," and "used interns to performed entry-level work with little supervision." *Wang v. Hearst Corp.*, No. 12 Civ. 793, 2012 WL 2864524, at *2 (S.D.N.Y. July 12, 2012). Courts in this Circuit routinely certify cases involving the uniform classification of workers as "exempt" from wage and hour requirements,[133] or as non-employee "independent contractors,"[134] which raise comparable issues and rely on similar types of proof, such as uniform compensation policies and job descriptions. *See, e.g., Damassia*, 250 F.R.D. at 159-64 (certifying class based on uniform classification policy and evidence of "centrally derived" business practices that governed the duties and responsibilities of class members) (internal quotation marks omitted); *Iglesias-Mendoza*, 239

---

[133]    *See Cuevas v. Citizens Fin. Grp., Inc.*, No. 10 Civ. 5582, 2012 WL 1865564, at *3 (E.D.N.Y. May 22, 2012); *Aponte v. Comprehensive Health Mgmt., Inc.*, No. 10 Civ. 4825, 2011 WL 2207586, at *9-12 (S.D.N.Y. June 2, 2011); *Han v. Sterling Nat'l Mortg. Co.*, No. 09 Civ. 5589, 2011 WL 4344235, at *4 (E.D.N.Y. Sept. 14, 2011); *Damassia v. Duane Reade Inc.*, 250 F.R.D. 152, 159-64 (S.D.N.Y. 2008).
[134]    *See Hart v. Rick's Cabaret Int'l Inc.*, No. 09 Civ. 3043, 2010 WL 5297221, at *6-7 (S.D.N.Y. Dec. 20, 2010); *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 370-73 (S.D.N.Y. 2007); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 203-05 (S.D.N.Y. 2006); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85-88 (S.D.N.Y. 2001).

F.R.D. at 373 ("common question[] of . . . whether [alleged independent contractors] were supposed to be paid the minimum wage as a matter of law" is "about the most perfect question[] for class treatment"). This case should be treated no differently. Defendants classified all interns in one fell swoop regardless of the particular tasks they were assigned, the office or division in which they worked, and what they gained from their internships. The proof that will drive the merits – the nature of Defendants' internship program, including its immersion of interns in day-to-day operations, the classification of interns as employees under personnel policies, and the reliance on interns to perform productive work and fill gaps resulting from employee cut-backs – is "generally applicable to the class" and capable of generating common answers to the merits questions. *See Myers*, 624 F.3d at 549.

### A.    Plaintiff Meets Each Rule 23(a) Requirement.

#### 1.    Numerosity

Rule 23(a)(1) requires Plaintiff to show that "the class is so numerous that joinder of all members if impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 2005). There are over forty members of the proposed Class. Bien Decl. ¶ 12.

#### 2.    Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A single common question of law or fact will suffice. *Marisol A.*, 126 F.3d at 376; *accord Wal-Mart*, 131 S. Ct. at 2556. The commonality requirement is met where a common question of fact or law is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551 (emphasis in original) (internal quotation marks omitted). Here, there are several common questions:

a.    <u>Whether Defendants Derived an Immediate Advantage From Interns' Work.</u>

Whether Defendants derived an immediate advantage from Plaintiff's and the class members' work is a common question that will generate a common answer. *See Archie*, 997 F. Supp. at 534 ("If a defendant gains an immediate advantage from a plaintiff's labor, courts have held that the plaintiff is an employe[e] for purposes of the FLSA."); Ex. 75 (DOL Fact Sheet). This question is appropriate for classwide resolution because it looks to *the nature of the work performed* – not the specific tasks. *Archie*, 997 F. Supp. at 535 (plaintiffs were employees because they "performed productive work for the defendants"); *Okoro v. Pyramid 4 Aegis*, No. 11 Civ. 267, 2012 WL 1410025, at *10 (E.D. Wis. Apr. 23, 2012) (individual whose duties were "undeniably of substantial assistance to [the company]" was an employee); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 471 (11th Cir. 1982) (mental patients who "did work which was of economic benefit" to defendant were employees); *Wirtz v. Wardlaw*, 339 F.2d 785, 786-88 (4th Cir. 1964) (high school students who helped to perform office tasks were employees). The answer to this question will not vary from intern to intern and "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551.

The proof capable of generating a common answer this question includes, but is not limited to: (1) internship guidelines FEG issued to all intern supervisors; (2) descriptions of interns' productive work in FEG's Intern Request Forms and other Company documents; (3) testimony of the intern recruiters charged with overseeing the FEG intern program; (4) testimony from interns, including Plaintiff and Opt-In Plaintiffs, regarding the productive work they performed; and (5) FEG's decision to change its program to a paid program because of the "value" that interns provided. *See* Factual Background, *supra* Sections I.B., III, IV.

b.    <u>Whether Interns Displaced Regular Employees.</u>

A second common question is whether Plaintiff and class members displaced regular employees by performing work that paid employees typically perform or by augmenting Defendants' existing workforce.  *See* Ex. 75 (DOL Fact Sheet); *Archie*, 997 F. Supp. at 533 (where defendant used services provided by alleged trainees and avoided having to pay others at market rates, alleged trainees were employees covered by the FLSA).  Much of the proof discussed above will generate a common answer to this question.  In addition, Defendants' own corporate representatives and documents demonstrate that they used interns to fill gaps resulting from "cost containment initiatives."  *See* Factual Background, *supra* Section III.F.

c.    <u>Whether FEG Structured its Internship Program Around its Actual Operations as Opposed to a Classroom or Academic Experience.</u>

A third common question is whether FEG structured its internship program around a classroom or academic experience as opposed to its actual operations.  *See* Ex. 75 (DOL Fact Sheet); *Archie*, 997 F. Supp. at 507 (finding plaintiffs were not trainees where the defendant did not "structure a training program as that concept is understood in case law and regulatory interpretations but instead structured a program that required the plaintiffs to do work that had a direct economic benefit for the defendants").  Evidence that Defendants provided interns with little classroom training, consisting of periodic "lunch & learns" and networking events, and instead structured their program around "key projects and day-to-day operations" will be common to Plaintiff and all class members.  *See* Factual Background, *supra* Section IV.

d.    <u>Whether FEG's Internship Program Was for the Benefit of Interns.</u>

A fourth common question is whether FEG's internship program was for the "for the benefit" of the interns or whether Defendants benefited from the program.  "If the interns are engaged in the operations of the employer or are performing productive work (for example,

filing, performing other clerical work, or assisting customers), then the fact that they may be receiving some benefits in the form of a new skill or improved work habits will not exclude [interns] from . . . minimum wage . . . requirements because the employer benefits from the interns' work." *See* Ex. 75 (DOL Fact Sheet); *Walling*, 330 U.S. at 152-53 (citing undisputed evidence that training was "solely for [plaintiffs'] personal purposes or pleasure," and that the "work serve[d] only [plaintiffs'] own interest"); *Archie*, 997 F. Supp. at 533 (although plaintiffs gained basic job skills that might help them in the job market, they were not trainees because their work benefited defendant by allowing it to offer services at below market rate).

In addition to evidence discussed above, FEG's internship guidelines provide common evidence of the benefits that it obtained from interns. Benefits of interns to Defendants included: their "[f]resh new energy . . . new ideas and different perspectives" and "[u]seful assistance on key projects and day-to-day operations." *See* Factual Background, *supra* Section II.B. The guidelines and other Company documents also demonstrate that Defendants sought to use their internship program to "identify talent early and build a diverse and trained pipeline" of future employees and for "overall recruitment for the company." *Id.* This common evidence is relevant to whether Defendants used their internship program to try out potential employees before hiring them. *See* Ex. 75 (DOL Fact Sheet) ("[U]npaid internships generally should not be used by the employer as a trial period for individuals seeking employment . . . ").

> e.   Whether Interns Were Employees as a Matter of "Economic Reality."

A fifth common question is whether interns were Defendants' employees as a matter of "economic reality." *See Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). Where a key issue is the existence of an employer-employee relationship, courts consider "any relevant evidence" that may aide in evaluating the economic relationship. *Id.* Here, there is

common evidence that FEG treated interns as employees.  FEG: (1) classified all interns as "at will" employees in form offer letters, enabling them to "terminate" their "employment" at any time; (2) classified interns as "special employees" for purposes of their worker's compensation insurance policy and required them to forgo bringing legal claims; (3) required interns to agree to Company policies that applied to employees, including confidentiality restrictions; and (4) used intern demographic information to satisfy their Equal Employment Opportunity obligations.  *See* Factual Background, *supra* Section V.

### 3.    Typicality

Rule 23(a)(3) is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Marisol A.*, 126 F.3d at 376 (internal quotation marks omitted).  "[M]inor variations in the fact patterns underlying individual claims" do not defeat typicality when the defendant directs "the same unlawful conduct" at the named plaintiff and the class.  *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).  The claims of the plaintiff and the class "only need to share the same essential characteristics, and need not be identical."  *Damassia*, 250 F.R.D. at 158 (internal quotation marks omitted).  The typicality requirement is not "highly demanding."  *Id.*

Here, Plaintiff is typical of the class she seeks to represent.  She participated in FEG's internship program, was not paid, performed productive work, including compiling information, researching, doing errands, doing mailings, and assisting at film screenings, received only on-the-job training and minimal "classroom" training, and was subject to the same personnel policies that Defendants imposed on other interns.  *See* Factual Background, *supra* Section I.B.1.

Plaintiff's claim is based on the same legal theory as the members of the Class – that Defendants' misclassified her as a non-employee and failed to pay her minimum wages under the

NYLL. *See Damassia*, 250 F.R.D. at 158 ("all class members' claims . . . are based on the same course of events and legal theory, namely that [defendant]'s decision to classify [them] . . . is inconsistent with the requirements of the NYLL").

### 4.    Adequacy

Rule 23(a)(4) tests whether the class representative will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). Where the "class representative[] [is] prepared to prosecute fully the action and ha[s] no known conflicts with any class member," the adequacy requirement is met. *Shahriar*, 659 F.3d at 253. "The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class." *Damassia*, 250 F.R.D. at 158. Plaintiff has no conflicts with the class. In furtherance of her duties as class representative, she sat for a full-day deposition and produced documents. Bien Decl. ¶ 9.

Plaintiffs' counsel are "qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrett Sec. Corp.*, 222 F. 3d 52, 60 (2d Cir. 2000). Outten & Golden LLP ("O&G") has substantial experience prosecuting wage and hour class and collective actions and has a very good reputation in the field of employment law. *See, e.g., Capsolas v. Pasta Res., Inc.*, No. 10 Civ. 5595, 2012 WL 4760910, at *3 (S.D.N.Y. Oct. 5, 2012).

### B.    Plaintiff Meets Rule 23(b)(3).

#### 1.    Common Questions Predominate.

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3). A common question predominates when "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized

proof, and if these particular issues are more substantial than the issues subject to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

As discussed above, generalized proof will "tend to show" that Plaintiff and class members were similar in ways that are material to the principal issue in this case: whether interns were employees or trainees. *See Myers*, 624 F.3d at 549. The common questions Plaintiff has identified, which generalized proof can answer, are substantial and predominate over any individual questions because they will be determinative of the merits issue. *See Walling*, 330 U.S. at 152-53 (decisive issues are whether the employer "receive[d] [an] 'immediate advantage' from any work done by the trainees," whether the trainees worked "solely for [their own] personal purpose or pleasure," and whether their "work serve[d] only [their] own interest"); *see also Torres v. Gristede's Operating Corp.*, No. 06 Civ. 3316, 2006 WL 2819730, at *14-16 (S.D.N.Y. Sept. 29, 2006) (where an issue is "outcome determinative," it predominates).

### 2.     A Class Action Is the Superior Mechanism.

Rule 23(b)(3) requires the Court to determine "that a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In determining whether superiority is met, the Court may consider the following:

> (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

Plaintiff satisfies each of the four factors. First, class members' interests would not be served by individually controlling the prosecution of the action because most lack the resources to even "contemplate proceeding with this litigation in any context other than through their

participation in a class action, given the expense and burden that such litigation would entail." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003). "[A] class action will save an enormous amount in litigation costs for all parties and allow them to more efficiently prosecute their claims and defenses." *Han*, 2011 WL 4344235, at *11. Second, there is no other litigation of which Plaintiff is aware raising the issues raised here. Third, the litigation should be concentrated in this forum because Plaintiff and the proposed Class all worked in New York City. Bien Decl. ¶ 12. Fourth, this case is unlikely to present manageability problems because the proposed Class is relatively small. *See Torres*, 2006 WL 2819730, at *16 (finding "little reason to expect" manageability problems for class action of 300 New York City grocery workers).

### III.   The Court Should Appoint Plaintiff's Counsel as Class Counsel.

The Court should appoint O&G as Class Counsel because they satisfy the requirements of Rule 23(g). *See* Fed. R. Civ. P. 23(g)(1)(A). O&G has performed significant litigation and discovery work. Bien Decl. ¶ 7. O&G has committed significant resources to representing the proposed class and will continue to do so. *Id*. Courts have recognized O&G's "substantial experience prosecuting and settling . . . wage and hour class actions," and found them to be "well-versed in wage and hour and class action law." *See Capsolas*, 2012 WL 4760910, at *3.

### IV.   Plaintiff Meets the Burden for Court-Authorized FLSA Notice.

The Court should authorize Plaintiff to send notice of this lawsuit to:

> All individuals who had unpaid internships between September 28, 2008 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

In an FLSA collective action, employees must receive timely notice in order for the "intended benefits of the collective action . . . to accrue." *Cuzco v. Orion Builders, Inc.*, 477 F.

Supp. 2d 628, 635 (S.D.N.Y. 2007). Without timely notice, workers' rights will diminish each day, *see Ruggles v. WellPoint, Inc.*, 591 F. Supp. 2d 150, 162 n.12 (N.D.N.Y. 2008), because the FLSA's statute of limitations runs until a worker files a written consent form.

To be entitled to notice, a plaintiff must establish that she and potential plaintiffs "together were victims of a common policy or plan that violated the law." *Myers*, 624 F.3d at 555 (internal quotation marks omitted). This threshold is "fairly lenient," even if "slightly higher scrutiny should apply" after discovery. *Silverstein v. AllianceBernstein L.P.*, No. 09 Civ. 5904 (S.D.N.Y. Aug. 24, 2011), ECF No. 41, at 2 (attached as Ex. 79 to Bien Decl.) (internal quotation marks omitted). Here, all interns were subject to the same policy of not being paid.

When a plaintiff moves for notice at this stage of a case, after substantial discovery, courts evaluate three additional factors: (1) whether disparate factual and employment settings of the individual plaintiffs exist; (2) whether any individualized defenses exist; and (3) fairness and procedural considerations. *Torres*, 2006 WL 2819730, at *9. All three factors favor Plaintiff.

All interns' relevant factual settings and employment settings are the same. FEG subjects all interns to policies that were centrally administered by a small team of intern recruiters. All interns performed productive work that benefited FEG, and received little or no formal training. FEG treated all interns as employees for other purposes. *See* Factual Background, *supra*.

Any other aspects of interns' employment settings are not material. Disparate facts "do not defeat Plaintiffs' valid basis for moving forward with collective action" where plaintiffs are "subject to a common practice or scheme." *See Torres*, 2006 WL 2819730, at *10 (internal quotation marks omitted).

No individualized defenses exist because the issue here is simple – whether FEG's interns were covered by the FLSA. If they are, there are no defenses to the FLSA's minimum

wage provisions that could apply to individual interns, nor has FEG raised any. *See id.* at *11 (individual defenses do not preclude Court-authorized notice where "the standard of proof and required evidence . . . is . . . one based on policy, practice, and conduct").

Finally, fairness and procedural considerations favor prompt notice, which will allow interns to decide whether to join the case and protect their rights. "[T]he policy objectives of reducing cost and increasing efficiency are best furthered by" notice. *Id.*

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court: (1) certify the proposed Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3); (2) appoint Plaintiffs' Counsel as Class Counsel; (3) approve Plaintiff's proposed class action notice, Bien Decl. Ex. 81; (4) conditionally certify the proposed Collective pursuant to 29 U.S.C. § 216(b) and authorize Plaintiff's proposed notice, Bien Decl. Ex. 82; (5) order Defendants to undertake a thorough search for the contact information and certify the steps that they have taken to the Court; and (6) order Defendants to produce a computer-readable data file containing the names, last known mailing addresses, last known telephone numbers, last known email addresses, internship location, and internship dates for all Class and Collective members.

Dated:          February 15, 2013
                New York, New York

                                        Respectfully submitted,

                                        **OUTTEN & GOLDEN LLP**
                                        By:

                                        /s/ Rachel Bien
                                        Rachel Bien

                                        Adam T. Klein
                                        Rachel Bien
                                        Elizabeth Wagoner
                                        Reena Arora

A0078

3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

*Attorneys for Plaintiffs*

**OUTTEN & GOLDEN LLP**
Adam T. Klein
Rachel Bien
Elizabeth Wagoner
Sally Abrahamson (admitted *pro hac vice*)
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC GLATT, ALEXANDER FOOTMAN, EDEN ANTALIK, and KANENE GRATTS, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>FOX SEARCHLIGHT PICTURES INC. and FOX ENTERTAINMENT GROUP, INC.,<br><br>          Defendants. | No. 11 Civ. 6784 (WHP) (AJP) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND COURT-AUTHORIZED NOTICE**

## TABLE OF CONTENTS

ARGUMENT ............................................................................................................. 1

I.    Defendants Fail to Rebut Plaintiff's Showing of Each Rule 23 Requirement ................... 1

      A.    Plaintiff Satisfies Numerosity ........................................................................ 1

      B.    Plaintiff Satisfies Typicality ......................................................................... 4

      C.    Defendants' Cherry-Picked Facts Do Not Defeat Commonality or
            Predominance ............................................................................................. 6

            1.    This Case Is Unlike *Dukes* and *Comcast* ....................................... 6

            2.    Defendants Fail to Rebut Substantial Evidence Demonstrating
                  Common Issues that Predominate ..................................................... 8

            3.    Evidence of Defendants' Uniform Classification Policy Supports
                  Certification ................................................................................... 10

            4.    The Applicable Merits Standard and FEG's Status as a Joint Employer
                  Raise Common Questions ................................................................ 11

II.   Defendants Fail to Rebut Plaintiff's Showing that She Is Similarly Situated to the
      Proposed FLSA Collective ............................................................................... 12

CONCLUSION ....................................................................................................... 15

A0081

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alcantara v. CNA Mgmt., Inc.*,
   264 F.R.D. 61 (S.D.N.Y. 2009) ................................................................2

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946) ..............................................................................7, 8

*Ansoumana v. Gristede's Operating Corp.*,
   201 F.R.D. 81 (S.D.N.Y. 2001) ..............................................................12

*Archie v. Grand Cent. P'ship*,
   997 F. Supp. 504 (S.D.N.Y. 1998).........................................................8, 9

*Brown v. City of Barre, Vermont*,
   No. 10 Civ. 812010, 2010 WL 5141783 (D. Vt. 2010) ...........................3

*Brown v. Wal-Mart Stores, Inc.*,
   No. 09 Civ. 3339, 2012 WL 3672957 (N.D. Cal. Aug. 24, 2012)..........10

*Comcast Corp. v. Behrend*,
   No. 11-864, 569 U.S. ---, 2013 WL 1222646 (Mar. 27, 2013)...............7

*Conway v. Microsoft Corp.*,
   414 F. Supp. 2d 450 (S.D.N.Y. 2006).....................................................13

*Damassia v. Duane Reade, Inc.*,
   No. 04 Civ. 8819, 2006 WL 2853971 (S.D.N.Y. Oct. 5, 2006) .............12

*Eng-Hatcher v. Sprint*,
   No. 07 Civ. 7350, 2009 WL 7311383 (S.D.N.Y. Nov. 19, 2009) ..........13

*Familienstiftung v. Askin*,
   178 F.R.D. 405 (S.D.N.Y. 1998) ..............................................................3

*Hart v. Rick's Cabaret Int'l Inc.*,
   No. 09 Civ. 3043, 2010 WL 5297221 (S.D.N.Y. Dec. 20, 2010)..........12

*Jacob v. Duane Reade Inc.*,
   No. 11 Civ. 0160, 2013 WL 1137024 (S.D.N.Y. Mar. 20, 2013) ......6, 12

*Jackson v. Foley*,
   156 F.R.D. 538 (E.D.N.Y. 1994).............................................................3

*Kopera v. Home Depot U.S.A., Inc.*,
  No. 09 Civ. 8337, 2011 WL 135016 (S.D.N.Y. Jan. 11, 2011)..............................................11

*Koss v. Wackenhut Corp.*,
  No. 03 Civ. 7679, 2009 WL 928087 (S.D.N.Y. Mar. 30, 2009) ..............................................3

*Lee v. ABC Carpet & Home*,
  236 F.R.D. 193 (S.D.N.Y. 2006) ..............................................12

*McNeill v. N.Y. City Hous. Auth.*,
  719 F. Supp. 233 (S.D.N.Y. 1989)..............................................2

*Morano v. Intercon. Cap. Grp., Inc.*,
  No. 10 Civ. 02192, 2012 WL 2952893 (S.D.N.Y. July 17, 2012) ..........................................13

*Myers v. Hertz*,
  624 F.3d 537 (2d Cir. 2010)..............................................10

*Okoro v. Pyramid 4 Aegis*,
  No. 11 Civ. 267, 2012 WL 1410025 (E.D. Wis. Apr. 23, 2012) ..........................................8, 9

*RBS Citizens, N.A. v. Ross*,
  No. 12-165, 2013 WL 1285303 (U.S. Apr. 1, 2013) ..............................................8

*Reich v. S. New England Telecomms. Corp.*,
  121 F.3d 58 (2d Cir. 1997)..............................................7, 8

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993)..............................................3

*Sutherland v. Ernst & Young LLP*,
  768 F. Supp. 2d 547 (S.D.N.Y. 2011)..............................................8

*Walling v. Portland Terminal Co.*,
  330 U.S. 148 (1947)..............................................8, 11

*Zavala v. Wal-Mart Stores, Inc.*,
  691 F.3d 527 (3d Cir. 2012)..............................................13

*Zivali v. AT&T Mobility, LLC*,
  784 F. Supp. 2d 456 (S.D.N.Y. 2011)..............................................13

**Other Authorities**

*1 Newberg on Class Actions* (5th ed.)..............................................3

iv

A0083

<u>ARGUMENT</u>

I.    **Defendants Fail to Rebut Plaintiff's Showing Regarding Each Rule 23 Requirement.**

    A.    **Plaintiff Satisfies Numerosity.**

Defendants admit that there are at least 45 interns in the proposed class, but argue that the Court should exclude some interns who worked for FNG subsidiaries.  As discussed in Plaintiffs' opening brief and below, the Court should not limit the class to just Searchlight and Twentieth Century Fox because the same corporate policies and practices applied to interns whom FEG Recruiter, Laura Wiggins, recruited for FNG subsidiaries.  *See* Pls. Br.[1] 5-7, 13-17.  To the extent that Defendants challenge the PeopleSoft data's accuracy, the data significantly *underreported* the number of interns in the proposed class.

Although Plaintiffs did not know it when they requested the data,[2] PeopleSoft turned out to have significant gaps, including almost no data for interns in New York during most of the class period except for 2009.[3]  Moreover, after the data was produced, Defendants' human resources witnesses testified that PeopleSoft was sporadically used to record intern personnel information and that other software programs, Taleo and Virtual Edge, were more commonly used.[4]  Defendants have refused to search Taleo and Virtual Edge for class member contact

---

[1]    "Pls. Br." refers to Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Court-Authorized Notice, ECF No. 104.

[2]    Defendants told Judge Peck during the October 23, 2012 conference in which he ordered the data produced that the data might be "over-inclusive."  *See* Supplemental Declaration of Rachel Bien in Support of Class Certification ("Suppl. Bien Decl.") Ex. 86 (Ct. Tr. Oct. 23, 2012) 20:1-25.

[3]    *See* Decl. of Rachel Bien in Supp. of Class Certification ("Bien Decl."), ECF No. 105, Ex. 74.  The class period extends back to September 28, 2005.

[4]    Suppl. Bien Decl. Ex. 83 (Johnson Tr.) 108:15-109:8 (testifying that PeopleSoft was going to be used to collect intern information "but that didn't work so well because the coordinators in Shared Services didn't have access to PeopleSoft, so it was then shifted back to the business partner to have to input and maintain, which never happened consistently"); 111:11-19 (testifying that PeopleSoft was used to maintain intern contact information for "a relatively

information or produce supplemental information to Plaintiffs, which is why Plaintiffs have requested that the Court order them to do so if it grants Plaintiffs' motion.

Although the Court should include interns who worked for the subsidiaries for which Wiggins recruited, the evidence suggests that there were well more than 17 interns who worked in New York for Searchlight and Twentieth Century Fox during the class period.   For example, Antalik's supervisor, John Maybee, testified that Searchlight's New York publicity office *alone* had between one and four interns each semester (Fall, Spring, and Summer),[5] and that he supervised interns throughout his career at Searchlight from February 2006 through the end of the class period.[6]  Intern Request Forms that Maybee submitted show that some semesters, he requested up to 5 interns.[7]  During the semester when Antalik interned, there were 4 other interns whom Maybee also supervised.[8]

Given these numbers and the testimony that PeopleSoft underreported the number of interns and that Defendants' other software programs will likely fill the gaps, Plaintiffs have satisfied their burden to prove numerosity.  *See Alcantara v. CNA Mgmt., Inc.*, 264 F.R.D. 61, 64-65 (S.D.N.Y. 2009) (numerosity satisfied where court was able to draw a "reasonable inference" from plaintiffs' identification of 29 class members and estimate that others could be identified through notice mailing process); *McNeill v. N.Y. City Hous. Auth.*, 719 F. Supp. 233, 252 (S.D.N.Y. 1989) ("the lack of knowledge as to the exact number of affected persons is not a

---

short period of time"); Ex. 2 (Hoffman Tr.) 343:21-344:15 (testifying that intern contact information was inputted into Taleo and Virtual Edge); 346:3-22 (testifying that to generate a complete list of interns, Taleo, Virtual Edge, PeopleSoft, and hard copy files would have to be searched).

[5]     Suppl. Bien Decl. Ex. 85 (Maybee Tr.) 69:24-71:11.

[6]     *Id*. (Maybee Tr.) 9:6-22; 27:11-28:12.

[7]     Bien Decl. Ex. 49 (Spring 2010 Form) at D0048783; Ex. 19 (Fall 2009 Form) at D008972.

[8]     *See* Suppl. Bien Decl. Ex. 88 (Email bet. Maybee and Hoffman) at D0049699.

2

bar to maintaining a class action where the defendants alone have access to such data"); 1

Newberg on Class Actions § 3:13 (5th ed.) ("[A] good-faith estimate of the class size is

sufficient when the precise number of class members is not readily ascertainable."); *see also*

*Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) ("Courts have not required evidence of

exact class size or identity of class members to satisfy the numerosity requirement.")

       Moreover, courts certify classes even when the class size is small under circumstances

where, as here, the individual claims are small and class members lack the resources to institute

individual suits.  *See Robidoux*, 987 F.2d at 936 ("practicability depends on all the circumstances

surrounding a case, not on mere numbers"); *Koss v. Wackenhut Corp.*, No. 03 Civ. 7679, 2009

WL 928087, at *4 (S.D.N.Y. Mar. 30, 2009) ("Rule 23 provides small claimants who would

otherwise be unable to bring individual lawsuits a vehicle by which a small, common claim . . .

can be heard."); *Familienstiftung v. Askin*, 178 F.R.D. 405, 411 (S.D.N.Y. 1998) ("One of the

basic reasons for promulgating [R]ule 23 was to provide small claimants with a method of

obtaining redress for claims which would otherwise be too small to warrant individual

litigation.") (internal quotation marks and citation omitted).  Here, class members are owed

minimum wages for relatively short periods of work and are young people who only recently

entered the job market.  Under these circumstances, it would be unlikely, if not impossible, for

them to litigate their claims individually.  *See Jackson v. Foley*, 156 F.R.D. 538, 542 (E.D.N.Y.

1994) (weighing likelihood that low-income class members would be unable to bring individual

suits in finding numerosity satisfied); *Brown v. City of Barre, Vermont*, No. 10 Civ. 812010,

2010 WL 5141783, at *4-5 (D. Vt. 2010) (the small size of the individual claims weighed

heavily in favor of numerosity even though the estimated class size was under 40).

**B.    Plaintiff Satisfies Typicality.**

Defendants claim that there is no proof that Antalik was subject to the same policies as

other FEG interns, but the evidence refutes their claim.  Antalik was an intern for Searchlight, a

FEG subsidiary for which Hoffman had oversight.[9]  She was subject to the same policy under

which she was not paid.[10]  She was required to complete the same paperwork as other interns.[11]

She performed productive work like other FEG interns.[12]  Her supervisor was required to comply

with FEG policies, including submitting Intern Request Forms and adhering to FEG Intern

Guidelines.[13]

Defendants claim that Antalik is a-typical because her school did not ultimately award

her academic credit for her internship, but Defendants did not require any interns to prove that

they actually received academic credit.  They simply required interns to submit a letter from their

school showing that they were eligible for credit, as Antalik did.[14]  Defendants did not track

whether interns actually received credit.[15]  Moreover, Defendants exaggerate the significance of

school credit under the law – the receipt of credit alone does not insulate Defendants from their

wage and hour obligations, as Defendants suggest.[16]  The Court should also not rely on NACE, a

professional organization that "connects" colleges with Human Resources personnel, to interpret

---

[9]      *See* Suppl. Bien Decl. Ex. 95 (NY Offer Letters) at DS003296.
[10]     *See id.*
[11]     *See id.*; *see also* Ex. 88 (Emails bet. Hoffman and Maybee) at D0049723.
[12]     *See* Pls. Br. at 3, 7-11; Suppl. Bien Decl. Ex. 93 (NY Intern Request Form); Bien Decl.
Exs. 19, 49.
[13]     *See* Suppl. Bien Decl. Ex. 93 (NY Intern Request Form); Ex. 91 (Hoffman email, dated
Feb. 17, 2010); Bien Decl. Exs. 19, 49.
[14]     *See* Bien Decl. Exs. 1 & 2 (Hoffman Tr.) 77:16-78:2; 128:10-17; 284:21-285:13.
[15]     *See* Suppl. Bien Decl. Ex. 84 (Johns Tr.) 88:21-90:20; Ex. 85 (Maybee Tr.) 83:23-91:6.
[16]     The Department of Labor ("DOL") has not included receipt of credit as one of the factors
("DOL Factors") supporting an unpaid internship program.  Instead, it requires internships to
provide training "similar to training which would be given in an educational environment."  Bien
Decl. Ex. 75 (DOL Factors).  Internships structured around a company's "actual operations" that
provide little or no academic training, like FEG's internships, fail this test.  *See id.* at 2.

4

the law and, in any case, Defendants distort NACE's position on unpaid internships.  NACE has not said that credit alone justifies an unpaid program, as Defendants state, *see* Defs.' Opp'n at 18-19; rather, its position is that internship programs must also comply with several criteria, most of which mirror the DOL Factors.[17]  NACE itself published a study last year showing that paid interns were more likely than unpaid interns to obtain jobs.[18]  Furthermore, to the extent that eligibility to receive credit is a factor at all, it is "common" to the class and supports certification.[19]  *See* Defs.' Opp'n at 19.

Defendants distort the record by attempting to deny Antalik's connection to FEG.  As shown in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Pls. Opp'n"), ECF No. 142, Hoffman required Antalik to submit to the same policies that applied to other FEG interns, including completing onboarding paperwork and demonstrating eligibility for school credit, and required her supervisors to follow FEG's Internship Guidelines and submit Intern Request Forms for pre-approval before hiring interns.  *See id*. at 31-33.  These same policies also applied to the interns that Wiggins recruited for FNG subsidiaries.  *See* Pls.' Br. at 5-7, 13-17.

Because Antalik is typical of the class she seeks to represent and Defendants have not rebutted her showing that she is adequate,[20] the Court should reject Defendants' suggestion that the class should not be certified because Antalik is the only named plaintiff.  In fact, Defendants repeatedly attack Plaintiffs for failing to recruit more interns to serve as named plaintiffs and say

---

[17]    *See* NACE website, http://www.naceweb.org/connections/advocacy/internship_position_paper/ (last visited Apr. 8, 2013).

[18]    *See* NACE website, http://www.naceweb.org/s08012012/paid-intern-job-offer/?referal=knowledgecenter&menuid=109 (last visited Apr. 8, 2013).

[19]    Another common question is the degree of deference, if any, that the Court should accord to schools' evaluation of the value of Defendants' internships.  *See* Defs.' Opp'n at 19 (claiming that "[a]ll Interns' Schools evaluated the educational value of each internship before approving student applicants' Credit eligibility . . .").

[20]    Because Defendants' adequacy argument is the same as its typicality argument, *see* Defs.' Opp'n at 21 fn.29, it also fails.

5

A0088

that this shows interns would be "unwilling" to participate in the case if given the opportunity to join. Their attack is off-base. Interns have not been provided with an opportunity to join the case yet. Plaintiffs did not use the contact information that the Court ordered Defendants to produce to solicit class members (and Defendants know that it would not have been appropriate for them to do so). In fact, the only "notice" that class members have received to date about the case came from Defendants,[21] not Plaintiffs, contained language that may have dissuaded class members from participating (i.e., telling interns that they need not respond to Plaintiffs' counsel's inquiries and that they "strongly disagree" with Plaintiffs' claims), and supports Plaintiffs' request that the Court issue an official notice that provides class and collective members with even-handed information about the case. Furthermore, Rule 23 provides a mechanism for "unwilling" class members to litigate their claims individually or not at all: they can opt-out.

### C. Defendants' Cherry-Picked Facts Do Not Defeat Commonality or Predominance.

#### 1. This Case Is Unlike *Dukes* and *Comcast*.

Courts have routinely rejected efforts by defendants to compare the discretionary decision-making practice in *Wal-Mart Stores v. Dukes* with straightforward wage and hour policies in misclassification cases. Most recently, in *Jacob v. Duane Reade*, *Inc.*, the court distinguished *Dukes*' discretionary decision-making practice from the misclassification claim at issue because, "[o]n its face, [*Dukes*] is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices." No. 11 Civ. 0160, 2013 WL 1137024, at *7 n.1 (S.D.N.Y. Mar. 20, 2013). Here, Plaintiffs challenge Defendants' uniform no-pay policy and support their motion

---

[21]    *See* Suppl. Bien Decl. Ex. 89 (Searchlight Email) at D0086835.

6

A0089

with evidence that the policy was centrally enforced by FEG's two intern recruiters. *See* Pls.'
Br. at 5-6.

      The Supreme Court's recent decision in *Comcast Corp. v. Behrend,* No. 11-864, 569 U.S.
---, 2013 WL 1222646 (Mar. 27, 2013), an antitrust case, does not establish a new class action
rule.[22]  *Comcast* does not change the principle that "individual damages calculations do not
preclude class certification under Rule 23(b)(3)." *Id.* at *9 (Ginsburg and Breyer, JJ., dissenting)
(*Comcast* "should not be read to require, as a prerequisite to certification, that damages
attributable to a classwide injury be measurable 'on a class-wide basis.'").

      This case could not be more different than *Comcast* because, here, Plaintiffs' theory of
liability is completely tethered to their damages theory.  Plaintiffs' theory of damages is that
Defendants should pay them for the hours they worked.  Plaintiffs will prove their damages on a
class-wide basis through Defendants' documents, supervisors' testimony, and testimony of class
members.  Plaintiffs need not prove damages with precision to satisfy Rule 23(b)(3).  *Comcast*,
2013 WL 1222646, at *5 ("Calculations need not be exact" to establish predominance).   In wage
cases, where an employer's records are inaccurate or incomplete, workers may demonstrate the
extent of their work by "just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680, 687 (1946); *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 68 (2d Cir.
1997).  Courts routinely award back pay to non-testifying claimants on the basis of evidence

---

[22]    *See Comcast*, 2013 WL 1222646, at *5 ("[t]his case thus turns on the straightforward
application of class-certification principles . . . ."); *id.* at *9 (Ginsburg and Breyer, JJ.,
dissenting) ("[T]he opinion breaks no new ground on the standard for certifying a class
action[.]").

adduced from a fairly representational subset. *See, e.g.*, *Reich*, 121 F.3d at 67 (holding that employees "need not present testimony from each underpaid employee").[23]

> **2.    Defendants Fail to Rebut Substantial Evidence Demonstrating Common Issues that Predominate.**

Defendants fail to rebut Plaintiff's evidence that all class members were part of the same internship program which was centrally administered by two recruiters, who subjected interns and their supervisors to the same policies and practices. *See* Pls. Br. at 5-7.

Defendants quibble with some of the evidence, but they fail to show that it does not support certification or is rebutted by other evidence. For example, Defendants argue that Intern Request Forms, which Plaintiff uses to show that interns regularly performed productive work,[24] do not show what "any internship actually entailed," but their Rule 30(b)(6) witnesses testified that the forms were completed by those with knowledge of the tasks that interns performed, that they were accurate, that they were completed close to the time that interns were hired, that they

---

[23]    As Defendants note in supplemental authority submitted to the Court today, the Supreme Court issued a summary order granting, vacating, and remanding the Seventh Circuit's decision in *Ross v. RBS Citizens, N.A.* for further consideration in light of *Comcast* – a "GVR order." *RBS Citizens, N.A. v. Ross*, No. 12-165, 2013 WL 1285303 (U.S. Apr. 1, 2013). However, the Court should rely on *Ross* to the extent it finds *Ross* persuasive, notwithstanding the GVR order. *See, e.g., Sutherland v. Ernst & Young LLP*, 768 F. Supp. 2d 547, 550-51 (S.D.N.Y. 2011) (recognizing persuasive authority of earlier Circuit decision, despite Supreme Court's GVR order).

[24]    Plaintiffs did not use Intern Request Forms to create a "'common' Intern job description," as Defendants contend, Defs.' Opp'n at 26, but to demonstrate the nature of the work that interns performed. Courts have held that the nature of the work – rather than the specific tasks performed – is critical to determining whether alleged trainees are employees. *See, e.g., Walling v. Portland Terminal Co.*, 330 U.S. 148, 153 (1947) (trainees are not employees because railroad received "no 'immediate advantage' from any work done by the trainees"); *Archie v. Grand Cent. P'ship*, 997 F. Supp. 504, 514, 516, 534-35 (S.D.N.Y. 1998) (trainees' activities, including maintenance, outreach, food preparation, and clerical work, provided an economic advantage); *Okoro v. Pyramid 4 Aegis*, No. 11 Civ. 267, 2012 WL 1410025, at *7-8 (E.D. Wis. Apr. 23, 2012) (defendant benefited from plaintiff's work performing day-to-day tasks of its business); *see also* Bien Decl. Ex. 75 (DOL Factors) (where "interns are engaged in the operations of the employer or are performing productive work (for example, filing, performing other clerical work, or assisting customers)," they are not excluded from the FLSA).

8

were reviewed and approved for compliance with FEG's Intern Guidelines, and that they were used to generate intern job descriptions.[25] None of the declarants on whom Defendants rely deny this – all acknowledge that the forms generally described the duties that interns performed.[26]

Defendants assert that their uniform Intern Supervisor Guidelines are "of little, if any, value," but fail to put forth any reasons why they are not probative of several relevant issues common to the class, including Defendants' expectations about the hours interns worked, the nature of the work interns were expected to perform, the purposes of the internship program, the process for recruiting and hiring interns, and the expectations of intern supervisors.[27] Defendants also attempt to sweep aside the personnel policies that applied to all interns, claiming that they are not relevant to the claims. However, in assessing the "economic reality" of the relationship between Defendants and their interns, it is relevant that Defendants treated interns as employees in several circumstances, including by requiring them to prove their eligibility to work, because the evidence undermines Defendants' claim that interns were engaged in a bonafide training program. *See Archie*, 997 F. Supp. at 533-34 (considering "economic reality" of relationship between alleged trainees and employer, including internal documents referring to alleged trainees as employees); *Okoro*, 2012 WL 1410025, at *6 ("To assess the economic reality of the nature of the working relationship, courts do not look to a particular isolated factor but to all the circumstances of the work activity.") (citing *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730 (1947)) (internal quotation marks and citation omitted).

---

[25]     Bien Decl. Exs. 1 and 2 (Hoffman Tr.) 105:17-107:4; 111:14-115:3; 118:19-121:15; 152:6-23; 206:6-207:2; 208:15-24; 279:3-280:17; 331:8-332:20; 341:19-342:17; Exs. 13-19; 34-35 (Intern Request Forms).
[26]     *See* Zambrana Decl. ¶ 7; Braginets Decl. ¶¶ 6, 9; Hicks Decl. ¶ 8; Thompson Decl. ¶ 11; Marks Decl. ¶ 5.
[27]     *See* Bien Decl. Ex. 30 (Email, dated Feb. 8, 2010, attaching Intern Supervisor Guidelines).

9

In fact, the only evidence that Defendants submit to attempt to rebut Plaintiffs' substantial common evidence is a single declaration from an intern supervisor in New York, Bruce Shirley.  The Court should not rely on the declaration and it should be stricken because Defendants failed to disclose Shirley either in their Rule 26 disclosures or in response to Plaintiffs' interrogatories.[28]  *See Brown v. Wal-Mart Stores, Inc.*, No. 09 Civ. 3339, 2012 WL 3672957, at *2-3 (N.D. Cal. Aug. 24, 2012) (disregarding declarations submitted in support of opposition to class certification, where declarants' identities were not "disclosed under Rule 26, identified in response to interrogatories seeking the identity of any person who had facts that supported [employer's] defenses, or otherwise disclosed to Plaintiffs" and therefore plaintiffs did not have opportunity to depose them).  Moreover, even if the Court considers the declaration, it discusses a small number of interns who participated in an Ad Sales Internship program that may not even fall under Plaintiffs' proposed class definition.

### 3. Evidence of Defendants' Uniform Classification Policy Supports Certification.

Contrary to Defendants' contention, *Myers v. Hertz* affirmed that a blanket classification policy can support certification where, as here, it is coupled with other evidence showing that class members were similar in ways that are relevant to the classification decision.  624 F.3d 537, 549 (2d Cir. 2010) (predominance may be met based on evidence of a uniform classification policy and evidence "tending to show that the plaintiffs' jobs were similar in ways material to the establishment of the exemption criteria").  Here, Plaintiff does not rely on Defendants' classification policy alone; she supports her motion with evidence that they subjected interns and their supervisors to the same guidelines, assigned interns productive work, and considered

---

[28]     For the same reasons, the Court should not rely on and should strike the Declarations of Dana Tuinier, ECF No. 134; Kim Beauvais, ECF No. 122; Natalie Gibbons, ECF No. 124; and Anatole Klebanow, ECF No. 130.

10

interns employees under certain personnel policies, and that these policies and practices applied

regardless of who an intern's supervisor was or the department in which he or she worked.

Moreover, this evidence is probative of the "exemption criteria" here because the criteria, as set

forth in *Walling* and the cases and Department of Labor criteria that apply it, can be

demonstrated through Plaintiff's common proof.  This case is not like *Kopera v. Home Depot

U.S.A., Inc.*, because there, the plaintiff presented no common evidence, such as corporate

policies, relevant to the exemption criteria.  No. 09 Civ. 8337, 2011 WL 135016, at *4 (S.D.N.Y.

Jan. 11, 2011).  The only policy that she presented was a training guide, which was insufficient,

because it did "not present an uncontested generalized picture of . . . actual duties" of the

job.  *Id*.

### 4.    The Applicable Merits Standard and FEG's Status as a Joint Employer Raise Common Questions.

Defendants argue that the Court should apply a "primary beneficiary" test to decide the

merits, but the test they propose is contrary to *Walling*, the binding precedent on whether

Plaintiffs were trainees or employees.  *Walling* did not apply a primary beneficiary test.  Rather,

it carved out a narrow exception to the FLSA's definition of "employ" for trainees that only

applies in limited circumstances.  First, the plaintiffs participated in a short seven to eight day

training program providing the "same kind of instruction" offered by a "public or private

vocational school."  330 U.S. at 152-53.  Second, the training provider received no "immediate

advantage" from any of the work done by the plaintiffs.  *Id*.  Third, the plaintiffs worked "solely

for [their own] personal purposes or pleasure," and their "work serve[d] only [their] own

interest."  *Id*.  The DOL Factors, which purport to codify *Walling*, and which Defendants appear

to adopt, also do not apply a primary beneficiary test.

11

A0094

In any event, to the extent that the parties disagree over the proper legal standard, the answer will be the same for all class members and supports certification. *See Jacob*, 2013 WL 1137024, at *6 (in misclassification case, the question of "how to assess the[] relative importance" of the plaintiffs' job duties where the central merits issue would require the court to determine the extent of managerial work that the plaintiffs performed was a common question proper for class treatment"). Defendants cite no authority for their assertion that either test is "individualized in nature" or requires "Intern-specific proof." *See* Defs.' Opp'n at 23. In fact, courts routinely certify cases, such as those involving misclassified independent contractors, where the merits questions involve consideration of a variety of factors.[29]

Defendants also fail to support their argument that FEG's status as an employer will vary from intern to intern. In fact, the claims of all class members will rise or fall together because the same evidence links FEG to Antalik and to the class, including its uniform policy and personnel documents and centralized control over intern recruitment and oversight.[30]

## II. Defendants Fail to Rebut Plaintiff's Showing that She Is Similarly Situated to the Proposed FLSA Collective.

Plaintiff's evidence of FEG's uniform policies that applied to her and to the proposed collective, the productive work they performed, and the type of training they received, is sufficient to satisfy her burden to show that she and collective members are similarly situated.

There is no requirement that Plaintiff prove that Defendants' intern policy was unlawful in order for her to certify an FLSA collective. *See Damassia v. Duane Reade, Inc.*, No. 04 Civ. 8819, 2006 WL 2853971, at *5 n.8 (S.D.N.Y. Oct. 5, 2006) (rejecting argument that plaintiffs

---

[29] *See Hart v. Rick's Cabaret Int'l Inc.*, No. 09 Civ. 3043, 2010 WL 5297221, at *6-7 (S.D.N.Y. Dec. 20, 2010); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 203-05 (S.D.N.Y. 2006); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85-88 (S.D.N.Y. 2001).
[30] *See* Pls. Opp'n at 31-36.

12

must "definitively prove that they were victims of a common illegal policy" in order to certify collective). Defendants claim that courts "routinely" refuse to certify facially lawful policies, but the sole case they cite, *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456 (S.D.N.Y. 2011), decertified the collective because there was no policy at all or evidence substantiating the plaintiffs' claim that the collective performed uncompensated off-the-clock work. *Id*. at 463-64, 469. Moreover, while the employer's official policy in *Zivali* was that employees *must be paid* for the hours they worked, here, Plaintiff challenges a "facially unlawful" policy – that interns *are not paid* for their work.

None of the "dissimilarities" to which Defendants point – among intern supervisors, departments, school credit rules, or the role that FEG recruiters played overseeing the intern program – are supported by the evidence.[31] To the contrary, the evidence demonstrates that FEG centrally managed its internship program, requiring interns and their supervisors to follow the same procedures and submit to the same policies.[32] *See* Pls.' Br. at 5-7. In fact, most of Defendants' declarants reported following those policies, including submitting Intern Request Forms to FEG's intern recruiters, obtaining potential intern candidates from the recruiters, taking

---

[31] The cases on which Defendants rely on page 32 of their brief are easily distinguished. Unlike here, there was no uniform corporate policy at issue – the workers claimed that they worked off-the-clock – and the evidence showed that differences in work locations, supervisors, and/or dates of work impacted the amount and extent of off-the-clock work performed. *See Morano v. Intercon. Cap. Grp., Inc.*, No. 10 Civ. 02192, 2012 WL 2952893, at *6-9 (S.D.N.Y. July 17, 2012); *Eng-Hatcher v. Sprint*, No. 07 Civ. 7350, 2009 WL 7311383, at *4-6 (S.D.N.Y. Nov. 19, 2009). In *Zavala v. Wal-Mart Stores, Inc.*, the members of the putative class were paid under a variety of wage rates and methodologies by over 70 joint employers and there was no evidence that Wal-Mart supervised some locations. *See* 691 F.3d 527, 538-39 (3d Cir. 2012). *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 259 (S.D.N.Y. 2006), was a Title VII race discrimination case that analyzed a very different issue: whether an employee was treated "less favorably than a similarly situated employee outside his protected group."

[32] Because the evidence shows that the same intern policies applied to interns for which Wiggins and Hoffman recruited, the Court should not limit the class or collective to the FEG subsidiaries for which Hoffman recruited, as Defendants request. *See* Defs. Opp'n at 35-36.

13

FEG's intern supervisor training, and/or having their interns complete FEG's onboarding paperwork.[33]

The evidence also demonstrates that interns regularly performed productive work as part of Defendants' day-to-day operations. *See* Pls.' Br. at 7-11. Even Defendants' declarants acknowledged that they gave interns productive work. For example, Scott Vyduna asked his intern to review contracts and isolate the deal points,[34] and an Intern Request Form that Vyduna submitted for Fall 2009 requested an intern to "[a]ssist in implementation of newly developed software solution" and perform "various regular and ad-hoc analysis[.]"[35] Jacqueline Zambrana submitted an Intern Request Form for Spring 2010 that included: "[d]evelop monthly retail pitch decks;" "[r]eview Brand Product Pages for inaccuracies/inconsistencies;" "[d]evelop EMA decks and put on memory sticks along with agendas and other necessary info and get to sales teams."[36] Jill Gwen Braginets had interns input data into financial reports and documents produced by Defendants show that this was a regular part of what interns did for Braginets and her associate, Adam Martinez.[37] An Intern Request Form submitted by Lori Hicks for Spring 2010 requests an

---

[33]    *See* Grammatke Decl. ¶ 8 (took online training course); Zambrana Decl. ¶¶ 7-8 (submitted Intern Request Form to recruiters and received resumes from recruiters); Braginets Decl. ¶¶ 6, 9 (received intern resumes from recruiters and completed Intern Request Forms); Hicks Decl. ¶ 8 (submitted Intern Request Forms and recruiters posted the intern openings for her and provided resumes); Thompson Decl. ¶ 11 (submitted Intern Request Forms); Marks Decl. ¶ 5 (submitted Intern Request Forms); Tuinier Decl. ¶¶ 5-6 (submitted Intern Request Forms, received intern resumes from recruiter, and recruiter coordinated administrative aspects of onboarding interns); Suppl. Bien Decl. Ex. 94 (Grammatke Offer Letter) (intern required to complete FEG onboarding paperwork); Ex. 92 (Vyduna Intern Request Form); Ex. 99 (Marks Intern Request Form).

[34]    Vyduna Decl. ¶ 12.

[35]    Suppl. Bien Decl. Ex. 92 (Vyduna Intern Request Form).

[36]    Bien Decl. Ex. 72 (Retail Marketing Internship).

[37]    Braginets Decl. ¶¶ 19-22; Suppl. Bien Decl. Ex. 87 (Braginets emails); Ex. 90 (Martinez Intern Request Forms).

14

intern to: "[a]ssist with preparation of balance sheet reconciliation schedules; P&L support schedules and other various administrative tasks (filing/research/etc)."[38]

Defendants have failed to show that collective members are subject to "highly individualized defenses" regarding whether FEG jointly employed them because their claims depend on common evidence. *See supra* Section I.C.4. Moreover, Defendants' concern that there will be "great potential for confusion" is unfounded. There is no reason why supervisors and interns from every FEG subsidiary will need to testify at trial because the relevant policies were set and administered by a few individuals at the corporate level and evidence about the nature of the work interns did, their supervision, and training can be established through corporate documents and the representative testimony of intern supervisors and class members.[39] *See supra* Section I.C.1.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Class Certification and Court-Authorized Notice.

---

[38]    Suppl. Bien Decl. Ex. 98 (Hicks Intern Request Form). *See also* Ex. 97 (Thompson Intern Request Form) (requesting two interns to do "[a]ppraisal, basic conservation, cataloguing, and creating finding aids for photographic collections"); Ex. 96 (Kasabian Intern Request Forms) (requesting intern to read scripts, watch and critique auditions and show dailies, respond to phone and email inquiries, and assist casting directors).

[39]    Although Defendants' objections to Plaintiff's proposed notice are without merit, Plaintiff will accept Defendants' invitation to meet and confer to attempt to narrow their disputes, and consent to Defendants' request that the Court direct the parties to do so. *See* Defs. Opp'n at 37.

Dated:        April 12, 2013
              New York, New York

                                 Respectfully submitted,
                                 **OUTTEN & GOLDEN LLP**
                                 By:
                                 /s/ Rachel Bien
                                 Rachel Bien

                                 Adam T. Klein
                                 Rachel Bien
                                 Elizabeth Wagoner
                                 Sally Abrahamson (admitted *pro hac vice*)
                                 3 Park Avenue, 29th Floor
                                 New York, New York 10016
                                 Telephone: (212) 245-1000

                                 *Attorneys for Plaintiffs*

16

# In The Matter Of:

*ERIC GLATT, et al., v*

*FOX SEARCHLIGHT PICTURES,*

---

*May 10, 2012*

---

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File d5anglaa.txt

**Min-U-Script® with Word Index**

**ERIC GLATT, et al., v**
**FOX SEARCHLIGHT PICTURES,**

**May 10, 2012**

---

D5anglaa          Argument          Page 1

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 3  ERIC GLATT, et al.,
 4              Plaintiffs,
 5        v.              11 CV 6784 (WHP)
 6  FOX SEARCHLIGHT PICTURES,
    INC.,
 7              Defendant.
 8
 9  ------------------------------x
                        New York, N.Y.
10                      May 10, 2012
                        11:45 a.m.
11  Before:
12            HON. WILLIAM H. PAULEY III,
13                        District Judge
14            APPEARANCES
15  OUTTEN & GOLDEN, LLP
         Attorneys for Plaintiffs
16  BY:  RACHEL BIEN
         JUNO TURNER
17
18  PROSKAUER ROSE LLP
         Attorneys for Defendants
19  BY:  ELISE BLOOM
         AMY MELICAN
20
21
22
23
24
25
```

D5anglaa          Argument          Page 2

1          (In open court)
2          (Case called)
3          THE COURT: This is oral argument on dueling motions
4  for summary judgment and a motion for class certification.
5          Who wants to be heard?
6          MS. BIEN: I would be happy to start, your Honor.
7          THE COURT: That is fine. Why don't you take the
8  podium.
9          MS. BIEN: OK. Good morning, your Honor. I think
10  that I would like to start with the class certification motion,
11  unless the Court would like me to proceed with the other
12  motions first.
13          THE COURT: That is fine.
14          MS. BIEN: We have moved for class certification under
15  Rule 23 for an intern class who worked in New York for certain
16  subsidiaries of Fox Entertainment Group.
17          THE COURT: What is the size of this putative class?
18          MS. BIEN: As you can see from the papers, there is
19  some dispute here about the size of the class because of
20  whether records were properly maintained. But the size of the
21  class, even based on the records that the defendants have
22  produced, which undercount the number of interns, there are
23  more than 40 interns. So that threshold question of whether
24  there are 40, there isn't a dispute there.
25          Defendants are trying to sort of scale back the size

D5anglaa          Argument          Page 3

1  of the class by saying that certain subsidiaries shouldn't be
2  included, but we don't agree with them, because the same
3  policies that we assert applied to the interns who worked for
4  the subsidiaries that they agree should be in the class also
5  apply to the subsidiaries that make out the full class.
6          Those policies were centrally derived from the intern
7  recruiters who worked for Fox Entertainment Group's human
8  resources department. There are a set of guidelines and
9  policies and procedures they require of their intern and the
10  intern supervisors to follow to the extent they participated in
11  the Fox Entertainment Group internship program, which is the
12  program that we are focusing on in this case.
13          So we think if defendants go back and do a more
14  thorough review of the different databases in which intern
15  information is stored that we will find that there are well
16  more than the 45 interns that we have been able to identify
17  through the PeopleSoft data that they have produced, and their
18  witnesses said that there are other sources of data that they
19  think would complete the picture.
20          THE COURT: Could I grant or deny certification of the
21  New York claims and do the opposite on the motion for a
22  collective action under the FLSA, or do they turn on the very
23  same questions?
24          MS. BIEN: The Court could go one way or the other,
25  but there are very -- I mean, the standards are different. As

D5anglaa          Argument          Page 4

1  we set out, the Rule 23 requirements are not the same under
2  216(b), but to a large extent the common evidence here is the
3  same.
4          So what we have pointed to here are a set of
5  internship guidelines that were centrally promulgated that were
6  enforced by the two intern recruiters who had primary
7  responsibility for overseeing the internship program and
8  enforcing the guidelines.
9          The guidelines are really important here because they
10  bear on several of the merits issues that the Court will
11  ultimately determine with respect to whether the interns should
12  be categorized as employees or trainees.
13          THE COURT: Is there anything about those guidelines
14  that's illegal or contrary to the Department of Labor
15  regulations?
16          MS. BIEN: We think that there are. We think there
17  are certainly aspects of them that wouldn't pass muster under
18  the Department of Labor guidelines. I am happy to point them
19  out to the Court. I have an extra copy if the Court would like
20  a copy to look over right now.
21          THE COURT: Which specific guidelines?
22          MS. BIEN: Sure.
23          For instance, we can start out with the stated purpose
24  of the internship program. There's two purposes that are
25  identified in the guidelines: To identify talent early and

---

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,

May 10, 2012

| D5anglaa | Argument | Page 5 |
|---|---|---|

1 build a diverse and trained pipeline. That is one of the
2 purposes. You will see that repeated in many of the documents
3 that are distributed to intern supervisors. We would say that
4 the purpose of the internship program has to be to benefit the
5 intern and not in order to build a diverse pipeline of future
6 employees for the company.
7      Another purpose, however, that may cut the other way,
8 but again applies uniformly to the entire class, is giving
9 students practical experience that complements their education.
10      THE COURT: Wasn't the purpose of the pipeline in
11 Walling or the purpose of the program to be a pipeline in
12 Walling?
13      MS. BIEN: The purpose was to train these future
14 brakemen to be able to perform that duty. In Walling --
15      THE COURT: The Supreme Court said that was lawful,
16 right?
17      MS. BIEN: It wasn't in order to train them to become
18 employees of that company. It was to train them so that they
19 would be able to go out and be able to get a job as brakemen.
20 In fact, in Walling if the trainees were then hired, the
21 company went back and paid them for the time that they spent in
22 training in recognition of the fact that they were not
23 participating in the training at that point only to benefit
24 themselves, they were participating in the training which
25 provided an immediate benefit to the company, which was they

| D5anglaa | Argument | Page 6 |
|---|---|---|

1 got a trained, new member of their workforce. So that is, I
2 think, a distinction that is a significant one.
3      Here we are finding people who are being trained to
4 become a pipeline of future employees for the company. But let
5 me point out a few other examples of ways that we think that
6 these guidelines won't pass muster. One of the aspects of the
7 guideline is they should be useful assistance on key projects
8 and day-to-day operations. We don't think that that is going
9 to satisfy the test for showing that they are trainees, and the
10 Department of Labor says that an intern must provide an
11 immediate advantage.
12      So if interns are expected to provide useful
13 assistance on key projects and day-to-day operations, then we
14 don't think that Fox is going to be able to satisfy that prong.
15      Again, this is an expectation that cuts across the
16 class, that applied to everyone here in the class.
17      But there are other aspects as well. There are
18 specific intern supervisor expectations that are set forth in
19 the guidelines about what intern supervisors are supposed to
20 provide to the interns. Some of them cut on the merits in
21 favor of the plaintiffs.
22      So, for example, intern supervisors must occasionally
23 give constructive feedback and provide coaching, day-to-day
24 coaching.
25      OK. We think that is the kind of supervision that is

| D5anglaa | Argument | Page 7 |
|---|---|---|

1 not envisioned by the Department of Labor. The Department of
2 Labor says the supervision has to be constant and consistent
3 like shadowing. That's the kind of supervision that the
4 brakemen received when they were part of the training program
5 that the railroads performed.
6      So and the Department of Labor also says that if you
7 provide supervision to interns that is similar to what you
8 would apply to regular employees, which we think giving
9 occasional constructive feedback and day-to-day coaching would
10 be, then that also wouldn't pass muster under the test. That
11 is an example of a piece of evidence that cuts across the class
12 that we think is going to help us on the merits.
13      there are other things in here that may help the
14 defendants on the merits, but the point is that those things
15 are not going to be individualized, because these are the set
16 of expectations and guidelines that were used for everyone in
17 the class that we seek to certify as well as the collective
18 members.
19      THE COURT: But what evidence in this case is capable
20 of generating classwide answers to common questions?
21      MS. BIEN: Your Honor, we would submit this set of
22 guidelines does generate common answers to the relevant
23 questions.
24      The relevant questions look at, did interns provide
25 any immediate advantage? Did interns participate in a training

| D5anglaa | Argument | Page 8 |
|---|---|---|

1 program that was similar to training received in a classroom or
2 educational experience? What did interns do? Did they
3 participate in the day-to-day operations as part of the regular
4 ongoing operations of the employer or not?
5      All of those things are spoken to in these guidelines.
6 The company gave the intern supervisors a set of guidelines
7 that they were expected to follow, and all of the testimony is
8 that these were very important to Fox and Fox made efforts
9 regularly to make sure that intern supervisors were aware of
10 these and that they were being enforced.
11      So this is one set of evidence that we think the Court
12 can look to. It is almost like a job description in a
13 misclassification case where the focus of the case is the
14 duties. Here the focus of the case is not the duties. There
15 isn't a duties test that's part of this intern test.
16      What we are looking for is a piece of corporatewide
17 evidence that bears on several of the merits issues that are
18 going to be important here, and this document does. There is
19 other evidence as well.
20      THE COURT: How is this different from Wal-Mart in
21 terms of supervisors making decisions?
22      MS. BIEN: We are saying that there were a set of
23 written policies that applied to the intern supervisors that
24 could guide what they could and couldn't do with respect to
25 interns.

A0102

D5anglaa        Argument        Page 9

1    So we have an actual policy here, and we have
2  practices that we can look to, whereas in Wal-Mart, which was
3  obviously a discrimination case, the manner in which the
4  discrimination occurred was entirely discretionary and in the
5  hands of the supervisors, and there wasn't evidence showing an
6  overarching pattern or manner in which that was executed. So I
7  think these facts are very different.
8       THE COURT: Didn't the supervisors treat interns
9  differently at Fox depending upon where they were? I recall
10  Math for Advertising or something like that and mock role
11  playing.
12       MS. BIEN: First of all, I would say that there
13  aren't -- defendants haven't pointed to examples of significant
14  differences in terms of how interns were used by supervisors.
15  I think the overwhelming evidence, if you look at the intern
16  request forms that we've submitted as well as the declarations
17  that they've submitted of intern supervisors, is that interns
18  were part of the day-to-day operations of the offices in which
19  they worked.
20       To the extent they received any training, the
21  overwhelming evidence is that the training that they received
22  was as part of that day-to-day participation in the ongoing
23  operations of the company.
24       There's no dispute here that the formal training that
25  any interns got was very limited, and we would concede that

D5anglaa        Argument        Page 10

1  there was some formal training provided. But it was very
2  limited, and we would say that to the extent that any was
3  provided it's not going to pass muster to satisfy the
4  requirement that the internship program, which is what we are
5  focused on here, was comparable to the kind of training that's
6  provided in educational or classroom experience.
7    I would like to just talk a little bit more about some
8  of the common evidence here just to draw the Court's attention
9  to it.
10    One of the factors is whether or not interns displaced
11  regular employees. Another factor is whether or not the
12  interns provided an immediate advantage to the company.
13    One of the pieces of evidence that we have pointed to
14  that applies across the class was a memo written by Fox
15  Entertainment Group's executive vice president in 2010, shortly
16  before they changed their program from an unpaid to a paid
17  program, in which, speaking of the Fox internship program, the
18  human resources head discussed how, as part of cost containment
19  initiatives at Fox, their paid internship program was
20  eliminated and overtime and temps were significantly scaled
21  back. She says, As a result, the number of credit internships
22  increased, and the size of our intern program more than
23  doubled.
24    This is a piece of evidence again that we point to,
25  one in addition to the guidelines, in addition to other sources

D5anglaa        Argument        Page 11

1  of evidence that cuts across the class that is going to be
2  useful in determining several of the merits questions down the
3  road.
4    So this is another piece of evidence that we think the
5  Court can look to in determining whether to certify the class
6  or collective.
7    There are also several different personnel and policy
8  documents that we point to as part of the -- in order to show
9  the economic reality of the employer/employee relationship
10  between Fox and the interns. The fact that interns were
11  considered at-will employees, the fact that interns were
12  required to sign worker's compensation agreements under which
13  they were designated as employees, the fact that they were
14  required to submit to personnel policies and other corporate
15  policies like a confidentiality agreement and other agreements
16  also is evidence that cuts across the entire class that is
17  going to bear on the employer employee, the nature of their
18  relationship.
19    Again, that's not intern specific. That was a policy
20  that applied across all of the interns in the class and
21  collective that we are seeking to certify.
22       THE COURT: After seeking leave to amend the complaint
23  to add Gratts' claim, why didn't plaintiffs move for class
24  certification of the California interns?
25       MS. BIEN: Gratts worked on a film production, so she

D5anglaa        Argument        Page 12

1  didn't work in the corporate offices of Fox Entertainment
2  Group. So, because she didn't work in the corporate offices
3  and she worked on a film production, in our view she wouldn't
4  necessarily be an appropriate class representative for the
5  corporate interns who worked in the corporate offices in
6  California. So we didn't seek to make her a class
7  representative of that class. So the people who worked in
8  California would be covered by the collective that we're
9  seeking to certify, but there isn't a separate California
10  claim.
11       THE COURT: All right. If there's no equitable
12  tolling with respect to Gratts' claim, and this Court were to
13  adopt the more lenient rule adopted by my colleague in the
14  eastern district, that the time runs from when leave is sought
15  to amend the complaint as opposed to when the amended complaint
16  is filed, isn't it true that Gratts' claim based on her
17  testimony at best would be limited to Friday, August 1, and
18  Saturday, August 2, of 2008?
19       MS. BIEN: Her period of time would be for the short
20  period of time that she worked in August of 2008.
21       THE COURT: Only those two days, right?
22       MS. BIEN: Well, from the time when we filed the
23  premotion letter, which I believe was August 2.
24       THE COURT: Right.
25       MS. BIEN: That's where the tolling would start.

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,

May 10, 2012

D5anglaa          Argument                      Page 13

1       THE COURT: If you look back four years and there was
2  no equitable tolling, she could only have a claim for August 2,
3  which according to my calendar was a Saturday, and I don't know
4  whether they worked on Saturdays, or August 1, which was a
5  Friday, right?
6       MS. BIEN: My understanding with the tolling would go
7  forward.  So if she continued to work, for example --
8       THE COURT: No.  The testimony is clear that at best
9  she worked in August.
10      MS. BIEN: Right.
11      THE COURT: At some point in August.
12      MS. BIEN: Correct.
13      THE COURT: Fox says that couldn't possibly be for a
14 variety of reasons and you've come back and said, Hey, she's
15 made this statement, I worked in August and I know it was very
16 hot.
17      That's the basis of her claim, right?
18      MS. BIEN: Defendants have pointed that out
19 repeatedly, but she also testified about what she did in August
20 and what her activities were.
21      THE COURT: But she said she worked in August and it
22 was very hot, and if there is no equitable tolling the only
23 days she would work in August would be August 1 and 2.
24      Could I take judicial notice of what the weather was
25 in Los Angeles on Friday, August 1?  Because I happened to look

D5anglaa          Argument                      Page 14

1  on weather.com and the high temperature in Los Angeles on
2  August 1 and August 2 was 82 degrees, and the low temperature
3  was in the low 60s.
4       MS. BIEN: I mean --
5       THE COURT: So maybe she was wrong about working in
6  August if she was sure it was very hot, because that just
7  doesn't sound very hot to me.
8       MS. BIEN: Your Honor, I think that she --
9       THE COURT: Could I take judicial notice of the
10 temperature?
11      MS. BIEN: I believe that the Court could, but again I
12 do think it may be a matter of people might have different
13 views on the heat.  But I don't want to be here taking the
14 Court's time arguing about the heat.  I think the point we
15 tried to make in our papers was really about that it wasn't her
16 responsibility to keep records of the time and hours that she
17 worked, that she attempted to show when she worked through her
18 best recollection of the time period that she worked.
19      THE COURT: But she thought she was going to get paid
20 and she didn't get paid, and then she even went to Fox and said
21 pay me.  But she waited four years to file the lawsuit.
22      MS. BIEN: The equitable tolling doctrine, the cases
23 that we have cited, there are examples of cases where, based on
24 the defendant's conduct and the fact that they don't produce
25 the contact information when they are supposed to courts have

D5anglaa          Argument                      Page 15

1  tolled that period of time in order to prevent them from
2  gaining sort of an advantage by withholding that information.
3  Those are the cases that we have cited that we've asked for in
4  a short period of equitable tolling during that period.
5       THE COURT: All right.
6       MS. BIEN: Your Honor, I do want to just return --
7  unless Court would like me to move on.
8       THE COURT: I don't blame you.  I have carried you off
9  on a detour and frolic.
10      MS. BIEN: It's a very interesting question.  I
11 appreciate that the Court's creativity in trying to answer it.
12      I do want to address, because I am sure that my
13 adversaries will address it, the decision that Judge Baer made
14 in the Hearst case that was submitted to the Court.  I think we
15 believe that in several respects that the decision was
16 incorrect.  I would like to address those, but I would like to
17 highlight first the ways in which -- and we've already been
18 discussing it -- the facts of this case are quite different
19 than the facts of that case.
20      There wasn't an overarching set of guidelines, policy
21 that was centrally promulgated by the human resources
22 department at Hearst that was meant to and then did apply
23 across the board to the interns who worked at its 19 magazines.
24      Defendants in that case repeatedly cited that fact.
25 We think that Court still could have certified the class based

D5anglaa          Argument                      Page 16

1  on lots of other evidence in the record that united members of
2  the class.
3       But here we don't have that circumstance.  Here we
4  have a comprehensive set of guidelines that did apply across
5  the class.  We had two intern recruiters who were responsible
6  for administering those guidelines and overseeing the entire
7  program.  We had a defined program.  We had a series of
8  onboarding and other personnel policies that apply to this
9  group that all fell under the Fox Entertainment Group
10 internship program.
11      So there is a different set of evidence here than we
12 had in the Hearst case.  One of the issues, though, that Judge
13 Baer really did focus in on was we had argued that in looking
14 at the Department of Labor factors, what is important is the
15 nature of the work that interns perform, because there are
16 several factors that look to -- for example, the fourth factor
17 questions whether the intern provides no immediate advantage to
18 the company.
19      If you look at the cases that have interpreted that
20 factor and from which it is derived, the Walling case, but then
21 if you look at the Archie case as well, the Courts look at the
22 nature of the work.
23      In Archie, for example, the individuals who were
24 participating in that program, they were homeless people who
25 were in a pathways to work program.  They performed lots of

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,

May 10, 2012

D5anglaa          Argument          Page 17

1 different kinds of work.
2       The point was, however, that across the different
3 kinds of work they did, whether administrative and clerical or
4 doing recycling or doing outreach to other homeless people, the
5 nature of their work provided an immediate advantage to the
6 company.
7       So what we argued in Hearst and what we also argued
8 here is that the Court can look at the job postings, the job
9 descriptions, what the plaintiffs and their supervisors have
10 testified about in terms of what interns did to make an
11 evaluation of the nature of the work and whether it provides no
12 immediate advantage, which is the test, or not.
13       So I think Judge Baer was looking at the class
14 certification decisions in misclassifications cases involving
15 exemptions, which are duties focused where you have to show
16 that the workers perform the same duties.  He said that the
17 fact that there wasn't some uniform job description showing
18 what duties interns performed and the fact that they did do
19 different tasks was ultimately detrimental to certifying the
20 class.
21       Why I point this out is that the test we are looking
22 at here is not an exemption duties test.  It looks at different
23 factors that aren't duties based, so we think the Court should
24 also look at the nature of the work as opposed to whether
25 interns did the exact same tasks from intern to intern.

D5anglaa          Argument          Page 18

1       THE COURT: Is the test only whether there is no
2 immediate advantage.
3       MS. BIEN: No.  We think that is a very important
4 factor in the test.  The test that we think the Court should
5 follow is a very narrow test that Walling set forth.  It is
6 important that the Court apply a very narrow test, because if
7 it applies one that is too broad, there is nothing that would
8 stop an employer from designating large swaths of its
9 workforce, especially entry-level workforce, as trainees,
10 because they're getting some benefit from the fact that they
11 are new employees who hadn't had a lot of job experience.
12       So we think that the Supreme Court in Walling
13 specifically designed a very, very narrow exception to the very
14 broad definition of employee and in fact warned future courts
15 not to go further.  The FLSA itself has a specific prescription
16 for learners, who it says do not have to be paid the full
17 minimum wage, but they still have to be paid most of the
18 minimum wage, and that could only last for a certain period of
19 time.
20       So we think Congress has already anticipated that
21 there are going to be certain individuals who are sort of in a
22 learner capacity, but still, even with respect to them, require
23 that there be some minimum wage paid.
24       So we advocate for a very narrow test, and we think
25 that Walling set forth a very narrow test saying that there has

D5anglaa          Argument          Page 19

1 to be a training program, and it has to be similar to training
2 provided in a vocational or classroom educational experience.
3 It has to be solely for the benefit of the interns.  There
4 can't be a benefit that the company derives.
5       The intern work must provide no immediate advantage to
6 the company.  Any immediate advantage, some immediate advantage
7 would not pass muster under that strict test, which the
8 Department of Labor has sought to codify in the six factors.
9       THE COURT: Was the education in Walling a classroom
10 experience?
11       MS. BIEN: It was vocational.  It was the same
12 training that vocational schools apparently were providing to
13 prospective railroad brakemen.  It just happened to be on the
14 premises of the railroad company as opposed to in a vocational
15 school.
16       THE COURT: It was on the work site.  It was on a
17 boxcar or in the rail yard, right?
18       MS. BIEN: Correct.  You could design an internship
19 program in an office setting that provided the same kind of
20 training that someone might get in a classroom or educational
21 experience.  So you could design specific projects.  It could
22 be a shadowing experience.
23       In fact, in training that Fox provided to its
24 supervisors in the few months before it changed from an unpaid
25 to a paid program, it itself identified the circumstances which

D5anglaa          Argument          Page 20

1 I guess the company believed would pass muster to meet that
2 requirement.
3       It said, What can I have my intern do?  Job shadow,
4 attend seminars, review/edit completed projects, re-create
5 completed research or other projects.
6       So one could design an internship program that was
7 solely for the benefit of the intern, in which the intern was
8 not providing useful assistance on day-to-day projects as part
9 of the company's ongoing operations, which the guidelines that
10 we were talking about say that interns did at Fox.
11       It certainly is conceivable, but that's not the
12 internship program according to the guidelines that Fox had up
13 until it changed and resulted in it changing its program from
14 an unpaid to a paid program.
15       THE COURT: Can the Court consider Fox's decision to
16 change the program from unpaid to paid?
17       MS. BIEN: What we believe the Court can consider was
18 the fact that it is relevant for purposes of determining
19 whether the Court should certify the class and collective.  So
20 we are not pointing to the change as evidence that they were
21 violating the law before.
22       That is not what we had pointed to in our papers, and
23 in fact we haven't moved for summary judgment at this point on
24 the legality of their corporate internship program.  We are
25 pointing to it because it's relevant to the fact that they made

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,

May 10, 2012

D5anglaa        Argument        Page 21

1 a change that applied across the board to all the interns in
2 the proposed class and collective.
3       They didn't go department by department or intern by
4 intern to determine whether some interns should remain unpaid
5 or some should stay paid in terms of the group that we have
6 identified.  They made a sweeping decision that in their view
7 there was a lot of risk going forward with respect to one of
8 the Department of Labor factors, in particular the fourth one,
9 as to whether the interns provided no immediate advantage to
10 company.
11       So we think that that uniform decision is certainly
12 relevant to the Court's certification decision.  Is it enough
13 to certify the class and collective on its own?  No, we
14 wouldn't argue that, just like a blanket classification policy
15 is not enough.
16       But it's certainly a piece of evidence that cuts
17 across the class that is relevant to the certification
18 decision, and courts have said that it is.
19       There is a case in the Southern District Rainier v.
20 Citigroup.  In that case it was an exemption case, but the
21 Court said that the fact that they reclassified the group of
22 workers at a certain point, while not dispositive of the class
23 and collective certification issues, was certainly relevant to
24 them.
25       I haven't talked about the summary judgment issues

D5anglaa        Argument        Page 22

1 with respect to --
2       THE COURT: Before you do, do the questions that the
3 classwide evidence can answer predominate over the individual
4 questions?
5       MS. BIEN: Yes.
6       The classwide evidence bears on most, if not all, of
7 the Department of Labor factors that we have been talking
8 about.
9       THE COURT: Are the intern guidelines facially
10 unlawful?
11       MS. BIEN: Aspects of them we think are facially
12 unlawful.  Aspects of them may not be, but to the extent that
13 they are not, they are the same across all of the interns in
14 the class.
15       So to the extent that ultimately the Court concludes
16 that supervision, in order to be sufficiently supervised as a
17 trainee, in order to be a bona fide training program, the
18 supervision that is required is occasional feedback and
19 day-to-day coaching, that is going to be a question that can be
20 answered across the class because that was the expectation or
21 one of the expectations of the supervisors who supervised the
22 interns here.
23       So, yes, so there may be some that I think the
24 defendants will argue cut their way, but to the extent that
25 they do, and we think that in fact they may not even cut their

D5anglaa        Argument        Page 23

1 way under a narrow reading of what is allowed in order for
2 there to be a bona fide training program, but to the extent
3 they do, they cut across the class, and we think there are very
4 significant and substantial issues that are going to favor the
5 plaintiffs, including that interns were expected to assist on
6 key projects as part of the day-to-day operations of the
7 office.  That is going to cut across all of the class, was part
8 of the expectations, and the guidelines is and is going to be
9 very significant to the Court's determination.
10       As the Court held in the Archie case that we cite
11 several times, Judge Sotomayor in that case, the individuals
12 participating in the program did derive significant benefits
13 from the sort of entry-level work experience that they were
14 getting.  But notwithstanding that, the fact that they were
15 performing productive work for the company was the most
16 significant factor to the Court and ultimately supported her
17 conclusion that they were employees and not trainees.
18       So we think the most substantial and significant
19 factors are going to cut in favor of the plaintiffs and they do
20 cut across the board.  But to the extent there may be some
21 issues that favor the defendants, again, they are classwide
22 issues and collective-wide issues.
23       One thing I would like to address before moving on
24 to -- it overlaps with the summary judgment issues, is the
25 Department of Labor has said that all of the six factors must

D5anglaa        Argument        Page 24

1 be met in order for an intern not to be paid.
2       We think there are really good reasons why all of the
3 factors must be met and that it shouldn't be just a balancing
4 test, where Fox could satisfy maybe two or three of them but
5 not satisfy the other three and still not pay interns.
6       That's really because there is a very broad definition
7 of what an employee is under the law.  An employee is someone
8 who's work is suffered or permitted.
9       The Supreme Court has recognized how broad it is.
10 Unless there is a stringent test, unless there is a narrow
11 definition of what a trainee is, it is going to open the door
12 to lots of workers being designated as nonemployees and then
13 not paid.
14       So, unlike other situations where you might have a
15 balancing test, for example, maybe with an independent
16 contractor situation, we are not talking about a situation
17 where that worker is paid to some extent and they are not
18 completely outside the bounds of any protections.
19       Here we are talking about a group of workers who would
20 otherwise be completely unprotected and not paid at all.  So we
21 think there's good reason why the Department of Labor has said
22 that each of the factors must be met in order for the intern to
23 be not paid.
24       THE COURT: Hasn't the Second Circuit endorsed a
25 totality of the circumstances test?

A0106

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,

May 10, 2012

1     MS. BIEN: The Department of Labor hasn't specifically
2  addressed the situation of interns or even trainees.  The Velez
3  case that may have been cited had to do with a domestic
4  worker who was working for a relative.  In the context of
5  trying to figure out whether that domestic worker or that
6  individual was a domestic worker who was covered by the law or
7  a family member who was just providing services, the Court did
8  look at a variety of economic reality factors and said that we
9  are going to look at a whole host of things.
10     But it didn't apply a balance of the benefits test,
11  and it wasn't speaking specifically anyway to the situation of
12  an unpaid internal or an unpaid trainee.
13     THE COURT: Are interns barred from doing any
14  productive work or benefiting the employer in any way?
15     MS. BIEN: Under the test, the intern can provide no
16  immediate advantage to employer.  So if the intern provides or
17  does productive work, then under the test that prong would not
18  be met.  If the Court requires that each of the prongs be met,
19  then if that one is not met, I think that internship program
20  wouldn't be a bona fide program.
21     THE COURT: So any employer who asks an intern to go
22  make a photocopy is subjecting themselves to FLSA liability?
23     MS. BIEN: I mean, I think there has to be sort of a
24  reasonableness factor brought into that.  Certainly if we had a
25  situation where it was a shadowing experience where the intern

1  was overwhelmingly not doing any of those things and there was
2  one instance or a few instances of doing something, then that's
3  not the kind of case that we would bring and that is not sort
4  of the focus and the concern here.
5     I think what we're talking about are interns who
6  regularly, as part of the day-to-day operations of these
7  offices, were providing work that was of an immediate
8  advantage, and I think that the overwhelming evidence here
9  shows that that phase, or that they were doing.  Even the declarations
10  that defendants have submitted from intern supervisors say that
11  interns did do productive work, and we've submitted other
12  evidence of the intern request forms that those very
13  supervisors themselves submitted showing that the job duties
14  that they expected interns to do were productive work job
15  duties.
16     So we are not saying that they can't have an
17  internship program that doesn't have interns do productive
18  work.  In fact, they have one now.  We are just saying that
19  those interns need to be paid minimum wage for the hours that
20  they work.
21     That's the conclusion that Fox ultimately reached, and
22  we think it is a good one.  We just think that the group of
23  workers who did those kinds of things in the past should be
24  compensated for the work that they did in the past.
25     I have been speaking for a long time, but I would just

1  like to just touch on the joint employer issues with the
2  production interns.
3     So, sort of switching gears a little bit, there are
4  certain named plaintiffs who worked for two film productions.
5  One was Black Swan and the other was 500 Days of Summer.  There
6  are two issues that we moved for summary judgment on, and the
7  defendants, I believe, have only moved for summary judgment on
8  the joint employer issue.
9     THE COURT: Isn't the custom in the industry to have
10  single-purpose entities created for each film?
11     MS. BIEN: It does appear to be the custom of the
12  industry that that the companies are created for the sole
13  purpose of creating a film.  Once they create that film, then
14  they cease to have any other operations or any other existence.
15     The fact that it is the custom of the industry doesn't
16  necessarily mean that it's legitimate or legal, and we are not
17  saying that those companies are in some way doing something
18  illegal in and of themselves.
19     What we are saying is, based on the regular and
20  routine ways in which Searchlight interacted with those single
21  entities that they jointly employed the people who worked on
22  their film productions and we --
23     THE COURT: Is it possible for Searchlight to have
24  been the joint employer of some Lake of Tears employees but not
25  the joint employer of other Lake of Tears employees?

1     MS. BIEN: No.  Under the case law either they had the
2  authority to control the work that went on in that workplace or
3  they didn't.
4     So there is no evidence that there was some kind of
5  fine demarcation between a certain part of the production over
6  which they did exercise substantial control on a day-to-day
7  basis and other parts of the operation.
8     So, for example, if they had no role whatsoever in the
9  postproduction phase, for example, Elizabeth Sayre, the
10  Searchlight employee who oversaw on a day-to-day basis the
11  entire production, if she had no role anymore, if at that point
12  they had no authority under the production finance distribution
13  agreements to approve or hire people who worked on the set or
14  used its own deal memos in order to set the terms of their
15  employment, then, yes, you could have a situation where I think
16  at that point they wouldn't be considered joint employers.
17     But that is not the situation here.  We are talking
18  about one temporal time period, and the individuals over which
19  Searchlight had day-to-day interactions and control of their
20  day-to-day conditions of employment were the very people who
21  supervised the interns on the set, including the three
22  individuals who moved for summary judgment.
23     So, looking at the evidence, including the production
24  finance distribution agreements, the day-to-day overseeing of
25  what went on in the productions, to make sure that they got

1 them done on schedule and on budget as well as the other
2 evidence that we have pointed to and we've outlined in our
3 reply brief, the issues on which there appears to be no
4 disputed facts, we think the Court can rule that with respect
5 to these three interns that Searchlight was their joint
6 employer.
7       Then, with respect to sort of a secondary question of
8 whether or not they might fall in the trainee or employee
9 bucket, the work that they were doing was just part of the
10 regular operations. They were working alongside paid employees
11 doing the very same things as those paid employees. They were
12 not part of a bona fide training program and the kind of work
13 experience that they got was the kind of work experience that
14 any paid employee on the set got. They didn't get sort of
15 special educational or other kind of training components.
16      So we think the Court can also rule on the undisputed
17 evidence to conclude that they should have been paid minimum
18 wage for the hours they worked.
19      THE COURT: All right.
20      MS. BIEN: If the Court has no further questions, I
21 will sit down.
22      THE COURT: Thank you very much, Ms. Bien.
23      MS. BIEN: Thank you very much.
24      THE COURT: Let's do this.
25      We are going to take literally five minutes, and then

1 I will hear from Ms. Bloom.
2       All right. We will reconvene in five minutes.
3       (Recess)
4       THE COURT: All right. Ms. Bloom.
5       MS. BLOOM: Thank you, your Honor.
6       I am just going to start with an answer to your
7 question. I do believe that you can take judicial notice of
8 the weather. I actually looked at that myself.
9       THE COURT: I think I may have gone off on a detour
10 and frolic.
11      MS. BLOOM: Yes.
12      THE COURT: So don't spend a lot of time addressing
13 that.
14      MS. BLOOM: But it was --
15      THE COURT: As I thought about it, I am not looking at
16 it correctly. It is what happens after August 2, on or after
17 August 2, not before, if equitable tolling doesn't apply.
18      MS. BLOOM: I will come back to Ms. Gratts.
19      THE COURT: I apologize to counsel for sending her on
20 a detour and frolic. I thought I had a bold idea yesterday
21 when I was thinking about this.
22      MS. BLOOM: I wanted to start with the class cert.
23 motion. I thought where I would start was with one of the
24 comments that counsel kept coming back to.
25      She kept saying the words "down the road." Why I

1 wanted to start with that was because I think it is important
2 to remember where we are right now, because we actually are
3 down the road.
4       The case has been going for over a year and a half.
5 We had a discovery schedule in this case that encompassed both
6 class certification discovery, FLSA discovery, and also merits
7 discovery. So we are not in a situation where we are looking
8 down the road to what might be and what the evidence might be.
9 We actually know what the evidence is.
10      An important lesson from the Dukes case that the
11 Supreme Court made very clear, and I think reinforced in its
12 decision in Comcast, is that when we are looking at the Rule 23
13 factors, we are not talking about a pleading requirement,
14 especially at this point in time.
15      We are talking about the fact that the plaintiffs have
16 to come forward with some significant proof that they have met
17 each of the Rule 23 factors. You asked the question about
18 whether you could reach a different decision on Rule 23 as
19 opposed to on the Fair Labor Standards Act. The answer to that
20 question in our opinion is that at this stage you should not.
21      Because, again, we are postdiscovery. So in
22 evaluating the FLSA claim you have to apply a higher standard
23 based on the evidence that you have before you as to whether or
24 not our named plaintiff in this case is similarly situated to
25 the collective that she seeks to represent.

1       I wanted to just go back a little bit to sort of where
2 we started and where we are now. When this case was first
3 brought, you may recall that there were two named plaintiffs.
4 There was an Alexander Footman and there was Mr. Glatt, Eric
5 Glatt. Those two individuals were individuals who had been
6 interns on the production Black Swan. They sued Searchlight
7 Pictures.
8       Subsequent to that you allowed amendment to the
9 complaint, and the amendment to the complaint did two things:
10 It added this entity called FEG, Fox Entertainment Group, and
11 it also added to the complaint another named plaintiff by the
12 name of Eden Antalik. We haven't heard Ms. Antalik's name
13 today, but I think it is important that we talk about
14 Ms. Antalik because the claims that we are talking about today
15 both in terms of the Rule 23 claims and in terms of the FLSA
16 collective, there is only one person that seeks to be the named
17 representative of those claims, and that is Eden Antalik.
18      Mr. Glatt and Mr. Footman for reasons, I assume after
19 evaluating the evidence, determined that moving for a class
20 certification with regard to the productions was not
21 appropriate and for whatever reason they have declined to do
22 so.
23      So we are talking about right now about whether Eden
24 Antalik is an appropriate representative for a Rule 23 class of
25 New York interns as well as a nationwide FLSA collective.

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,

May 10, 2012

| D5anglaa | Argument | Page 33 |
| --- | --- | --- |

1  We believe that she's not. One of the key things and
2  one of the questions that you asked my adversary was about the
3  guidelines that she kept pointing to. I think there may be
4  some confusion as to who even this class is that they are
5  seeking to certify.
6  I say that because with regard to Eden Antalik,
7  Ms. Antalik worked in an office here, the publicity office here
8  for Searchlight Pictures. She was engaged by a gentleman by
9  the name of John Mabey. Mr. Mabey is somebody who works for
10  Searchlight Pictures. With regard to the intern, one of the
11  intern coordinators that Ms. Bien has referred to, that person
12  I assume she's talking about, Aimee Hoffman, knew nothing
13  whatsoever about the existence of Ms. Antalik.
14  Ms. Antalik worked in the publicity office here in New
15  York. She was an intern with Mr. John Mabey, Searchlight
16  employee. She got from Mr. Mabey direction as to what she was
17  doing as an intern. She has no knowledge about anybody outside
18  of that office, and she certainly has no knowledge about
19  anybody outside of New York Searchlight.
20  What this case is really about is about the fact under
21  the Department of Labor guidelines, whether you apply a narrow
22  reading of it or a broad reading of it, there can be no common
23  answer, as is required by Dukes.
24  The reason for that is because each intern's
25  experience is going to be individualized. The extent to which

| D5anglaa | Argument | Page 34 |
| --- | --- | --- |

1  the experience that that person has is educational and
2  beneficial to them is going to turn on who their supervisor is,
3  what office they're in, what they're asked to do. And, as the
4  evidence that we presented to you shows, also what school they
5  went to, what were the requirements of their school.
6  You saw that in the document that we provided to the
7  Court we actually gave you letters from various schools from a
8  variety of different interns, and those schools had different
9  requirements. But the one thing that those schools had in
10  common was that each of them blessed the internship that their
11  student was going to become involved in.
12  So in order to answer the question about whether or
13  not somebody was properly called an intern, you are going to
14  have to look at what that person was actually doing, how, and
15  how did that impact their educational experience. So that
16  means, for example --
17  THE COURT: Just to go back, even assuming that
18  Antalik is sort of working in this cocoon up in Midtown and
19  doesn't know any of the others --
20  MS. BLOOM: Yes.
21  THE COURT: -- is a class rep required to know of
22  other similarly situated individuals.
23  MS. BLOOM: She wouldn't be required to know of other
24  similarly situated individuals. But remember that the class
25  that they are trying to certify in this case and the collective

| D5anglaa | Argument | Page 35 |
| --- | --- | --- |

1  that they are seeking to have certified is not just about
2  Searchlight.
3  What they are asking for is for this entity that they
4  call FEG, Fox Entertainment Group. That entity has 500 subs.
5  She never had any connection with FEG at all.
6  So, yes, I do think that it would be important for
7  she have some connection to some other sub besides Searchlight
8  if she is going to be a class representative for that
9  congolomerate.
10  THE COURT: But the guidelines applied across the
11  board to all the subs, didn't they?
12  MS. BLOOM: No. There is no evidence of that.
13  What happened is that after you allowed the complaint
14  to be amended to add FEG we went to Magistrate Peck, and it
15  became obvious that how are we going to do discovery about 500
16  subsidiaries.
17  What we narrowed it down to was that there was an
18  intern recruiter who did not work for FEG, her name was Aimee
19  Hoffman, but she had a support role for nine subsidiaries
20  within FEG.
21  So we were going to do discovery with regard to any
22  common policies or practices. What came out of that discovery
23  was that this person, Aimee Hoffman, that what she essentially
24  would do is she would collect intern request forms from
25  different departments within the different subs. You've seen

| D5anglaa | Argument | Page 36 |
| --- | --- | --- |

1  many of them, and each one is individualized. She would
2  collect them and post them and then an intern could post for
3  that position.
4  As the affidavits we provided to you demonstrate, the
5  interviewing for the position was done in the department by the
6  people who would actually supervise the intern. The decision
7  about whether to pick a particular intern was done by that
8  person.
9  That was the process by which the interns were
10  selected. Then they would go off to their department and they
11  would do what they did based on their supervisors and what
12  their role was going to be.
13  The guidelines that Ms. Bien has been referring to are
14  guidelines that Ms. Hoffman sent out to different supervisors
15  within those nine companies. They deposed somebody by the name
16  of Laura Wiggins who worked for a different part of Fox
17  Entertainment Group, and Ms. Wiggins was very clear about what
18  whatever forms Ms. Hoffman used she didn't use.
19  So you have a small universe of sampling for this big
20  conglomerate of 500 subsidiaries, and there's no evidence
21  whatsoever that it went beyond the Aimee Hoffman companies.
22  In fact, if you look at guidelines that were
23  submitted, they have, I think it's Twentieth Century Fox on
24  them. But even if the guidelines went to all 500 subsidiaries,
25  you still can't satisfy the Dukes test because determining

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,                                      May 10, 2012

1 whether or not the intern was properly classified as an intern
2 again is going to be a person-by-person determination.
3      The group that they are trying to bring together
4 includes people like the food service chef, who you read the
5 supervisor's declaration and you heard about how that person
6 did food service preparation.
7      It's the intern in the casting department who read
8 scripts, but not read scripts in place of somebody else, read
9 scripts with regular employees, and the employees would sit and
10 talk to the person about what did you think about the script,
11 what was important about the script.
12      The intern in the casting department, who went to
13 auditions.
14      The intern in the promotion department, who worked on
15 PowerPoint presentations, but not in place of an employee.
16 They were shown -- the company or the supervisor would walk
17 them through the presentation, would ask them different
18 questions about the presentation, would have them do a mock
19 one-page presentation, but not anything that was being used,
20 something as a purely educational experience.
21      So, regardless of whether those guidelines had
22 application across one or more FEG subsidiaries, that's not
23 going to solve the problem, because the ultimate question that
24 needs to be answered in this case is was the person properly
25 classified as an intern?

1      In order to answer that question, you have to look at
2 that person. There's no better evidence of that in this case
3 then if you look to the three people that are actually
4 potentially involved in either the FLSA collective or the Rule
5 23 class.
6      You had Eden Antalik. She works in the publicity
7 office here in New York. She comes on board in 2009. She's
8 onboarded by John Mabey. She has a letter from her school
9 talking about the fact that she's going to get credit for the
10 internship. She even writes a letter to Mr. Mabey after the
11 fact saying it's the best internship she ever had.
12      Then, for reasons known only to her, she ultimately
13 doesn't get credit for the internship. We believe it is
14 because she didn't put in the paperwork. That's Eden Antalik.
15 That's your named plaintiff.
16      THE COURT: There is like a whole new vocabulary that
17 I'm learning from these motions, including the term onboarding,
18 which is really hiring.
19      The plaintiffs make a point about offer letters to
20 interns that use the word employment, which is obviously a
21 freighted term. But they didn't use "onboarding." It is only
22 Fox's counsel, it seems to me, that is introducing this new
23 terminology. I mean, onboarding is not anywhere in any piece
24 of paper, is it, that anybody at Fox generated?
25      MS. BLOOM: No.

1      THE COURT: OK.
2      MS. BLOOM: It is not. That is my term.
3      THE COURT: All right.
4      MS. BLOOM: For me onboarding is selecting the person,
5 you bring them on, you tell them what they are going to be
6 doing. It is a little bit broader than just hiring.
7      THE COURT: Or a little narrower.
8      MS. BLOOM: Either.
9      THE COURT: I must say I stumbled across it once or
10 twice, and then I figured it out.
11      MS. BLOOM: Sorry.
12      THE COURT: All right.
13      MS. BLOOM: So we have Ms. Antalik. She is the named
14 plaintiff. Based on her deposition testimony, at least at the
15 time that she had the internship, she wasn't complaining about
16 what it was she was doing. She was complaining about her
17 relationship with Mr. Mabey.
18      The other two people who have opted into this case,
19 one of them, a Mr. Stevenson, is time barred. Although we note
20 there is an argument that's been made that there should be
21 equitable tolling as to him, he was an intern in human
22 resources, so I think it's unlikely this equitable tolling
23 would apply.
24      But even taking that out of equation for a minute, his
25 internship was about human resources. His résumé, his

1 subsequent employment career has been in human resources. So
2 the question is going to be what did he do, and was that a
3 value to him.
4      Certainly whatever Mr. Stevenson was doing may have
5 had educational value to him, but wouldn't have had educational
6 value to Ms. Antalik, and similarly might not have had -- well,
7 wouldn't have had educational importance to the chef.
8      Then you have the third person who was at the sports
9 network, Brian Nichols. What was he doing? He says he was
10 looking at sports films, but again there's going to be an
11 individualized inquiry that's going to be required.
12      THE COURT: Whether an intern complains about or
13 champions and enjoys her internship, is that relevant to FLSA
14 liability?
15      MS. BLOOM: It is not relevant to FLSA liability. But
16 the place where it is potentially important for Ms. Antalik
17 with regard to whether or not you should certify the collective
18 in this case is that one of the potential defenses -- you have
19 to look down the road to see how this case will be tried. Is
20 she going to be able to be representative of this larger,
21 nationwide group; or will her individual claim sort of subsume
22 the collective?
23      With regard to her, it becomes relevant because if she
24 comes in here and testifies, one of the first things that I am
25 going to do after I show her the offer letter that she got from

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,

May 10, 2012

 1 John Mabey is I'm going to show her her e-mail where she says
 2 it was one of the best internships she ever had.  And I am
 3 going to argue that her internship was very beneficial to her
 4 and that she enjoyed it and that she got a benefit out of it.
 5       I assume they are going to argue that it wasn't
 6 educational, and I think that that really focuses us on the
 7 fact that it is all individualized.
 8       I think that Judge Baer was correct when he held that
 9 simply because you have a policy for unpaid interns, simply
10 because you may have, and we have the guidelines in this case
11 that Ms. Bien has pointed to, that you're never going to have a
12 common answer because the common answer is going to turn on
13 what did those people do.
14       As I said when I first got up here, we don't have to
15 guess in this case because we know.  We know what Eden Antalik,
16 we know what she testified to that she did.  We have 14
17 supervisor declarations that talk about what their interns did.
18 With regard those, the supervisor declarations, there are three
19 of them that deal directly with the intern request forms that
20 were proposed by the plaintiffs.
21       I just want to make sure that those are in the record.
22 Jacqueline Zambrana, whose declaration is document No. 137.
23 Her declaration pertains to job requisition 105-73.  When you
24 look at her declaration and you hear about what her interns
25 were doing, they were shadowing, they were attending meetings,

 1 they would talk to them about the meetings before, they would
 2 talk to them about the meetings after, completely
 3 individualized experience.
 4       The same thing for Jill Gwen, which is declaration No.
 5 126, and job requisition 148-8.
 6       She had her interns attend morning meetings with one
 7 of the copresidents to talk about box office results.  They
 8 attended marketing meetings, business affair meetings, and her
 9 declaration is very clear that she had them do nothing to
10 prepare for the meetings and they weren't assigned any kind of
11 work either before or after them.
12       The third one was Scott Vyduna, who was a director of
13 finance.  His declaration is 135, job rec. 148-10.  His
14 internship for an intern at Twentieth Century Fox was
15 completely different than anything we have been talking about,
16 because they would look at complex contracts and he would be
17 working with the interns on understanding how complex, how
18 contracts are done within the entertainment industry.
19       So we know what the evidence is, and we know that each
20 of these interns was doing something that was different and
21 that there is no way to satisfy the Dukes standard in this
22 case.
23       THE COURT: Could one internship be subject to FLSA
24 liability because the intern gained little from it and another
25 not be subject to liability, the very same internship, for an

 1 intern who felt that he or she gained a lot from it?
 2       MS. BLOOM: I think it's individualized.  In terms of
 3 what they gained from it, it would be part and parcel of what
 4 they were doing and how that fell and how that worked within
 5 their educational experience, their career aspirations, their
 6 final career.
 7       So, yes, I think it's going to be very individualized,
 8 which is the reason why it can't be treated as a collective.
 9       THE COURT: Even in the examples that you just cited
10 to me, if one of those interns who tagged along to meetings
11 with the president, the copresident on box office receipts --
12       MS. BLOOM: Right.
13       THE COURT: -- if that individual at the end of the
14 internship said this was totally useless, I got nothing out of
15 this, all I was doing was tagging around from one conference
16 room to another, would that subject Fox to liability?
17       MS. BLOOM: In the example that you gave --
18       THE COURT: Yes.
19       MS. BLOOM: -- I think the answer is no, because
20 whether the individual felt that doing shadowing and going to
21 these meetings was valuable or not, I think it would be pretty
22 clear, I would hope that that would be a situation where we
23 would be able to get summary judgment as to that person on that
24 question.
25       They may have just dislike their supervisor.  Like

 1 Eden Antalik, she didn't like the way Mr. Mabey spoke to her.
 2 That doesn't mean it wasn't educational, it wasn't beneficial
 3 to them.  It doesn't mean that people from the company didn't
 4 spend a lot of time, time that took away from their regular
 5 duties, and that it was actually a hindrance to the company.
 6       I will go on to the summary judgment unless you have
 7 any other questions about the class certification.
 8       THE COURT: No.  You can proceed.
 9       MS. BLOOM: OK.
10       THE COURT: Would you turn to the joint employer
11 question.
12       MS. BLOOM: Sure.  Absolutely.  I would be glad to do
13 that.
14       THE COURT: Just one other thing.
15       MS. BLOOM: Go ahead.
16       THE COURT: Is the elimination of the unpaid
17 internship program evidence that Fox thought that it was
18 unlawful as to the entire class?
19       MS. BLOOM: No.
20       For several reasons:  First of all, whether or not it
21 was lawful before the change is going to be dependent upon what
22 each individual intern was actually doing.
23       So, looking at it, the change would only apply to what
24 happened going forward.  It wouldn't answer the question as to
25 whether or not they met the DOL factors under a narrow or a

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,

May 10, 2012

| D5anglaa | Argument | Page 45 |
| --- | --- | --- |

1 broad test at a point before that. But the other thing that I
2 think is important for you to know is that there is not
3 evidence that there was a companywide change to start paying
4 interns.
5      In fact, there's evidence that some of the interns
6 started to be paid, but there is not evidence in the record
7 that everybody started to be paid. I know that there's not
8 evidence in the record as to that fact. But, even if there
9 was, it is like any other FLSA or misclassification situation.
10 We look at what the person is doing at the time to make the
11 determination about whether they were properly classified or
12 not.
13      With regard to the joint employer argument, do you
14 want me to spend any time on Gratts, or do you think we've
15 sufficiently talked about her?
16      MS. BLOOM: I think I have a good understanding
17 notwithstanding my confused questions to your colleague earlier
18 in this argument.
19      So, with regard to the joint employer test, we believe
20 that under the Barfield case and the other cases that are cited
21 in our brief that it is a case-by-case analysis and that you
22 can't -- in this situation we have Alexander Footman and Eric
23 Glatt, both of whom are interns on Black Swan, and then you
24 have Kanene Gratts, who was an intern to 500 Days of Summer.
25      But even with regard to Mr. Glatt and Mr. Footman, we

| D5anglaa | Argument | Page 46 |
| --- | --- | --- |

1 believe that it would be an individual analysis as to each of
2 them to see whether or not there was control; and, if control
3 is sufficient, control by anyone at Searchlight.
4      THE COURT: So could Searchlight have been the joint
5 employer of some Lake of Tears employees, but not others?
6      MS. BLOOM: I believe that they could, because it is a
7 fact-intensive analysis.
8      I don't believe that there are facts in the record
9 which would allow you to find that they were the joint employer
10 as to anybody on the Black Swan film; but theoretically, if the
11 right facts existed, yes.
12      With regard to the two people that we are talking
13 about here, if you start with Mr. Footman, again, we don't have
14 to guess about what happened because we know what happened.
15 Mr. Footman was part of the Black Swan production before
16 Searchlight ever got involved. He joined the Black Swan
17 production in October of 2009. Searchlight became involved in
18 the Black Swan production in November of 2009.
19      The people that supervised him, Lindsay Feldman and
20 Jody Aronson, both employees of Lake of Tears, both were
21 involved with the Black Swan production before Searchlight ever
22 gets involved.
23      But, more significantly, Mr. Footman, who set his
24 hours? Who did he talk to about his hours?
25      He talked to Lindsay Feldman, the Lake of Tears

| D5anglaa | Argument | Page 47 |
| --- | --- | --- |

1 employee. When he wanted to change his schedule, who did he
2 talk to about changing his schedule? He talked to Lindsay
3 Feldman.
4      THE COURT: Didn't Searchlight have the power to take
5 over the production completely --
6      MS. BLOOM: To take over the production, yes.
7      THE COURT: -- in its own discretion, doesn't that
8 give it control?
9      MS. BLOOM: It gives it -- I'm sorry?
10      THE COURT: Doesn't Searchlight's power to take over
11 the entire production if it was dissatisfied or just in the
12 exercise of its unfettered discretion it takes over control of
13 the production because Ms. Sayre doesn't like what's going on,
14 doesn't that give Searchlight control over Lake of Tears?
15      MS. BLOOM: It gives it potential control over Lake of
16 Tears, but in order to be the joint employer of Mr. Footman or
17 the joint employer of Mr. Glatt, it actually has to exercise
18 control over the terms and conditions of their employment, over
19 their day-to-day activities, and there's no evidence at all in
20 this case that Searchlight did. If you look at the record with
21 regard to Mr. Footman, all of his interactions were with these
22 Lake of Tears employees. He has no interaction with anybody
23 from Searchlight.
24      As I said, on his day-to-day duties and his day-to-day
25 he wants to change his schedule, he goes to somebody from Lake

| D5anglaa | Argument | Page 48 |
| --- | --- | --- |

1 of Tears. He doesn't go to somebody from Searchlight.
2      THE COURT: But is it the defendant's position that
3 the power to control is not enough?
4      MS. BLOOM: Yes. It's our position that you actually
5 have to exercise that control.
6      THE COURT: What about the fact that Ms. Sayre was
7 insisting on reports every day?
8      MS. BLOOM: Budget reports to see whether they were on
9 schedule or not.
10      THE COURT: Yes, every day.
11      MS. BLOOM: That's correct.
12      She was getting reports to see whether or not they
13 were on schedule and whether they were within budget. There is
14 no evidence that she knew about either Mr. Glatt or
15 Mr. Footman, and the really interesting thing is that there's
16 been a suggestion that somehow Searchlight's concern over the
17 budget was what demonstrates their control and what
18 demonstrates their desire to reduce labor costs and therefore
19 sort of endorse these unpaid interns.
20      But if you look at the record, what you see is that
21 the budget pre-Searchlight was $16 million, and the post-
22 Searchlight budget was $17 million, so the budget actually went
23 up after Searchlight became involved in the production.
24      THE COURT: That shouldn't surprise anybody, should
25 it?

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,                                    May 10, 2012

D5anglaa          Argument                    Page 49

1      MS. BLOOM: Well, if the argument is what
2  Searchlight's goal was, was to reduce labor costs by having
3  these unpaid interns, first of all, the budget went up; and,
4  second of all, there is no evidence that Searchlight knew that
5  these unpaid interns even existed.
6      THE COURT: What about the plaintiff's argument that
7  when certain austerity measures were being taken at Fox, at
8  FEG, and there was a hiring freeze and a prohibition on
9  overtime that the number of interns went up?
10     MS. BLOOM: That has nothing to do with Mr. Glatt and
11 Mr. Footman. Mr. Glatt and Mr. Footman are not at all
12 involved, or Ms. Gratts in FEG. They are only involved with
13 Searchlight, and it only has to do with what went on the
14 productions. So that would have no bearing on whether or not
15 they were jointly employed by Lake of Tears.
16     So, I mean, it's our position that --
17     THE COURT: All right. Let's --
18     MS. BLOOM: Go ahead.
19     THE COURT: Focusing on the Black Swan, if at least
20 some of the employees couldn't be paid until they completed
21 Searchlight deal memos, isn't that evidence that Searchlight
22 controlled their wages?
23     MS. BLOOM: But there was no Searchlight deal memo.
24 All the deal memos were Lake of Tears. The deal memos are all
25 Lake of Tears deal memos.

D5anglaa          Argument                    Page 50

1      Am I misunderstanding your question?
2      THE COURT: I thought that when Searchlight came in
3  that Searchlight insisted on deal memos?
4      MS. BIEN: That is true.
5      MS. BLOOM: The deal memos that were signed were deal
6  memos that were signed with Lake of Tears, though.
7      THE COURT: Was it Searchlight that insisted on those?
8  I will have to go back and look at this.
9      MS. BLOOM: I guess Searchlight wanted to make sure
10 that the deal memos were in fact signed. But the deal memos
11 that were signed were deal memos between Lake of Tears and the
12 individual employees, and certainly not with the interns, but
13 with the supervisors of the interns. The deal memos that got
14 signed were the Lake of Tears ones.
15     THE COURT: All right.
16     MS. BIEN: Your Honor, I don't mean to interrupt, but
17 just to clarify for the record, they were Fox's template deal
18 memos that they created and designed, and they gave them to the
19 productions and said you have to have people sign these.
20     The actual signatories were between the production
21 company and the employees on the productions, but they were
22 Fox's deal memos, and it was their policy that they had to be
23 signed.
24     THE COURT: All right. Thank you.
25     MS. BLOOM: There were none with Searchlight and

D5anglaa          Argument                    Page 51

1  certainly none with the interns.
2      All the paperwork that you see with regard to the
3  interns and -- so with regard to Mr. Glatt, he interned on
4  three separate occasions. Once for a day in October of 2009,
5  pre-Searchlight, then he starts his second internship period,
6  also October of 2009, pre-Searchlight.
7      Then he comes back after the production for yet a
8  third internship, which is post-Searchlight, but in order to
9  get that third internship, he doesn't approach anybody at
10 Searchlight. He approaches someone at Lake of Tears,
11 Mr. Robinson, about the fact that he wants to come back and be
12 an intern postproduction.
13     It's our position that there is no evidence other than
14 those PFD contracts that would suggest that Searchlight had any
15 day-to-day control over these interns, and there's no paperwork
16 other than when you see them in the credits of the films.
17 There's even a form that is signed by Mr. Glatt when he got
18 paid for one day, a form that is signed with Lake of Tears.
19 And each of their supervisors worked for Lake of Tears.
20     Any other questions on the joint employer?
21     THE COURT: Did Searchlight maintain, have a personnel
22 file for Mr. Glatt?
23     MS. BLOOM: It did not. When we were doing the
24 discovery on the films, one of the difficulties was that the
25 documents belonged to the film companies, and some of the like

D5anglaa          Argument                    Page 52

1  the wrap-up documents get sent back to Searchlight after the
2  films are completed, but there were no personnel files for
3  Mr. Glatt, Mr. Footman or any of the other interns.
4      Do you want me to talk about -- Kanene Gratts was an
5  intern on a separate film.
6      THE COURT: Yes, on the 500 Days of Summer.
7      Is it appropriate for this Court, in determining
8  whether Searchlight was the employer with respect to Black
9  Swan, to look at whether it exercised aspects of control over
10 500 Days of Summer?
11     MS. BLOOM: Absolutely not.
12     THE COURT: Why not.
13     MS. BLOOM: Because they are different relationships
14 with different companies. That was a different production
15 company. It was at a different point in time. It was in 2008.
16 Black Swan was in 2009.
17     Again, the question is going to focus on what was
18 Ms. Gratts' experience and how did Searchlight act with regard
19 to 500 Days of Summer.
20     Again, it is a fact-sensitive inquiry, and they could
21 potentially be a joint employer on 500 Days of Summer and not
22 be a joint employer on Black Swan.
23     THE COURT: Were there any significant differences in
24 the production agreements between Searchlight and any of these
25 films?

A0113

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,                                    May 10, 2012

| D5anglaa | Argument | Page 53 |

1        MS. BLOOM: The PFDs are all essentially the same.
2  The PFDs basically deal with the production of the film and the
3  budget of the film.  They certainly don't deal with the
4  interns.
5        With regard to Ms. Gratts, she was doing, as you know,
6  construction design, but it is our position that she is time
7  barred under any reasonable interpretation of the facts.
8        Do you need me to go into any more detail on
9  Ms. Gratts?
10       THE COURT: No.
11       MS. BLOOM: Any other questions on the joint employer?
12       THE COURT: No.
13       MS. BLOOM: OK.  Thank you.
14       THE COURT: Anything further?
15       MS. BIEN: I have a few points I would like to make.
16       THE COURT: Yes.
17       First, is Ms. Bloom correct that the guidelines only
18  apply to nine of the subsidiaries and not all of the FEG
19  groups.
20       MS. BIEN: I mean, there are several, I think,
21  misstatements that were said that I want to clarify.
22       The first is that we have not sought to certify a
23  class or collective of 500 subsidiaries.  We have limited the
24  subsidiaries on page 19 of our opening brief to just certain
25  divisions of FEG that Ms. Hoffman or Ms. Wiggins were the

| D5anglaa | Argument | Page 54 |

1  recruiters for because the evidence shows that they had the
2  same recruitment duties, they followed the same guidelines,
3  sent the same guidelines and subjected the interns to the same
4  policies.  That's why we have restricted it in this way.
5        So it is just not true that those guidelines did not
6  apply.  In fact, Ms. Wiggins testified, although she was no
7  longer an employee of the company and so didn't have access to
8  the documents in front of her, she testified that the kinds of
9  guidelines that I was describing to her were the kinds of
10 guidelines that applied to interns that she supervised.
11       There is plenty of evidence showing that the same kind
12 of personnel policies, those guidelines, the same trainings,
13 the two of them did those trainings together.
14       So that's why we have defined the class the way that
15 we have, and we have significantly narrowed it from 500
16 subsidiaries to just the subsidiaries that fall within Fox
17 Films Entertainment, the subsidiaries that fall under Fox
18 Network Group, and then just a few other departments because
19 Ms. Hoffman said that she did recruiting for them, Fox Group,
20 and then Fox Interactive Media.  So it is a significantly
21 limited set.
22       It's not true that those guidelines did not apply to
23 interns at the subsidiaries Ms. Wiggins recruited for.  Two of
24 the individuals who opted in worked for those subsidiaries, and
25 you can see from the declarations that we've submitted that

| D5anglaa | Argument | Page 55 |

1  they had very, very similar experiences to the individuals or
2  to Ms. Antalik who worked for a subsidiary that Ms. Hoffman
3  recruited for.
4        There were a couple of other issues I just really want
5  to clarify.  It is not true that Ms. Antalik was somehow part
6  of some kind of rogue internship program here in New York.  She
7  worked for Searchlight, which is one of the subsidiaries that
8  Ms. Hoffman covers.
9        Her supervisor, John Mabey, was repeatedly sent the
10 same internship guidelines that we have been talking about.  He
11 was required to submit the same intern request forms that we
12 have been talking about.  He was involved in the same kinds of
13 trainings and oversight.
14       Although when she started she didn't sign the
15 paperwork that all of the interns were required to sign and
16 Ms. Hoffman wasn't aware of her, once Ms. Hoffman found out
17 that she hadn't done that, she immediately took steps to make
18 sure she completed all that paperwork.  She provided a letter
19 from her school showing she was eligible to get credit.  She
20 signed the workman's compensation policy.  She got an offer
21 letter inviting her to the same internship program.  So it is
22 just simply not true that she was somehow off the grid.
23       We also have evidence in the record that she performed
24 some of her duties for another Fox Entertainment Group
25 subsidiary, Twentieth Century Fox, so sometimes when they

| D5anglaa | Argument | Page 56 |

1  needed help from interns she went and helped them with some of
2  their events and greeted guests and did other things like that.
3        She also worked alongside other interns at Searchlight
4  that did very similar things that she did.  The evidence in the
5  record shows that she was very similar to what other interns
6  did and not that she was somehow different or uniquely
7  situated.
8        I think the Court really sort of hit the nail on the
9  head when it said how could the benefit that one intern got
10 really be the decisive factor in whether or not someone gets
11 paid.
12       So the fact that, for instance, I get more out of a my
13 job as a lawyer than my colleague here does, it shouldn't hinge
14 on that as to whether or not we are employees who are covered
15 by the law.
16       This argument that every aspect of this test is
17 individualized, that it comes down to what did I get out of my
18 internship versus what did my colleague get, is absurd.  It
19 makes no sense.  The focus has to be on what the internship
20 program is and whether the internship program is designed to
21 solely benefit the intern.
22       That's what the Department of Labor factors look at.
23 That's what Walling looked at.  It's not whether some intern
24 comes out of the experience and says I had a great time, I had
25 a terrible time.  It is just we look at what the program

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,

May 10, 2012

| D5anglaa | Argument | Page 57 |
|---|---|---|

1 itself, what its purpose was and what it was meant to do.
2     We can look at the guidelines that apply across the
3 board to give us good evidence about what the purpose of the
4 program was and what kinds of benefits it expected intern
5 supervisors to provide to the individuals that they supervised.
6     The declarations that they cited of intern supervisors
7 are a few pieces of evidence that might be able to shed light
8 on some of the things interns did. In addition to those in the
9 record, we've submitted a host of intern request forms that
10 also bear on the kinds of things that interns did.
11     All of that together, put together in one sort of
12 bundle the Court can look at to determine the nature or the
13 kinds of activities that these interns were doing and the
14 extent to which the kinds of activities that they were doing
15 provided an immediate advantage to the company.
16     So all of that evidence is circumstantial evidence
17 that goes to certainly trying to define and understand how the
18 guidelines were applied and how that policy played out.
19     I just want to touch very briefly, our position is the
20 Second Circuit has made clear that you don't have to have the
21 control. The ability to control, the power to control is what
22 the test is.
23     The Courts in this circuit and the Second Circuit
24 don't require there to be an actual exercise of control with
25 respect to the particular workers who are claiming to be

| D5anglaa | Argument | Page 58 |
|---|---|---|

1 jointly employed. In fact, in the Herman case that we all
2 repeatedly cite in our papers, the employer did not hire, fire
3 or directly supervise the workers in question. There was
4 evidence in the record that he hired some of the managerial
5 workers. The Court said that demonstrates the power to control
6 with respect to the workers in question because the fact that
7 that control was delegated to others is really what is
8 decisive. The fact that control was held and could be
9 delegated was the point.
10     We obviously disagree that there aren't good grounds
11 for looking at some of the other five sample films that the
12 Court ordered us to focus our discovery on in determining
13 whether or not Searchlight had the power to control.
14     I think for the reasons the Court addressed, the fact
15 that the operative agreement here, the production finance
16 distribution agreement was cookie cutter, pretty much the same
17 kinds of programmers on every film; Elizabeth Sayre, the
18 Searchlight employee, who oversaw the productions, had very
19 similar duties with respect to all of the productions in terms
20 of her oversight and regular interaction. But even if the
21 Court said I have to focus directly on 500 Days of Summer or
22 Black Swan, we think there's sufficient undisputed evidence
23 with respect to Searchlight's role individually on each of
24 those films that it could conclude that it jointly employed the
25 plaintiffs.

| D5anglaa | Argument | Page 59 |
|---|---|---|

1     That is all I have.
2     Thank you.
3     THE COURT: Thank you, Ms. Bien.
4     All right.
5     Counsel, I appreciate your arguments in the case on
6 these motions. I am sure I am not going to surprise you when I
7 tell you that I am reserving decision.
8     Have a good weekend.
9     (Adjourned)

ERIC GLATT, et al., v
FOX SEARCHLIGHT PICTURES,

May 10, 2012

**$**

**$16 (1)**
48:21
**$17 (1)**
48:22

**A**

**ability (1)**
57:21
**able (8)**
3:16;5:14,19,19;
6:14;40:20;43:23;57:7
**Absolutely (2)**
44:12;52:11
**absurd (1)**
56:18
**access (1)**
54:7
**according (2)**
13:3;20:12
**across (20)**
6:15;7:11;10:14;
11:1,16,20;15:23;16:4;
17:2;21:1,17;22:13,20;
23:3,7,20;35:10;37:22;
39:9;57:2
**Act (2)**
31:19;52:18
**action (1)**
3:22
**activities (4)**
13:20;47:19;57:13,
14
**actual (3)**
9:1;50:20;57:24
**actually (12)**
30:8;31:2,9;34:7,14;
36:6;38:3;44:5,22;
47:17;48:4,22
**add (2)**
11:23;35:14
**added (2)**
32:10,11
**addition (1)**
10:25,25;57:8
**address (4)**
15:12,13,16;23:23
**addressed (2)**
25:2;58:14
**addressing (1)**
30:12
**Adjourned (1)**
59:9
**administering (1)**
16:6
**administrative (1)**
17:3
**adopt (1)**
12:13
**adopted (1)**

12:13
**advantage (15)**
6:11;7:25;10:12;
15:2;16:17;17:5,12;
18:2;19:5,6,6;21:9;
25:16;26:8;57:15
**adversaries (1)**
15:13
**adversary (1)**
33:2
**Advertising (1)**
9:10
**advocate (1)**
18:24
**affair (1)**
42:8
**affidavits (1)**
36:4
**again (12)**
5:8;6:15;10:24;
11:19;14:11;23:21;
31:21;37:2;40:10;
46:13;52:17,20
**agree (2)**
3:2,4
**agreement (3)**
11:15;58:15,16
**agreements (5)**
11:12,15;28:13,24;
52:24
**ahead (2)**
44:15;49:18
**Aimee (4)**
33:12;35:18,23;
36:21
**Alexander (2)**
32:4;45:22
**allow (1)**
46:9
**allowed (3)**
23:1;32:8;35:13
**almost (1)**
8:12
**along (1)**
43:10
**alongside (2)**
29:10;56:3
**Although (1)**
39:19;54:6;55:14
**amend (1)**
11:22;12:15
**amended (1)**
12:15;35:14
**amendment (2)**
32:8,9
**analysis (3)**
45:21;46:1,7
**Angeles (2)**
13:25;14:1
**answered (2)**
22:20;37:24
**Antalik (18)**
32:12,14,17,24;33:6,

7,13,14;34:18;38:6,14;
39:13;40:6,16;41:15;
44:1;55:2,5
**Antalik's (1)**
32:12
**anticipated (1)**
18:20
**anymore (1)**
28:11
**apologize (1)**
30:19
**apparently (1)**
19:12
**appear (1)**
27:11
**appears (1)**
29:3
**application (1)**
37:22
**applied (8)**
3:3;6:16;8:23;11:20;
21:1;35:10;54:10;
57:18
**applies (3)**
5:8;10:14;18:7
**apply (16)**
3:5;7:8;15:22;16:4,
8;18:6;25:10;30:17;
31:22;33:21;39:23;
44:23;53:18;54:6,22;
57:2
**appreciate (2)**
15:11;59:5
**approach (1)**
51:9
**approaches (1)**
51:10
**appropriate (4)**
12:4;32:21,24;52:7
**approve (1)**
28:13
**Archie (3)**
16:21,23;23:10
**argue (4)**
21:14;22:24;41:3,5
**argued (3)**
16:13;17:7,7
**arguing (1)**
14:14
**argument (7)**
2:3;39:20;45:13,18;
49:1,6;56:16
**arguments (1)**
59:5
**Aronson (1)**
46:20
**around (1)**
43:15
**aspect (1)**
56:16
**aspects (6)**
4:17;6:6,17;22:11,
12;52:9

7,13,14;34:18;38:6,14;
39:13;40:6,16;41:15;
44:1;55:2,5
**aspirations (1)**
43:5
**assert (1)**
3:3
**assigned (1)**
42:10
**assist (1)**
23:5
**assistance (3)**
6:7,13;20:8
**assume (3)**
32:18;33:12;41:5
**assuming (1)**
34:17
**attempted (1)**
14:17
**attend (2)**
20:4;42:6
**attended (1)**
42:8
**attending (1)**
41:25
**attention (1)**
10:8
**at-will (1)**
11:11
**auditions (1)**
37:13
**August (19)**
12:17,18,20,23;13:2,
4,9,11,15,19,21,23,23,
25;14:2,2,6;30:16,17
**austerity (1)**
49:7
**authority (1)**
28:2,12
**aware (2)**
8:9;55:16
**away (1)**
44:4

**B**

**back (14)**
2:25;3:13;5:21;
10:21;13:1,14;30:18,
24;32:1;34:17;50:8;
51:7,11;52:1
**Baer (4)**
15:13;16:13;17:13;
41:8
**balance (1)**
25:10
**balancing (2)**
24:3,15
**Barfield (1)**
45:20
**barred (3)**
25:13;39:19;53:7
**based (9)**
2:21;12:16;14:23;
15:25;17:23;27:19;
31:23;36:11;39:14

**basically (1)**
53:2
**basis (3)**
13:17;28:7,10
**bear (3)**
4:10;11:17;57:10
**bearing (1)**
49:14
**bears (2)**
8:17;22:6
**became (3)**
35:15;46:17;48:23
**become (3)**
5:17;6:4;34:11
**becomes (1)**
40:23
**belonged (1)**
51:25
**beneficial (3)**
34:2;41:3;44:2
**benefit (10)**
5:4,23,25;18:10;
19:3,4;20:7;41:4;56:9,
21
**benefiting (1)**
25:14
**benefits (5)**
23:12;25:10;57:4
**besides (1)**
35:7
**best (5)**
12:17;13:8;14:18;
38:11;41:2
**better (1)**
38:2
**beyond (1)**
36:21
**BIEN (48)**
2:6,9,14,18;3:24;
4:16,22;5:13,17;7:21;
8:22;9:12;11:25;12:19,
22,25;13:6,10,12,18;
14:4,8,11,22;15:6,10;
18:3;19:11,18;20:17;
22:5,11;25:1,15,23;
27:11;28:1;29:20,22,
23;33:11;36:13;41:11;
50:4,16;53:15,20;59:3
**big (1)**
36:19
**bit (4)**
10:7;27:3;32:1;39:6
**Black (13)**
27:5;32:6;45:23;
46:10,15,16,18,21;
49:19;52:8,16,22;
58:22
**blame (1)**
15:8
**blanket (1)**
21:14
**blessed (1)**
34:10

**Bloom (47)**
30:1,4,5,11,14,18,22;
34:20,23;35:12;38:25;
39:2,4,8,11,13;40:15;
43:2,12,17,19;44:9,12,
15,19;45:16;46:6;47:6,
9,15;48:4,8,11;49:1,10,
18,23;50:5,9,25;51:23;
52:11,13;53:1,11,13,17
**board (6)**
15:23;21:1;23:20;
35:11;38:7;57:3
**bold (1)**
30:20
**bona (4)**
22:17;23:2;25:20;
29:12
**both (5)**
31:5;32:15;45:23;
46:20,20
**bounds (1)**
24:18
**box (2)**
42:7;43:11
**boxcar (1)**
19:17
**brakemen (4)**
5:14,19;7:4;19:13
**Brian (1)**
40:9
**brief (3)**
29:3;45:21;53:24
**briefly (1)**
57:19
**bring (3)**
26:3;37:3;39:5
**broad (6)**
18:7,14;24:6,9;
33:22;45:1
**broader (1)**
39:6
**brought (2)**
25:24;32:3
**bucket (1)**
29:9
**budget (9)**
29:1;48:8,13,17,21,
22,22;49:3;53:3
**build (2)**
5:1,5
**bundle (1)**
57:12
**business (1)**
42:8

**C**

**calendar (1)**
13:3
**California (4)**
11:24;12:6,8,9
**call (1)**
35:4

**called (3)**
2:2;32:10;34:13
**came (2)**
35:22;50:2
**can (20)**
2:18;4:23;8:12;9:2;
11:5;17:8;20:3,15,17;
22:3,19;25:15;29:4,16;
30:7;33:22;44:8;54:25;
57:2,12
**capable (1)**
7:19
**capacity (1)**
18:22
**career (3)**
40:1;43:5,6
**carried (1)**
15:8
**Case (41)**
2:2;3:12;7:19;8:13,
13,14;9:3;15:14,18,19,
24;16:12,20,21;21:19,
20,20;23:10,11;25:3;
26:3;28:1;31:4,5,10,
24;32:2;33:20;34:25;
37:24;38:2;39:18;
40:18,19;41:10,15;
42:22;45:20;47:20;
58:1;59:5
**case-by-case (1)**
45:21
**cases (6)**
14:22,23;15:3;16:19;
17:14;45:20
**casting (2)**
37:7,12
**categorized (1)**
4:12
**cease (1)**
27:14
**centrally (3)**
3:6;4:5;15:21
**Century (3)**
36:23;42:14;55:25
**cert (1)**
30:22
**certain (9)**
2:15;3:1;18:18,21;
21:22;27:4;28:5;49:7;
53:24
**certainly (12)**
4:17;20:11;21:11,16,
23;25:24;33:18;40:4;
50:12;51:1;53:3;57:17
**certification (12)**
2:4,10,14;3:20;
11:24;17:14;21:12,17,
23;31:6;32:20;44:7
**certified (2)**
15:25;35:1
**certify (10)**
7:17;11:5,21;12:9;
20:19;21:13;33:5;

34:25;40:17;53:22
**certifying (1)**
17:19
**champions (1)**
40:13
**change (8)**
20:16,20;21:1;44:21,
23;45:3;47:1,25
**changed (3)**
10:16;19:24;20:13
**changing (2)**
20:13;47:2
**chef (2)**
37:4;40:7
**Circuit (4)**
24:24;57:20,23,23
**circumstance (1)**
16:3
**circumstances (2)**
19:25;24:25
**circumstantial (1)**
57:16
**cite (2)**
23:10;58:2
**cited (7)**
14:23;15:3,24;25:3;
43:9;45:20;57:6
**Citigroup (1)**
21:20
**claim (8)**
11:23;12:10,12,16;
13:2,17;31:22;40:21
**claiming (1)**
57:25
**claims (4)**
3:21;32:14,15,17
**clarify (3)**
50:17;53:21;55:5
**class (51)**
2:4,10,14,15,17,19,
21;3:1,4,5;5:8;6:16,16;
7:11,17;10:14;11:1,5,
16,20,23;12:4,6,7;
15:25;16:2,5;17:13,20;
20:19;21:2,13,17,22;
22:14,20;23:3,7;30:22;
31:6;32:19,24;33:4;
34:21,24;35:8;38:5;
44:7,18;53:23;54:14
**classification (1)**
21:14
**classified (3)**
37:1,25;45:11
**classroom (5)**
8:1;10:6;19:2,9,20
**classwide (1)**
7:20;22:3,6;23:21
**clear (6)**
13:8;31:11;36:17;
42:9;43:22;57:20
**clerical (1)**
17:3
**coaching (4)**

6:23,24;7:9;22:19
**cocoon (1)**
34:18
**codify (1)**
19:8
**colleague (4)**
12:13;45:17;56:13,
18
**collect (2)**
35:24;36:2
**collective (18)**
3:22;7:17;11:6,21;
12:8;20:19;21:2,13,23;
31:25;32:16,25;34:25;
38:4;40:17,22;43:8;
53:23
**collective-wide (1)**
23:22
**Comcast (1)**
31:12
**coming (1)**
30:24
**comments (1)**
30:24
**common (9)**
4:2;7:20,22;10:8;
33:22;34:10;35:22;
41:12,12
**companies (6)**
27:12,17;36:15,21;
51:25;52:14
**company (23)**
5:6,18,21,25;6:4;8:6;
9:23;10:12;16:18;17:6;
19:4,6,14;20:1;21:10;
23:15;37:16;44:3,5;
50:21;52:15;54:7;
57:15
**company's (1)**
20:9
**companywide (1)**
45:3
**comparable (1)**
10:5
**compensated (1)**
26:24
**compensation (2)**
11:12;55:20
**complaining (2)**
39:15,16
**complains (1)**
40:12
**complaint (7)**
11:22;12:15,15;32:9,
9,11;35:13
**complements (1)**
5:9
**complete (1)**
3:19
**completed (5)**
20:4,5;49:20;52:2;
55:18
**completely (5)**

24:18,20;42:2,15;
47:5
**complex (2)**
42:16,17
**components (1)**
29:15
**comprehensive (1)**
16:4
**concede (1)**
9:25
**conceivable (1)**
20:11
**concern (2)**
26:4;48:16
**conclude (2)**
29:17;58:24
**concludes (1)**
22:15
**conclusion (2)**
23:17;26:21
**conditions (2)**
28:20;47:18
**conduct (1)**
14:24
**conference (1)**
43:15
**confidentiality (1)**
11:15
**confused (1)**
45:17
**confusion (1)**
33:4
**conglomerate (1)**
36:20
**congolomerate (1)**
35:9
**Congress (1)**
18:20
**connection (2)**
35:5,7
**consider (2)**
20:15,17
**considered (2)**
11:11;28:16
**consistent (1)**
7:2
**constant (1)**
7:2
**construction (1)**
53:6
**constructive (2)**
6:23;7:9
**contact (1)**
14:25
**containment (1)**
10:18
**context (1)**
25:4
**continued (1)**
13:7
**contractor (1)**
24:16
**contracts (3)**

42:16,18;51:14
**contrary (1)**
    4:14
**control (24)**
    28:2,6,19;46:2,2,3;
    47:8,12,14,15,18;48:3,
    5,17;51:15;52:9;57:21,
    21,21,24;58:5,7,8,13
**controlled (1)**
    49:22
**cookie (1)**
    58:16
**coordinators (1)**
    33:11
**copresident (1)**
    43:11
**copresidents (1)**
    42:7
**copy (2)**
    4:19,20
**corporate (6)**
    11:14;12:1,2,5,5;
    20:24
**corporatewide (1)**
    8:16
**correctly (1)**
    30:16
**cost (1)**
    10:18
**costs (2)**
    48:18;49:2
**counsel (4)**
    30:19,24;38:22;59:5
**couple (1)**
    55:4
**court (128)**
    2:1,3,7,11,13,17;
    3:20,24;4:10,13,19,19,
    21;5:10,15,15;7:19;
    8:11,20;9:8;11:5,22;
    12:11,12,21,24;13:1,8,
    11,13,21;14:5,9,11,19;
    15:5,7,8,14,25;17:8,23;
    18:1,4,6,12;19:9,16;
    20:15,15,17,19;21:21;
    22:2,9,15;23:10,16;
    24:9,24;25:7,13,18,21;
    27:9,23;29:4,16,19,20,
    22,24;30:4,9,12,15,19;
    31:11;34:7,17,21;
    35:10;38:16;39:1,3,7,9,
    12;40:12;42:23;43:9,
    13,18;44:8,10,14,16;
    46:4;47:4,7,10;48:2,6,
    10,24;49:6,17,19;50:2,
    7,15,24;51:21;52:6,7,
    12,23;53:10,12,14,16;
    56:8;57:12;58:5,12,14,
    21;59:3
**courts (5)**
    14:25;16:21;18:14;
    21:18;57:23
**Court's (5)**

10:8;14:14;15:11;
    21:12;23:9
**covered (3)**
    12:8;25:6;56:14
**covers (1)**
    55:8
**create (1)**
    27:13
**created (3)**
    27:10,12;50:18
**creating (1)**
    27:13
**creativity (1)**
    15:11
**credit (4)**
    10:21;38:9,13;55:19
**credits (1)**
    51:16
**custom (3)**
    27:9,11,15
**cut (8)**
    5:7;6:20;22:24,25;
    23:3,7,19,20
**cuts (5)**
    6:15;7:11;11:1,16;
    21:16
**cutter (1)**
    58:16

## D

**data (2)**
    3:17,18
**databases (1)**
    3:14
**day (4)**
    48:7,10;51:4,18
**days (9)**
    12:21;13:23;27:5;
    45:24;52:6,10,19,21;
    58:21
**day-to-day (20)**
    6:8,13,23;7:9;8:3;
    9:18,22;20:8;22:19;
    23:6;26:6;28:6,10,19,
    20,24;47:19,24,24;
    51:15
**deal (18)**
    28:14;41:19;49:21,
    23,24,24,25;50:3,5,5,
    10,10,11,13,17,22;
    53:2,3
**decision (11)**
    15:13,15;20:15;21:6,
    11,12,18;31:12,18;
    36:6;59:7
**decisions (2)**
    8:21;17:14
**decisive (2)**
    56:10;58:8
**declaration (7)**
    37:5;41:22,23,24;
    42:4,9,13

**declarations (6)**
    9:16;26:9;41:17,18;
    54:25;57:6
**declined (1)**
    32:21
**defendants (11)**
    2:21,25;3:13;7:14;
    9:13;13:18;15:24;
    22:24;23:21;26:10;
    27:7
**defendant's (2)**
    14:24;48:2
**defenses (1)**
    40:18
**define (1)**
    57:17
**defined (2)**
    16:7;54:14
**definition (3)**
    18:14;24:6,11
**degrees (1)**
    14:2
**delegated (2)**
    58:7,9
**demarcation (1)**
    28:5
**demonstrate (1)**
    36:4
**demonstrates (3)**
    48:17,18;58:5
**deny (1)**
    3:20
**department (24)**
    3:8;4:14,18;6:10;7:1,
    1,6;15:22;16:14;19:8;
    21:3,3,8;22:7;23:25;
    24:21;25:1;33:21;36:5,
    10;37:7,12,14;56:22
**departments (2)**
    35:25;54:18
**dependent (1)**
    44:21
**depending (1)**
    9:9
**deposed (1)**
    36:15
**deposition (1)**
    39:14
**derive (1)**
    23:12
**derived (2)**
    3:6;16:20
**derives (1)**
    19:4
**describing (1)**
    54:9
**description (2)**
    8:12;17:17
**descriptions (1)**
    17:9
**design (4)**
    19:18,21;20:6;53:6
**designated (2)**

11:13;24:12
**designating (1)**
    18:8
**designed (3)**
    18:13;50:18;56:20
**desire (1)**
    48:18
**detail (1)**
    53:8
**determination (3)**
    23:9;37:2;45:11
**determine (3)**
    4:11;21:4;57:12
**determined (1)**
    32:19
**determining (6)**
    11:2,5;20:18;36:25;
    52:7;58:12
**detour (3)**
    15:9;30:9,20
**detrimental (1)**
    17:19
**differences (2)**
    9:14;52:23
**different (27)**
    3:14,25;8:20;9:7;
    11:7;14:12;15:18;
    16:11;17:1,2,19,22;
    31:18;34:8,8;35:25,25;
    36:14,16;37:17;42:15,
    20;52:13,14,14,15;56:6
**differently (1)**
    9:9
**difficulties (1)**
    51:24
**direction (1)**
    33:16
**directly (3)**
    41:19;58:3,21
**director (1)**
    42:12
**disagree (1)**
    58:10
**discovery (9)**
    31:5,6,6,7;35:15,21,
    22;51:24;58:12
**discretion (2)**
    47:7,12
**discretionary (1)**
    9:4
**discrimination (2)**
    9:3,4
**discussed (1)**
    10:18
**discussing (1)**
    15:18
**dislike (1)**
    43:25
**displaced (1)**
    10:10
**dispositive (1)**
    21:22
**dispute (3)**

2:19;24:9;24
**disputed (1)**
    29:4
**dissatisfied (1)**
    47:11
**distinction (1)**
    6:2
**distributed (1)**
    5:3
**distribution (3)**
    28:12,24;58:16
**district (2)**
    12:14;21:19
**diverse (1)**
    5:1,5
**divisions (1)**
    53:25
**doctrine (1)**
    14:22
**document (3)**
    8:18;34:6;41:22
**documents (5)**
    5:2;11:8;51:25;52:1;
    54:8
**DOL (1)**
    44:25
**domestic (3)**
    25:3,5,6
**done (5)**
    29:1;36:5,7;42:18;
    55:17
**door (1)**
    24:11
**doubled (1)**
    10:23
**down (8)**
    11:2;29:21;30:25;
    31:3,8;35:17;40:19;
    56:17
**draw (1)**
    10:8
**dueling (1)**
    2:3
**Dukes (4)**
    31:10;33:23;36:25;
    42:21
**during (1)**
    15:4
**duties (15)**
    8:14,14,15;17:15,16,
    18,22,23;26:13,15;
    44:5;47:24;54:2;55:24;
    58:19
**duty (1)**
    5:14

## E

**earlier (1)**
    45:17
**early (1)**
    4:25
**eastern (1)**

**ERIC GLATT, et al., v**
**FOX SEARCHLIGHT PICTURES,**

May 10, 2012

12:14
**economic (2)**
11:9;25:8
**Eden (8)**
32:12,17,23;33:6;
38:6,14;41:15;44:1
**education (2)**
5:9;19:9
**educational (14)**
8:2;10:6;19:2,20;
29:15;34:1,15;37:20;
40:5,5,7;41:6;43:5;
44:2
**efforts (1)**
8:8
**either (5)**
28:1;38:4;39:8;
42:11;48:14
**eligible (1)**
55:19
**eliminated (1)**
10:20
**elimination (1)**
44:16
**Elizabeth (2)**
28:9;58:17
**else (1)**
37:8
**e-mail (1)**
41:1
**employed (4)**
27:21;49:15;58:1,24
**employee (12)**
11:17;18:14;24:7,7;
28:10;29:8,14;33:16;
37:15;47:1;54:7;58:18
**employees (23)**
4:12;5:6,18;6:4;7:8;
10:11;11:11,13;18:11;
23:17;27:24,25;29:10,
11;37:9,9;46:5,20;
47:22;49:20;50:12,21;
56:14
**employer (24)**
8:4;11:17;18:8;
25:14,16,21;27:1,8,24,
25;29:6;44:10;45:13,
19;46:5,9;47:16,17;
51:20;52:8,21,22;
53:11;58:2
**employer/employee (1)**
11:9
**employers (1)**
28:16
**employment (5)**
28:15,20;38:20;40:1;
47:18
**encompassed (1)**
31:5
**end (1)**
43:13
**endorse (1)**
48:19

**endorsed (1)**
24:24
**enforced (2)**
4:6;8:10
**enforcing (1)**
4:8
**engaged (1)**
33:8
**enjoyed (1)**
41:4
**enjoys (1)**
40:13
**enough (3)**
21:12,15;48:3
**Entertainment (12)**
2:16;3:7,11;10:15;
12:1;16:9;32:10;35:4;
36:17;42:18;54:17;
55:24
**entire (6)**
5:8;11:16;16:6;
28:11;44:18;47:11
**entirely (1)**
9:4
**entities (2)**
27:10,21
**entity (3)**
32:10;35:3,4
**entry-level (2)**
18:9;23:13
**envisioned (1)**
7:1
**equation (1)**
39:24
**equitable (8)**
12:11;13:2,22;14:22;
15:4;30:17;39:21,22
**Eric (2)**
32:4;45:22
**especially (2)**
18:9;31:14
**essentially (1)**
35:23;53:1
**evaluating (2)**
31:22;32:19
**evaluation (1)**
17:11
**even (17)**
2:21;14:20;18:22;
22:25;25:2;26:9;33:4;
34:17;36:24;38:10;
39:24;43:9;45:8,25;
49:5;51:17;58:20
**events (1)**
56:2
**everybody (1)**
45:7
**everyone (2)**
6:16;7:16
**evidence (56)**
4:2;7:11,19;8:11,17,
19;9:5,15,21;10:8,13,
24;11:1,4,16;16:1,11;

20:20;21:16;22:3,6;
26:8,12;28:4,23;29:2,
17;31:8,9,23;32:19;
34:4;35:12;36:20;38:2;
42:19;44:17;45:3,5,6,
8;47:19;48:14;49:4,21;
51:13;54:1,11;55:23;
56:4;57:3,7,16,16;58:4,
22
**exact (1)**
17:25
**example (10)**
6:22;7:11;13:7;
16:16,23;24:15;28:8,9;
34:16;43:17
**examples (4)**
6:5;9:13;14:23;43:9
**exception (1)**
18:13
**executed (1)**
9:6
**executive (1)**
10:15
**exemption (2)**
17:22;21:20
**exemptions (1)**
17:15
**exercise (5)**
28:6;47:12,17;48:5;
57:24
**exercised (1)**
52:9
**existed (2)**
46:11;49:5
**existence (2)**
27:14;33:13
**expectation (2)**
6:15;22:20
**expectations (4)**
6:18;7:16;22:21;
23:8
**expected (5)**
6:12;8:7;23:5;26:14;
57:4
**experience (20)**
5:9;8:2;10:6;18:11;
19:2,10,21,22;23:13;
25:25;29:13,13;33:25;
34:1,15;37:20;42:3;
43:5;52:18;56:24
**experiences (1)**
55:1
**extent (12)**
3:10;4:2;9:20;10:2;
22:12,15,24;23:2,20;
24:17;33:25;57:14
**extra (1)**
4:19

**F**

**facially (2)**
22:9,11

**fact (37)**
5:20,22;11:10,11,13;
14:24;15:24;17:17,18;
18:10,14;19:23;20:18,
23,25;21:21;22:25;
23:14;26:18;27:15;
31:15;33:20;36:22;
38:9,11;41:7;45:5,8;
48:6;50:10;51:11;54:6;
56:12;58:1,6,8,14
**fact-intensive (1)**
46:7
**factor (7)**
10:11;16:16,20;18:4;
23:16;25:24;56:10
**factors (16)**
10:10;16:14,16;
17:23;19:8;21:8;22:7;
23:19,25;24:3,22;25:8;
31:13,17;44:25;56:22
**facts (7)**
9:7;15:18,19;29:4;
46:8,11;53:7
**fact-sensitive (1)**
52:20
**Fair (1)**
31:19
**fall (3)**
29:8;54:16,17
**family (1)**
25:7
**favor (4)**
6:21;23:4,19,21
**feedback (3)**
6:23;7:9;22:18
**FEG (11)**
32:10;35:4,5,14,18,
20;37:22;49:8,12;
53:18,25
**Feldman (3)**
46:19,25;47:3
**fell (2)**
16:9;43:4
**felt (2)**
43:1,20
**few (6)**
6:5;19:24;26:2;
53:15;54:18;57:7
**fide (4)**
22:17;23:2;25:20;
29:12
**figure (1)**
25:5
**figured (1)**
39:10
**file (2)**
14:21;51:22
**filed (2)**
12:16,22
**files (1)**
52:2
**film (13)**
11:25;12:3;27:4,10,

13,13,22;46:10;51:25;
52:5;53:2,3;58:17
**films (8)**
40:10;51:16,24;52:2,
25;54:17;58:11,24
**final (1)**
43:6
**finance (4)**
28:12,24;42:13;
58:15
**find (2)**
3:15;46:9
**finding (1)**
6:3
**fine (3)**
2:7,13;28:5
**fire (1)**
58:2
**first (10)**
2:12;9:12;15:17;
32:2;40:24;41:14;
44:20;49:3;53:17,22
**five (3)**
29:25;30:2;58:11
**FLSA (12)**
3:22;18:15;25:22;
31:6,22;32:15,25;38:4;
40:13,15;42:23;45:9
**focus (8)**
8:13,14;16:13;26:4;
52:17;56:19;58:12,21
**focused (2)**
10:5;17:15
**focuses (1)**
41:6
**focusing (2)**
3:12;49:19
**follow (3)**
3:10;8:7;18:5
**followed (1)**
54:2
**food (2)**
37:4,6
**Footman (13)**
32:4,18;45:22,25;
46:13,15,23;47:16,21;
48:15;49:11,11;52:3
**form (2)**
51:17,18
**formal (1)**
9:24;10:1
**forms (7)**
9:16;26:12;35:24;
36:18;41:19;55:11;
57:9
**forth (3)**
6:18;18:5,25
**forward (4)**
13:7;21:7;31:16;
44:24
**found (1)**
55:16
**four (2)**

13:1;14:21
**fourth (2)**
  16:16;21:8
**Fox (35)**
  2:16;3:7,11;6:14;8:8,
  8;9:9;10:14,17,19;
  11:10;12:1;13:13;
  14:20;16:9;19:23;
  20:10,12;24:4;26:21;
  32:10;35:4;36:16,23;
  38:24;42:14;43:16;
  44:17;49:7;54:16,17,
  19,20;55:24,25
**Fox's (4)**
  20:15;38:22;50:17,
  22
**freeze (1)**
  49:8
**freighted (1)**
  38:21
**Friday (3)**
  12:17;13:5,25
**frolic (1)**
  15:9;30:10,20
**front (1)**
  54:8
**full (2)**
  3:5;18:16
**further (3)**
  18:15;29:20;53:14
**future (4)**
  5:5,13;6:4;18:14

**G**

**gained (3)**
  42:24;43:1,3
**gaining (1)**
  15:2
**gave (4)**
  8:6;34:7;43:17;
  50:18
**gears (1)**
  27:3
**generate (1)**
  7:22
**generated (1)**
  38:24
**generating (1)**
  7:20
**gentleman (1)**
  33:8
**gets (2)**
  46:22;56:10
**gives (2)**
  47:9,15
**giving (2)**
  5:8;7:8
**glad (1)**
  44:12
**Glatt (13)**
  32:4,5,18;45:23,25;
  47:17;48:14;49:10,11;

51:3,17,22;52:3
**goal (1)**
  49:2
**goes (2)**
  47:25;57:17
**Good (8)**
  2:9;24:2,21;26:22;
  45:16;57:3;58:10;59:8
**grant (1)**
  3:20
**Gratts (8)**
  11:25;30:18;45:14,
  24;49:12;52:4;53:5,9
**Gratts' (4)**
  11:23;12:12,16;
  52:18
**great (1)**
  56:24
**greeted (1)**
  56:2
**grid (1)**
  55:22
**grounds (1)**
  58:10
**Group (17)**
  2:16;3:11;12:2;16:9,
  9;21:5,21;24:19;26:22;
  32:10;35:4;36:17;37:3;
  40:21;54:18,19;55:24
**groups (1)**
  53:19
**Group's (2)**
  3:7;10:15
**guess (4)**
  20:1;41:15;46:14;
  50:9
**guests (1)**
  56:2
**guide (1)**
  8:24
**guideline (1)**
  6:7
**guidelines (42)**
  3:8;4:5,8,9,13,18,21,
  25;6:6,19;7:16,22;8:5,
  6;10:25;15:20;16:4,6;
  20:9,12;22:9;23:8;
  33:3,21;35:10;36:13,
  14,22,24;37:21;41:10;
  53:17;54:2,3,5,9,10,12,
  22;55:10;57:2,18
**Gwen (1)**
  42:4

**H**

**half (1)**
  31:4
**hands (1)**
  9:5
**happened (6)**
  13:25;19:13;35:13;
  44:24;46:14,14

**happens (1)**
  30:16
**happy (2)**
  2:6;4:18
**head (2)**
  10:18;56:9
**hear (2)**
  30:1;41:24
**heard (3)**
  2:5;32:12;37:5
**Hearst (4)**
  15:14,22;16:12;17:7
**heat (2)**
  14:13,14
**held (3)**
  23:10;41:8;58:8
**help (3)**
  7:12,13;56:1
**helped (1)**
  56:1
**Herman (1)**
  58:1
**Hey (1)**
  13:14
**high (1)**
  14:1
**higher (1)**
  31:22
**highlight (1)**
  15:17
**hindrance (1)**
  44:5
**hinge (1)**
  56:13
**hire (2)**
  28:13;58:2
**hired (2)**
  5:20;58:4
**hiring (3)**
  38:18;39:6;49:8
**hit (1)**
  56:8
**Hoffman (12)**
  33:12;35:19,23;
  36:14,18,21;53:25;
  54:19;55:2,8,16,16
**homeless (2)**
  16:24;17:4
**Honor (7)**
  2:6,9;7:21;14:8;
  15:6;30:5;50:16
**hope (1)**
  43:22
**host (2)**
  25:9;57:9
**hot (4)**
  13:16,22;14:6,7
**hours (5)**
  14:16;26:19;29:18;
  46:24,24
**human (6)**
  3:7;10:18;15:21;
  39:21,25;40:1

**I**

**idea (1)**
  30:20
**identified (3)**
  4:25;19:25;21:6
**identify (2)**
  3:16;4:25
**illegal (2)**
  4:14;27:18
**immediate (15)**
  5:25;6:11;7:25;
  10:12;16:17;17:5,12;
  18:2;19:5,6,6;21:9;
  25:16;26:7;57:15
**immediately (1)**
  55:17
**impact (1)**
  34:15
**importance (1)**
  40:7
**important (13)**
  4:9;8:8,18;16:14;
  18:3,6;31:1,10;32:13;
  35:6;37:11;40:16;45:2
**included (1)**
  3:2
**includes (1)**
  37:4
**including (4)**
  23:5;28:21,23;38:17
**incorrect (1)**
  15:16
**increased (1)**
  10:22
**independent (1)**
  24:15
**individual (8)**
  22:3;25:6;40:21;
  43:13,20;44:22;46:1;
  50:12
**individualized (9)**
  7:15;33:25;36:1;
  40:11;41:7;42:3;43:2,
  7;56:17
**individually (1)**
  58:23
**individuals (12)**
  16:23;18:21;23:11;
  28:18,22;32:5,5;34:22,
  24;54:24;55:1;57:5
**industry (4)**
  27:9,12,15;42:18
**information (3)**
  3:15;14:25;15:2
**initiatives (1)**
  10:19
**inquiry (2)**
  40:11;52:20
**insisted (2)**
  50:3,7
**insisting (1)**

48:7
**instance (3)**
  4:23;26:2;56:12
**instances (1)**
  26:2
**interacted (1)**
  27:20
**interaction (2)**
  47:22;58:20
**interactions (2)**
  28:19;47:21
**Interactive (1)**
  54:20
**interesting (2)**
  15:10;48:15
**intern (72)**
  2:15;3:6,9,10,14;4:6;
  5:3,5,6:10,18,19,22;
  8:6,9,15,23;9:15,17;
  10:22;11:19;16:5,17;
  17:25,25;19:5;20:3,7,
  7;21:3,4;22:9;24:1,22;
  25:15,16,21,25;26:10,
  12;33:10,11,15,17;
  34:13;35:18,24;36:2,6,
  7;37:1,1,7,12,14,25;
  39:21;40:12;41:19;
  42:14,24;43:1;44:22;
  45:24;51:12;52:5;
  55:11;56:9,21,23;57:4,
  6,9
**internal (1)**
  25:12
**interned (1)**
  51:3
**interns (84)**
  2:22,23;3:3,16;4:11;
  6:12,20;7:7,24,25;8:2,
  25;9:8,14,17,25;10:10,
  12;11:10,10,11,20,24;
  12:5;15:23;16:15;
  17:10,18,25;19:3;
  20:10;21:1,4,9;22:13,
  22;23:5;24:5;25:2,13;
  26:5,11,14,17,19;27:2;
  28:21;29:5;32:6,25;
  34:8;36:9;38:20;41:9,
  17,24;42:6,17,20;
  43:10;45:4,5,23;48:19;
  49:3,5,9;50:12,13;51:1,
  3,15;52:3;53:4;54:3,
  10,23;55:15;56:1,3,5;
  57:8,10,13
**intern's (1)**
  33:24
**internship (37)**
  3:11;4:5,7,24;5:4;
  10:4,17,19;16:10;
  19:18;20:6,12,24;
  25:19;26:17;34:10;
  38:10,11,13;39:15,25;
  40:13;41:3;42:14,23,
  25;43:14;44:17;51:5,8,

9;55:6,10,21;56:18,19,
20
**internships (2)**
10:21;41:2
**interpretation (1)**
53:7
**interpreted (1)**
16:19
**interrupt (1)**
50:16
**interviewing (1)**
36:5
**into (3)**
25:24;39:18;53:8
**introducing (1)**
38:22
**inviting (1)**
55:21
**involved (10)**
34:11;38:4;46:16,17,
21,22;48:23;49:12,12;
55:12
**involving (1)**
17:14
**issue (1)**
27:8
**issues (14)**
4:10;8:17;16:12;
21:23,25;23:4,21,22,
22,24;27:1,6;29:3;55:4

**J**

**Jacqueline (1)**
41:22
**Jill (1)**
42:4
**job (13)**
5:19;8:12;17:8,8,17;
18:11;20:3;26:13,14;
41:23;42:5,13;56:13
**Jody (1)**
46:20
**John (5)**
33:9,15;38:8;41:1;
55:9
**joined (1)**
46:16
**joint (17)**
27:1,8,24,25;28:16;
29:5;44:10;45:13,19;
46:4,9;47:16,17;51:20;
52:21,22;53:11
**jointly (1)**
27:21;49:15;58:1,24
**Judge (5)**
15:13;16:12;17:13;
23:11;41:8
**judgment (9)**
2:4;20:23;21:25;
23:24;27:6,7;28:22;
43:23;44:6
**judicial (3)**

13:24;14:9;30:7

**K**

**Kanene (2)**
45:24;52:4
**keep (1)**
14:16
**kept (3)**
30:24,25;33:3
**key (4)**
6:7,13;23:6;33:1
**kind (12)**
6:25;7:3;10:5;19:19;
26:3;28:4;29:12,13,15;
42:10;54:11;55:6
**kinds (11)**
17:1,3;26:23;54:8,9;
55:12;57:4,10,13,14;
58:17
**knew (3)**
33:12;48:14;49:4
**knowledge (2)**
33:17,18
**known (1)**
38:12

**L**

**Labor (18)**
4:14,18;6:10;7:1,2,6;
16:14;19:8;21:8;22:7;
23:25;24:21;25:1;
31:19;33:21;48:18;
49:2;56:22
**Lake (18)**
27:24,25;46:5,20,25;
47:14,15,22,25;49:15,
24,25;50:6,11,14;
51:10,18,19
**large (2)**
4:2;18:8
**larger (1)**
40:20
**last (1)**
18:18
**Laura (1)**
36:16
**law (5)**
20:21;24:7;25:6;
28:1;56:15
**lawful (2)**
5:15;44:21
**lawsuit (1)**
14:21
**lawyer (1)**
56:13
**learner (1)**
18:22
**learners (1)**
18:16
**learning (1)**
38:17

**least (2)**
39:14;49:19
**leave (2)**
11:22;12:14
**legal (1)**
27:16
**legality (1)**
20:24
**legitimate (1)**
27:16
**lenient (1)**
12:13
**lesson (1)**
31:10
**letter (6)**
12:23;38:8,10;40:25;
55:18,21
**letters (2)**
34:7;38:19
**liability (6)**
25:22;40:14,15;
42:24,25;43:16
**light (1)**
57:7
**limited (5)**
9:25;10:2;12:17;
53:23;54:21
**Lindsay (3)**
46:19,25;47:2
**literally (1)**
29:25
**little (6)**
10:7;27:3;32:1;39:6,
7;42:24
**long (1)**
26:25
**longer (1)**
54:7
**look (32)**
4:20;7:24;8:12;9:2,
15;11:5;13:1,25;16:16,
19,21,21;17:8,24;25:8,
9;34:14;36:22;38:1,3;
40:19;41:24;42:16;
45:10;47:20;48:20;
50:8;52:9;56:22,25;
57:2,12
**looked (2)**
30:8;56:23
**looking (11)**
8:16;16:13;17:13,21;
28:23;30:15;31:7,12;
40:10;44:23;58:11
**looks (1)**
17:22
**Los (2)**
13:25;14:1
**lot (5)**
18:11;21:7;30:12;
43:1;44:4
**lots (3)**
16:1,25;24:12
**low (2)**

14:2,3

**M**

**Mabey (10)**
33:9,9,15,16;38:8,
10;39:17;41:1;44:1;
55:9
**magazines (1)**
15:23
**Magistrate (1)**
35:14
**maintain (1)**
51:21
**maintained (1)**
2:20
**makes (1)**
56:19
**making (1)**
8:21
**managerial (1)**
58:4
**manner (2)**
9:3,6
**many (2)**
5:2;36:1
**marketing (1)**
42:8
**Math (1)**
9:10
**matter (1)**
14:12
**may (14)**
5:7;7:13;14:12;
22:12,23,25;23:20;
25:3;30:9;32:3;33:3;
40:4;41:10;43:25
**maybe (3)**
14:5;24:4,15
**mean (10)**
3:25;14:4;25:23;
27:6;30:23;44:2,3;
49:16;50:16;53:20
**means (1)**
34:16
**meant (2)**
15:22;57:1
**measures (1)**
49:7
**Media (1)**
54:20
**meet (1)**
20:1
**meetings (9)**
41:25;42:1,2,6,8,8,
10;43:10,21
**member (2)**
6:1;25:7
**members (2)**
7:18;16:1
**memo (2)**
10:14;49:23
**memos (14)**

28:14;49:21,24,24,
25;50:3,5,6,10,10,11,
13,18,22
**merits (7)**
4:10;6:20;7:12,14;
8:17;11:2;31:6
**met (8)**
24:1,3,22;25:18,18,
19;31:16;44:25
**Midtown (1)**
34:18
**might (8)**
14:12;19:20;24:14;
29:8;31:8,8;40:6;57:7
**million (2)**
48:21,22
**minimum (5)**
18:17,18,23;26:19;
29:17
**minute (1)**
39:24
**minutes (2)**
29:25;30:2
**misclassification (2)**
8:13;45:9
**misclassifications (1)**
17:14
**misstatements (1)**
53:21
**misunderstanding (1)**
50:1
**mock (2)**
9:10;37:18
**months (1)**
19:24
**more (10)**
2:23;3:13,16;10:7,
22;12:13;37:22;46:23;
53:8;56:12
**morning (2)**
2:9;42:6
**most (5)**
18:17;22:6;23:15,18
**motion (2)**
2:4,10;3:21;30:23
**motions (4)**
2:3,12;38:17;59:6
**move (2)**
11:23;15:7
**moved (5)**
2:14;20:23;27:6,7;
28:22
**moving (2)**
23:23;32:19
**much (3)**
29:22,23;58:16
**must (7)**
6:10,22;19:5;23:25;
24:3,22;39:9
**muster (6)**
4:17;6:6;7:10;10:3;
19:7;20:1
**myself (1)**

30:8

**N**

**nail (1)**
56:8
**name (5)**
32:12,12;33:9;35:18;
36:15
**named (5)**
27:4;31:24;32:3,11,
16;38:15;39:13
**narrow (9)**
18:5,6,13,24,25;
23:1;24:10;33:21;
44:25
**narrowed (2)**
35:17;54:15
**narrower (1)**
39:7
**nationwide (2)**
32:25;40:21
**nature (7)**
11:17;16:15,22;17:5,
11,24;57:12
**necessarily (2)**
12:4;27:16
**need (2)**
26:19;53:8
**needed (1)**
56:1
**needs (1)**
37:24
**network (2)**
40:9;54:18
**New (11)**
2:15;3:21;6:1;18:11;
32:25;33:14,19;38:7,
16,22;55:6
**Nichols (1)**
40:9
**nine (1)**
35:19;36:15;53:18
**none (2)**
50:25;51:1
**nonemployees (1)**
24:12
**note (1)**
39:19
**notice (3)**
13:24;14:9;30:7
**notwithstanding (2)**
23:14;45:17
**November (1)**
46:18
**number (3)**
2:22;10:21;49:9

**O**

**obvious (1)**
35:15
**obviously (3)**

9:3;38:20;58:10
**occasional (2)**
7:9;22:18
**occasionally (1)**
6:22
**occasions (1)**
51:4
**occurred (1)**
9:4
**October (1)**
46:17;51:4,6
**off (4)**
15:8;30:9;36:10;
55:22
**offer (3)**
38:19;40:25;55:20
**office (10)**
19:19;23:7;33:7,7,
14,18;34:3;38:7;42:7;
43:11
**offices (5)**
9:18;12:1,2,5;26:7
**OK (5)**
2:9;6:25;39:1;44:9;
53:13
**onboarded (1)**
38:8
**onboarding (5)**
16:8;38:17,21,23;
39:4
**Once (1)**
27:13;39:9;51:4;
55:16
**one (44)**
3:24;5:1;6:2,6;8:11;
10:10,13,25;16:12;
18:7;20:6;21:7,8;
22:21;23:23;25:19;
26:2,18,22;27:5;28:18;
30:23;32:16;33:1,2,10;
34:9;36:1;37:22;39:19;
40:18,24;41:2;42:6,12,
23;43:10,15;44:14;
51:18,24;55:7;56:9;
57:11
**one-page (1)**
37:19
**ones (1)**
50:14
**ongoing (3)**
8:4;9:22;20:9
**only (14)**
5:23;12:21;13:2,22;
18:1,18;27:7;32:16;
38:12,21;44:23;49:12,
13;53:17
**open (2)**
2:1;24:11
**opening (1)**
53:24
**operation (1)**
28:7
**operations (11)**

6:8,13;8:3,4;9:18,23;
20:9;23:6;26:6;27:14;
29:10
**operative (1)**
58:15
**opinion (1)**
31:20
**opposed (4)**
12:15;17:24;19:14;
31:19
**opposite (1)**
3:21
**opted (2)**
39:18;54:24
**oral (1)**
2:3
**order (14)**
5:5,17;11:8;15:1;
22:16,17;23:1;24:1,22;
28:14;34:12;38:1;
47:16;51:8
**ordered (1)**
58:12
**others (3)**
34:19;46:5;58:7
**otherwise (1)**
24:20
**out (20)**
3:5;4:1,19,23;5:19;
6:5;13:18;17:21;25:5;
35:22;36:14;39:10,24;
41:4;43:14;55:16;
56:12,17,24;57:18
**outlined (1)**
29:2
**outreach (1)**
17:4
**outside (3)**
24:18;33:17,19
**over (16)**
4:20;22:3;28:5,18;
31:4;47:5,6,10,12,14,
15,18,18;48:16;51:15;
52:9
**overarching (2)**
9:6;15:20
**overlaps (1)**
23:24
**oversaw (2)**
28:10;58:18
**overseeing (3)**
4:7;16:6;28:24
**oversight (2)**
55:13;58:20
**overtime (2)**
10:20;49:9
**overwhelming (3)**
9:15,21;26:8
**overwhelmingly (1)**
26:1
**own (3)**
21:13;28:14;47:7

6:8,13;8:3,4;9:18,23;
20:9;23:6;26:6;27:14;
29:10

**P**

**page (1)**
53:24
**paid (27)**
5:21;10:16,19;14:19,
20;18:16,17,23;19:25;
20:14,16;21:5;24:1,13,
17,20,23;26:19;29:10,
11,14,17;45:6,7;49:20;
51:18;56:11
**paper (1)**
38:24
**papers (4)**
2:18;14:15;20:22;
58:2
**paperwork (5)**
38:14;51:2,15;55:15,
18
**parcel (1)**
43:3
**part (18)**
7:4;8:3,15;9:18,22;
10:18;11:8;20:8;23:6,
7;26:6;28:5;29:9,12;
36:16;43:3;46:15;55:5
**participate (2)**
7:25;8:3
**participated (1)**
3:10
**participating (4)**
5:23,24;16:24;23:12
**participation (1)**
9:22
**particular (3)**
21:8;36:7;57:25
**parts (1)**
28:7
**pass (6)**
4:17;6:6;7:10;10:3;
19:7;20:1
**past (2)**
26:23,24
**pathways (1)**
16:25
**pattern (1)**
9:6
**pay (2)**
14:21;24:5
**paying (1)**
45:3
**Peck (1)**
35:14
**people (17)**
6:3;12:7;14:12;
16:24;17:4;27:21;
28:13,20;36:6;37:4;
38:3;39:18;41:13;44:3;
46:12,19;50:19
**PeopleSoft (1)**
3:17
**perform (3)**

5:14;16:15;17:16
**performed (4)**
7:5;16:25;17:18;
55:23
**performing (1)**
23:15
**period (9)**
12:19,20;14:18;15:1,
4,4;18:18;28:18;51:5
**permitted (1)**
24:8
**person (14)**
32:16;33:11;34:1,14;
35:23;36:8;37:5,10,24;
38:2;39:4;40:8;43:23;
45:10
**person-by-person (1)**
37:2
**personnel (6)**
11:7,14;16:8;51:21;
52:2;54:12
**pertains (1)**
41:23
**PFD (1)**
51:14
**PFDs (2)**
53:1,2
**phase (1)**
28:9
**photocopy (1)**
25:22
**pick (1)**
36:7
**picture (1)**
3:19
**Pictures (3)**
32:7;33:8,10
**piece (6)**
7:11;8:16;10:24;
11:4;21:16;38:23
**pieces (2)**
10:13;57:7
**pipeline (5)**
5:1,5,10,11;6:4
**place (3)**
37:8,15;40:16
**plaintiff (4)**
31:24;32:11;38:15;
39:14
**plaintiffs (11)**
6:21;11:23;17:9;
23:5,19;27:4;31:15;
32:3;38:19;41:20;
58:25
**plaintiff's (1)**
49:6
**played (1)**
57:18
**playing (1)**
9:11
**pleading (1)**
31:13
**plenty (1)**

54:11
**podium (1)**
2:8
**point (19)**
4:18;5:23;6:5;7:14;
10:24;11:8;13:11;
14:14;17:2,21;20:23;
21:22;28:11,16;31:14;
38:19;45:1;52:15;58:9
**pointed (7)**
4:4;9:13;10:13;
13:18;20:22;29:2;
41:11
**pointing (3)**
20:20,25;33:3
**points (1)**
53:15
**policies (10)**
3:3,6,9;8:23;11:14,
15;16:8;35:22;54:4,12
**policy (9)**
9:1;11:7,19;15:20;
21:14;41:9;50:22;
55:20;57:18
**position (8)**
36:3,5;48:2,4;49:16;
51:13;53:6;57:19
**possible (1)**
27:23
**possibly (1)**
13:13
**post (2)**
36:2,2
**post- (1)**
48:21
**postdiscovery (1)**
31:21
**postings (1)**
17:8
**postproduction (2)**
28:9;51:12
**post-Searchlight (1)**
51:8
**potential (2)**
40:18;47:15
**potentially (3)**
38:4;40:16;52:21
**power (6)**
47:4,10;48:3;57:21;
58:5,13
**PowerPoint (1)**
37:15
**practical (1)**
5:9
**practices (2)**
9:2;35:22
**predominate (1)**
22:3
**premises (1)**
19:14
**premotion (1)**
12:23
**preparation (1)**

37:6
**prepare (1)**
42:10
**prescription (1)**
18:15
**pre-Searchlight (3)**
48:21;51:5,6
**presentation (3)**
37:17,18,19
**presentations (1)**
37:15
**presented (1)**
34:4
**president (2)**
10:15;43:11
**pretty (2)**
43:21;58:16
**prevent (1)**
15:1
**primary (1)**
4:6
**problem (1)**
37:23
**procedures (1)**
3:9
**proceed (2)**
2:11;44:8
**process (1)**
36:9
**produce (1)**
14:24
**produced (1)**
2:22;3:17
**production (23)**
11:25;12:3;27:2;
28:5,11,12,23;32:6;
46:15,17,18,21;47:5,6,
11,13;48:23;50:20;
51:7;52:14,24;53:2;
58:15
**productions (9)**
27:4,22;28:25;32:20;
49:14;50:19,21;58:18,
19
**productive (6)**
23:15;25:14,17;
26:11,14,17
**program (42)**
3:11,12;4:7,24;5:4,
11;7:4;8:1;10:4,16,17,
17,19,22;16:7,7,10,24,
25;19:1,19,25;20:6,12,
13,14,16,24;22:17;
23:2,12;25:19,20;
26:17;29:12;44:17;
55:6,21;56:20,20,25;
57:4
**programmers (1)**
58:17
**prohibition (1)**
49:8
**projects (7)**
6:7,13;19:21;20:4,5,

8;23:6
**promotion (1)**
37:14
**promulgated (2)**
4:5;15:21
**prong (2)**
6:14;25:17
**prongs (1)**
25:18
**proof (1)**
31:16
**properly (5)**
2:20;34:13;37:1,24;
45:11
**proposed (2)**
21:2;41:20
**prospective (1)**
19:13
**protections (1)**
24:18
**provide (9)**
6:10,12,20,23;7:7,
24;19:5;25:15;57:5
**provided (14)**
5:25;10:1,3,6,12;
17:5;19:2,19,23;21:9;
34:6;36:4;55:18;57:15
**provides (3)**
16:17;17:11;25:16
**providing (4)**
19:12;20:8;25:7;
26:7
**publicity (3)**
33:7,14;38:6
**purely (1)**
37:20
**purpose (9)**
4:23;5:4,7,10,11,13;
27:13;57:1,3
**purposes (3)**
4:24;5:2;20:18
**put (2)**
38:14;57:11
**putative (1)**
2:17

**Q**

**quite (1)**
15:18

**R**

**rail (1)**
19:17
**railroad (2)**
19:13,14
**railroads (1)**
7:5
**Rainier (1)**
21:19
**reach (1)**
31:18

**reached (1)**
26:21
**read (4)**
37:4,7,8,8
**reading (3)**
23:1;33:22,22
**reality (2)**
11:9;25:8
**really (13)**
4:9;14:15;16:13;
24:2,6;33:20;38:18;
41:6;48:15;55:4;56:8,
10;58:7
**reason (4)**
24:21;32:21;33:24;
43:8
**reasonable (1)**
53:7
**reasonableness (1)**
25:24
**reasons (6)**
13:14;24:2;32:18;
38:12;44:20;58:14
**rec (1)**
42:13
**recall (2)**
9:9;32:3
**receipts (1)**
43:11
**received (4)**
7:4;8:1;9:20,21
**Recess (1)**
30:3
**reclassified (1)**
21:21
**recognition (1)**
5:22
**recognized (1)**
24:9
**recollection (1)**
14:18
**reconvene (1)**
30:2
**record (12)**
16:1;41:21;45:6,8;
46:8;47:20;48:20;
50:17;55:23;56:5;57:9;
58:4
**records (3)**
2:20,21;14:16
**re-create (1)**
20:4
**recruited (2)**
54:23;55:3
**recruiter (1)**
35:18
**recruiters (4)**
3:7;4:6;16:5;54:1
**recruiting (1)**
54:19
**recruitment (1)**
54:2
**recycling (1)**

17:4
**reduce (2)**
48:18;49:2
**referred (1)**
33:11
**referring (1)**
36:13
**regard (16)**
32:20;33:6,10;35:21;
40:17,23;41:18;45:13,
19,25;46:12;47:21;
51:2,3;52:18;53:5
**regardless (1)**
37:21
**regular (8)**
7:8;8:3;10:11;27:19;
29:10;37:9;44:4;58:20
**regularly (2)**
8:9;26:6
**regulations (1)**
4:15
**reinforced (1)**
31:11
**relationship (3)**
11:9,18;39:17
**relationships (1)**
52:13
**relative (1)**
25:4
**relevant (10)**
7:22,24;20:18,25;
21:12,17,23;40:13,15,
23
**remain (1)**
21:4
**remember (2)**
31:2;34:24
**rep (1)**
34:21
**repeated (1)**
5:2
**repeatedly (4)**
13:19;15:24;55:9;
58:2
**reply (1)**
29:3
**reports (3)**
48:7,8,12
**represent (1)**
31:25
**representative (6)**
12:4,7;32:17,24;
35:8;40:20
**request (6)**
9:16;26:12;35:24;
41:19;55:11;57:9
**require (3)**
3:9;18:22;57:24
**required (9)**
11:12,14;22:18;
33:23;34:21,23;40:11;
55:11,15
**requirement (3)**

10:4;20:2;31:13
**requirements (3)**
4:1;34:5,9
**requires (1)**
25:18
**requisition (2)**
41:23;42:5
**research (1)**
20:5
**reserving (1)**
59:7
**resources (6)**
3:8;10:18;15:21;
39:22,25;40:1
**respect (13)**
4:11;8:24;12:12;
18:22;21:7;22:1;29:4,
7;52:8;57:25;58:6,19,
23
**respects (1)**
15:15
**responsibility (2)**
4:7;14:16
**responsible (1)**
16:5
**restricted (1)**
54:4
**result (1)**
10:21
**resulted (1)**
20:13
**results (1)**
42:7
**résumé (1)**
39:25
**return (1)**
15:6
**review (1)**
3:14
**review/edit (1)**
20:4
**right (23)**
4:20;5:16;12:11,21,
24;13:5,10,17;15:5;
19:17;29:19;30:2,4;
31:2;32:23;39:3,12;
43:12;46:11;49:17;
50:15,24;59:4
**risk (1)**
21:7
**road (5)**
11:3;30:25;31:3,8;
40:19
**Robinson (1)**
51:11
**rogue (1)**
55:6
**role (6)**
9:10;28:8,11;35:19;
36:12;58:23
**room (1)**
43:16
**routine (1)**

27:20
**Rule (11)**
2:15;4:1;12:13;29:4,
16;31:12,17,18;32:15,
24;38:4
**runs (1)**
12:14

---

**S**

**same (24)**
3:2,23;4:1,3;17:16,
25;19:11,19;22:13;
29:11;42:4,25;53:1;
54:2,2,3,3,11,12;55:10,
11,12,21;58:16
**sample (1)**
58:11
**sampling (1)**
36:19
**satisfy (7)**
6:9,14;10:3;24:4,5;
36:25;42:21
**Saturday (2)**
12:18;13:3
**Saturdays (1)**
13:4
**saw (1)**
34:6
**saying (9)**
3:1;8:22;18:25;
26:16,18;27:17,19;
30:25;38:11
**Sayre (4)**
28:9;47:13;48:6;
58:17
**scale (1)**
2:25
**scaled (1)**
10:20
**schedule (7)**
29:1;31:5;47:1,2,25;
48:9,13
**school (5)**
19:15;34:4,5;38:8;
55:19
**schools (4)**
19:12;34:7,8,9
**Scott (1)**
42:12
**script (2)**
37:10,11
**scripts (3)**
37:8,8,9
**Searchlight (45)**
27:20,23;28:10,19;
29:5;32:6;33:8,10,15,
19;35:2,7;46:3,4,16,17,
21;47:4,14,20,23;48:1,
22,23;49:4,13,21,21,
23;50:2,3,7,9,25;51:10,
14,21;52:1,8,18,24;
55:7;56:3;58:13,18

**Searchlight's (4)**
47:10;48:16;49:2;
58:23
**Second (5)**
24:24;49:4;51:5;
57:20,23
**secondary (1)**
29:7
**seek (2)**
7:17;12:6
**seeking (5)**
11:21,22;12:9;33:5;
35:1
**seeks (2)**
31:25;32:16
**seems (1)**
38:22
**selected (1)**
36:10
**selecting (1)**
39:4
**seminars (1)**
20:4
**sending (1)**
30:19
**sense (1)**
56:19
**sent (4)**
36:14;52:1;54:3;
55:9
**separate (3)**
12:9;51:4;52:5
**series (1)**
16:7
**service (2)**
37:4,6
**services (1)**
25:7
**set (20)**
3:8;4:1,4;6:18;7:15,
21;8:6,11,22;15:20;
16:4,11;18:5,25;28:13,
14,21;29:14;46:23;
54:21
**setting (1)**
19:19
**several (9)**
4:10;8:17;11:2,7;
15:15;16:16;23:11;
44:20;53:20
**shadow (1)**
20:3
**shadowing (5)**
7:3;19:22;25:25;
41:25;43:20
**shed (1)**
57:7
**short (2)**
12:19;15:4
**shortly (1)**
10:15
**show (5)**
11:8;14:17;17:15;

40:25;41:1
**showing (6)**
6:9;9:5;17:17;26:13;
54:11;55:19
**shown (1)**
37:16
**shows (4)**
26:9;34:4;54:1;56:5
**sign (4)**
11:12;50:19;55:14,
15
**signatories (1)**
50:20
**signed (9)**
50:5,6,10,11,14,23;
51:17,18;55:20
**significant (9)**
6:2;9:13;23:4,9,12,
16,18;31:16;52:23
**significantly (4)**
10:20;46:23;54:15,
20
**similar (7)**
7:7;8:1;19:1;55:1;
56:4,5;58:19
**similarly (4)**
31:24;34:22,24;40:6
**simply (3)**
41:9,9;55:22
**single (1)**
27:20
**single-purpose (1)**
27:10
**sit (2)**
29:21;37:9
**site (1)**
19:16
**situated (4)**
31:24;34:22,24;56:7
**situation (11)**
24:16,16;25:2,11,25;
28:15,17;31:7;43:22;
45:9,22
**situations (1)**
24:14
**six (2)**
19:8;23:25
**size (5)**
2:17,19,20,25;10:22
**small (1)**
36:19
**sole (1)**
27:12
**solely (3)**
19:3;20:7;56:21
**solve (1)**
37:23
**somebody (6)**
33:9;34:13;36:15;
37:8;47:25;48:1
**somehow (4)**
48:16;55:5,22;56:6
**someone (4)**

19:20;24:7;51:10;
56:10
**sometimes (1)**
55:25
**Sorry (2)**
39:11;47:9
**sort (15)**
2:25;15:2;18:21;
23:13;25:23;26:3;27:3;
29:7,14;32:1;34:18;
40:21;48:19;56:8;
57:11
**Sotomayor (1)**
23:11
**sought (3)**
12:14;19:8;53:22
**sound (1)**
14:7
**sources (2)**
3:18;10:25
**Southern (1)**
21:19
**speaking (3)**
10:17;25:11;26:25
**special (1)**
29:15
**specific (5)**
4:21;6:18;11:19;
18:15;19:21
**specifically (3)**
18:13;25:1,11
**spend (3)**
30:12;44:4;45:14
**spent (1)**
5:21
**spoke (1)**
44:1
**spoken (1)**
8:5
**sports (2)**
40:8,10
**stage (1)**
31:20
**standard (2)**
31:22;42:21
**standards (2)**
3:25;31:19
**start (10)**
2:6,10;4:23;12:25;
30:6,22,23;31:1;45:3;
46:13
**started (4)**
32:2;45:6,7;55:14
**starts (1)**
51:5
**stated (1)**
4:23
**statement (1)**
13:15
**stay (1)**
21:5
**steps (1)**
55:17

**Stevenson (2)**
39:19;40:4
**still (5)**
15:25;18:17,22;24:5;
36:25
**stop (1)**
18:8
**stored (1)**
3:15
**strict (1)**
19:7
**stringent (1)**
24:10
**student (1)**
34:11
**students (1)**
5:9
**stumbled (1)**
39:9
**sub (1)**
35:7
**subject (3)**
42:23,25;43:16
**subjected (1)**
54:3
**subjecting (1)**
25:22
**submit (3)**
7:21;11:14;55:11
**submitted (9)**
9:16,17;15:14;26:10,
11,13;36:23;54:25;
57:9
**subs (3)**
35:4,11,25
**Subsequent (2)**
32:8;40:1
**subsidiaries (18)**
2:16;3:1,4,5;35:16,
19;36:20,24;37:22;
53:18,23,24;54:16,16,
17,23,24;55:7
**subsidiary (2)**
55:2,25
**substantial (3)**
23:4,18;28:6
**subsume (1)**
40:21
**sued (1)**
32:6
**suffered (1)**
24:8
**sufficient (2)**
46:3;58:22
**sufficiently (2)**
22:16;45:15
**suggest (1)**
51:14
**suggestion (1)**
48:16
**summary (9)**
2:4;20:23;21:25;
23:24;27:6,7;28:22;

43:23;44:6
**Summer (7)**
27:5;45:24;52:6,10,
19,21;58:21
**supervise (2)**
36:6;58:3
**supervised (6)**
22:16,21;28:21;
46:19;54:10;57:5
**supervision (6)**
6:25;7:2,3,7;22:16,
18
**supervisor (7)**
6:18;34:2;37:16;
41:17,18;43:25;55:9
**supervisors (23)**
3:10;5:3;6:19,22;8:6,
9,21,23;9:5,8,14,17;
17:9;19:24;22:21;
26:10,13;36:11,14;
50:13;51:19;57:5,6
**supervisor's (1)**
37:5
**support (1)**
35:19
**supported (1)**
23:16
**supposed (2)**
6:19;14:25
**Supreme (4)**
5:15;18:12;24:9;
31:11
**Sure (10)**
4:22;8:9;14:6;15:12;
28:25;41:21;44:12;
50:9;55:18;59:6
**surprise (2)**
48:24;59:6
**Swan (13)**
27:5;32:6;45:23;
46:10,15,16,18,21;
49:19;52:9,16,22;
58:22
**swaths (1)**
18:8
**sweeping (1)**
21:6
**switching (1)**
27:3

**T**

**tagged (1)**
43:10
**tagging (1)**
43:15
**talent (1)**
4:25
**talk (10)**
10:7;32:13;37:10;
41:17;42:1,2,7;46:24;
47:2;52:4
**talked (4)**

21:25;45:15;46:25;
47:2
**talking (16)**
20:10;22:7;24:16,19;
26:5;28:17;31:13,15;
32:14,23;33:12;38:9;
42:15;46:12;55:10,12
**tasks (2)**
17:19,25
**Tears (18)**
27:24,25;46:5,20,25;
47:14,16,22;48:1;
49:15,24,25;50:6,11,
14;51:10,18,19
**temperature (3)**
14:1,2,10
**template (1)**
50:17
**temporal (1)**
28:18
**temps (1)**
10:20
**term (3)**
38:17,21;39:2
**terminology (1)**
38:23
**terms (10)**
8:21;9:14;17:10;
21:5;28:14;32:15,15;
43:2;47:18;58:19
**terrible (1)**
56:25
**test (27)**
6:9;7:10;8:15,15;
17:12,21,22;18:1,4,4,5,
6,24,25;19:7;24:4,10,
15,25;25:10,15,17;
36:25;45:1,19;56:16;
57:22
**testified (5)**
13:19;17:10;41:16;
54:6,8
**testifies (1)**
40:24
**testimony (4)**
8:7;12:17;13:8;
39:14
**theoretically (1)**
46:10
**therefore (1)**
48:18
**thinking (1)**
30:21
**third (4)**
40:8;42:12;51:8,9
**thorough (1)**
3:14
**though (2)**
16:12;50:6
**thought (6)**
14:19;30:15,20,23;
44:17;50:2
**three (7)**

24:4,5;28:21;29:5;
38:3;41:18;51:4
**threshold (1)**
2:23
**times (1)**
23:11
**today (2)**
32:13,14
**together (4)**
37:3;54:13;57:11,11
**tolled (1)**
15:1
**tolling (10)**
12:12,25;13:2,6,22;
14:22;15:4;30:17;
39:21,22
**took (2)**
44:4;55:17
**totality (1)**
24:25
**totally (1)**
43:14
**touch (2)**
27:1;57:19
**train (3)**
5:13,17,18
**trained (3)**
5:1;6:1,3
**trainee (4)**
22:17;24:11;25:12;
29:8
**trainees (6)**
4:12;5:20;6:9;18:9;
23:17;25:2
**training (20)**
5:22,23,24;7:4,25;
8:1;9:20,21,24;10:1,5;
19:1,1,12,20,23;22:17;
23:2;29:12,15
**trainings (3)**
54:12,13;55:13
**treat (1)**
9:8
**treated (1)**
43:8
**tried (2)**
14:15;40:19
**true (6)**
12:16;50:4;54:5,22;
55:5,22
**trying (6)**
2:25;15:11;25:5;
34:25;37:3;57:17
**turn (4)**
3:22;34:2;41:12;
44:10
**Twentieth (3)**
36:23;42:14;55:25
**twice (1)**
39:10
**two (14)**
4:6,24;12:21;16:5;
24:4;27:4,6;32:3,5,9;

24:4,5;28:21;29:5;
38:3;41:18;51:4
39:18;46:12;54:13,23

**U**

**ultimate (1)**
37:23
**ultimately (6)**
4:11;17:19;22:15;
23:16;26:21;38:12
**under (19)**
2:14;3:22;4:1,17;
7:10;11:12;16:9;19:7;
23:1;24:7;25:15,17;
28:1,12;33:20;44:25;
45:20;53:7;54:17
**undercount (1)**
2:22
**undisputed (2)**
29:16;58:22
**unfettered (1)**
47:12
**uniform (2)**
17:17;21:11
**uniformly (1)**
5:8
**uniquely (1)**
56:6
**united (1)**
16:1
**universe (1)**
36:19
**unlawful (3)**
22:10,12;44:18
**unless (5)**
2:11;15:7;24:10,10;
44:6
**unlike (1)**
24:14
**unlikely (1)**
39:22
**unpaid (12)**
10:16;19:24;20:14,
16;21:4;25:12,12;41:9;
44:16;48:19;49:3,5
**unprotected (1)**
24:20
**up (6)**
20:12;34:18;41:14;
48:23;49:3,9
**upon (2)**
9:9;44:21
**use (3)**
36:18;38:20,21
**used (5)**
7:16;9:14;28:14;
36:18;37:19
**useful (4)**
6:7,12;11:2;20:8
**useless (1)**
43:14

**V**

valuable (1)
43:21
value (3)
40:3,5,6
variety (3)
13:14;25:8;34:8
various (1)
34:7
Velez (1)
25:2
versus (1)
56:18
vice (1)
10:15
view (2)
12:3;21:6
views (1)
14:13
violating (1)
20:21
vocabulary (1)
38:16
vocational (4)
19:2,11,12,14
Vyduna (1)
42:12

**W**

wage (5)
18:17,18,23;26:19;
29:18
wages (1)
49:22
waited (1)
14:21
walk (1)
37:16
Walling (10)
5:11,12,14,20;16:20;
18:5,12,25;19:9;56:23
Wal-Mart (2)
8:20;9:2
wants (3)
2:5;47:25;51:11
warned (1)
18:14
way (10)
3:24;5:7;22:24;23:1;
25:14;27:17;42:21;
44:1;54:4,14
ways (3)
6:5;15:17;27:20
weather (2)
13:24;30:8
weathercom (1)
14:1
weekend (1)
59:8
weren't (1)
42:10
what's (1)
47:13

whatsoever (3)
28:8;33:13;36:21
whereas (1)
9:2
whole (2)
25:9;38:16
who's (1)
24:8
whose (1)
41:22
Wiggins (5)
36:16,17;53:25;54:6,
23
withholding (1)
15:2
within (7)
35:20,25;36:15;
42:18;43:4;48:13;
54:16
witnesses (1)
3:18
word (1)
38:20
words (1)
30:25
work (31)
12:1,2;13:7,23;
16:15,22,25;17:1,3,5,
11,24;19:5,16;23:13,
15;24:8;25:14,17;26:7,
11,14,18,20,24;28:2;
29:9,12,13;35:18;
42:11
worked (31)
2:15;3:3,7;9:19;
11:25;12:3,5,7,20;13:4,
9,15,21;14:17,17,18;
15:23;27:4,21;28:13;
29:18;33:7,14;36:16;
37:14;43:4;51:19;
54:24;55:2,7;56:3
worker (4)
24:17;25:4,5,6
workers (9)
17:16;21:22;24:12,
19;26:23;57:25;58:3,5,
6
worker's (1)
11:12
workforce (3)
6:1;18:9,9
working (5)
14:5;25:4;29:10;
34:18;42:17
workman's (1)
55:20
workplace (1)
28:2
works (2)
33:9;38:6
wrap-up (1)
52:1
writes (1)

38:10
written (2)
8:23;10:14
wrong (1)
14:5

**Y**

yard (1)
19:17
year (1)
31:4
years (2)
13:1;14:21
yesterday (1)
30:20
York (7)
2:15;3:21;32:25;
33:15,19;38:7;55:6

**Z**

Zambrana (1)
41:22

**1**

1 (5)
12:17;13:4,23,25;
14:2
105-73 (1)
41:23
126 (1)
42:5
135 (1)
42:13
137 (1)
41:22
14 (1)
41:16
148-10 (1)
42:13
148-8 (1)
42:5
19 (2)
15:23;53:24

**2**

2 (7)
12:18,23;13:2,23;
14:2;30:16,17
2008 (3)
12:18,20;52:15
2009 (6)
38:7;46:17,18;51:4,
6;52:16
2010 (1)
10:15
216b (1)
4:2
23 (8)
2:15;4:1;31:12,17,

18;32:15,24;38:5

**4**

40 (2)
2:23,24
45 (1)
3:16

**5**

500 (13)
27:5;35:4,15;36:20,
24;45:24;52:6,10,19,
21;53:23;54:15;58:21

**6**

60s (1)
14:3

**8**

82 (1)
14:2

Proskauer»  Proskauer Rose LLP  Eleven Times Square  New York, NY 10036-8299

June 25, 2013

Elise M. Bloom
Member of the Firm
d 212.969.3410
f 212.969.2900
ebloom@proskauer.com
www.proskauer.com

**BY HAND**

The Honorable William H. Pauley III
United States District Court for the
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re:     *Glatt, et al. v. Fox Searchlight Pictures, Inc., et. al.* No. 11 Civ. 6784 (WHP)

Dear Judge Pauley:

        Defendants respectfully request a conference concerning their planned motion under 28 U.S.C § 1292(b), which will ask this Court to certify an interlocutory appeal in light of its June 11, 2013 Order ("the Order") with respect to two controlling questions of law:

        (1)     What is the test for determining whether an unpaid intern has been misclassified and is entitled to compensation as an employee; and

        (2)     What legal standard applies at the post-discovery stage in the FLSA conditional certification context.

Both questions raise "substantial ground for difference[s] of opinion," and will "advance the ultimate termination of th[is] litigation." 28 U.S.C. § 1292(b). As discussed below, the Second Circuit has not yet ruled on either of these questions and there are conflicts between courts in this Circuit and with other circuits. Indeed, interlocutory appeal is also warranted here because jurisprudence states that cases at close of discovery raising class certification issues are ripe for interlocutory appeal because the litigation has closed any additional discovery to shape the matter prior to trial. *See Sperry Rand Corp. v. Larson*, 554 F.2d 868, 871 n. 3 (8th Cir. 1977); *LaFleur v. Dollar Tree Stores, Inc.,* No. 12-cv-00363, 2013 U.S. Dist. LEXIS 5352 (E.D. Va. Jan. 11, 2013); *Karlo v. Pittsburgh Glass Works, LLC*, No. 10-1283, 2012 U.S. Dist. LEXIS 101092 (W.D. Pa. July 20, 2012). Thus, the requirements for interlocutory appeal have been satisfied.

Controlling Question No. 1:  What is the test for determining whether an unpaid intern has been misclassified and is entitled to compensation as an employee?

        The Court's Order establishes a legal test for determining whether an individual has been misclassified as an "intern" for purposes of the FLSA and New York State Law. The Court specifically rejected a "primary beneficiary test" and looked to the totality of the circumstances applied within the six factors listed in U.S. Department of Labor, Fact Sheet # 71. The Second Circuit has not yet articulated a test to be applied to determine whether an unpaid intern is an employee and has been misclassified. The number of variations on the test, adopted within this

Beijing | Boca Raton | Boston | Chicago | Hong Kong | London | Los Angeles | New Orleans | New York | Newark | Paris | São Paulo | Washington, DC

Proskauer≫

The Honorable William H. Pauley III
June 25, 2013
Page 2

district and other circuits, establish that there is substantial ground for difference of opinion. Most notably, the court in *Wang v. Hearst* just recently recognized an "intern" test far different than this Court, holding that the totality of the circumstances test would apply and a "key consideration is 'who is the primary recipient of benefits from the relationship.'" *Wang*, 12 CV 793 (HB), 2013 U.S. Dist. LEXIS 65869, at *13 (S.D.N.Y. May 8, 2013). The *Wang* plaintiffs filed a subsequent motion for certification of the court's order for interlocutory appeal regarding the appropriate legal standard that should be applied to unpaid interns' claims that they are employees, and noted that the court adopted a "primary beneficiary test." Indeed, Hearst has not opposed the motion, citing this Court's ruling as evidence that there exists substantial ground for differences of opinion.

The appropriate standard for evaluating the class members' misclassification claim affects the viability of a collective under Section 216(b) of the FLSA and will ultimately determine the standard for liability that will govern as this case proceeds. The Second Circuit's ruling will also provide guidance to other courts in this district as they seek to address new claims involving this unsettled question. *See Mark v. Gawker Media, LLC,* No. 13 Civ. 4347 (filed June 21, 2013, S.D.N.Y.); *Ballinger v. Advance Magazine Publishers, Inc. d/b/a Condé Nast Publications*, No. 13 Civ. 4036 (filed June 13, 2013, S.D.N.Y.); *Van Rabeswaay v. Kamali*, No. 13 Civ. 3594 (filed May 29, 2012; S.D.N.Y.).

<u>Controlling Question of Law No. 2:  What legal standard applies at the post-discovery stage in the FLSA conditional certification context?</u>

The Second Circuit has recognized that a two-stage approach to FLSA certification applies. *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (noting that "district courts of this Circuit appear to have coalesced around a two-step method [for FLSA certification]…which we think is sensible"). The Second Circuit, however, has not yet articulated what level of scrutiny applies to FLSA conditional certification motions filed at the second, *post-discovery* stage.

Recognizing there was no guidance from the Second Circuit, this Court looked to the following three factors the district court in *Torres v. Gristede's Operating Corp.* applied in ruling on a post-discovery motion for FLSA certification:  "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." Op. at 35 (citing *Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316 (PAC), 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) (adopting the three factors from *Thiessen v. Gen. Elec. Capital Corp.*, 256 F.3d 1095, 1102 (10th Cir. 2001))).

At least one district court in this Circuit, however, has explicitly declined to follow *Torres. See e.g., Gortat v. Capala Bros., Inc.,* No. 07 Civ. 3629 (ILG), 2010 U.S. Dist. LEXIS 35451, at *9 n. 12 (E.D.N.Y. 2010) ("In one case cited by the magistrate judge, *Torres*…the court explicitly endorsed the application of heightened scrutiny in a post-discovery, but pre-notice, context…This [c]ourt declines to follow *Torres*"). In addition, even when courts have

2

Proskauer

The Honorable William H. Pauley III
June 25, 2013
Page 3

applied the three *Torres* factors, they have done so inconsistently. *See e.g., Perkins v. S. New Engl. Tel. Co.*, 669 F. Supp. 2d 212, 222 (D. Conn. 2009) (granting conditional certification, even though the second factor regarding individualized defenses "does not heavily weigh one way or the other").

Before finding that certification at the second, post-discovery, stage was appropriate, the *Torres* court identified and applied three different factors concluding <u>each</u> weighed in favor of certification. *See Torres*, 2006 WL 2819730, at *11. This Court, however, recognized *Torres'* three factors, but found that one factor had not been satisfied because "disparate factual and employment settings" existed among the putative nationwide class. *See* Order at 35. Therefore, there is an open question in this Circuit as to whether a class can be certified at the post-discovery stage on fewer than <u>all</u> three factors identified by the *Torres* court.

Thus, this Court should certify the second controlling question to the Second Circuit. Given the issues in this case, the Order will provide the Court with a record on which to provide guidance as to whether the three factors identified in *Torres* are the controlling factors for a second-stage, post-discovery, scrutiny and to determine whether fewer than all three factors can satisfy the standard in a nationwide class, where there has been a finding of "disparate factual and employment settings." This question will "advance the ultimate termination of the case" because it will establish whether the nationwide class is viable and determine the scope of the class for trial.

Because the Order certifying a FLSA collective action post-discovery raises numerous controlling questions of law where substantial differences of opinion exist, both within this Circuit and in other circuit courts, Defendants request a conference to seek permission to file a motion seeking that this Court certify the issues for interlocutory appeal under 28 U.S.C. § 1292(b). Alternatively, Defendants are prepared to file their motion and supporting memorandum should a conference be deemed unnecessary.

Sincerely yours,

*Elise Bloom* JB

Elise M. Bloom

cc: Adam T. Klein, Esq. (*by email*)
    Rachel Bien, Esq. (*by email*)
    Juno Turner, Esq. (*by email*)
    Amy F. Melican, Esq. (*by email*)

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2013, I electronically served the foregoing

***Plaintiffs-Respondents' Opposition to Petition for Permission to Appeal***

***Pursuant to Federal Rule of Civil Procedure 23(f)***, by ECF, upon the following:

Elise M. Bloom, Esq.
**Proskauer Rose LLP**
Eleven Times Square
New York, New York, 10036
(212) 969-3000
ebloom@proskauer.com

**Attorney for Defendants-Petitioners Fox Searchlight Pictures, Inc., and**
      **Fox Entertainment Group, Inc.**

I certify that an electronic copy was uploaded to the Court's electronic filing

system and three (3) hard copies of the foregoing ***Plaintiffs-Respondents'***

***Opposition to Petition for Permission to Appeal Pursuant to Federal Rule of***

***Civil Procedure 23(f)*** will be sent to the Clerk's Office By Hand Delivery to:

Clerk of Court
United States Court of Appeals, Second Circuit
United States Courthouse
40 Foley Square
New York, New York 10007
(212) 857-8500


/s/ Adam T. Klein
