# 13-_____

## United States Court of Appeals

*for the*

## Second Circuit

FOX SEARCHLIGHT PICTURES, INC.,
FOX ENTERTAINMENT GROUP, INC.,

*Petitioners,*

– v. –

ERIC GLATT, on behalf of himself and all others similarly situated,
ALEXANDER FOOTMAN, on behalf of himself and all others similarly situated,
EDEN M. ANTALIK, KANENE GRATTS, on behalf of themselves and all
others similarly situated, BRIAN NICHOLS, DAVID B. STEVENSON,

*Respondents.*

ON PETITION FOR PERMISSION TO APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

# APPENDIX TO PETITION FOR PERMISSION TO APPEAL PURSUANT TO 28 U.S.C. § 1292(b) AND FED. R. APP. 5(a)

ELISE M. BLOOM
MARK D. HARRIS
AMY F. MELICAN
PROSKAUER ROSE LLP
*Attorneys for Petitioners*
11 Times Square
New York, New York 10036
(212) 969-3000

*Fox Searchlight Pictures, Inc. and Fox Entertainment Group, Inc. v. Eric Glatt, on behalf of himself and all others similarly situated, Alexander Footman, on behalf of himself and all others similarly situated, Eden M. Antalik, Kanene Gratts, on behalf of themselves and all others similarly situated, Brian Nichols, David B. Stevenson*

| No. | Document Description | Page |
|-----|---------------------|------|
| 1 | Memorandum and Order, Honorable William H. Pauley (June 11, 2013) | A00001 |
| 2 | Opinion and Order, Honorable Harold Baer, *Wang v. Hearst* (12-cv-793) (May 8, 2013) | A00037 |
| 3 | U.S. Dep't of Labor, Fact Sheet #71: Internship Programs Under The Fair Labor Standards Act | A00050 |
| 4 | Memorandum of Law in Support of Plaintiff's Motion for Class Certification and Court-Authorized Notice (February 15, 2013) | A00052 |
| 5 | Letter from M. Patricia Smith, Solicitor of Labor U.S. Dep't of Labor to Laurel G. Bellows, Immediate Past President American Bar Association (September 12, 2013) | A00090 |
| 6 | Deposition of Eden Antalik, July 23, 2012, excerpts | A00093 |
| 7 | Memorandum Order, Honorable Harold Baer, *Wang v. Hearst* (12-cv-793) (June 27, 2013) | A00123 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                   :

ERIC GLATT, *et al.*,                :       11 Civ. 6784 (WHP)

                Plaintiffs,   :      MEMORANDUM & ORDER

          -against-        :

FOX SEARCHLIGHT PICTURES
INC., *et ano.*,              :

             Defendants    :
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

        Plaintiffs Eric Glatt, Alexander Footman, Kanene Gratts, and Eden Antalik bring

this putative class action under the Fair Labor Standards Act ("FLSA"), New York Labor Law

("NYLL"), and California Unfair Competition Law ("CAUCL") against Defendants Fox

Searchlight Pictures Inc. ("Searchlight") and Fox Entertainment Group, Inc. ("FEG").  Plaintiffs

contend that Searchlight and FEG violated federal and state labor laws by classifying them as

unpaid interns instead of paid employees.

        Glatt, Footman, and Gratts move for summary judgment that (1) they were

"employees" covered by the FLSA and NYLL and (2) Searchlight was their employer.  Antalik

moves for class certification of her NYLL claims and conditional certification of a collective

action for her FLSA claims.  Defendants move for summary judgment that (1) Gratts's claims

are time-barred; (2) Searchlight did not employ Glatt, Footman, or Gratts; (3) FEG did not

employ Antalik; and (4) Searchlight did not employ any of the production interns on five films

financed by Searchlight.  For the following reasons, Plaintiffs' summary judgment motion is

granted in part and denied in part, Defendants' summary judgment motion is granted in part and

denied in part, and Antalik's motions for class certification of her NYLL claims and conditional

certification of an FLSA collective action are granted.

## BACKGROUND

### The Parties

Glatt and Footman were unpaid interns who worked on production of the film Black Swan in New York. After production ended, Glatt took a second unpaid internship relating to Black Swan's post-production. Gratts was an unpaid intern who worked on production of the film 500 Days of Summer in California. Antalik was an unpaid intern at Searchlight's corporate offices in New York.

FEG is the parent corporation of approximately 800 subsidiaries, including co-defendant Searchlight. Searchlight produces and distributes feature films. Searchlight does not produce the films itself. Rather, it enters into Production-Distribution-Finance Agreements ("Production Agreements") with corporations created for the sole purpose of producing particular films.

### The Film Productions

Black Swan began as a collaboration between director Darren Aronofsky and producer Scott Franklin. Aronofsky and Franklin incorporated Lake of Tears, Inc. for the purpose of producing Black Swan. On November 2, 2009, Searchlight and Lake of Tears entered into a Production Agreement for Black Swan.

500 Days of Summer was produced by 500 DS Films, Inc., a corporation created solely to produce that film. Searchlight entered into a Production Agreement with 500 DS Films for 500 Days of Summer. The Production Agreements for Black Swan and 500 Days of Summer

2

A00002

do not differ materially from one another.[1]  They gave Searchlight the power to hire and fire

production personnel, set budgets, and monitor the progress of films.

#### FEG's Internship Program

Antalik claims she was part of a "centralized unpaid internship program" in which

unpaid interns at FEG's subsidiaries were subject to a single set of policies administered by a

small team of intern recruiters.  She maintains that two employees oversaw FEG's internship

program during the relevant periods and their responsibilities included soliciting "intern request

forms" from supervisors at subsidiaries interested in hiring interns, approving those requests,

screening internship applicants, and processing interns' paperwork.  According to Antalik, she

and the members of her proposed class and collective action were victims of a common policy of

using unpaid interns to perform work that required them to be paid.

Defendants deny there was any "centralized" internship program.  They argue

internships varied considerably among various FEG subsidiaries and departments, and interns'

experiences were shaped by the particular supervisors they were matched with.

## DISCUSSION

### Summary Judgment Motions

I.   Legal Standard

Summary judgment should be granted if the record shows that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

The burden of demonstrating the absence of any genuine dispute as to a material fact rests with

the moving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving

---

[1] May 10, 2013 Tr. at 52:23-53:4.

3

party has made an initial showing that there is no genuine dispute of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment, Liberty Lobby, 477 U.S. at 252, but must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original); see also Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citation omitted). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita, 475 U.S. at 586-87).

The Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party. See Liberty Lobby, 477 U.S. at 255; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). A party opposing summary judgment "is not entitled to rely solely on the allegations of her pleading, but must show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion." Fitzgerald v. Henderson, 251 F.3d 345, 361 (2d Cir. 2001). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998).

II.    Statute of Limitations for Gratts's CAUCL Claim

Defendants argue Gratts's CAUCL claim is time-barred. The CAUCL has a four-year statute of limitations. Cal. Bus. & Prof. Code § 17208. Gratts was not a plaintiff when the

4

action was filed in September 2011.[2] Pursuant to this Court's individual practices, Plaintiffs

filed a pre-motion letter on August 2, 2012 requesting leave to move to file an amended

complaint.[3] The pre-motion letter attached a proposed amended complaint, adding Gratts as a

plaintiff. On September 5, 2012, Plaintiffs filed a motion to amend the complaint.[4] On October

19, 2012, Plaintiffs filed their amended complaint.

        Gratts's claims do not relate back to the filing of the original complaint.[5]

Defendants contend that Gratts's action was "commenced" on September 5, 2012 because "the

date of the filing of the motion to amend constitutes the date the action was commenced for

statute of limitations purposes." Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir. 2000); see also

Nw. Nat'l Ins. Co. v. Alberts, 769 F. Supp. 498, 510 (S.D.N.Y. 1991). But "[t]he theory

underlying this rule is that a . . . defendant is on notice at the time a plaintiff files its motion

because the plaintiff attached the proposed amended complaint to the motion." In re Methyl

Tertiary Butyl Ether Prods. Liab. Litig., MDL No. 1358 (SAS), 2007 WL 2979642, at *4

(S.D.N.Y. Oct. 10, 2007). Here, Defendants were on notice of Gratts's claims when Plaintiffs

submitted their pre-motion letter and included a draft amended complaint. See Reza v. Khatun,

No. 09 Civ. 233 (MKB), 2013 WL 596600, at *4 (E.D.N.Y. Feb. 15, 2013); Lekic v. 222 E. 8th

St. LLC, No. 11 Civ. 1242, 2012 WL 4447625, at *1, 4 (E.D.N.Y. Sept. 25, 2012). Thus, Gratts

commenced her claim on August 2, 2012.

        Accordingly, Gratts's claim is timely only if she worked on the 500 Days of

Summer production on or after August 2, 2008. The amended complaint alleges, somewhat

---

[2] Compl. (Docket Entry #1).
[3] Docket Entry #24.
[4] Docket Entry #27.
[5] Oct. 9, 2012 Tr. at 14:17-15:4 (Docket Entry # 51).

Case 1:11-cv-06784-WHP    Document 163    Filed 06/11/13    Page 6 of 36

unconfidently, that Gratts's internship lasted from May 1, 2008 "through approximately August 2008."[6] The only evidence that Gratts's internship in fact continued into August is her testimony that when she performed her last internship task, taking down movie sets, "the weather was really hot. It was warm and it was at the end of summer. It was in August."[7] When asked whether she would have any basis to dispute records indicating her internship ended earlier, she conceded "I'm just going by what I remember, so if your records say one thing, I'm going by . . . the way I remember it . . . It was in the first week of August."[8]

Defendants have produced records demonstrating Gratts's internship ended before August. Gratts testified there were approximately six weeks of shooting followed by a "wrap party," about a two week break, and then about five days of taking down sets.[9] Charles Varga, the art director for 500 Days of Summer, maintains that shooting wrapped on June 21, 2008.[10] And the invitation to the wrap party announces June 22, 2008 as the event date.[11] Giving full credit to Gratts's testimony that she worked for five days two weeks after shooting wrapped, her internship would have ended July 9, 2008.

But there is reason to believe Gratts's internship may have ended even sooner. Steven Fox, head of the construction department for 500 Days of Summer, claims that his involvement with the film did not end until the sets were dismantled.[12] His time sheets show that June 25, 2008 was the last date he worked on the film.[13] And Varga moved to other projects in

---

[6] Am. Compl. ¶ 148 (Docket Entry #58).
[7] Dep. of Kanene Gratts dated Dec. 5, 2012 ("Gratts Tr.") at 45:7-9.
[8] Gratts Tr. 45:19-23.
[9] Gratts Tr. 93:19-22, 95:17-97:6.
[10] Declaration of Charles Varga ("Varga Decl."), dated Feb. 13, 2013 ¶ 5 (Docket Entry #100).
[11] Varga Decl. Ex. A.
[12] Declaration of Steven Fox ("Fox Decl."), dated Feb. 14, 2013 ¶ 9 (Docket Entry #101).
[13] Fox Decl. ¶ 5, Ex. A.

6

July 2008.[14] As art director, all set work—including dismantling sets—was completed before he moved on.[15]

Moreover, Gratts testified that she only worked at one film location during her internship, where she helped to build sets and then dismantle them.[16] She recalled that they built cubicles and other rooms to create an office for a greeting card company and built an apartment upstairs.[17] That construction occurred at the historic Fenton Building, at 833 South Spring Street in Los Angeles.[18] The call sheets for 500 Days of Summer show that filming at the Fenton Building was completed on May 17, 2008.[19] The location rental agreement shows that the building was rented by the production only until May 23, 2008.[20]

In sum, the only evidence that Gratts worked in August 2008 is her recollection, four years later, that when her internship ended, "the weather was really hot . . . it was in August."[21] This "scintilla of evidence" is not "evidence on which the jury could reasonably find for the plaintiff." Liberty Lobby, 477 U.S. at 252. This conclusion does not require a credibility determination, given her concession that she could be persuaded by documentary evidence.[22]

Plaintiffs argue that even if Gratts's internship ended before August 2008, her claims should be saved by the doctrine of equitable tolling. "[E]quitable tolling is only appropriate 'in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising [her] rights.'" Zerilli-Edelglass v. N.Y.C. Transit Auth., 333

---

[14] Varga Decl. ¶ 7, Exs. B-C.
[15] Varga Decl. ¶ 6.
[16] Gratts Tr. 74:24-78:3.
[17] Gratts. Tr. 76:1-10.
[18] Fox Decl. ¶¶ 6-7.
[19] Decl. of Elise M. Bloom, Esq. ("Bloom SJ Decl.") dated Feb. 15, 2013 (Docket Entry #109), Ex. DD.
[20] Decl. of Steven Wolfe ("Wolfe Decl."), dated Feb. 13, 2013 (Docket Entry #99), Ex. A.
[21] Gratts Tr. 45:7-9.
[22] Gratts Tr. 45:19-23.

F.3d 74, 80 (2d Cir. 2003) (internal quotations and alterations omitted). Equitable tolling is appropriate when the plaintiff (1) filed a defective pleading that otherwise would have been timely, (2) was unaware of her cause of action due to the misleading conduct of the defendant, or (3) has a medical or mental condition preventing her from proceeding in a timely fashion. Zerilli-Edelglass, 333 F.3d at 80. If one of those conditions applies, the plaintiff must show she "(1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." Zerilli-Edelglass, 333 F.3d at 80-81 (internal quotation omitted).

Gratts has a weaker claim to equitable tolling than her co-plaintiffs because she is the only plaintiff who was aware of her potential wage claim nearly from the day it accrued. Gratts testified that she understood she would earn minimum wage at her internship.[23] After her internship, she left several messages at the production office and even went to the Fox Studios lot to try to get her paycheck.[24] Unlike an unpaid intern who does not realize she may be entitled to compensation, Gratts was aware of her claim since 2008 and did not act with reasonable diligence in the time period she seeks to have tolled.

Gratts's CAUCL claim is time-barred because her internship ended before August 2008 and she is not entitled to equitable tolling.

III.    Was Searchlight the Employer of Glatt and Footman?

Plaintiffs and Defendants each move for summary judgment on the issue of whether Searchlight was the "employer" of Glatt and Footman as that term is defined in the FLSA and NYLL. The FLSA defines "employ" as "to suffer or permit to work." 29 U.S.C. §

---

[23] Gratts Tr. at 66:12-19; 69:12-70:8; 149:19-25.
[24] Gratts Tr. 74:6-19; 185:6-186:5.

8

203(g). The law allows for the possibility of joint employers, and "all joint employers are responsible, both individually and jointly, with all the applicable provisions of the [FLSA]." 29 C.F.R. § 791.2(a).

"[T]he 'striking breadth' of the FLSA's definition of 'employ' 'stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles.'" Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992)). "[W]hether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'" Barfield, 537 F.3d at 141 (quoting Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961)). "Employment" under the FLSA is "to be determined on a case-by-case basis by review of the totality of the circumstances." Barfield, 537 F.3d at 141-42. "Above and beyond the plain language, moreover, the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact in the national economy.'" Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (quoting Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984)).

"When it comes to 'employer' status under the FLSA, control is key." Lopez v. Acme Am. Envtl. Co., No. 12 Civ. 511(WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012). The Second Circuit has set out different tests to aid in determining whether an employment relationship exists under the FLSA. Carter adopted a four-factor test to determine whether an alleged joint employer exercised "formal control" over an employee: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of

9

payment, and (4) maintained employment records." 735 F.2d at 12 (quoting Bonnette v. Cal. Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983)).

Zheng v. Liberty Apparel Co., 355 F.3d 61 (2d Cir. 2003) articulated another set of factors for determining whether an alleged employer exercised "functional control" over an employee even if it lacked formal control: "(1) whether the [alleged employer's] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the alleged employer's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [alleged employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [alleged employer]." 355 F.3d at 72.

The NYLL's definitions are nearly identical to the FLSA's. See N.Y. Lab. Law § 2(7); see also Garcia v. La Revise Assocs. LLC, No. 08 Civ. 9356 (LTS) (THK), 2011 WL 135009, at *5 (S.D.N.Y. Jan. 13, 2011). Courts use the same tests to determine joint employment under both the NYLL and the FLSA. See Paz v. Piedra, No. 09 Civ. 03977 (LAK) (GWG), 2012 WL 121103, at *5 (S.D.N.Y. Jan. 12, 2012); Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 189 (S.D.N.Y. 2003).

A. Formal Control Test

1. Hiring and Firing Power

This factor focuses on the "the power to hire and fire," not whether that power was exercised. See Carter, 735 F.2d at 12. The Black Swan Production Agreement required Searchlight's approval to hire key production staff, including the department heads where Glatt

10

and Footman interned.[25]  Though Searchlight did not hire the line producers or department heads

on Black Swan, it often did on other films with similar Production Agreements.[26]  Searchlight's

ability to hire managerial staff is enough to satisfy this factor.  See Herman, 172 F.3d at 140

(Although Defendant's "hiring involved mainly managerial staff, the fact that [Defendant] hired

individuals who were in charge of the [Plaintiffs] is a strong indication of control."); Torres v.

Gristede's Operating Corp., No. 04 Civ. 3316 (PAC), 2011 WL 4571792, at *2 (S.D.N.Y. Sept.

23, 2011) ("There is no evidence that [Defendant] hired any class member, but there does not

have to be.  It stands uncontradicted that he hired managerial employees.").

Searchlight's power to fire Black Swan production staff was unbridled.

Searchlight reserved the right, "in its sole reasonable discretion," to "require [Lake of Tears] to

dispense with the services of any person rendering services with respect to [Black Swan]."[27]

Because Searchlight acquired the power to fire, it is irrelevant that Glatt was offered his

internship and Footman began his before Searchlight became involved with Black Swan.  Glatt's

supervisor told Glatt he needed "to clear with the Fox production executive for interns to be

working for free and getting no college credits."[28]

Defendants argue that Searchlight had the right to fire employees "only if certain

conditions were met."[29]  But Searchlight had the right to require Lake of Tears to fire any worker

---

[25] Decl. of Rachel Bien in Supp. of Pls.' Mot. For Partial Summ. J., dated Feb. 15, 2013, ("Bien SJ Decl.") (Docket Entry #92), Ex. 22 ("Production Agreement").

[26] Dep. of Elizabeth Sayre dated Aug. 15, 2012 ("Sayre Tr.") 22:5-11; 53:5-55:12.  The Court may consider evidence of Searchlight's control over the productions of films other than Black Swan, because as Defendants conceded, Searchlight's rights with respect to the films did not differ materially.  May 10, 2013 Tr. at 52:23-53:4; see also Herman, 172 F.3d at 139 ("Since economic reality is determined based upon all the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." (emphasis in original)).

[27] Production Agreement (emphasis added).

[28] Bien SJ Decl. Ex. 14.

[29] Mem. of Law in Opp. to Pls.' Mot. for Partial Summ. J. ("Defs.' SJ Opp. Br.") (Docket Entry #118) at 11.

11

at Searchlight's "sole reasonable discretion."[30]  Regardless, "[c]ontrol may be restricted, or

exercised only occasionally, without removing the employment relationship from the protections

of the FLSA, since such limitations on control do not diminish the significance of its existence."

Herman, 172 F.3d at 139.

> 2. Searchlight's Ability to Supervise or Control Work Schedules or Conditions

Searchlight closely supervised work on Black Swan.  The production sent

Searchlight "crew lists" with the contact information for all staff, including interns.[31]

Searchlight required them to send daily "call sheets" listing the scenes to be filmed the next day

and the work schedules for all personnel.[32]  The production also sent Searchlight daily "wrap

reports" listing scenes scheduled to be filmed that day, scenes actually filmed, and the hours

worked by production employees.[33]  Searchlight Executive Vice President Elizabeth Sayre

required production employees to call her each morning to let her know what time filming began

and again each evening to let her know what time shooting wrapped.[34]  The production sent

Searchlight weekly schedules and cost reports detailing expenses.[35]  It needed Searchlight's

permission to incur cost overruns.[36]

Status as a joint employer "does not require continuous monitoring of employees,

looking over their shoulders at all times."  Herman, 172 F.3d at 139.  In Herman, the Second

Circuit affirmed the district court's finding that the defendant supervised and controlled

employee work schedules where he "kept himself apprised of [] operations by receiving periodic

---

[30] Production Agreement.
[31] Sayre Tr. 78:1-79:1.
[32] Sayre Tr. 46:21-48:10.
[33] Sayre Tr. 50:11-51:1, 81:15-82:16.
[34] Sayre Tr. 82:3-22.
[35] Sayre Tr. 125:1-22; Production Agreement; Bien SJ Decl. Ex. 6 Ex. B, Ex. 27.
[36] Sayre Tr. 177:22-179:5.

12

reports from employees," including phoning managerial employees "reasonably frequently." Herman, 172 F.3d at 137.

### 3. Whether Searchlight Determined the Rate and Method of Payment

Searchlight set the overall budget for Black Swan and set the allocations for each line item.[37] Glatt and Footman argue that through its control of the budget, Searchlight "de facto" set wages for all production workers.[38] In Rutherford Food Corp. v. McComb, 331 U.S. 722 (1947), the Supreme Court held that a slaughterhouse jointly employed meat de-boners even though they were directly controlled by a boning supervisor who contracted with the slaughterhouse. In Zheng, the Second Circuit discussed Rutherford and noted that "the slaughterhouse de facto set the workers' wages, because the boners did no meat boning for any other firm and shared equally in the funds paid to the boning supervisor." Zheng, 355 F.3d at 72. Here, the crucial factor of equally sharing wages is absent. An increase in the wages budget would not necessarily result in across the board raises; the production might have hired additional workers or increased pay to particular employees.

But even though Lake of Tears hired Glatt, it needed Searchlight's permission to have an unpaid intern who was not receiving college credit.[39] Moreover, Searchlight withheld employees' pay until they signed Searchlight-approved employment agreements.[40] While Searchlight may not have had the power to set employees' rate of pay, it was involved in their method of pay. Cf. Herman, 172 F.3d at 140 ("little evidence" showed defendant determined plaintiffs' rate of payment, "[b]ut he did participate in the method of payment").

---

[37] Sayre Tr. 17:11-18:12.
[38] Mem. of Law in Support of Pls.' Mot. For Partial Summ J. ("Pls.' SJ Br.") (Docket Entry #90) at 26 (citing Zheng, 355 F.3d at 72).
[39] Bien SJ Decl. Ex. 14.
[40] Sayre Tr. 75:24-76:11; Bien Decl. Ex. 19.

4.  <u>Whether Searchlight Maintained Employment Records</u>

Searchlight required production staff to sign confidentiality agreements and employment agreements known as "deal memos." Moreover, Searchlight insisted that <u>Black Swan</u> employees sign revised deal memos it drafted even if they had signed memos before Searchlight's involvement.[41] Searchlight did not allow production employees to be paid until they signed one of Searchlight's deal memos.[42] After shooting wrapped, Searchlight required Lake of Tears to send it the signed memos.[43]

Searchlight takes a narrow view, pointing out there is no evidence that Glatt, Footman, or any other unpaid intern signed a deal memo.[44] But the fact that Searchlight required memos from the paid employees who oversaw the unpaid interns is evidence of control over the interns.

B.  <u>Functional Control Test</u>

A district court must "look beyond an entity's formal right to control the physical performance of another's work before declaring that the entity is not an employer under the FLSA." <u>Zheng</u>, 355 F.3d at 69. "[A]n entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them." <u>Zheng</u>, 355 F.3d at 70.

1.  <u>Whether Searchlight's Premises and Equipment Were Used for Plaintiffs' Work</u>

Glatt and Footman's internships were based at Lake of Tears' offices, which it leased before signing the Production Agreement with Searchlight.[45] There is no evidence either

---

[41] Bien SJ Decl. Ex. 21; Sayre Tr. 172:9-74:4, 115:8-23.
[42] Sayre Tr. 75:24-76:11; Bien Decl. Ex. 19.
[43] Bien Decl. Ex. 42.
[44] Defs.' SJ Opp. Br. at 17.
[45] Dep. of Alexander Footman, dated May 7, 2012 ("Footman Tr.") at 198:2-4.

14

Glatt or Footman ever visited Searchlight offices or used its equipment. The fact that Lake of Tears' office space and equipment may have been rented or purchased in part by funds from Searchlight does not transform them into Searchlight's premises or equipment.

   2.   <u>Whether Lake of Tears Could Shift From One Putative Joint Employer to Another</u>

This factor is derived from <u>Rutherford</u>, where the plaintiff meat boners "had no business organization that could or did shift as a unit from one slaughterhouse to another." <u>Rutherford</u>, 331 U.S. at 730. The Second Circuit observed this is relevant to joint employment "because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client." <u>Zheng</u>, 355 F.3d at 72.

The <u>Black Swan</u> production could not shift from one film studio to another. The Production Agreement prohibited Lake of Tears from taking <u>Black Swan</u> elsewhere unless Searchlight abandoned the project or failed to advance funds.[46] It is irrelevant that the Production Agreement did not prohibit Lake of Tears from working on other projects. This ignores economic reality in the film industry, where a film is produced by a single-purpose entity whose operations cease after the film is made.[47]

   3.   <u>Extent to Which Plaintiffs Performed a Discrete Line-Job That Was Integral to Searchlight's Process of Production</u>

In <u>Rutherford</u>, the meat boners' work was "a part of the integrated unit of production" at the slaughterhouse. <u>Rutherford</u>, 331 U.S. at 729. "Interpreted broadly, this factor could be said to be implicated in <u>every</u> subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service." <u>Zheng</u>,

---

[46] Production Agreement.
[47] <u>See</u> Franklin Tr. 16:5-14.

355 F.3d at 73 (emphasis in original). But the Second Circuit has held this factor "to mean that work on a production line occupies a special status under the FLSA." Zheng, 355 F.3d at 73. Glatt and Footman's work was not part of an "integrated production unit" comparable to a production line. Zheng, 355 F.3d at 73.

### 4. Whether Responsibility Could Pass From One Subcontractor to Another Without Material Changes

In Rutherford, "even when the boning supervisor abandoned his position and another supervisor took his place . . . the same employees would continue to do the same work in the same place." Zheng, 355 F.3d at 74 (emphasis in the original). "[T]his factor weighs in favor of a determination of joint employment when employees are tied to an entity such as the slaughterhouse rather than to an ostensible direct employer such as the boning supervisor." Zheng, 355 F.3d at 74.

The crew of Black Swan was tied to Searchlight, not Lake of Tears. Searchlight, in its "sole reasonable discretion," had the power to replace key production personnel without material changes to those underneath them.[48] Searchlight could even have dismissed Lake of Tears and taken over the production.[49] The crew was not tied to Lake of Tears, which everyone knew would cease operations after delivering Black Swan to Searchlight.

### 5. Degree to Which Searchlight Supervised the Plaintiffs' Work

Supervision "weighs in favor of joint employment only if it demonstrates effective control of the terms and conditions of the plaintiff's employment." Zheng, 355 F.3d at 75 (citing Rutherford, 331 U.S. at 726)). "By contrast, supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry."

---

[48] Production Agreement.
[49] Production Agreement.

Zheng, 355 F.3d at 75.  As discussed above, Searchlight closely monitored work on the Black Swan production and exercised effective control over it.

### 6.   Whether Plaintiffs Worked Exclusively or Predominantly for Searchlight

As Defendants concede, Footman and Glatt worked exclusively on Black Swan, which weighs in favor of finding joint employment.[50]

In sum, the formal and functional control tests "state no rigid rule" and "provide 'a nonexclusive and overlapping set of factors' to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." Barfield, 537 F.3d at 143 (quoting Zheng, 355 F.3d at 75-76).  Summary judgment may be granted to the plaintiffs "even when isolated factors point against imposing joint liability." Zheng, 355 F.3d at 77.  Searchlight emphasizes the lack of evidence that Glatt or Footman themselves were ever "controlled" by Searchlight, but "[s]uch a contention ignores the relevance of the totality of the circumstances." Herman, 172 F.3d at 140 (rejecting argument that overall operational control is irrelevant "and that only evidence indicating [] direct control over [Plaintiffs] should be considered").

The fact that all four formal control factors weigh in favor of finding Searchlight was a joint employer is sufficient to find Searchlight was Plaintiffs' employer even if no functional control factors were satisfied.  That conclusion is bolstered by the finding that Searchlight also exercised significant functional control.  And, in the end, it is all about control. Lopez, 2012 WL 6062501, at *3.

---

[50] Defs.' SJ Opp. Br. at 22.

17

IV.    Was Searchlight the Employer of All Production Interns?

Discovery in this putative class action has been limited to interns on the productions of five representative Searchlight films: Black Swan, 500 Days of Summer, Our Family Wedding, Cedar Rapids, and The Savages. Defendants move for summary judgment finding that none of the production interns on any of these films were employed by Searchlight. But Glatt, Footman, and Gratts are the only production interns who are plaintiffs in this action. There is no proposed class containing any other production interns. As previously discussed, Gratts's claim is time-barred, and Searchlight was the employer of Glatt and Footman. Summary judgment is denied as moot as to any other production interns, as there are none in this action.

V.    Was FEG Antalik's Employer?

Defendants move for summary judgment holding that FEG was not a joint employer of Antalik under the FLSA or NYLL. Defendants argue that FEG is not liable for its subsidiary's acts except in extraordinary circumstances because of the "strong presumption that a parent is not the employer of its subsidiary's employees."[51] But that standard relates to piercing the corporate veil, not finding joint employment under the FLSA. Cf. Flemming v. REM Conn. Cmty. Servs. Inc., No. 11 Civ. 689 (JBA), 2012 WL 6681862, at *4-5 (D. Conn. Dec. 21, 2012). When a parent is held to be a joint employer under the FLSA, it is not being held liable for the acts of its subsidiary, rather, it is liable for its own acts of control over an employee. The same formal and functional control tests discussed earlier apply in determining whether FEG was Antalik's employer.

Antalik asserts that she was part of a centralized internship program run by FEG. Interns received offer letters welcoming them to "Fox Entertainment Group's internship

---

[51] Defs.' SJ Br. at 26 (quoting Balut v. Loral Elec. Sys., 988 F. Supp. 339, 344 (S.D.N.Y. 1997)).

18

program."[52]  Intern recruiters Aimee Hoffman and Laura Wiggins oversaw internships at various

FEG companies.[53]  Hoffman did not recruit Antalik, but when Hoffman became aware of

Antalik's internship, she required Antalik to submit paperwork to continue her internship.[54]

Hoffman sent internship guidelines applicable to all FEG interns to Antalik's supervisor at

Searchlight.[55]  Hoffman provided training to intern supervisors at FEG.[56]  FEG exercised some

control over interns' schedules at its subsidiaries by requiring interns to work between 16 and 24

hours per week, or 40 hours in the summer.[57]  And FEG maintained employment records and a

personnel file for Antalik.[58]

This evidence raises factual disputes that preclude summary judgment in favor of

the Defendants.

VI.    Were Glatt and Footman "Employees" Covered by the FLSA and NYLL?

Glatt and Footman move for summary judgment holding they were "employees"

covered by the FLSA and NYLL and do not fall under the "trainee" exception established by

Walling v. Portland Terminal Co., 330 U.S. 148 (1947).

In Walling, a case involving a railroad that held a week-long training course for

prospective brakemen, the Supreme Court determined that "trainees" were not covered

employees under the FLSA.  The trainees "[did] not displace any of the regular employees, who

---

[52] Decl. of Rachel Bien in Opp. to Defs.' Mot. for Summ. J, dated Mar. 29, 2013 ("Bien SJ Opp. Decl.") (Docket Entry #140) Exs. 87, 99.

[53] Dep. of Aimee Hoffman, dated Aug. 16, 2012 ("Hoffman Tr.") at 265:2-268:22.  Defendants emphasize Hoffman was employed by Fox Group, New America Inc. and not by FEG.  Decl. of Aimee Hoffman, dated Mar. 26, 2013 ¶2 (Docket Entry #128).  However, this does not preclude the possibility she administered a centralized FEG internship program.  Her email signature lists her position as "FEG intern recruiter."  Bien Class Cert. Decl. Ex. 22.

[54] Bien SJ Opp. Decl. Ex. 63.

[55] Bien SJ Opp. Decl. Ex. 95.

[56] Bien SJ Opp. Decl. Ex. 86.

[57] Bien SJ Opp. Decl. Exs. 65, 78.

[58] Bien SJ Opp. Decl. Exs. 68, 69.

[did] most of the work themselves, and must stand immediately by to supervise whatever the trainees do." Walling, 330 U.S. at 149-50. The trainees' work "[did] not expedite the company business, but may, and sometimes [did], actually impede and retard it." Walling, 330 U.S. at 150. The Court held that the FLSA "cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction . . . the [FLSA] was not intended to penalize [employers] for providing, free of charge, the same kind of instruction [as a vocational school] at a place and in a manner which would most greatly benefit the trainee." Walling, 330 U.S. at 153. The Court concluded that "[a]ccepting the unchallenged findings here that the railroads receive no 'immediate advantage' from any work done by the trainees, we hold that they are not employees within the Act's meaning." Walling, 330 U.S. at 153.

A Department of Labor fact sheet helps to determine whether interns at for-profit businesses fall within this exception. See U.S. Dep't of Labor Fact Sheet #71 (April 2010) ("DOL Intern Fact Sheet"). The Fact Sheet notes that "[t]he Supreme Court has held that the term 'suffer or permit to work' cannot be interpreted so as to make a person whose work serves only his or her own interest an employee of another who provides aid or instruction." It enumerates six criteria for determining whether an internship may be unpaid:

1. The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

2. The internship experience is for the benefit of the intern;

3. The intern does not displace regular employees, but works under close supervision of existing staff;

4. The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

20

     5. The intern is not necessarily entitled to a job at the conclusion of the internship; and

     6. The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

"This exclusion from the definition of employment is necessarily quite narrow because the FLSA's definition of 'employ' is very broad." DOL Intern Fact Sheet.

     The Second Circuit has not addressed the "trainee" exception to the FLSA. Defendants urge that the DOL factors are not the applicable standard and that this Court should apply a "primary benefit test" by determining whether "the internship's benefits to the intern outweigh the benefits to the engaging entity."[59]

     While some Circuits have applied a "primary beneficiary" test, it has little support in Walling. The Supreme Court did not weigh the benefits to the trainees against those of the railroad, but relied on findings that the training program served only the trainees' interests and that the employer received "no 'immediate advantage' from any work done by the trainees." Walling, 330 U.S. at 153 (emphasis added).

     Thus, Walling created a narrow exception to an expansive definition. "A broader or more comprehensive coverage of employees . . . would be difficult to frame." United States v. Rosenwasser, 323 U.S. 360, 362 (1945). There is "no doubt as to the Congressional intention to

---

[59] Defs.' SJ Opp. Br. at 23. (citing Solis v. Laurelbrook Sanitarium & Sch., Inc., 642 F.3d 518, 525 (6th Cir. 2011) ("[T]he ultimate inquiry in a learning or training situation is whether the employee is the primary beneficiary of the work performed."); Blair v. Wills, 420 F.3d 823, 829 (8th Cir. 2005) (finding students' chores at boarding school were not work where they "were primarily for the students' . . . benefit"); McLaughlin v. Ensley, 877 F.2d 1207, 1209 (4th Cir. 1989) ("[T]he general test used to determine if an employee is entitled to the protections of the Act is whether the employee or the employer is the primary beneficiary of the trainees' labor.")); see also Velez v. Sanchez, 693 F.3d 308, 330 (2d Cir. 2012) (in determining whether a plaintiff is a domestic service worker covered by the FLSA, "[a] court should also consider who is the primary recipient of benefits from the relationship").

include all employees within the scope of the Act unless specifically excluded." Courts should be cautious in expanding the "trainee" exception established in Walling.

Moreover, a "primary beneficiary" test is subjective and unpredictable. Defendants' counsel argued the very same internship position might be compensable as to one intern, who took little from the experience, and not compensable as to another, who learned a lot.[60] Under this test, an employer could never know in advance whether it would be required to pay its interns. Such a standard is unmanageable.

By contrast, the DOL factors have support in Walling. Because they were promulgated by the agency charged with administering the FLSA and are a reasonable application of it, they are entitled to deference.[61] Wang v. Hearst Corp., --- F.Supp.2d ----, 2013 WL 1903787, at *5 (S.D.N.Y. May 8, 2013) (citing United States v. Mead Corp., 533 U.S. 218, 234 (2001). No single factor is controlling; the test "requires consideration of all the circumstances." Archie v. Grand Cent. P'ship, 997 F. Supp. 504, 532 (S.D.N.Y. 1998); see also Wang, 2013 WL 1903787, at *4 ("[T]he prevailing view is the totality of the circumstances test.").

As noted above, "since the NYLL's definition of employment is nearly identical to the FLSA's[,] courts in this circuit have held that the New York Labor Law embodies the same standard for employment as the FLSA." Cano v. DPNY, Inc., 287 F.R.D. 251, 260 n.2 (S.D.N.Y. 2012) (internal quotation and alterations omitted). The analysis for the trainee

---

[60] May 10, 2013 Tr. 42:23-43:8.

[61] Defendants argue the DOL factors do not deserve deference because DOL opinion letters, which do not stem from "formal agency adjudication or notice-and-comment rulemaking, are not binding authority." Defs.' SJ Opp. Br. at 25 n.14. (quoting Barfield, 537 F.3d at 149). But even if not binding, "such agency letters represent 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" Barfield, 537 F.3d at 149 (quoting Gualandi v. Adams, 385 F.3d 236, 243 (2d Cir. 2004)). The DOL Intern Fact Sheet was issued in 2010, but the same six factors "have appeared in Wage and Hour Administrator opinions since at least 1967." Reich v. Parker Fire Prot. Dist., 992 F.2d 1023, 1027 (10th Cir. 1993).

22

exception to the NYLL is the same as that for the FLSA.[62]  See Wang, 2013 WL 1903787, at *3 n.3.

1.  Training Similar to an Educational Environment

While classroom training is not a prerequisite, internships must provide something beyond on-the-job training that employees receive.  "A training program that emphasizes the prospective employer's particular policies is nonetheless comparable to vocational school if the program teaches skills that are fungible within the industry."  Reich v. Parker Fire Prot. Dist., 992 F.2d 1023, 1028 (10th Cir. 1993).

Footman did not receive any formal training or education during his internship.[63]  He did not acquire any new skills aside from those specific to Black Swan's back office, such as how it watermarked scripts or how the photocopier or coffee maker operated.[64]  It is not enough that Footman "learned what the function of a production office was through experience."[65]  He accomplished that simply by being there, just as his paid co-workers did, and not because his internship was engineered to be more educational than a paid position.

The record for Glatt is inconclusive on this factor.  Plaintiffs argue he "did not receive any training on Black Swan."[66]  But Glatt claimed only that he didn't learn much.[67]  Whether someone learned anything does not answer the question of whether training or useful knowledge was offered.  As any student knows, even a classic educational environment sometimes results in surprisingly little learning.

---

[62] The New York State Department of Labor has its own fact sheet for unpaid internships incorporating the six DOL factors and adding five additional considerations.  See Bien SJ Decl. Ex. 35.

[63] Footman Tr. 140:4-10; 221:18-222:8.

[64] Footman Tr. 36:22-27:16; 93:12-21; 96:9-97:5.

[65] Footman Tr. 97:6-14.

[66] Pls. SJ Br. at 4,

[67] See Glatt Tr. 121:4-11; 305:25-306:6.

23

2.  <u>Whether the Internship Experience is for the Benefit of the Intern</u>

Undoubtedly, Glatt and Footman received some benefits from their internships, such as resume listings, job references, and an understanding of how a production office works.[68] But those benefits were incidental to working in the office like any other employee and were not the result of internships intentionally structured to benefit them. Resume listings and job references result from any work relationship, paid or unpaid, and are not the academic or vocational training benefits envisioned by this factor.

On the other hand, Searchlight received the benefits of their unpaid work, which otherwise would have required paid employees. Even under Defendants' preferred test, the Defendants were the "primary beneficiaries" of the relationship, not Glatt and Footman.

3.  <u>Whether the Plaintiffs Displaced Regular Employees</u>

Glatt and Footman performed routine tasks that would otherwise have been performed by regular employees. In his first internship, Glatt obtained documents for personnel files, picked up paychecks for coworkers, tracked and reconciled purchase orders and invoices, and traveled to the set to get managers' signatures.[69] His supervisor stated that "[i]f Mr. Glatt had not performed this work, another member of my staff would have been required to work longer hours to perform it, or we would have needed a paid production assistant or another intern to do it."[70] At his post-production internship, Glatt performed basic administrative work such as drafting cover letters, organizing filing cabinets, making photocopies, and running errands.[71] This is work that otherwise would have been done by a paid employee.

---

[68] Footman Tr. 97:6-14, 212:24-213:10.
[69] Bien SJ Decl. Ex. 9 ¶ 16.
[70] Bien SJ Decl. Ex. 9 ¶ 16.
[71] Bien SJ Decl. Ex. 6 ¶ 7-8.

24

Footman performed similar chores, including assembling office furniture, arranging travel plans, taking out trash, taking lunch orders, answering phones, watermarking scripts, and making deliveries.[72]  Again, if Footman had not performed these tasks for free, a paid employee would have been needed.  When Footman went from five to three days a week, Black Swan hired another part-time intern.[73]

    4.  Whether Searchlight Obtained an Immediate Advantage From Plaintiffs' Work

Searchlight does not dispute that it obtained an immediate advantage from Glatt and Footman's work.  They performed tasks that would have required paid employees.  There is no evidence they ever impeded work at their internships.  Menial as it was, their work was essential.  The fact they were beginners is irrelevant.  The FLSA recognizes this by authorizing the Secretary of Labor to issue certificates allowing "learners" and "apprentices" to be paid less than minimum wage.  See 29 U.S.C. § 214(a).  "An employee is entitled to compensation for the hours he or she actually worked, whether or not someone else could have performed the duties better or in less time."  Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 471 n.3 (11th Cir. 1982).

    5.  Whether Plaintiffs Were Entitled to a Job at the End of Their Internships

There is no evidence Glatt or Footman were entitled to jobs at the end of their internships or thought they would be.

    6.  Whether Searchlight and the Plaintiffs Understood They Were Not Entitled to Wages

Glatt and Footman understood they would not be paid.[74]  But this factor adds little, because the FLSA does not allow employees to waive their entitlement to wages.  "[T]he

---

[72] Pls.' Rule 56.1 Statement (Docket Entry #91) ¶ 223.
[73] Footman Tr. 43:3-9.
[74] Glatt Tr. 77:5-18; Footman Tr. 20:24-21:3.

25

purposes of the Act require that it be applied even to those who would decline its protections. If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 299, 301 (1985). This protects more than the Plaintiffs themselves, because "[s]uch exceptions to coverage would . . . exert a general downward pressure on wages in competing businesses." Tony & Susan Alamo Found., 471 U.S. at 302. It also protects businesses by preventing anticompetitive behavior. "An employer is not to be allowed to gain a competitive advantage by reason of the fact that his employees are more willing to waive [FLSA claims] than are those of his competitor." Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 710 (1945).

Considering the totality of the circumstances, Glatt and Footman were classified improperly as unpaid interns and are "employees" covered by the FLSA and NYLL. They worked as paid employees work, providing an immediate advantage to their employer and performing low-level tasks not requiring specialized training. The benefits they may have received—such as knowledge of how a production or accounting office functions or references for future jobs—are the results of simply having worked as any other employee works, not of internships designed to be uniquely educational to the interns and of little utility to the employer. They received nothing approximating the education they would receive in an academic setting or vocational school. This is a far cry from Walling, where trainees impeded the regular business of the employer, worked only in their own interest, and provided no advantage to the employer. Glatt and Footman do not fall within the narrow "trainee" exception to the FLSA's broad coverage.

26

Class Certification of Antalik's NYLL Claims

Antalik moves to certify a class consisting of

[a]ll individuals who had unpaid internships in New York between September 28, 2005 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

She asserts Defendants violated the NYLL with respect to the proposed class.

I.    Legal Standard

A party seeking class certification must first satisfy Federal Rule of Civil Procedure 23(a), which "requires that a proposed class action (1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010) (citing Fed. R. Civ. P. 23(a)). In addition, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2548 (2011). Here, Antalik relies on Rule 23(b)(3), which "requires the party seeking certification to show that 'questions of law or fact common to class members predominate over any questions affecting only individual members' and that class treatment would be superior to individual litigation." Myers, 624 F.3d at 547 (quoting Fed. R. Civ. P. 23(b)(3)).

Rule 23 "does not set forth a mere pleading standard." Wal-Mart, 131 S. Ct. at 2551. Rather, "[t]he party seeking class certification must affirmatively demonstrate compliance with the Rule, and a district court may only certify a class if it is satisfied, after a rigorous analysis, that the requirements of Rule 23 are met." In re Am. Int'l Grp., Inc. Sec. Litig., 689 F.3d 229, 237-38 (2d Cir. 2012).

27

**A00027**

II.    Numerosity

        The numerosity requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of 40 members." Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 2005). While a party seeking class certification must prove "there are in fact sufficiently numerous parties," Wal-Mart, 131 S. Ct. at 2551 (emphasis in original), "[c]ourts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).

        Antalik offers Defendants' intern personnel database as proof there were at least 45 class members who interned between 2007 and 2010.[75] But Defendants argue that their database can "not be relied upon for its accuracy."[76] If anything, the proposed class is likely to be larger than the database indicates.   The proposed class period dates to 2005, but 36 of the 45 interns in the database were hired in 2009, and none before 2007.[77]  Based on this, the Court is permitted to draw a "reasonable inference" that there are at least 40 class members. See Alcantara v. CAN Mgmt., Inc., 264 F.R.D. 61, 64-65 (S.D.N.Y. 2009).  Moreover, the Defendants cannot argue that the class size "is far too indefinite and speculative"[78] and thereby capitalize on their own inability to produce accurate information. See McNeill v. N.Y.C. Hous. Auth., 719 F. Supp. 233, 252 (S.D.N.Y. 1989) ("[T]he lack of knowledge as to the exact number

---

[75] Decl. of Rachel Bien in Support of Pls.' Mot. for Class Certification and Court-Authorized Notice, dated Feb. 15, 2013 ("Bien Class Cert. Decl.") (Docket Entry #105) ¶ 12, Ex. 74.
[76] Mem. of Law in Opp. to Pl. Eden Antalik's Mot. for NYLL and FLSA Certification ("Defs.' Class Cert. Opp. Br.") at 13 (Docket Entry #138) (emphasis in original).
[77] Bien Class Cert. Decl. Ex. 74; see also Dep. of David Johnson, dated Dec. 13, 2012 111:11-19 (People Soft was only used to track interns for "a relatively short period of time").
[78] Defs.' Class Cert. Opp. Br. at 14.

A00028

of affected persons is not a bar to maintaining a class action where the defendants alone have access to such data.")

Nor have Defendants rebutted the presumption of numerosity. Joinder is impracticable here because Plaintiffs do not have accurate information regarding potential class members. Thus they cannot invite them to join as plaintiffs. A class action serves judicial economy and makes recovery economically feasible for class members who would otherwise need to retain lawyers for individual actions seeking relatively small recoveries. See Robidoux, 987 F.2d at 936 (citing Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980)).

III.   Commonality

A party seeking certification must show "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "That language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" Wal-Mart, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. Law Rev. 97, 131-32 (2009)). Class claims "must depend upon a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Wal-Mart, 131 S. Ct. at 2551 (emphasis in original) (quoting Nagareda, supra, at 132).

Antalik has identified several common questions relevant to determining NYLL violations, including: (1) whether Defendants derived an immediate advantage from interns'

29

work, (2) whether interns displaced regular employees, and (3) whether FEG's internship program was for the benefit of interns.[79] Some evidence Antalik claims may answer these questions is either individualized proof or of little evidentiary value. For example, there is nothing facially unlawful about the FEG internship guidelines that might generate common answers to drive the litigation.[80] She also claims FEG's internship request forms, which describe various internship positions, constitute classwide evidence that interns provided an immediate advantage to Defendants. A completed request form may be evidence that a particular internship did not fall within the NYLL's "trainee" exception, but that is individualized proof. Only the blank request form is common to the class, and it is not capable of resolving any question.[81]

But Antalik also identifies evidence that _is_ capable of answering common questions on a classwide basis. Departments at FEG companies requested interns based on their "needs," and they requested more when they were busier, the opposite of what one would expect if interns provided little advantage to the company and sometimes impeded its work.[82] An internal memo reports that because paid internships were eliminated and overtime pay and temporary employees scaled back, "the size of our [unpaid] intern program more than doubled."[83] Using unpaid interns to fill the interstices created by eliminating paid positions is a clear violation of the NYLL.

The April 2010 release of the DOL Intern Fact Sheet did not represent a change in applicable law. See, e.g., Reich, 992 F.2d at 1027 (The six DOL criteria "were derived almost directly from [Walling] and have appeared in Wage and Hour Administrator opinions since at

---

[79] See Mem. of Law in Support of Pls.' Mot. for Class Certification and Court-Authorized Notice ("Pls.' Class Cert. Br.") at 22-24 (Docket Entry #104).
[80] See Bien Class Cert. Decl. Ex. 30.
[81] See, e.g., Bien Class Cert. Decl. Ex. 50.
[82] Hoffman Tr. 31:17-33:3.
[83] Bien Class Cert. Decl. Ex. 38.

30

least 1967."). But the reactions to the fact sheet indicate FEG's internship overseers believed "the regulations have been changed significantly creating a lot more risk going forward."[84] Antalik's supervisor, John Maybee, asked intern recruiter Aimee Hoffman "[w]hy would an office have an intern that provides no immediate advantage from said intern's activities?"[85] Hoffman responded, "That is the question! . . . If we give them work to benefit the company, we really should pay them . . . these DOL guidelines really make you think about whether it's worth it or not to have [an unpaid intern]."[86]

At least one FEG department bowed out of the internship program, believing it could not comply with the DOL criteria.[87] Hoffman informed internship supervisors that "internships will be changing considerably" and "we are tightening up our guidelines due to the department of labor's definition of a [sic] unpaid intern."[88] An internal memo in August 2008 states that "[s]tarting with the Fall 2010 internship program . . . Fox will only provide paid internships unless a manager can comply with the six criteria provided by the DOL."[89] Ultimately, FEG eliminated unpaid internships altogether because of "the new regulation on [unpaid] interns."[90]

Evidence that interns were recruited to help with busy periods, that they displaced paid employees, and that those who oversaw the internships did not believe they complied with applicable law is evidence capable of generating common answers to questions of liability.

---

[84] Bien Class Cert. Decl. Ex. 46; see also Ex. 21 ("the 'suggested' guidelines and the former reality [sic] differ quite drastically"); Ex. 24 (DOL factors "indicate[] that [interns'] duties and participation here may change substantially").
[85] Bien Class Cert. Decl. Ex. 22.
[86] Bien Class Cert. Decl. Ex. 22.
[87] Bien Class Cert. Decl. Ex. 32.
[88] Bien Class Cert. Decl. Ex. 26.
[89] Bien Class Cert. Decl. Ex. 38.
[90] Bien Class Cert. Decl. Ex. 27.

IV.    Typicality

Typicality "requires that the claims of the class representative[] be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)). "The commonality and typicality requirements tend to merge into one another." Marisol, 126 F.3d at 376. "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 155 (S.D.N.Y. 2002). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux, 987 F.2d at 936-37. Antalik participated in the same internship program administered by the same set of recruiters as all class members, was classified as an unpaid intern like all class members, and brings an NYLL wage claim like all class members. She satisfies the typicality requirement.

Defendants argue vigorously that Antalik has not met this requirement because she did not receive academic credit for her internship and Aimee Hoffman did not recruit her.[91] Receipt of academic credit is of little moment. A university's decision to grant academic credit is not a determination that an unpaid internship complies with the NYLL. Universities may add additional requirements or coursework for students receiving internship credit, but the focus of the NYLL is on the requirements and training provided by the alleged employer.

---

[91] Defs.' Class Cert Opp. Br. at 17-21.

32

That Hoffman did not recruit Antalik does not defeat typicality because Antalik still worked in the same FEG internship program supervised by Hoffman. The potential liability arises from the operation of the program, not recruitment of the interns. And though Hoffman did not hire Antalik, she required Antalik to send her the same paperwork as all other interns.[92]

V.    Adequacy

Adequacy requires determining whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000). "The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class." Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 158 (S.D.N.Y. 2008). Defendants do not dispute either point. Antalik has no known conflicts with the class. Her counsel are experienced in prosecuting employment class actions. See Capsolas v. Pasta Res., Inc., No. 10 Civ. 5595 (RLE), 2012 WL 4760910, at *3 (S.D.N.Y. Oct. 5, 2012).

VI.    Predominance

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).

As discussed above, Antalik submitted generalized proof on the issue of Defendants' liability. In an FLSA class, common questions of liability predominate over

---

[92] Bien SJ Opp. Decl. Ex. 63.

individual calculations of damages. See Torres v. Gristede's Operating Corp., No. 04 Civ. 3316

(PAC), 2006 WL 2819730, at *15 (S.D.N.Y. Sept. 29, 2006); Noble v. 93 Univ. Place Corp., 224

F.R.D. 330, 345 (S.D.N.Y. 2004).

VII.    Superiority

In determining whether "a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy," the Court must consider

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Here, the relatively small recoveries available to individual plaintiffs

make a class action a more efficient mechanism. There are no known litigations raising the same

issues. This Court is a desirable forum because the proposed class worked in New York. And

there is no reason to expect manageability difficulties.

For the foregoing reasons, the Court certifies Antalik's proposed class under Rule

23(b)(3) with Antalik as class representative. The Court appoints Outten & Golden LLP as class

counsel under Rule 23(g).

### Conditional Certification of Antalik's FLSA Claims

The FLSA allows plaintiffs to bring claims on behalf of "other employees

similarly situated." 29 U.S.C. § 216(b). "Although they are not required to do so by [the] FLSA,

district courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating

notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as

represented plaintiffs." Myers, 624 F.3d at 554 (quoting Hoffmann-La Roche Inc. v. Sperling,

493 U.S. 165, 169 (1989)). To be entitled to notice, Plaintiffs must make a "'modest factual

34

showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" Myers, 624 F.3d at 555 (quoting Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).

Courts apply "heightened scrutiny" to motions for court-authorized notice made after discovery. Torres, 2006 WL 2819730, at *9. For post-discovery motions, courts consider whether the plaintiff and proposed class members are "similarly situated" by considering "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." Torres, 2006 WL 2819730, at *9 (internal alteration omitted) (quoting Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001)).

Antalik moves for authorization to send notice of this action to

all individuals who had unpaid internships between September 28, 2008 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

As discussed above, Antalik has put forth generalized proof that interns were victims of a common policy to replace paid workers with unpaid interns. Though there are disparate factual and employment settings, the common issues of liability predominate over individual issues and defenses. See Torres, 2006 WL 2819730, at *10. And the same fairness and procedural considerations that make a class action a superior mechanism for the NYLL claims make a collective action a superior mechanism for the FLSA claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment that Gratts's CAUCL claim is time-barred is granted, and the remainder of its summary judgment

35

motion is denied. Glatt and Footman's motion for summary judgment that they are "employees" covered by the FLSA and NYLL and that Searchlight is their joint employer is granted. Gratts's motion for summary judgment is denied. Antalik's motions for class certification of her NYLL claims and conditional certification of an FLSA collective action are granted and the law firm of Outten & Golden LLP is appointed as class counsel. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 89, 93, and 103.

Dated: June 11, 2013
     New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Adam T. Klein, Esq.
Rachel M. Bien, Esq.
Jennifer L. Liu, Esq.
Juno E. Turner, Esq.
Sally J. Abrahamson, Esq.
Outten & Golden, LLP
3 Park Avenue, 29th Floor
New York, NY 10016
*Counsel for Plaintiffs*

Elise M. Bloom, Esq.
Amy F. Melican, Esq.
Proskauer Rose LLP
11 Times Square
New York, NY 10036
*Counsel for Defendant*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
```
XUEDAN WANG, on behalf of herself and all    :
others similarly situated,    :
    :
        Plaintiff,    :
    :    12 CV 793 (HB)
    - against -    :
    :    <u>OPINION & ORDER</u>
THE HEARST CORPORATION,    :
    :
        Defendant.    :
```
-----------------------------------------------------------------x
```
Hon. HAROLD BAER, JR., District Judge:

      Before the Court are Plaintiffs' motions for partial summary judgment under Fed. R. Civ.

P. 56(a) and class certification pursuant to Fed. R. Civ. P. 23(a) and b(3). Plaintiffs previously

interned at various magazines owned by Defendant Hearst Corporation ("Defendant") without

pay. Plaintiffs allege that Defendant violated the minimum wage requirements, overtime

provisions, and recordkeeping requirements in the Fair Labor Standards Act ("FLSA"), 29

U.S.C. §§ 201 *et seq.*, and the New York Labor Law ("NYLL") Art. 19 §§ 650 *et seq.*, and seek

the certification of the following class for their claims under the NYLL: "All persons who have

worked as unpaid interns at Hearst Magazines in New York between February 1, 2006 and the

date of final judgment in this matter." For the reasons set forth below, Plaintiffs' motions for

partial summary judgment and class certification are DENIED.

<b>Background[1]</b>

      Hearst is one of the world's largest publishers of monthly magazines with 20 U.S.

magazine titles and several corporate departments. Pls.' 56.1 ¶¶ 1, 5, 6. Hearst is also an

"employer" under the FLSA and NYLL and in addition, has had more than 3,000 interns over the

past six years. Pls.' 56.1 ¶¶ 3, 17. The background is applicable to both motions, summary

judgment and class certification.

      Since 2008, Hearst worked to reduce costs by decreasing its headcount and expenses at

the magazines as a response to the recession, and internal emails within Harper's Bazaar and

Marie Claire instructed the staff to use interns rather than paid messengers to save costs. Pls.'

---

[1] Facts laid out in this section are not disputed between the parties, unless noted otherwise.

1

56.1 ¶¶ 100, 104, 110.  Discovery revealed that in 2008, 229 full-time employees were eliminated: 109 left due to the closure of three magazines; another 88 positions that were eliminated were middle to senior level employees; and 32 positions were entry-level. Def.'s 56.1 ¶¶ D274-8.

Hearst's Human Resources Department is charged with making sure that the company's magazines and departments are in compliance with wage and hour laws, and a part of its mission was to instruct all concerned to have the interns provide "school credit letters."  Pls.' 56.1 ¶¶ 41, 66.  The primary criteria relied upon by Hearst in concluding not to pay the interns was that for the most part, they were in college and eligible to receive academic credit. Pls.' 56.1 ¶ 70.  This policy has been in place at least since 2006. Pls.' 56.1 ¶ 73.  For the most part, all magazines followed this policy.  To provide some flavor, I describe below what some interns did during their internship.

Named Plaintiff Xuedan Wang worked as an intern five days a week, sometimes from 9 a.m. to 8 p.m., at the accessories department of Harper's Bazaar Magazine from August 2011 to December 2011. Pls.' 56.1 ¶¶ 7, 117, 198.  Wang's duties included serving as a contact between editors and public relations representatives, doing online research, cataloguing samples, maintaining the accessories closet, and doing story boards. Pls.' 56.1 ¶ 164.

Named Plaintiff Erin Spencer and Opt-in Plaintiff Sarah Wheels were interns at Cosmopolitan Magazine, the former from June 1, 2010 to August 15, 2010, and the latter from May 20, 2011 to August 10, 2011. Pls.' 56.1 ¶¶ 8, 14.  Spencer, as a bookings intern, worked four days per week from 9 a.m. to 5 or 5:30 p.m., and her duties included organizing files, holding casting calls, assisting at photo shoots, running errands, mailing magazine pages where models appear to models' agents, updating contact lists, and assisting in the fashion closet. Pls.' 56.1 ¶¶ 216, 222, 223, 231.  Wheels, as an editorial intern, worked four days a week from 9:15 a.m. to 6 p.m., and her duties included responding to emails from readers, researching for articles, surveying people on the street, transcribing interviews, compiling sales statistics, locating articles in the magazine's archive, writing content, and fact-checking articles. Pls.' 56.1 ¶¶ 365, 358.

Opt-in Plaintiffs Elizabeth Mancini and Caitlin Leszuk were interns at Marie Claire Magazine, the former from January 2009 through June 2009 and the latter from January 11, 2010 to May 15, 2010. Pls.' 56.1 ¶¶ 9, 12; Def.'s 56.1 ¶¶ 9, 12.  As a fashion intern, Mancini worked

three to four days a week and arrived between 8:30 and 9 a.m. and left some time after 6 p.m., and her duties included receiving clothing ordered from photo shoots, unpacking the items and checking to make sure that everything ordered was received and not broken, photographing the items, filing invoices, and putting the items on garment racks. Pls.' 56.1 ¶¶ 242, 270, 272. Leszuk, as a sales intern, worked four days a week, from 9 a.m. to 6 p.m., and she spent the majority of her time creating "edit credit" spreadsheets, which involved a line-by-line review of Marie Claire and its competitors' magazines. Pls.' 56.1 ¶¶ 316, 323, 330.

Opt-in Plaintiff Matthew Wagster was an intern at Esquire from July 2009 to December 2009, where he worked three days a week from 9 a.m. to 6 p.m. Pls.' 56.1 ¶¶ 10, 314.  As an intern in the publishing department, he ran errands, updated guest lists for events, helped prepare for events, and worked at the doors at the events. Pls.' 56.1 ¶ 305.

Opt-in Plaintiff Stephanie Skorka was an intern at Redbook from September 2009 to December 2009. Pls.' 56.1 ¶ 11.  As a beauty intern, Skorka worked three days a week from 10 a.m. to 6 or 7 p.m., and her duties included managing the beauty closet, assisting with photo shoots, coming up with beauty story ideas, writing posts for the website, attending beauty product launches, contacting public relation firms, and selecting beauty products for potential inclusion in the magazine. Pls.' 56.1 ¶¶ 280-282, 290.

Opt-in Plaintiff Alexandra Rappaport was an intern at Seventeen from May 23, 2011 to July 26, 2011. Pls.' 56.1 ¶ 13.  As an intern in the fashion closet, Rappaport worked four days a week, from 9:20 a.m. to between 6:30 and 7:30 p.m., and her duties included organizing clothes, hanging them on racks, packing them, picking up and returning clothing, organizing jewelry, sending packages, copying, faxing, and responding to emails from designers. Pls.' 56.1 ¶¶ 348, 351.

Some interns, e.g. Spencer and Wheels, attended four, one-hour sessions of "Cosmo-U" during which the editors at Cosmopolitan talked about their careers. Pls.' 56.1 ¶¶ 232, 363. Leszuk received at least one MediaMath class. Def.'s 56.1 ¶ D27.   More importantly, all Plaintiffs understood prior to their internship that the position was unpaid, Def.'s 56.1 ¶¶ D1, D36, D92, D151, D192, D219, D245, and Hearst made it clear that there was little likelihood, and certainly no guarantee, of a job at the end of their internship, Def.'s 56.1 ¶¶ D2, D37, D93, D152, D193, D220, D246.  The parties do not dispute that some of the duties performed by Plaintiffs were performed by paid employees. *See* Pls.' 56.1 ¶¶ 157, 286, 312, 327, 349.

3

However, the parties dispute the amount of supervision provided, Def.'s 56.1 ¶¶ D12-14, D48, D85, D105, D114-116, D161, D201, D225, D254-256, as well as the benefits received and the advantages that Hearst derived, Def.'s 56.1 ¶¶ D20-25, D29, D53-59, D75-77, D121-2, D170-3, D187, D202-204, D228-230, D249-251, D260.

Discussion

## A. Motion for Partial Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of any genuine issue of material fact, and all reasonable inferences must be drawn in the non-movant's favor. *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). A material fact is one that "might affect the outcome of the suit under the governing law," and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation and quotation omitted).

### 1. Applicable Legal Standard

Plaintiffs move for partial summary judgment contending that they were "employees" under the FLSA and NYLL.[2] The FLSA[3] defines "employee" as "any individual employed by an employer" and the term "employ" is defined broadly to include "to suffer or permit to work." 29 U.S.C. § 203(e)(1), (g); *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 66 (2d Cir. 2003). Although the term "intern" is neither defined nor provided as an exception in the FLSA, the parties do not dispute, and the Court agrees, that for this lawsuit, the Supreme Court in *Walling v. Portland Terminal Co.* 330 U.S. 148 (1947) provides, for the most part, the governing case law. In *Walling*, the Supreme Court found that trainees who worked for seven or eight days for the defendant railroad without pay during "a course of practical training" were not "employees" under the FLSA based on "the unchallenged findings [] that the railroads receive no 'immediate advantage' from any work done by the trainees." 330 U.S. at 153. The Court reasoned that "[t]he definition 'suffer or permit to work' was obviously not intended to stamp all persons as

---

[2] Although Plaintiffs also moved for partial summary judgment with respect to Defendant's willfulness and Plaintiffs' entitlement to liquidated damages, the Court denied that portion of the motion from the bench after the oral argument on April 16, 2013. *See* ECF No. 143.

[3] The courts in this circuit have held that the NYLL "embodies the same standard for employment as the FLSA." *Cano v. DPNY, Inc.*, 287 F.R.D. 251, 260 (S.D.N.Y. 2012). The parties' briefs accordingly focused on the FLSA, Pls.' Supp. 24; Def.'s Opp. 26, and the analysis below is based on the FLSA but is applicable to the NYLL.

4

employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Id.* at 152.

The Department of Labor ("DOL") published a fact sheet in April 2010, which puts some meat on the *Walling* bones. U.S. Dep't of Labor, "Fact Sheet # 71: Internship Programs Under The Fair Labor Standards Act," available at http://www.dol.gov/whd/regs/compliance/whdfs71.pdf ("DOL Fact Sheet #71"). In order to overcome the employment label, the internship, according to the DOL, must meet all of the following six factors:

> (1) The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;
>
> (2) The internship experience is for the benefit of the intern;
>
> (3) The intern does not displace regular employees, but works under close supervision of existing staff;
>
> (4) The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;
>
> (5) The intern is not necessarily entitled to a job at the conclusion of the internship; and
>
> (6) The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

While the weight to be given to these factors is far from crystal clear, the Fact Sheet adds to the confusion with the introductory language: "whether an internship or training program meets this exclusion depends upon all of the facts and circumstances of each such program." *Id.*

Not surprisingly, the parties disagree as to the appropriate test for defining an "employee" under *Walling*. Plaintiffs urge the Court to adopt a standard of "immediate advantage," contending that the outcome in *Walling* "would have been different if the railroads had obtained an immediate advantage from the trainees . . . . When an employer obtains a direct or immediate benefit from work, if has 'suffered or permitted' work and must compensate for it." Pls.' Supp. 26. In the alternative, they argue that Hearst "must meet all of the factors" in the Department of Labor's ("DOL") six-factor test and that it has failed to do so. Pls.' Supp. 29. On the other hand, Hearst urges the Court to adopt a "balancing of the benefits test" which looks to the totality of circumstances to evaluate the "economic reality" of the relationship. Def.'s Opp. 28. As for the DOL's six-factor test, Hearst contends that no judicial deference is required and is critical of Plaintiffs' effort to apply it as "a rigid checklist." *Id.* at 31.

I agree with Hearst that the Supreme Court in *Walling* looked to the totality of circumstances of the training program to determine whether the plaintiffs were "employees" under the FLSA. Although the Supreme Court held in *Walling* that the men in that case were not employees because the defendant railroads received "no immediate advantage" from the trainees, 330 U.S. at 153, it does not logically follow that the reverse is true, i.e. that the presence of an "immediate advantage" alone creates an employment relationship under the FLSA. Moreover, Plaintiffs' reading of *Walling* as establishing the test for an employer-employee relationship solely based on "direct or immediate benefit" is misplaced. There is no one-dimensional test; rather, the prevailing view is the totality of circumstances test. *See Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985). To make the cheese more binding, the Second Circuit in a decision only last year echoed that view when it wrote, "whether an employer-employee relationship exists does not depend on isolated factors but rather upon the circumstances of the whole activity," and specifically noted that a key consideration in the analysis depended on "who is the primary recipient of benefits from the relationship . . . ." *Velez v. Sanchez*, 693 F.3d 308, 326, 330 (2d Cir. 2012).

All that said, I am also of the mind that the six factors in Fact Sheet #71 ought not be disregarded; rather, it suggests a framework for an analysis of the employee-employer relationship. After all, they emanate from the agency that administers the laws under which Plaintiffs brought this lawsuit. This position finds support in *United States v. Mead Corp.*, where we read "[A]n agency's interpretation may merit some deference whatever its form, given the specialized experience and broader investigations and information and given the value of uniformity in its administrative and judicial understandings of what a national law requires." 533 U.S. 218, 234 (2001) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). The cases in this district that have considered the six-factor test conclude that the Fact Sheet is "a reasonable application of the FLSA and . . . entitled to deference by this court." *Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 531 (S.D.N.Y. 1998) (Sotomayor, J.); *see also Brown v. New York City Dep't of Educ.,* No. 12 Civ. 35, 2012 WL 6186496, at *8 (S.D.N.Y. Dec. 12, 2012) (referring to DOL Fact Sheet #71, along with agency regulation, to distinguish between services provided to for-profit private sector employers and public agencies).[4]

---

[4] Although Defendants rely on a Sixth Circuit case that denied any deference on the ground that the test was too rigid, the same case still noted that "the six factors may be helpful in guiding that inquiry." *Solis v. Laurelbrook*

### 2. Dispute Regarding Material Facts

Plaintiffs seek partial summary judgment based on the "immediate advantage" standard, while Hearst bases its argument on the totality of circumstances standard. This alone creates a genuine issue of fact sufficient to deny summary judgment. Further, to the extent that Plaintiffs seek partial summary judgment based on the DOL six-factor test, that branch of the motion too must be denied. A genuine dispute and material issues of fact exists, at least with respect to the first, second, third, and fourth factors. This is not a winner-take-all test, and Hearst has shown with respect to each Plaintiff that there was *some* educational training, *some* benefit to individual interns, *some* supervision, and *some* impediment to Hearst's regular operations, etc., which, if viewed in the light most favorable to the non-moving party, as it must be, supports the view that a jury could return a verdict in Hearst's favor.

### B. Motion for Class Certification

Plaintiffs also move the Court to certify the following class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) for the claims under the NYLL: "All persons who have worked as unpaid interns at Hearst Magazines in New York between February 1, 2006 and the date of final judgment in this matter." Pls.' Supp. 40. "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (citation omitted). Under the threshold requirements of Rule 23(a), the party seeking class certification must show that: (1) the class is sufficiently numerous; (2) there are questions of law or fact common to the class; (3) the class representative has claims and defenses that are typical of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, Rule 23(b)(3) requires the court to examine whether "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior" to individual litigation. Fed. R. Civ. P. 23(b)(3). Here, the parties do not dispute, and I agree, that Plaintiffs meet three out of four requirements under Rule 23(a): numerosity, typicality, and adequacy. However, the parties disagree about whether commonality and predominance requirements are satisfied.

---

*Sanitarium & Sch., Inc.*, 642 F.3d 518, 525 (6th Cir. 2011); *see also Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1027 (10th Cir. 1993) ("We are satisfied that the six criteria are relevant but not conclusive . . . ."). There is also contrary persuasive authority at the circuit level; the Eleventh Circuit affords deference to the six-factor test. *Kaplan v. Code Blue Billing & Coding, Inc.*, No. 12-12011, 2013 WL 238120, at *2 (11th Cir. Jan. 22, 2013).

1. **Rule 23(a): Numerosity, Typicality, and Adequacy**

Numerosity is satisfied under the 40-member presumption adopted by the courts of this Circuit, *see Shahriar v. Smith & Wollensky Rest. Group, Inc*., 659 F.3d 234, 252 (2d Cir. 2011), as there are more than 3,000 members of the proposed class, Bien Decl. ¶ 13.  Typicality is also satisfied, since Plaintiffs, like the class they seek to represent, worked for Hearst as unpaid interns, and all of them are suing under the same legal theory that they were "employees" under the NYLL. *See Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993) ("Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.").  The adequacy requirement too is satisfied given the quality of the representation by Plaintiffs' counsel and Plaintiffs' participation in this action without any known conflicts. *See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (defining the adequacy requirement as "inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation") .

2. **Rule 23(a): Commonality**

Fed. R. Civ. P 23(a)(2) is satisfied when "there are questions of law or fact common to the class."  The Supreme Court has recently held that the party seeking class certification must raise more than a litany of common questions; rather, "[w]hat matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Plaintiffs point out that Hearst has a "centralized policy" of classifying all interns as unpaid, non-employees and propose five common questions "that will generate a common answer:" (1) whether Hearst derived an immediate advantage from the interns' work; (2) whether paid workers were displaced; (3) whether an educational experience was provided; (4) whether the members derived benefit; and (5) whether the economic reality of the relationship was one of employment. Pls.' Reply 16; Pls.' Supp. 42-45.  According to Plaintiffs, the common proof would consist of testimony by select interns and supervisors, Hearst's job postings and evaluation forms, and intern manuals and guidelines from individual magazines. Pls.' Supp. 43.

8

Hearst responds that the right legal standard involves an examination of individual factors that generate no common class-wide answers, and as in *Dukes*, "'significant proof' of a general policy that resulted in a class-wide violation" is absent. Def.'s 35. The cornerstone of Hearst's argument is that its 20 magazines have "no uniform policies or practices among magazines prescribing what interns must do." *Id.*

Here, while a close question, the commonality requirement is not satisfied because Plaintiffs cannot show anything more than a uniform policy of unpaid internship. In *Dukes*, the Supreme Court noted that the plaintiff failed to provide evidence of a "general policy of discrimination" that would constitute "significant proof" abridging the gap between an individual and a class claim. 131 S. Ct. at 2554. The evidence of a corporate-wide policy of classifying the proposed class members as unpaid interns is insufficient, as that policy alone cannot answer the liability question, which turns on what the interns did and what benefits they received during their internship. Although Plaintiffs have raised many common questions, under *Dukes*, this Court must "consider dissimilarities . . . in order to determine (as Rule 23(a)(2) requires) whether there is even a single common question." 131 S. Ct. at 2556 (alterations and internal quotation marks omitted). The duties performed by Lead and Opt-In Plaintiffs—to say nothing of the variation within each magazine and corporate department—clearly suggest that internships varied greatly from magazine to magazine. As it is Plaintiffs' burden to demonstrate by preponderance of evidence that this litigation will "generate common *answers* apt to drive the resolution," 131 S. Ct. at 2551, the Court is required to appraise such dissimilarities in its commonality analysis. Plaintiffs' vague advice that the Court consider instead "the nature of the work that interns performed," Oral Arg. Tr. 11:8-13:1, eschews, rather than addresses, the glaring problem here, that the Court cannot resort to any common proof to determine the very "nature" of the interns' work.

Certainly, even after *Dukes*, courts of this district have routinely found commonality in analogous misclassification cases under the NYLL. *See Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 616 (S.D.N.Y. 2012) ("The weight of authority rejects the argument that *Dukes* bars certification in wage and hour cases.") (citing cases). However, those cases are very different. *Compare Meyer v. U.S. Tennis Ass'n*, No. 11 Civ. 6268, 2013 WL 1777556, at *6 (S.D.N.Y. Apr. 25, 2013) (finding commonality because the proposed class members "carry out their duties for the [defendant] pursuant to a uniform policy, uniform training, uniform job

9

description, and uniform procedures"), *and Jacob v. Duane Reade, Inc.*, No. 11 Civ. 0160, 2013 WL 1137024, at *6 (S.D.N.Y. Mar. 20, 2013) (finding commonality not just based on "the uniform classification of [the plaintiffs as Assistant Store Managers ("ASM")]," but also "the uniform description of ASMs' duties"), *with White v. W. Beef Properties, Inc.*, No. 07 Civ. 2345, 2011 WL 6140512, at *5 (E.D.N.Y. Dec. 9, 2011) (denying commonality based on uniform classification alone based because the "evidence span[ned] nine different departments—Meat, Produce, Frozen, Fish, Grocery, Bakery, Deli, Dairy and Receiving—each of which has a distinct set of concerns and job duties").  The plaintiffs in *Meyer* and *Jacob* were able to show a company-wide policy regarding employee *duties* in addition to a company-wide policy regarding a certain employee classification, whereas here, as in *White*, there is nothing more than a corporate-wide policy of classifying the proposed class members as unpaid interns based on academic credit letters.  To mix a metaphor, while half a loaf is better than none, Plaintiffs' argument here just doesn't cut the mustard.

### 3.   Rule 23(b)(3): Predominance and Superiority

Having failed to show sufficient evidence to support commonality, Plaintiffs have an even higher hurdle in their effort to meet the predominance and superiority requirements of Fed. R. Civ. P. 23(b)(3).  "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," and the courts are instructed to "take a close look at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citation and internal quotation marks omitted).  The Second Circuit instructs that requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  In an analogous misclassification case, the Second Circuit held that while the defendant's "blanket [overtime] exemption policy" regarding the proposed class members is "in a general way relevant to the inquiry here, the existence of a blanket exemption policy, standing alone, is not itself determinative of the main concern in the predominance inquiry: the balance between individual and common issues." *Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010).  The Second Circuit reasoned that "[i]n possible contrast to a uniform corporate policy detailing employees' job duties, the fact of common exemption does not establish whether all plaintiffs were actually entitled to overtime

pay or whether they were covered by the applicable administrative regulations defining FLSA's exemptions." *Id.*

As explained above, Plaintiffs fail to satisfy the predominance requirement because the record shows that there is no uniform policy among the magazines with respect to the contents of the internship, including interns' duties, their training, and supervision, such that the analysis of four out of six DOL factors would have to be individualized.  Plaintiffs argue that the Court should overlook such deficiency in the record because the Court can make a determination at the general level as to the nature of the interns' duties, as well as the benefits, training, and supervision that they received, and suggest that the Court do so based on the testimony of select interns and supervisors, various job postings and evaluation forms, and intern manuals and guidelines of individual magazines. Pls.' Reply 17-20.  Unfortunately, this is precisely the reason which, when examined closely, directly undermines the predominance prerequisites.  For instance, there is a myriad of internship postings, manuals, and guidelines that set out different duties and training for each magazine; indeed, this is so even for the specific department *within* a single magazine. *See, e.g.*, Bien Decl. Ex. 167 (Cosmopolitan Fashion Intern Guide); Ex. 177 (Elle Accessories Intern Survival Guide); Ex. 169 (Esquire Fashion Closet Guide); Ex. 55 (Harper's Bazaar Fashion Editorial Internship Guidelines); Ex. 205 (Harper's Bazaar Intern Guide); Ex. 93 (Marie Claire Fashion Intern Handbook); Ex. 201 (Redbook Magazine Fashion Closet Intern Guide); Ex. 196 (Town & Country Intern Guide); Ex. 72 (Seventeen Beauty Intern Guide); Ex. 219 (Cosmopolitan Beauty Internship); Ex. 219 (Good Housekeeping Beauty Internship); Ex. 222 (Harper's Bazaar Beauty Internship); Ex. 216 (Town & Country Beauty Internship); Ex. 63 (Seventeen Editorial Intern Manual); Ex. 198 (Esquire Interns: A Guidebook); Ex. 95 (Marie Claire Features Intern Handbook); Ex. 202 (Redbook Features Intern Handbook); Ex. 209 (Cosmopolitan Editorial Internship); Ex 230 (Country Living Editorial Internship); Ex. 231 (Elle Features Internship); Ex. 224 (Harper's Bazaar Features Internship); Ex. 234 (Marie Claire Editorial Internship); Ex. 240 (Woman's Day Editorial Internship); Ex. 94 (Bazaar Photo & Bookings Internship); Ex. 204 (Marie Claire Photo Intern Guide); Ex. 200 (Seventeen Photo Intern Manual); Ex. 257 (Cosmopolitan Bookings Intern); Ex. 258 (Seventeen Magazine Bookings Internship); Ex. 212 (Esquire Art Internship); Ex. 91 (Esquire Sales and Marketing Internship); Ex. 178 (Marie Claire Marketing Internship Overview and

Responsibilities); Ex. 247 (Hearst Communications Internship); Ex. 248 (Hearst Marketing Internship).

To make liability determinations, the Court would have to evaluate all of such individualized evidence, in addition to individualized testimony about the level of supervision and respective benefits, against the six factors suggested by the DOL.  Because the content of the internships, which is the core of the dispute, cannot be evaluated based on common proof, individual issues clearly overwhelm the common ones here.  This case is therefore different from the post-*Dukes* misclassification cases. *See Meyer*, 2013 WL 1777556, at *11-12 (finding predominance because the class members' "primary duties" are governed by "Official's Code of Conduct" and their experience varied "at the margins"); *Jacob*, 2013 WL 1137024, at *12-15 (finding predominance "given [the defendant's] uniform [] job description and consistent approach to training"). *See also White*, 2011 WL 6140512, at *5 (denying class certification because there is no "standardized company-wide description of responsibilities").

I further note that the above analysis on predominance does not even take into consideration any problems related to damages calculation. *See Comcast Corp.*, 133 S. Ct. at 1433 (holding that the Circuit Court erred in its predominance analysis by failing to consider whether "questions of individual damage calculations will inevitably overwhelm questions common to the class").  Although Plaintiffs argue that *Comcast* is limited to anti-trust cases, the majority opinion explicitly rejected that very proposition. *Id.* at 1433 ("This case [] turns on the straightforward application of class-certification principles . . . .").  Indeed, although one could certainly quibble with the significance of a grant, vacate, and remand ("GVR") order from the Supreme Court, one must pause at least for a moment when one sees that the Supreme Court, "in light of *Comcast*," has issued an order vacating and remanding a Seventh Circuit's decision affirming the district court's certification in an overtime misclassification case. *RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013).

The superiority analysis involves a consideration of four nonexclusive factors: (1) the interest of the class members in controlling the litigation of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).  While there is undeniable efficiency that stems from consolidating and concentrating the litigation of

12

similar claims, the individualized nature of proofs in this case signals that case management would be difficult, if not near impossible, and separate actions may be more appropriate. Furthermore, given that the predominance requirement cannot be satisfied, Rule 23(b)(3) remains an insurmountable barrier to Plaintiffs.

### Conclusion

I have considered the parties' remaining arguments and find them to be without merit. For the foregoing reasons, Plaintiffs' motion for summary judgment regarding their status as "employees" under the FLSA and NYLL is DENIED. Plaintiffs' motion for class certification under the NYLL claims is also DENIED. The trial, which is scheduled to commence on May 28, 2013, is adjourned sine die. The Clerk of the Court is instructed to close the two motions (ECF No. 105 & 106) and remove them from my docket.

**SO ORDERED**
**May _7_, 2013**
**New York, New York**

Hon. Harold Baer, Jr.
U.S.D.J.

13

## U.S. Department of Labor
## Wage and Hour Division



U.S. Wage and Hour Division

(April 2010)

# Fact Sheet #71:  Internship Programs Under The Fair Labor Standards Act

This fact sheet provides general information to help determine whether interns must be paid the minimum wage and overtime under the Fair Labor Standards Act for the services that they provide to "for-profit" private sector employers.

**Background**

The Fair Labor Standards Act (FLSA) defines the term "employ" very broadly as including to "suffer or permit to work."  Covered and non-exempt individuals who are "suffered or permitted" to work must be compensated under the law for the services they perform for an employer.  Internships in the "for-profit" private sector will most often be viewed as employment, unless the test described below relating to trainees is met.  Interns in the "for-profit" private sector who qualify as employees rather than trainees typically must be paid at least the minimum wage and overtime compensation for hours worked over forty in a workweek.[*]

**The Test For Unpaid Interns**

There are some circumstances under which individuals who participate in "for-profit" private sector internships or training programs may do so without compensation.  The Supreme Court has held that the term "suffer or permit to work" cannot be interpreted so as to make a person whose work serves only his or her own interest an employee of another who provides aid or instruction.  This may apply to interns who receive training for their own educational benefit if the training meets certain criteria.  The determination of whether an internship or training program meets this exclusion depends upon all of the facts and circumstances of each such program.

The following six criteria must be applied when making this determination:

1.  The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

2.  The internship experience is for the benefit of the intern;

3.  The intern does not displace regular employees, but works under close supervision of existing staff;

4.  The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

5.  The intern is not necessarily entitled to a job at the conclusion of the internship; and

6.  The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

If all of the factors listed above are met, an employment relationship does not exist under the FLSA, and the Act's minimum wage and overtime provisions do not apply to the intern.  This exclusion from the definition of employment is necessarily quite narrow because the FLSA's definition of "employ" is very broad.  Some of the most commonly discussed factors for "for-profit" private sector internship programs are considered below.

FS 71

**Similar To An Education Environment And The Primary Beneficiary Of The Activity**
In general, the more an internship program is structured around a classroom or academic experience as opposed to the employer's actual operations, the more likely the internship will be viewed as an extension of the individual's educational experience (this often occurs where a college or university exercises oversight over the internship program and provides educational credit). The more the internship provides the individual with skills that can be used in multiple employment settings, as opposed to skills particular to one employer's operation, the more likely the intern would be viewed as receiving training. Under these circumstances the intern does not perform the routine work of the business on a regular and recurring basis, and the business is not dependent upon the work of the intern. On the other hand, if the interns are engaged in the operations of the employer or are performing productive work (for example, filing, performing other clerical work, or assisting customers), then the fact that they may be receiving some benefits in the form of a new skill or improved work habits will not exclude them from the FLSA's minimum wage and overtime requirements because the employer benefits from the interns' work.

**Displacement And Supervision Issues**
If an employer uses interns as substitutes for regular workers or to augment its existing workforce during specific time periods, these interns should be paid at least the minimum wage and overtime compensation for hours worked over forty in a workweek. If the employer would have hired additional employees or required existing staff to work additional hours had the interns not performed the work, then the interns will be viewed as employees and entitled compensation under the FLSA. Conversely, if the employer is providing job shadowing opportunities that allow an intern to learn certain functions under the close and constant supervision of regular employees, but the intern performs no or minimal work, the activity is more likely to be viewed as a bona fide education experience. On the other hand, if the intern receives the same level of supervision as the employer's regular workforce, this would suggest an employment relationship, rather than training.

**Job Entitlement**
The internship should be of a fixed duration, established prior to the outset of the internship. Further, unpaid internships generally should not be used by the employer as a trial period for individuals seeking employment at the conclusion of the internship period. If an intern is placed with the employer for a trial period with the expectation that he or she will then be hired on a permanent basis, that individual generally would be considered an employee under the FLSA.

**Where to Obtain Additional Information**
This publication is for general information and is not to be considered in the same light as official statements of position contained in the regulations.

**For additional information, visit our Wage and Hour Division Website: http://www.wagehour.dol.gov and/or call our toll-free information and helpline, available 8 a.m. to 5 p.m. in your time zone, 1-866-4USWAGE (1-866-487-9243).**

| | |
|---|---|
| **U.S. Department of Labor** | **1-866-4-USWAGE** |
| Frances Perkins Building | TTY: 1-866-487-9243 |
| 200 Constitution Avenue, NW | **Contact Us** |
| Washington, DC 20210 | |

---

[*] The FLSA makes a special exception under certain circumstances for individuals who volunteer to perform services for a state or local government agency and for individuals who volunteer for humanitarian purposes for private non-profit food banks. WHD also recognizes an exception for individuals who volunteer their time, freely and without anticipation of compensation for religious, charitable, civic, or humanitarian purposes to non-profit organizations. Unpaid internships in the public sector and for non-profit charitable organizations, where the intern volunteers without expectation of compensation, are generally permissible. WHD is reviewing the need for additional guidance on internships in the public and non-profit sectors.

**OUTTEN & GOLDEN LLP**
Adam T. Klein
Rachel Bien
Elizabeth Wagoner
Reena Arora
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC GLATT, ALEXANDER FOOTMAN, EDEN ANTALIK, and KANENE GRATTS, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>FOX SEARCHLIGHT PICTURES INC. and FOX ENTERTAINMENT GROUP, INC.,<br><br>    Defendants. | No. 11 Civ. 6784 (WHP) (AJP) |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND COURT-AUTHORIZED NOTICE

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

PROCEDURAL HISTORY.................................................................................... 2

FACTUAL BACKGROUND .................................................................................. 2

    I.    The Parties ............................................................................................ 2

        A.    Defendants ................................................................................ 2

        B.    Plaintiff and Opt-In Plaintiffs ................................................ 3

            1.    Eden Antalik ................................................................ 3

            2.    Brian Nichols ................................................................ 4

            3.    David Stevenson .......................................................... 4

    II.    All Interns Participated in FEG's Centralized Unpaid Internship Program .......... 5

        A.    A Small Team of Recruiters Oversaw the Internship Program and Implemented a Uniform Set of Internship Policies..................................... 5

        B.    Defendants Applied the Same Policies to FEG Interns ............................. 6

        C.    Defendants Applied the Same Compensation Policies to All FEG Interns........................................................................................ 7

    III.    FEG Interns Uniformly Performed the Routine Work of the Company................ 7

        A.    Interns Performed Administrative and Clerical Duties.............................. 8

        B.    Interns Maintained Records and Databases ............................................... 8

        C.    Interns Compiled Information and Did Research ...................................... 9

        D.    Interns Provided Feedback on Potential Projects...................................... 10

        E.    Interns Performed Other Productive Work ................................................ 11

        F.    Defendants Relied on Interns to Get More Work Done ........................... 11

    IV.    FEG Structured its Internship Program Around its Actual Operations ................ 12

A00053

V.   FEG Treated Interns as Employees with Respect to Key Personnel
     Policies ................................................................................................. 13

     A.   Offer Letter .................................................................................. 14

     B.   Workers' Compensation Agreement ............................................ 14

     C.   Corporate Policy Acknowledgment ............................................ 15

     D.   Affirmative Action Self-Identification Form .............................. 15

VI.  FEG Changed its Internship Program from an Unpaid to a Paid Program in
     Response to the Risk that the Program Was Noncompliant .................. 16

ARGUMENT .................................................................................................. 17

I.   The FLSA and NYLL Protect Plaintiff and the Proposed Class ......... 17

II.  Plaintiff Meets All of the Rule 23 Requirements .............................. 19

     A.   Plaintiff Meets Each Rule 23(a) Requirement ......................... 21

          1.   Numerosity ....................................................................... 21

          2.   Commonality ..................................................................... 21

               a.   Whether Defendants Derived an Immediate
                    Advantage From Interns' Work ....................... 22

               b.   Whether Interns Displaced Regular Employees .............. 23

               c.   Whether FEG Structured its Internship Program Around
                    its Actual Operations as Opposed to a Classroom or
                    Academic Experience .................................. 23

               d.   Whether FEG's Internship Program Was for the Benefit
                    of Interns .................................................. 23

               e.   Whether Interns Were Employees as a Matter of
                    "Economic Reality." ...................................... 24

          3.   Typicality ........................................................................... 25

          4.   Adequacy ........................................................................... 26

     B.   Plaintiff Meets Rule 23(b)(3) ................................................. 26

iii

**A00054**

1.  Common Questions Predominate .................................................. 26

2.  A Class Action Is the Superior Mechanism .................................. 27

III.  The Court Should Appoint Plaintiff's Counsel as Class Counsel........................ 28

IV.  Plaintiff Meets the Burden for Court-Authorized FLSA Notice ......................... 28

CONCLUSION............................................................................................................ 30

iv

A00055

## TABLE OF AUTHORITIES

Page(s)

CASES

*Alvarez v. IBP, Inc.,*
  339 F.3d 894 (9th Cir. 2003) ..................................................................17

*Ansoumana v. Gristede's Operating Corp.,*
  201 F.R.D. 81 (S.D.N.Y. 2001) ...............................................................20

*Aponte v. Comprehensive Health Mgmt., Inc.,*
  No. 10 Civ. 4825, 2011 WL 2207586 (S.D.N.Y. June 2, 2011)...............20

*Archie v. Grand Cent. P'ship, Inc.,*
  997 F. Supp. 504 (S.D.N.Y. 1998)..........................................18, 22, 23, 24

*Baffa v. Donaldson, Lufkin & Jenrett Sec. Corp.,*
  222 F. 3d 52 (2d Cir. 2000)......................................................................26

*Capsolas v. Pasta Res., Inc.,*
  No. 10 Civ. 5595, 2012 WL 4760910 (S.D.N.Y. Oct. 5, 2012) ........26, 28

*Clougher v. Home Depot U.S.A., Inc.,*
  696 F. Supp. 2d 285 (E.D.N.Y. 2010) .....................................................18

*Consol. Rail Corp. v. Town of Hyde Park,*
  47 F.3d 473 (2d Cir. 2005)........................................................................21

*Cuevas v. Citizens Fin. Grp., Inc.,*
  No. 10 Civ. 5582, 2012 WL 1865564 (E.D.N.Y. May 22, 2012)............20

*Cuzco v. Orion Builders, Inc.,*
  477 F. Supp. 2d 628 (S.D.N.Y. 2007)......................................................28

*Damassia v. Duane Reade Inc.,*
  250 F.R.D. 152 (S.D.N.Y. 2008) ..................................................20, 25, 26

*Donovan v. New Floridian Hotel, Inc.,*
  676 F.2d 468 (11th Cir. 1982) ..................................................................22

*Han v. Sterling Nat'l Mortg. Co.,*
  No. 09 Civ. 5589, 2011 WL 4344235 (E.D.N.Y. Sept. 14, 2011)......20, 28

*Hart v. Rick's Cabaret Int'l Inc.,*
  No. 09 Civ. 3043, 2010 WL 5297221 (S.D.N.Y. Dec. 20, 2010)............20

A00056

*Herman v. RSR Sec. Servs., Ltd.,*
  172 F.3d 132 (2d Cir. 1999)........................................................................24

*Iglesias-Mendoza v. La Belle Farm, Inc.,*
  239 F.R.D. 363 (S.D.N.Y. 2007) ................................................................20

*In re Initial Pub. Offering Sec. Lit.,*
  471 F.3d 24 (2d Cir. 2006)........................................................................20

*Lee v. ABC Carpet & Home,*
  236 F.R.D. 193 (S.D.N.Y. 2006) ...............................................................20

*Marisol A. v. Guiliani,*
  126 F.3d 372 (2d Cir. 1997)..........................................................19, 21, 25

*Moore v. PaineWebber, Inc.,*
  306 F.3d 1247 (2d Cir. 2002)....................................................................27

*Myers v. Hertz Corp.,*
  624 F.3d 539 (2d Cir. 2010)..............................................19, 21, 27, 29

*Okoro v. Pyramid 4 Aegis,*
  No. 11 Civ. 267, 2012 WL 1410025 (E.D. Wis. Apr. 23, 2012) ..............22

*Robidoux v. Celani,*
  987 F.2d 931 (2d Cir. 1993)......................................................................25

*Ruggles v. WellPoint, Inc.,*
  591 F. Supp. 2d 150 (N.D.N.Y. 2008) ......................................................29

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.,*
  659 F.3d 234 (2d Cir. 2011)...............................................................20, 26

*Silverstein v. AllianceBernstein L.P.,*
  No. 09 Civ. 5904 (S.D.N.Y. Aug. 24, 2011) .............................................29

*Tony & Susan Alamo Found. v. Sec'y of Labor,*
  471 U.S. 290 (1985).............................................................................17, 18

*Torres v. Gristede's Operating Corp.,*
  No. 06 Civ. 3316, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) .........27, 28, 29, 30

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011)........................................................19, 21, 22

*Walling v. Portland Terminal Co.,*
  330 U.S. 148 (1947)...........................................................................18, 24, 27

vi

Case: 13-2467    Document: 45    Page: 60    10/01/2013    1055728    128

*Wang v. Hearst Corp.*,
   No. 12 Civ. 793, 2012 WL 2864524 (S.D.N.Y. July 12, 2012) ..............................20

*Wirtz v. Wardlaw*,
   339 F.2d 785 (4th Cir. 1964) ...............................................................22

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) ............................................................28

*Zheng v. Liberty Apparel Co.*,
   355 F.3d 61 (2d Cir. 2003) ..................................................................17

**STATUTES**

29 U.S.C. § 202 ...........................................................................................17

29 U.S.C. § 203 ...........................................................................................17

N.Y. Lab. Law § 651 ...................................................................................18

**RULES**

Fed. R. Civ. P. 23 .....................................................................21, 26, 27, 28

A00058

## PRELIMINARY STATEMENT

Plaintiff Eden Antalik ("Plaintiff") worked as an intern in the corporate offices of Defendants Fox Entertainment Group, Inc. ("FEG" or "the Company") and Fox Searchlight Pictures, Inc. ("Searchlight") compiling information, researching, assisting at screenings, and doing other work for free. Plaintiff seeks to certify a class and collective of unpaid interns who also worked for no pay and whom FEG uniformly classified as non-employee "trainees" exempt from the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").

Plaintiff and the proposed class and collective all participated in the same centrally administered "Fox Entertainment Group Internship Program." They were all subject to the same internship policies implemented by a small team of intern recruiters. They were all unpaid pursuant to the same policy not to pay them and received little training because FEG structured its internship program around its operations. The nature of Interns' work, which included clerical duties, record and database maintenance, research, compiling information, providing feedback on projects, and other productive work, was beneficial to FEG. FEG also accepted their work and relied on it to make up for "cost containment initiatives" that limited overtime, reduced FEG's temporary paid workforce, and increased the unpaid internship program twofold.

FEG also treated Plaintiff and class and collective members like employees in a number of significant ways. FEG issued them offer letters, labeled them "at will" employees, checked their immigration status, required them to sign workers' compensation agreements, designated them as "special employees" under the Company's workers' compensation insurance policy, and required them to submit to personnel policies that applied to employees.

## PROCEDURAL HISTORY

Plaintiffs Eric Glatt and Alexander Footman filed a Class Action Complaint on September 28, 2011 on behalf of themselves and all other unpaid interns who worked for Searchlight. ECF No. 1. The Court granted Plaintiffs leave to amend their Complaint to add Eden Antalik as a named Plaintiff and Fox Entertainment Group, Inc. as a Defendant, and to expand the class of unpaid interns to include all interns who worked in Defendants' corporate offices, ECF No. 46, which Plaintiffs did on October 19, 2012. ECF No. 58.

The parties have completed merits discovery, except with respect to damages and Defendants' good faith affirmative defense. *See* ECF No. 27. Plaintiffs have moved for summary judgment for Glatt, Footman, and Gratts. Following the completion of discovery, Plaintiffs anticipate moving for summary judgment with respect to the corporate interns.

## FACTUAL BACKGROUND

I.    **The Parties**

A.    **Defendants**

Defendant Fox Entertainment Group, Inc. ("FEG" or "the Company") is a wholly-owned subsidiary of News Corporation.[1] FEG's subsidiaries include Fox's film and television studios, including Twentieth Century Fox Television and Twentieth Century Fox Film and its broadcast and cable networks.[2] Defendant Fox Searchlight Pictures, Inc. ("Searchlight") is a FEG subsidiary that acquires, produces, markets, and distributes films.[3]

---

[1]    *See* ECF No. 62.
[2]    All exhibits are attached to the Declaration of Rachel Bien in Support of Class Certification and Court-Authorized Notice ("Bien Decl."). Ex. 37 (News Corp. Press Release).
[3]    Ans. to 1st Am. Compl. ¶ 1, ECF No. 60.

2

**B.     Plaintiff and Opt-In Plaintiffs**

**1.     Eden Antalik**

Plaintiff, Eden Antalik, interned at Searchlight in the News Corp. building located in New York City from approximately May 2009 through August 2009.[4] Antalik worked approximately three days a week from approximately 8:30 a.m. to 5 p.m.[5] Her job duties included "doing breaks," which involving searching for mentions of Searchlight films on the internet and in other media and compiling the information into a document to be circulated to Searchlight executives;[6] assisting with film screenings in the News Corp. building, including set up, starting the screening, and directing journalists;[7] doing errands for supervisors;[8] doing online research;[9] doing mailings;[10] and making travel arrangements.[11] Antalik sometimes performed tasks for another FEG subsidiary, Twentieth Century Fox Film Corporation, which was located in the same office building, including setting up and taking down the red carpet at film premieres, checking in attendees, and working in the theater.[12] Antalik worked with four other interns who performed the same duties that she performed.[13] During her internship, Antalik did not attend any formal training sessions and learned how to perform her duties on the job.[14]

---

[4]     Ex. 7 (Antalik Tr.) 36:13-23; 1st Am. Compl. ¶ 17.
[5]     Ex. 7 (Antalik Tr.) 204:9-17.
[6]     *Id.* at 89:4-24; 142:14-143:16.
[7]     *Id.* at 143:17-144:7.
[8]     *Id.* at 110:3-11; 112:17-113:2.
[9]     *Id.* at 145:2-146:4; 193:19-195:13.
[10]     *Id.* at 155:3-157:2.
[11]     *Id.* at 146:16-149:15; 150:21-151:12.
[12]     *Id.* at 98:10-20.
[13]     *Id.* at 69:22-70:6; 143:17-144:25; 148:21-149:15; 152:15-153:20.
[14]     *Id.* at 143:5-16; 145:18-146:15; 146:22-147:9; 157:13-16; 179:21-180:18; 197:23-198:5.

3

### 2.    Brian Nichols

Opt-In Plaintiff, Brian Nichols, interned at Fox Sports on the Fox Studios Lot in Century City, California from approximately January 11, 2010 through May 6, 2010.[15] Nichols interned approximately two days a week from approximately 9 a.m. to 5 p.m.[16] His job duties included reviewing video footage of sports events in Fox's video library to locate highlights and noting the time the highlights occurred on a spreadsheet.[17] The spreadsheet was used to locate video clips for Fox Sports broadcasts.[18] Nichols worked alongside three to four other interns who performed generally the same duties.[19] Nichols also went on errands approximately every other day, including dropping off films.[20]

### 3.    David Stevenson

Opt-In Plaintiff, David Stevenson at Fox Television Studios from approximately August 2007 to approximately December 2007 and at Fox Networks Group from approximately December 2007 to approximately April 2008.[21] During his first internship, Stevenson's duties included filing documents, inputting information into contracts, and research.[22] He worked two full days a week during the first part of his internship and then one full day and two half days during the second part of his internship.[23] Stevenson worked with other interns who did similar work.[24] During his second internship, Stevenson's duties included filing, inputting information

---

[15]    Ex. 78 (Nichols Decl.) ¶ 2.
[16]    *Id.* ¶ 8.
[17]    *Id.* ¶ 9.
[18]    *Id.*
[19]    *Id.* ¶ 13.
[20]    *Id.* ¶ 11.
[21]    Ex. 8 (Stevenson Tr.) 12:11-13; 27:15-19.
[22]    *Id.* at 31:8-32:4.
[23]    *Id.* at 32:9-20.
[24]    *Id.* at 35:21-36:7; 36:20-37:3; 43:4-45:16.

4

about job applicants into the recruitment tracking system, creating new hire gift bags,[25] doing mailings,[26] screening intern applicants by reviewing their resumes,[27] and sending intern resumes to hiring managers.[28]  He worked two full days a week.[29]

## II.   All Interns Participated in FEG's Centralized Unpaid Internship Program.

Plaintiff, Opt-In Plaintiffs, and class and collective members were subject to the same internship policies that were centrally administered by a small team of intern recruiters, performed productive work that benefited Defendants, received little or no training other than what they gained on the job, and were treated as employees under key personnel policies.

### A.   A Small Team of Recruiters Oversaw the Internship Program and Implemented a Uniform Set of Internship Policies.

Defendants' internship program was centrally administered by a small team of intern recruiters.  The recruiters' duties included: (1) obtaining intern requests from employees who needed interns; (2) reviewing and approving the requests; (3) screening applicants who had applied through the "Fox Careers" website[30] and submitting screened applicants to employees to review; (4) processing interns' new hire paperwork; and (5) overseeing the intern program.[31]

Aimee Hoffman and Laura Wiggins served as Defendants' primary intern recruiters during the relevant class and collective periods.[32]  Aimee Hoffman recruited and oversaw interns

---

[25]    *Id.* at 47:17-48:5.
[26]    *Id.* at 50:17-51:5.
[27]    *Id.* at 53:8-19.
[28]    *Id.* at 55:25-56:16.
[29]    *Id.* at 41:11-13.
[30]    *See* Ex. 39 (Fox Careers Website).
[31]    Exs. 1 & 2 (Hoffman Tr.) 15:2-13, 22:6-17, 297:3-280:17, 281:7-18, 283:16-284:20, 285:14-286:12, 288:16-21; Ex. 4 (Wiggins Tr.) 19:6-18; 20:18-21:6; 21:24-22:4; 22:9-14; 22:23-23:1; 26:2-9; 32:16-33:14; 35:15-36:3; 36:22-37:3; 36:13-22; Ex. 47 (Wiggins Profile).
[32]    Ex. 2 (Hoffman Tr.) 265:14-266:6, 270:23-271:272:1, 308:20-5; Ex. 29 (Hoffman Resume); Ex. 4 (Wiggins Tr.) 57:22-58:5; Ex. 47 (Wiggins Profile).

5

for particular groups of FEG subsidiaries and Laura Wiggins had similar responsibilities with respect to other groups of FEG subsidiaries.[33]  These subsidiaries included:

    (1)        Film and television subsidiaries that the Company grouped under the heading, "Fox Filmed Entertainment" or "FFE;"[34]

    (2)        Cable and broadcast subsidiaries that the Company grouped under the heading, "Fox Networks Group," or "FNG;"[35]

    (3)        Corporate departments grouped under the heading, "Fox Group;"[36] and

    (4)        FEG subsidiaries grouped under the heading "Fox Interactive Media" or "FIM," which is now called News Corp. Digital Media.[37]

Plaintiff and the members of the proposed class and collective interned for one or more of the FEG subsidiaries that Hoffman and Wiggins oversaw ("FEG Interns").

### B.    Defendants Applied the Same Policies to FEG Interns.

FEG's internship program was tied to its "overall recruitment for the company."[38] The program sought to "identify talent early and build a diverse and trained pipeline" of future employees for the Company, as well as to provide students with "practical experience" related to

---

[33]      Ex. 2 (Hoffman Tr.) 265:14-266:6, 267:3-268:22, 308:20-5; Ex. 4 (Wiggins Tr.) 13:19-14:6.

[34]      Ex. 3 (Johnson Tr.) 18:5-7.  FFE included Defendant Fox Searchlight Pictures, Inc., Twentieth Century Fox Film Corporation, Twentieth Century Fox Home Entertainment, LLC, Fox Television Studios, Inc., TVM Productions, Inc., Fox 21, Inc., Fox International Productions, Inc., Fox Music, Inc., and Fox Atomic, Inc./Fox Digital Entertainment, Inc.  Ex. 2 (Hoffman Tr.) 272:2-11; Ex. 36 (FEG Entities); Ex. 3 (Johnson Tr.) 22:3-7.  A list of the subsidiaries and/or divisions of FFE that had interns between 2009 and 2010 is set forth in Ex. 38 (Email, dated Aug. 13, 2010) at D0093800-06.

[35]      Ex. 3 (Johnson Tr.) 47:5-9; Ex. 4 (Wiggins Tr.) 13:19-14:25; 72:1-16; Ex. 48 (FEG Organizational Charts).

[36]      Ex. 2 (Hoffman Tr.) 267:3-268:22; Ex. 43 (Intern Training), at D0094135.  *See* Ex. 5 (Johns Tr.) 40:19-25; 100:16-101:3.

[37]      Ex. 2 (Hoffman Tr.) 266:7-267:4; 268:5-11, 20-22.

[38]      Ex. 1 (Hoffman Tr.) 52:20-24; Ex. 31 (Email, dated Mar. 2, 2010) at D0093202 ("Our intern program is meant to build a pipeline of talent for full time openings.")

6

their education.[39]  FEG issued internship guidelines to all intern supervisors.[40]  It instructed

supervisors that interns should be: (1) "Fresh new energy to your team bringing new ideas and

different perspectives;" (2) "Useful assistance on key projects and day-to-day operations;" (3)

"Viewed as trainees here to learn more about the business;" (4) "Given professional feedback to

help him/her grow;" and (5) "Coached on do's and don'ts in your office."[41]

### C.    Defendants Applied the Same Compensation Policies to All FEG Interns.

All FEG Interns were subject to the same policy not to pay them any wages.[42]  Beginning

in September 2010, FEG changed this policy and instituted a paid internship program.[43]  FEG

started paying undergraduate interns $8 per hour and graduate interns $10 per hour.[44]  FEG did

not pay backpay to interns who interned prior to September 2010 even though there were no

changes made to the program other than making it a paid program.[45]

### III.    FEG Interns Uniformly Performed the Routine Work of the Company.

FEG expected interns to be "immersed in . . . day-to-day operations[.]"[46]  FEG's Intern

Request Forms that listed the projects and tasks that interns performed,[47] and other Company

documents, demonstrate that interns regularly performed productive work for FEG.

---

[39]    Ex. 30 (Email, dated Feb. 8, 2010) at D0093190.
[40]    Ex. 2 (Hoffman Tr.) 291:5-8; Ex. 30 (Email, dated Feb. 8, 2010) at D0093190; Ex. 4 (Wiggins Tr.) 64:6-18; 66:6-10; 78:11-79:13.
[41]    Ex. 2 (Hoffman Tr.) 292:9-23; Ex. 30 (Email, dated Feb. 8, 2010, attaching Intern Supervisor Guidelines) at D0093190.
[42]    Exs. 1 & 2 (Hoffman Tr.) 28:1-4, 275:5-9, 277:21-278:6-279:2, 304:10-20; Ex. 4 (Wiggins Tr.) 23:9-20; 24:4-6.
[43]    Ex. 2 (Hoffman Tr.) 278:21:24; 303:4-304:20; Ex. 3 (Johnson Tr.) 119:4-17.
[44]    See Ex. 1 (Hoffman Tr.) 90:2-7.
[45]    Ex. 3 (Johnson Tr.) 180:23-182:10.
[46]    Ex. 1 (Hoffman Tr.) 54:11-15.
[47]    Ex. 2 (Hoffman Tr.) 331:24-332:20.  The Intern Request Forms are admissible under the Federal Rules of Evidence as business records under Rule 803(6) and as statements of an opposing party under Rule 801(d)(2)(D).

### A.    Interns Performed Administrative and Clerical Duties.

Defendants regularly assigned interns administrative tasks.  These tasks included: answering phones;[48] calling messengers;[49] making coffee runs;[50] general office work, such as making copies, shredding, and doing mailings;[51] opening mail;[52] making travel arrangements;[53] restocking the office refrigerator;[54] and running errands.[55]

### B.    Interns Maintained Records and Databases.

Interns' duties regularly included maintaining Company records and keeping them up to date.  Examples of such tasks included:

- Tracking information, such as studio and network information;[56] box office performance;[57] film festivals, actors, directors, and other "talent,"[58] and cable programming;[59]

---

[48]      Ex. 50 (TV Music Production and Admin. Internship); Ex. 52 (Publicity – Photo Department Internship); Ex. 62 (Post Production Service Internship); Ex. 1 (Hoffman Tr.) 64:16-24; Ex. 70 (In Theatre Marking Internship).
[49]      Ex. 52 (Publicity – Photo Department Internship).
[50]      Ex. 62 (Post Production Service Internship); Ex. 25 (Email, dated June 19, 2010).
[51]      Ex. 63 (International Theatrical Sales Internship); Ex. 14 (Searchlight Production Internship); Ex. 19 (Searchlight New York Publicity Internship); Ex. 18 (Intern Responsibilities); Ex. 25 (Email, dated June 19, 2010); Ex. 57 (Fox 2000); Ex. 65 (Fox International Productions Internship); Ex. 80 (Home Entertainment Publicity Internship); Ex. 70 (In Theatre Marking Internship).
[52]      Ex. 67 (Fox Music Internship).
[53]      Ex. 19 (Searchlight New York Publicity Internship).
[54]      Ex. 1 (Hoffman Tr.) 124:1-11; Ex. 25 (Email, dated June 19, 2010); Ex. 20 (Email, dated July 7, 2010).
[55]      Ex. 3 (Johnson Tr.) 159:2-22; Ex. 45 (Email, dated May 13, 2009) at D0051511; Ex. 25 (Email, dated June 19, 2010); Ex. 1 (Hoffman Tr.) 122:19-24.
[56]      Ex. 34 (TCFTV Comedy Development Internship).
[57]      Ex. 13 (Searchlight Finance & Operations Internship).
[58]      Ex. 35 (MPD Feature Production Internship) at D0093979.
[59]      Ex. 64 (Research & Marketing Internship).

8

- Organizing information, such as music department files and deal memos;[60] photos;[61] marketing materials;[62] books and DVDs;[63] and press clippings;[64]

- Updating information, including status reports;[65] publicity materials;[66] contact lists;[67] calendars of key dates and events;[68]

- Populating databases;[69] and

- Reviewing and logging videos.[70]

### C.    Interns Compiled Information and Did Research.

Interns' duties routinely included compiling and researching various types of information for Defendants' use. For example, Twentieth Century Fox Television interns helped compile information for executives in multiple departments.[71] Fox Television Studios interns created lists of online platforms and digital production companies and scoured the Internet for new talent and ideas.[72] Interns in Twentieth Century Fox Television's Brand Management and Strategy Department researched online marketing and distribution opportunities and assisted in compiling reports and presentations on these opportunities.[73] Interns in Fox's Retail Marketing Department

---

[60]     Ex. 50 (TV Music Production and Admin. Internship); Ex. 51 (Fox TV Music Internship).

[61]     Ex. 52 (Publicity – Photo Department Internship).

[62]     Ex. 58 (TCFTVD Photography Internship).

[63]     Ex. 61 (Research Library Internship).

[64]     Ex. 69 (Marketing, Publicity & Promotions Internship).

[65]     Ex. 19 (Searchlight New York Publicity Internship).

[66]     Ex. 35 (TCF Publicity Internship) at D0093983.

[67]     Ex. 19 (Searchlight New York Publicity Internship); Ex. 70 (In Theatre Marking Internship).

[68]     Ex. 71 (TCFTV Brand Management & Strategy Internship); Ex. 17 (Searchlight Marketing Internship); Ex. 69 (Marketing, Publicity & Promotions Internship).

[69]     Ex. 58 (TCFTVD Photography Internship); Ex. 64 (Research & Marketing Internship).

[70]     Ex. 59 (FTVS Internship); Ex. 67 (Fox Music Internship).

[71]     Ex. 34 (TCFTV Comedy Development Internship).

[72]     Ex. 59 (FTVS Internship).

[73]     Ex. 71 (TCFTV Brand Management & Strategy Internship).

compiled retail price and other sales information for sales presentations.[74]  Fox Searchlight

interns researched and analyzed changes in market trends,[75] charted press coverage of

Searchlight films,[76] conducted research on event venues and sponsors,[77] and compiled and

circulated "breaks" (newspaper and online press clippings of Searchlight films).[78]  Interns in

FEG's Research & Marketing department "research[ed] television blogs and wr[o]te reports

based on the feedback from fans."[79]

> **D.    Interns Provided Feedback on Potential Projects.**

FEG frequently asked interns to provide feedback on its ongoing or potential projects.

This included reading scripts and other creative materials and providing feedback;[80]

brainstorming new ideas;[81] evaluating the effectiveness of strategies;[82] assisting in

conceptualizing projects;[83] researching and coming up with presentations;[84] updating executives

on trends;[85] and helping to develop better systems for cataloging and coordinating projects.[86]

---

[74]    Ex. 72 (Retail Marketing Internship).
[75]    Ex. 15 (Searchlight Distribution Internship).
[76]    Ex. 16 (Searchlight Publicity Internship).
[77]    Ex. 17 (Searchlight Marketing Internship).
[78]    Ex. 19 (Searchlight New York Publicity Internship).
[79]    Ex. 64 (Research & Marketing Internship).
[80]    Ex. 19 (Searchlight New York Publicity Internship); Ex. 65 (Fox International Productions Internship); Ex. 67 (Fox Music Internship); Ex. 14 (Searchlight Production Internship); Ex. 68 (Fox Digital Studio Internship); Ex. 70 (In Theatre Marking Internship).
[81]    Ex. 54 (Digital Marketing Internship); Ex. 71 (TCFTV Brand Management & Strategy Internship); Ex. 19 (Searchlight New York Publicity Internship); Ex. 35 (TCF Publicity Internship); Ex. 66 (Promotions Internship); Ex. 70 (In Theatre Marking Internship).
[82]    Ex. 54 (Digital Marketing Internship).
[83]    Ex. 53 (TVD/MPP/Creative Department Internship).
[84]    Ex. 59 (FTVS Internship).
[85]    *See* Ex. 59 (FTVS Internship); Ex. 53 (TVD/MPP/Creative Department Internship); Ex. 54 (Digital Marketing Internship); Ex. 63 (International Theatrical Sales Internship).
[86]    Ex. 71 (TCFTV Brand Management & Strategy Internship).

10

### E.　Interns Performed Other Productive Work.

Interns performed other duties that helped the Company operate.　For example, interns in Fox's Publicity – Photo Department placed orders with the Studio's photo labs.[87] Interns in Fox's Television Distribution department assisted in designing web page content and print material.[88] Interns in Fox Television Studio's Business and Legal Affairs Department worked on legal rights and clearance and drafted agreements relating to the production of television shows.[89] Interns in Fox Television Studio's Post Production department created DVDs of television "dailies" and helped distribute them.[90] Interns in Fox's Network Finance Department reconciled balance sheets, ran reports, and recorded information in personnel software.[91] Interns in FEG's Human Resources department assisted in evaluating employee training materials, helped conduct trainings, and helped set up the Company's internal SharePoint website.[92]

### F.　Defendants Relied on Interns to Get More Work Done.

Defendants used interns to fill gaps that resulted from their "cost containment initiatives" in or around 2008.　FEG ordered a hiring freeze and limited the amount of overtime that employees could work.[93] Paid internships were eliminated and temporary workers were "significantly scaled back."[94] "As a result, the number of [unpaid] internships increased and the

---

[87]　Ex. 52 (Publicity – Photo Department Internship).
[88]　Ex. 53 (TVD/MPP/Creative Department Internship).
[89]　Ex. 55 (Business and Legal Affairs Internship).
[90]　Ex. 56 (FTVS Post Production Internship).
[91]　Ex. 60 (Network Finance Internship).
[92]　Ex. 35 (TCFFC Human Resources Internship) at D0093983; Ex. 4 (Wiggins Tr.) 81:17-23.
[93]　Ex. 3 (Johnson Tr.) 123:22-124:3; Ex. 42 (Email, dated Jan. 26, 2009).
[94]　Ex. 38 (Email, dated Aug. 13, 2010) at D0093799; Ex. 44 (Email, dated July 9, 2013) at D0093818.

11

size of [FEG's] intern program more than doubled."[95]

FEG believed that the tasks and projects that interns performed benefitted it.[96] FEG typically hired interns based on each department's "needs" – the more projects a department had, the more interns it hired.[97] When a department was not busy, it typically would not have a need to hire many interns.[98] When a department was busier, more interns were requested.[99] More interns were needed because employees relied on interns to assist them with their work.[100]

## IV.    FEG Structured its Internship Program Around its Actual Operations.

FEG provided interns with little or no classroom training and structured its internship program around its actual operations. The only formal training FEG provided were periodic "lunch & learns" and networking events that focused on how to get a job.[101]

FEG's on-the-job approach is reflected in the "learning objectives" of its internships as set forth in Intern Request Forms. For example, Eden Antalik's supervisor stated that the "learning objectives" of an internship in Searchlight's Publicity Department in New York were: "To receive a hands-on, real world experience working in a film studio's national publicity office, and understanding the details that go in to preparing and executing a successful film

---

[95]    *Id.*
[96]    Ex. 1 (Hoffman Tr.) 75:16-76:10; 139:7-13; 210:19-21; 212:19-213:16; 213:19-23; 215:4-13; 217:19-218:7.
[97]    Ex. 1 (Hoffman Tr.) 31:17-32:13.
[98]    *Id.* 32:14-33:3.
[99]    *Id.* 63:12-16; *see* Ex. 16 (Intern Request Form) ("I would like someone interested in going above and beyond and learning in a real work environment as we're going to have a busy Spring!"); Ex. 28 (Email, dated Apr. 9, 2010) ("If we could even have two interns per day, this would be a big help as we are often understaffed the busier it becomes.") at D0050906; Ex. 73 (Email, dated Dec. 11, 2009) at D0093183 ("We are in need of an intern over here in the Publicity department.").
[100]    Ex. 1 (Hoffman Tr.) 63:24-64:11; 239:2-18.
[101]    Ex. 1 (Hoffman Tr.) 107:6-110:13; Ex. 4 (Wiggins Tr.) 47:2-9; 52:4-54:15; Ex. 33 (Orientation Agenda).

publicity campaign."[102]   An intern supervisor in the Comedy Development department of Twentieth Century Fox Television stated that interns would "come away with an understanding of how our department functions within the larger company and how we contribute to the television process.[103]   An intern supervisor in the Publicity – Photo department stated that interns would "have a better understanding of how a still photography department works" and a "better understanding of a professional environment and how a marketing department is structured[.]"[104] An intern supervisor in the Fox Television Studio Postproduction department stated that interns would learn to "understand the post production work flow[,]" "[i]dentify the post production personnel and vendors[,]" and "[e]xperience firsthand, how the post department is involved . . . on a show."[105]   An intern supervisor in Fox 2000 stated that interns would "witness[] the synergy between departments" and "become creatively linked and bonded with our projects."[106]   An intern supervisor in Network Finance stated that interns would "apply[] accounting concepts learned in school to 'real world' work experience."[107]

## V.   FEG Treated Interns as Employees with Respect to Key Personnel Policies.

Although FEG uniformly classified interns as non-employees for purposes of its wage and hour obligations, it treated interns as employees when it benefited from doing so.

---

[102]   Ex. 49 (Searchlight New York Publicity Internship).
[103]   Ex. 34 (TCFTV Comedy Development Internship).
[104]   Ex. 52 (Publicity – Photo Department Internship).
[105]   Ex. 56 (FTVS Post Production Internship).
[106]   Ex. 57 (Fox 2000 Internship).
[107]   Ex. 60 (Network Finance Internship).

13

## A.    Offer Letter

FEG issued offer letters to new interns.[108]  Offer letters informed interns that their offers were "contingent" on background checks and proof of eligibility to work in the United States.[109]  FEG required interns to fill out I-9 Employment Eligibility Verification forms.[110]  Offer letters explained that if "any of these contingencies [were] not satisfied[,] the Company reserve[d] its right to revoke the offer of employment."[111]  Offer letters also advised interns that their "employment" with the Company was "at will," and that, therefore, both the intern and "the Company ha[d] the right to terminate the employment relationship at any time[.]"[112]

## B.    Workers' Compensation Agreement

FEG required interns to sign Workers' Compensation agreements.[113]  The agreements provided that interns would "be considered employee[s], as defined by Labor Code Section 3351, for the purposes of worker's compensation coverage" and that the "Company's Workers' Compensation Insurance w[ould] be the sole remedy if [sic] Intern sustains an injury arising out of and in the course of Intern's employment."[114]

A News Corporation worker's compensation insurance policy applied to all FEG employees and interns.[115]  Interns were called "special employees," who "in every way other

---

[108]    Ex. 11 (Offer Letter); Ex. 3 (Johnson Tr.) 79:6-9; Ex. 4 (Wiggins Tr.) 45:10-19; Ex. 77 (Offer Letters).
[109]    Ex. 11 (Offer Letter); Ex. 77 (Offer Letters).
[110]    Ex. 1 & 2 (Hoffman Tr.) 79:1-13; 286:13-24; Ex. 3 (Johnson Tr.) 79:10-13; Ex. 4 (Wiggins Tr.) 39:14-40:11.
[111]    Exs. 1 & 2 (Hoffman Tr.) 79:1-13; 286:13-24; Ex. 3 (Johnson Tr.) 79:10-13; Ex. 11 (Offer Letter); Ex. 77 (Offer Letters).
[112]    Ex. 11 (Offer Letter); Ex. 77 (Offer Letters).
[113]    Exs. 1 & 2 (Hoffman Tr.) 79:11-17, 286:13-24; Ex. 3 (Johnson Tr.) 80:11-15; Ex. 4 (Wiggins Tr.) 41:16-42:6; Ex. 12 (Worker's Compensation Agreement).
[114]    *Id.*
[115]    Ex. 6 (Karn Tr.) 14:23-25; 17:7-13; 18-24-19:7; 21:3-10.

than the fact they are not issued a paycheck, are employees of the company."[116]

### C.      Corporate Policy Acknowledgment

FEG required interns to sign a form acknowledging that they had reviewed and would adhere to FEG's corporate personnel policies.[117] In particular, FEG required interns to sign a confidentiality agreement that acknowledged that they would "become aware of or have access to proprietary information," and prohibited them from disclosing such information both during their internships and after their internships had ended.[118] The confidentiality agreement also required interns to agree that, "in consideration of [their] continued employment with and compensation by the Company," they agreed that "the Company [would be] entitled to not less than $10,000 in liquidated damages per breach of th[e] Policy[.]"[119]

FEG also required interns to acknowledge that they had read and adhered to unlawful harassment and discrimination policies and policies on electronic communications, insider trading, standards of business conduct, conflicts of interest, security, and records management.[120]

### D.      Affirmative Action Self-Identification Form

FEG asked interns to self-identify by race, gender, and other protected categories as part of its Affirmative Action Plan and to meet its obligations to maintain information regarding the number of protected individuals who applied for positions at the Company.[121]

---

[116]    *Id.* at 19:9-22; 21:3-22:19; 23:14-18; 25:2-7.
[117]    Ex. 1 (Hoffman Tr.) 78:5-16; Ex. 3 (Johnson Tr.) 79:14-80:3; 102:22-103:7; Ex. 41 (Intern Personnel File) at D0091079.
[118]    Ex. 10 (Confidentiality Obligations of Employees Policy) ¶¶ 1-2, 4.
[119]    *Id.* ¶ 5.
[120]    Ex. 3 (Johnson Tr.) 79:14-80:3; Ex. 41 (Intern Personnel File) at D0091079.
[121]    Ex. 1 (Hoffman Tr.) 77:8-15; 80:21-81:5; Ex. 9 (Self-Identification Form).

15

**VI.    FEG Changed its Internship Program from an Unpaid to a Paid Program in Response to the Risk that the Program Was Noncompliant.**

FEG changed from an unpaid to paid program in or about September 2010 in response to the U.S. Department of Labor's Fact Sheet #71: Internship Programs Under the Fair Labor Standards Act ("DOL Factors"), which sets forth six factors that private sector employers must meet in order to maintain a lawful unpaid internship program.[122]  In particular, there was concern that the fourth factor – which prohibits employers from deriving an "immediate advantage from the activities of the intern" – "creat[ed] a lot more risk going forward."[123]  According to FEG's corporate representative on its internship policies, before the program changed, interns "may have" provided value to the Company.[124]  For example, after reviewing the DOL Factors, which FEG circulated to intern supervisors before the program changed to a paid program, one supervisor noted that, "the 'suggested' guidelines and the former reality differ quite drastically."[125]  Another stated that the DOL Factors "indicate[] that [interns'] duties and participation here may change substantially."[126]  Antalik's supervisor asked Ms. Hoffman, "Why would an office have an intern that provides no immediate advantage from said intern's activities?"[127]  An intern supervisor told Ms. Hoffman that she did not believe that her department should participate in the program until it became paid.[128]  In response to the DOL

---

[122]    Ex. 1 (Hoffman Tr.) 190:14-191:3; Ex. 27 (Email, dated July 14, 2010); Ex. 3 (Johnson Tr.) 171:18-172:2; 173:18-25; Ex. 46 (Email, dated July 15, 2010) at D0053834.
[123]    Ex. 3 (Johnson Tr.) 171:18-173:13; Ex. 46 (Email, dated July 15, 2010) at D0053834.
[124]    Ex. 3 (Johnson Tr.) 174:1-13; *see also* Ex. 1 (Hoffman Tr.) 139:7-13 (A: "Did the interns ever do work that provided immediate advantage?  I would say: Yes, that could have happened. Q: Do you think what the interns did provided the company with value? A: I think in some cases, yes, they did contribute and add value.")
[125]    Ex. 21 (Email, dated May 19, 2010) at D0059390.
[126]    Ex. 24 (Email, dated June 18, 2010) at D0075177.
[127]    Ex. 22 (Hoffman Email, dated May 19, 2010).
[128]    Ex. 32 (Email, dated May 27, 2010).

16

Factors, FEG attempted to "tighten[] up [its] guidelines" before ultimately changing its program from an unpaid to paid program.[129]  FEG had no policy preventing interns from doing work that provided value to the Company during the period when it had an unpaid program.[130]

## ARGUMENT

**I.     The FLSA and NYLL Protect Plaintiff and the Proposed Class.**

The FLSA requires employers to pay for all work they "suffer or permit."  29 U.S.C. § 203(g).  To further its remedial and humanitarian goals, the FLSA broadly defines an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003).  "Employer" is also defined expansively as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"  29 U.S.C. § 203(d).  "Work" is any "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer."  *Alvarez v. IBP, Inc.,* 339 F.3d 894, 902 (9th Cir. 2003) (internal quotation marks omitted), *aff'd*, 546 U.S. 21 (2005).

The FLSA's broad definitions of employ, employee, and employer are meant to ensure that commercial businesses do not obtain an unfair competitive advantage in the marketplace by employing individuals who voluntarily work for no wage.  *See* 29 U.S.C. § 202(a)(3) (declaring Congress's intention to correct "detrimental" labor conditions that create "an unfair method of competition in commerce" through passage of the FLSA); *see also Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985) ("[E]xceptions to [FLSA] coverage . . . exert a general downward pressure on wages in competing businesses[.]").  "If an exception to the Act

---

[129]      Ex. 26 (Email, dated July 13, 2013).
[130]      Ex. 3 (Johnson Tr.) 174:14-19; *see* Ex. 4 (Wiggins Tr.) 30:8-13; Ex. 1 (Hoffman Tr.) 75:2-15; 137:7-10.

were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." *Alamo Found.*, 471 U.S. at 302.

The NYLL is an equally protective "remedial" statute. *Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 289 n.4 (E.D.N.Y. 2010). Its definitions of "employee" and "employer" are nearly identical to the FLSA's. *See* N.Y. Lab. Law § 651(5) (an employee is "any individual employed or permitted to work by an employer in any occupation"); § 651(6) (an employer "includes any individual, partnership, association, corporation, limited liability company . . . or any organized group of persons acting as employer").

Although the FLSA does not define the word "intern" and there is no exception for "interns" anywhere in the statute, in 1947, the U.S. Supreme Court carved out a narrow exception to the definition of an employee for "trainees" participating in short-term training programs that provide "the same kind of instruction" offered by a "public or private vocational school." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152-53 (1947). Where it is undisputed that the alleged employer "receive[d] *no* 'immediate advantage' from any work done by the trainees," the trainees worked "*solely* for [their own] personal purpose or pleasure," and their "work serve[d] *only* [their] own interest," it has not "suffered or permitted" work and therefore does not owe the trainees compensation. *Id.* (emphasis added). The U.S. Department of Labor ("DOL") later developed a six-factor test intended to codify *Walling*, which courts have applied to workers alleged to be trainees,[131] and which the DOL recently adapted, with little change, to interns who work for private sector employers, like Defendants. *See* U.S. Dep't of

---

[131]    *See, e.g., Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 531-32 (S.D.N.Y. 1998).

18

**A00076**

Labor, Fact Sheet #71: Internship Programs Under the FLSA (Ex. 75).[132]

## II.    Plaintiff Meets All of the Rule 23 Requirements.

Plaintiff's minimum wage claim is well suited for class certification.  All of the members

of the proposed class worked in New York as unpaid interns, participated in FEG's centralized

internship program, performed productive work, were classified as employees under the same

FEG personnel policies, and were uniformly classified as non-employees with respect to

Defendants' wage and hour policies.  These circumstances, which were the same across the

class, will drive the resolution of the key questions in this case: whether interns were covered

"employees" or fell under *Walling*'s narrow exception for "trainees."  *See Myers v. Hertz Corp.*,

624 F.3d 539, 549 (2d Cir. 2010) (class certification is appropriate where "evidence generally

applicable to the class" may answer the key issues in the case); *Wal-Mart Stores, Inc. v. Dukes*,

131 S. Ct. 2541, 2551 (2011) (certification is warranted where the evidence is capable of

"generat[ing] common *answers* apt to drive the resolution of the litigation").

Plaintiff Eden Antalik seeks to certify the following class under Rule 23 for violations of

Article 19 of the NYLL:

> All individuals who had unpaid internships in New York between September 28,
> 2005 and September 1, 2010 with one or more of the following divisions of FEG:
> Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive
> Media (renamed News Corp. Digital Media).

Courts in this Circuit give Rule 23 a "liberal rather than restrictive construction," and

"adopt a standard of flexibility" when they apply it.  *Marisol A. v. Guiliani*, 126 F.3d 372, 377

(2d Cir. 1997) (internal quotation marks omitted).  The Court "must receive enough evidence, by

---

[132]    The New York Department of Labor has adopted the DOL's test and added more factors.
*See* N.Y. Dep't of Labor, Fact Sheet, Wage Requirements for Interns in For-Profit Businesses
(Ex. 76).

affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *In re Initial Pub. Offering Sec. Lit.*, 471 F.3d 24, 41 (2d Cir. 2006). "[I]n making such determinations, [the Court] should not assess any aspect of the merits unrelated to a Rule 23 requirement;" however, where a Rule 23 requirement and a merits issue overlap, the Court must resolve those disputes that are necessary to determining whether Rule 23 has been met. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011).

Although this is the first case in which a court has been asked to certify a class of interns, the Honorable Harold Baer, Jr. granted conditional certification of an intern collective under 29 U.S.C. § 216(b) last year based on evidence that the defendant "made a uniform determination that interns were not employees," "required interns to submit college credit letters," and "used interns to performed entry-level work with little supervision." *Wang v. Hearst Corp.*, No. 12 Civ. 793, 2012 WL 2864524, at *2 (S.D.N.Y. July 12, 2012). Courts in this Circuit routinely certify cases involving the uniform classification of workers as "exempt" from wage and hour requirements,[133] or as non-employee "independent contractors,"[134] which raise comparable issues and rely on similar types of proof, such as uniform compensation policies and job descriptions. *See, e.g., Damassia*, 250 F.R.D. at 159-64 (certifying class based on uniform classification policy and evidence of "centrally derived" business practices that governed the duties and responsibilities of class members) (internal quotation marks omitted); *Iglesias-Mendoza*, 239

---

[133]     *See Cuevas v. Citizens Fin. Grp., Inc.*, No. 10 Civ. 5582, 2012 WL 1865564, at *3 (E.D.N.Y. May 22, 2012); *Aponte v. Comprehensive Health Mgmt., Inc.*, No. 10 Civ. 4825, 2011 WL 2207586, at *9-12 (S.D.N.Y. June 2, 2011); *Han v. Sterling Nat'l Mortg. Co.*, No. 09 Civ. 5589, 2011 WL 4344235, at *4 (E.D.N.Y. Sept. 14, 2011); *Damassia v. Duane Reade Inc.*, 250 F.R.D. 152, 159-64 (S.D.N.Y. 2008).
[134]     *See Hart v. Rick's Cabaret Int'l Inc.*, No. 09 Civ. 3043, 2010 WL 5297221, at *6-7 (S.D.N.Y. Dec. 20, 2010); *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 370-73 (S.D.N.Y. 2007); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 203-05 (S.D.N.Y. 2006); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85-88 (S.D.N.Y. 2001).

20

F.R.D. at 373 ("common question[] of . . . whether [alleged independent contractors] were supposed to be paid the minimum wage as a matter of law" is "about the most perfect question[] for class treatment").  This case should be treated no differently.  Defendants classified all interns in one fell swoop regardless of the particular tasks they were assigned, the office or division in which they worked, and what they gained from their internships.  The proof that will drive the merits – the nature of Defendants' internship program, including its immersion of interns in day-to-day operations, the classification of interns as employees under personnel policies, and the reliance on interns to perform productive work and fill gaps resulting from employee cut-backs – is "generally applicable to the class" and capable of generating common answers to the merits questions.  *See Myers*, 624 F.3d at 549.

### A.   Plaintiff Meets Each Rule 23(a) Requirement.

#### 1.   Numerosity

Rule 23(a)(1) requires Plaintiff to show that "the class is so numerous that joinder of all members if impracticable."  Fed. R. Civ. P. 23(a)(1).  "[N]umerosity is presumed at a level of 40 members."  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 2005).  There are over forty members of the proposed Class.  Bien Decl. ¶ 12.

#### 2.   Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  A single common question of law or fact will suffice.  *Marisol A.*, 126 F.3d at 376; *accord Wal-Mart*, 131 S. Ct. at 2556.  The commonality requirement is met where a common question of fact or law is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 131 S. Ct. at 2551 (emphasis in original) (internal quotation marks omitted).  Here, there are several common questions:

21

a.    Whether Defendants Derived an Immediate Advantage From Interns' Work.

Whether Defendants derived an immediate advantage from Plaintiff's and the class members' work is a common question that will generate a common answer. *See Archie*, 997 F. Supp. at 534 ("If a defendant gains an immediate advantage from a plaintiff's labor, courts have held that the plaintiff is an employe[e] for purposes of the FLSA."); Ex. 75 (DOL Fact Sheet). This question is appropriate for classwide resolution because it looks to *the nature of the work performed* – not the specific tasks. *Archie*, 997 F. Supp. at 535 (plaintiffs were employees because they "performed productive work for the defendants"); *Okoro v. Pyramid 4 Aegis*, No. 11 Civ. 267, 2012 WL 1410025, at *10 (E.D. Wis. Apr. 23, 2012) (individual whose duties were "undeniably of substantial assistance to [the company]" was an employee); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 471 (11th Cir. 1982) (mental patients who "did work which was of economic benefit" to defendant were employees); *Wirtz v. Wardlaw*, 339 F.2d 785, 786-88 (4th Cir. 1964) (high school students who helped to perform office tasks were employees). The answer to this question will not vary from intern to intern and "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551.

The proof capable of generating a common answer this question includes, but is not limited to: (1) internship guidelines FEG issued to all intern supervisors; (2) descriptions of interns' productive work in FEG's Intern Request Forms and other Company documents; (3) testimony of the intern recruiters charged with overseeing the FEG intern program; (4) testimony from interns, including Plaintiff and Opt-In Plaintiffs, regarding the productive work they performed; and (5) FEG's decision to change its program to a paid program because of the "value" that interns provided. *See* Factual Background, *supra* Sections I.B., III, IV.

22

        b.    <u>Whether Interns Displaced Regular Employees.</u>

A second common question is whether Plaintiff and class members displaced regular employees by performing work that paid employees typically perform or by augmenting Defendants' existing workforce.  *See* Ex. 75 (DOL Fact Sheet); *Archie*, 997 F. Supp. at 533 (where defendant used services provided by alleged trainees and avoided having to pay others at market rates, alleged trainees were employees covered by the FLSA).  Much of the proof discussed above will generate a common answer to this question.  In addition, Defendants' own corporate representatives and documents demonstrate that they used interns to fill gaps resulting from "cost containment initiatives."  *See* Factual Background, *supra* Section III.F.

        c.    <u>Whether FEG Structured its Internship Program Around its Actual Operations as Opposed to a Classroom or Academic Experience.</u>

A third common question is whether FEG structured its internship program around a classroom or academic experience as opposed to its actual operations.  *See* Ex. 75 (DOL Fact Sheet); *Archie*, 997 F. Supp. at 507 (finding plaintiffs were not trainees where the defendant did not "structure a training program as that concept is understood in case law and regulatory interpretations but instead structured a program that required the plaintiffs to do work that had a direct economic benefit for the defendants").  Evidence that Defendants provided interns with little classroom training, consisting of periodic "lunch & learns" and networking events, and instead structured their program around "key projects and day-to-day operations" will be common to Plaintiff and all class members.  *See* Factual Background, *supra* Section IV.

        d.    <u>Whether FEG's Internship Program Was for the Benefit of Interns.</u>

A fourth common question is whether FEG's internship program was for the "for the benefit" of the interns or whether Defendants benefited from the program.  "If the interns are engaged in the operations of the employer or are performing productive work (for example,

23

filing, performing other clerical work, or assisting customers), then the fact that they may be receiving some benefits in the form of a new skill or improved work habits will not exclude [interns] from . . . minimum wage . . . requirements because the employer benefits from the interns' work." *See* Ex. 75 (DOL Fact Sheet); *Walling*, 330 U.S. at 152-53 (citing undisputed evidence that training was "solely for [plaintiffs'] personal purposes or pleasure," and that the "work serve[d] only [plaintiffs'] own interest"); *Archie*, 997 F. Supp. at 533 (although plaintiffs gained basic job skills that might help them in the job market, they were not trainees because their work benefited defendant by allowing it to offer services at below market rate).

In addition to evidence discussed above, FEG's internship guidelines provide common evidence of the benefits that it obtained from interns. Benefits of interns to Defendants included: their "[f]resh new energy . . . new ideas and different perspectives" and "[u]seful assistance on key projects and day-to-day operations." *See* Factual Background, *supra* Section II.B. The guidelines and other Company documents also demonstrate that Defendants sought to use their internship program to "identify talent early and build a diverse and trained pipeline" of future employees and for "overall recruitment for the company." *Id.* This common evidence is relevant to whether Defendants used their internship program to try out potential employees before hiring them. *See* Ex. 75 (DOL Fact Sheet) ("[U]npaid internships generally should not be used by the employer as a trial period for individuals seeking employment . . . ").

  e. <u>Whether Interns Were Employees as a Matter of "Economic Reality."</u>

A fifth common question is whether interns were Defendants' employees as a matter of "economic reality." *See Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). Where a key issue is the existence of an employer-employee relationship, courts consider "any relevant evidence" that may aide in evaluating the economic relationship. *Id.* Here, there is

24

common evidence that FEG treated interns as employees. FEG: (1) classified all interns as "at will" employees in form offer letters, enabling them to "terminate" their "employment" at any time; (2) classified interns as "special employees" for purposes of their worker's compensation insurance policy and required them to forgo bringing legal claims; (3) required interns to agree to Company policies that applied to employees, including confidentiality restrictions; and (4) used intern demographic information to satisfy their Equal Employment Opportunity obligations. *See* Factual Background, *supra* Section V.

### 3.   Typicality

Rule 23(a)(3) is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376 (internal quotation marks omitted). "[M]inor variations in the fact patterns underlying individual claims" do not defeat typicality when the defendant directs "the same unlawful conduct" at the named plaintiff and the class. *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). The claims of the plaintiff and the class "only need to share the same essential characteristics, and need not be identical." *Damassia*, 250 F.R.D. at 158 (internal quotation marks omitted). The typicality requirement is not "highly demanding." *Id.*

Here, Plaintiff is typical of the class she seeks to represent. She participated in FEG's internship program, was not paid, performed productive work, including compiling information, researching, doing errands, doing mailings, and assisting at film screenings, received only on-the-job training and minimal "classroom" training, and was subject to the same personnel policies that Defendants imposed on other interns. *See* Factual Background, *supra* Section I.B.1.

Plaintiff's claim is based on the same legal theory as the members of the Class – that Defendants' misclassified her as a non-employee and failed to pay her minimum wages under the

25

NYLL.  *See Damassia*, 250 F.R.D. at 158 ("all class members' claims . . . are based on the same

course of events and legal theory, namely that [defendant]'s decision to classify [them] . . . is

inconsistent with the requirements of the NYLL").

### 4. Adequacy

Rule 23(a)(4) tests whether the class representative will fairly and adequately protect the

interests of the class.  Fed. R. Civ. P. 23(a)(4).  Where the "class representative[] [is] prepared to

prosecute fully the action and ha[s] no known conflicts with any class member," the adequacy

requirement is met.  *Shahriar*, 659 F.3d at 253.  "The fact that plaintiffs' claims are typical of the

class is strong evidence that their interests are not antagonistic to those of the class; the same

strategies that will vindicate plaintiffs' claims will vindicate those of the class."  *Damassia*, 250

F.R.D. at 158.  Plaintiff has no conflicts with the class.  In furtherance of her duties as class

representative, she sat for a full-day deposition and produced documents.  Bien Decl. ¶ 9.

Plaintiffs' counsel are "qualified, experienced and able to conduct the litigation."  *Baffa*

*v. Donaldson, Lufkin & Jenrett Sec. Corp.*, 222 F. 3d 52, 60 (2d Cir. 2000).  Outten & Golden

LLP ("O&G") has substantial experience prosecuting wage and hour class and collective actions

and has a very good reputation in the field of employment law.  *See, e.g., Capsolas v. Pasta Res.,*

*Inc.*, No. 10 Civ. 5595, 2012 WL 4760910, at *3 (S.D.N.Y. Oct. 5, 2012).

### B. Plaintiff Meets Rule 23(b)(3).

#### 1. Common Questions Predominate.

Rule 23(b)(3) requires that "questions of law or fact common to class members

predominate over any questions affecting only individual members[.]"  Fed. R. Civ. P. 23(b)(3).

A common question predominates when "resolution of some of the legal or factual questions that

qualify each class member's case as a genuine controversy can be achieved through generalized

26

proof, and if these particular issues are more substantial than the issues subject to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

As discussed above, generalized proof will "tend to show" that Plaintiff and class members were similar in ways that are material to the principal issue in this case: whether interns were employees or trainees. *See Myers*, 624 F.3d at 549. The common questions Plaintiff has identified, which generalized proof can answer, are substantial and predominate over any individual questions because they will be determinative of the merits issue. *See Walling*, 330 U.S. at 152-53 (decisive issues are whether the employer "receive[d] [an] 'immediate advantage' from any work done by the trainees," whether the trainees worked "solely for [their own] personal purpose or pleasure," and whether their "work serve[d] only [their] own interest"); *see also Torres v. Gristede's Operating Corp.*, No. 06 Civ. 3316, 2006 WL 2819730, at *14-16 (S.D.N.Y. Sept. 29, 2006) (where an issue is "outcome determinative," it predominates).

### 2.    A Class Action Is the Superior Mechanism.

Rule 23(b)(3) requires the Court to determine "that a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In determining whether superiority is met, the Court may consider the following:

> (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

Plaintiff satisfies each of the four factors. First, class members' interests would not be served by individually controlling the prosecution of the action because most lack the resources to even "contemplate proceeding with this litigation in any context other than through their

27

participation in a class action, given the expense and burden that such litigation would entail." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003). "[A] class action will save an enormous amount in litigation costs for all parties and allow them to more efficiently prosecute their claims and defenses." *Han*, 2011 WL 4344235, at *11. Second, there is no other litigation of which Plaintiff is aware raising the issues raised here. Third, the litigation should be concentrated in this forum because Plaintiff and the proposed Class all worked in New York City. Bien Decl. ¶ 12. Fourth, this case is unlikely to present manageability problems because the proposed Class is relatively small. *See Torres*, 2006 WL 2819730, at *16 (finding "little reason to expect" manageability problems for class action of 300 New York City grocery workers).

### III.  The Court Should Appoint Plaintiff's Counsel as Class Counsel.

The Court should appoint O&G as Class Counsel because they satisfy the requirements of Rule 23(g). *See* Fed. R. Civ. P. 23(g)(1)(A). O&G has performed significant litigation and discovery work. Bien Decl. ¶ 7. O&G has committed significant resources to representing the proposed class and will continue to do so. *Id.* Courts have recognized O&G's "substantial experience prosecuting and settling . . . wage and hour class actions," and found them to be "well-versed in wage and hour and class action law." *See Capsolas*, 2012 WL 4760910, at *3.

### IV.  Plaintiff Meets the Burden for Court-Authorized FLSA Notice.

The Court should authorize Plaintiff to send notice of this lawsuit to:

> All individuals who had unpaid internships between September 28, 2008 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

In an FLSA collective action, employees must receive timely notice in order for the "intended benefits of the collective action . . . to accrue." *Cuzco v. Orion Builders, Inc.*, 477 F.

28

Supp. 2d 628, 635 (S.D.N.Y. 2007).  Without timely notice, workers' rights will diminish each day, *see Ruggles v. WellPoint, Inc.*, 591 F. Supp. 2d 150, 162 n.12 (N.D.N.Y. 2008), because the FLSA's statute of limitations runs until a worker files a written consent form.

To be entitled to notice, a plaintiff must establish that she and potential plaintiffs "together were victims of a common policy or plan that violated the law." *Myers*, 624 F.3d at 555 (internal quotation marks omitted).  This threshold is "fairly lenient," even if "slightly higher scrutiny should apply" after discovery. *Silverstein v. AllianceBernstein L.P.*, No. 09 Civ. 5904 (S.D.N.Y. Aug. 24, 2011), ECF No. 41, at 2 (attached as Ex. 79 to Bien Decl.) (internal quotation marks omitted).  Here, all interns were subject to the same policy of not being paid.

When a plaintiff moves for notice at this stage of a case, after substantial discovery, courts evaluate three additional factors: (1) whether disparate factual and employment settings of the individual plaintiffs exist; (2) whether any individualized defenses exist; and (3) fairness and procedural considerations. *Torres*, 2006 WL 2819730, at *9.  All three factors favor Plaintiff.

All interns' relevant factual settings and employment settings are the same.  FEG subjects all interns to policies that were centrally administered by a small team of intern recruiters.  All interns performed productive work that benefited FEG, and received little or no formal training.  FEG treated all interns as employees for other purposes. *See* Factual Background, *supra*.

Any other aspects of interns' employment settings are not material.  Disparate facts "do not defeat Plaintiffs' valid basis for moving forward with collective action" where plaintiffs are "subject to a common practice or scheme." *See Torres*, 2006 WL 2819730, at *10 (internal quotation marks omitted).

No individualized defenses exist because the issue here is simple – whether FEG's interns were covered by the FLSA.  If they are, there are no defenses to the FLSA's minimum

29

wage provisions that could apply to individual interns, nor has FEG raised any. *See id.* at *11 (individual defenses do not preclude Court-authorized notice where "the standard of proof and required evidence . . . is . . . one based on policy, practice, and conduct").

Finally, fairness and procedural considerations favor prompt notice, which will allow interns to decide whether to join the case and protect their rights. "[T]he policy objectives of reducing cost and increasing efficiency are best furthered by" notice. *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court: (1) certify the proposed Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3); (2) appoint Plaintiffs' Counsel as Class Counsel; (3) approve Plaintiff's proposed class action notice, Bien Decl. Ex. 81; (4) conditionally certify the proposed Collective pursuant to 29 U.S.C. § 216(b) and authorize Plaintiff's proposed notice, Bien Decl. Ex. 82; (5) order Defendants to undertake a thorough search for the contact information and certify the steps that they have taken to the Court; and (6) order Defendants to produce a computer-readable data file containing the names, last known mailing addresses, last known telephone numbers, last known email addresses, internship location, and internship dates for all Class and Collective members.

Dated:     February 15, 2013
           New York, New York

                                    Respectfully submitted,

                                    **OUTTEN & GOLDEN LLP**
                                    By:

                                    /s/ Rachel Bien
                                    Rachel Bien

                                    Adam T. Klein
                                    Rachel Bien
                                    Elizabeth Wagoner
                                    Reena Arora

30

3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

*Attorneys for Plaintiffs*

31

U.S. Department of Labor

Solicitor of Labor
Washington, D.C. 20210



SEP 1 2 2013

Laurel G. Bellows
Immediate Past President
American Bar Association
321 North Clark Street
Chicago, IL  60654-7598

Dear Immediate Past President Bellows:

I am writing in response to the concerns you raised regarding the limitations imposed by the Fair Labor Standards Act (FLSA) on the ability of law students to secure work experience through unpaid internships with private law firms where the work they perform is limited to pro bono activities.

Generally, the FLSA does not permit individuals to volunteer their services to for-profit businesses such as law firms.  In most instances, individuals who are suffered or permitted to perform work by a covered for-profit entity are considered employees under the FLSA and entitled to minimum wage and overtime unless they are covered by a specific exemption or exclusion.  The FLSA does, however, permit individuals to participate in unpaid internships or training programs conducted by for-profit entities if certain criteria are met.

Under certain circumstances, law school students who perform unpaid internships with for-profit law firms for the student's own educational benefit may not be considered employees entitled to wages under the FLSA.  The determination of whether such an internship meets this exclusion depends upon all of the facts and circumstances of each student's case.  Where all of the following criteria are met, an employment relationship does not exist under the FLSA[1]:

1. The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;
2. The internship experience is for the benefit of the intern;
3. The intern does not displace regular employees, but works under close supervision of existing staff;
4. The employer that provides the training derives no immediate advantage from the activities of the intern, and on occasion its operations may actually be impeded;
5. The intern is not necessarily entitled to a job at the conclusion of the internship; and
6. The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

---

[1] See WHD Fact Sheet 71, enclosed, for further guidance.

While the intern (or trainee) exclusion from the definition of employment is necessarily quite narrow because the FLSA's definition of "employ" is very broad, it may be met in some circumstances when law students perform unpaid internships for for-profit law firms.  We understand your specific concern with respect to law students involves unpaid internships (whether or not any academic credit is provided) in which the law school places students with for-profit law firms and acts as an intermediary empowered to monitor the progress of the internship, and in which the law firms provide written assurance that the students will receive an educational experience related to the practice of law and that the student will be assigned exclusively to non-fee-generating pro bono matters.

Where the program is designed to provide a law student with professional practice in the furtherance of his or her education and the experience is academically oriented for the benefit of the student, the student may be considered a trainee and not an employee.  Accordingly, where a law student works only on pro bono matters that do not involve potential fee-generating activities, and does not participate in a law firm's billable work or free up staff resources for billable work that would otherwise be utilized for pro bono work, the firm will not derive any immediate advantage from the student's activities, although it may derive intangible, long-term benefits such as general reputational benefits associated with pro bono activities.  Where law firm internships involve law students participating in or observing substantive legal work, such as drafting or reviewing documents or attending client meetings or hearings, the experience should be consistent with the educational experience the intern would receive in a law school clinical program.  Such internships also offer significant benefit to law students because legal representation and licensing requirements necessitate that unlicensed law students receive close and constant supervision from the firm's licensed attorneys.  Such supervision both provides an educational benefit to the law student, and reduces the time that firm attorneys may spend on other work, potentially impeding the firm's operations.  Thus, where the hiring of unpaid law student interns does not displace regular employees, the law student is not necessarily entitled to a job at the conclusion of the internship, and the law firm and the law student agree that the intern is not entitled to wages, an unpaid internship with a for-profit law firm structured in such a manner as to provide the student with professional experience in furtherance of their education, involving exclusively non-fee generating pro bono matters would  not be considered employment subject to the FLSA.[2]  In contrast, a law student would be considered an employee subject to the FLSA where he or she works on fee generating matters, performs routine non-substantive work that could be performed by a paralegal, receives minimal supervision and guidance from the firm's licensed attorneys, or displaces regular employees (including support staff).

You also raised concerns that recent law school graduates who have not yet passed any state bar should be able to participate in unpaid internships with law firms working on pro bono matters to the same extent as current law students.  But we understand from your communications that the Labor and Employment Law Section leadership has

---

[2] The Department considers all of the facts in assessing whether all of the criteria are met. A different set of circumstances may, thus, lead to a different conclusion.

2

reviewed this matter and determined that law graduates may not volunteer for private law firms without pay in the same manner.  Likewise, we believe that the analysis would be different for law school graduates than for law students as the former have completed their legal education.  Additionally, law schools would not have the same ability to act as intermediaries between graduates and the law firms that they do with current students and would not be able to monitor the internship's compliance with these principles.

I hope that this summary is helpful in clarifying the limitations the FLSA places on unpaid work in various situations.

Sincerely,

*M Patricia Smith*

M. Patricia Smith
Solicitor of Labor

3

1

1

2     IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF NEW YORK
3
      Civil Action No. 11 Civ 6784
4     - - - - - - - - - - - - - - - - - - -x

5     ERIC GLATT and ALEXANDER FOOTMAN,
      on behalf of themselves and all others
6     similarly situated,

7                              Plaintiffs,

8            -against-

9     FOX SEARCHLIGHT PICTURES, INC.,

10                             Defendant.

11    - - - - - - - - - - - - - - - - - - -x

12
                             July 23, 2012
13                           11:06 a.m.

14

15              Videotaped deposition of

16    Plaintiff, EDEN ANTALIK, taken by attorneys for

17    Defendant, pursuant to notice, held at the

18    offices of Proskauer Rose LLP, Eleven Times

19    Square, New York, New York, before Nicole

20    Cannistraci, a Shorthand Reporter and Notary

21    Public within and for the State of New York.

22

23

24

25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

A00093

89

```
 1                    EDEN ANTALIK
 2    to answer your question?
 3            A.     Yeah.  Is that okay?
 4            Q.     That's fine.  So why don't you --
 5    why don't we start -- why don't you tell me what
 6    it is that you did on a daily basis at Fox
 7    Searchlight during the internship.
 8            A.     When I started -- daily you
 9    arrived around like 8-ish and you go to the
10    mailroom and you had these, like, massive crates
11    of mail, magazines, newspapers, journals and
12    whatnot.  What you had to do is you had a
13    certain time before morning meeting, about a
14    half hour, to run through all of those media
15    outlets basically, including Web sites as well,
16    and check for mentions -- or well, breaks, of
17    any movies that they were publicizing.  So by
18    formulating all the piles and doing the
19    research, you then had to put it into a
20    document.  The document was given to the VP of
21    publicity to go over so that they had an
22    accurate idea of what movies needed more work
23    and whatnot.  So it was an extremely extensive
24    project in the morning.
25                    Now, the documentation that you
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

**A00094**

94

                    EDEN ANTALIK

1
2   reprimanded because I was never taught.  How was
3   I supposed to know?  I was never taught by like
4   a supervisor, John Maybee.  If it was such an
5   important document that was getting into the
6   hands of the VP, I felt that some extra care
7   would have been necessary, so I would have
8   understood exactly what they wanted and I could
9   output that.
10        Q.    During the conversation you had in
11   the conference room with John Maybee, did he
12   explain what the expectations were with respect
13   to the spacing?
14        A.    He just told me what -- what --
15   how many spaces he actually wanted, if that's
16   what you're asking, yes.
17        Q.    And by having that conversation,
18   would you say that he was giving you feedback
19   that would help you, you know, understand the
20   process and the importance of certain aspects of
21   preparing the break document?
22        A.    "Feedback" is a -- is a very
23   careful word to use for that because feedback
24   would have been "Whenever you're setting this
25   up, this is exactly how you want it to look.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022


**A00095**

110

```
 1                    EDEN ANTALIK
 2          Q.    How about Diana Loomis?
 3          A.    I liked Diana.  She was very nice
 4    to me.  She told me multiple times that I was
 5    doing a very good job.
 6          Q.    Did she ever give you feedback?
 7          A.    I don't remember ever getting
 8    feedback from her.  I went and got her coffees
 9    multiple times and lunches multiple times, but I
10    never got really feedback from her.  She just
11    told me I was doing a good job.
12          Q.    How about the two vice presidents
13    that you mentioned, Barry and James?
14          A.    The only real communication that I
15    had with Barry besides professional
16    hello/good-bye/how are you was through Facebook.
17    And James, very cordial conversation, but
18    nothing ever concerning my career, so...
19          Q.    So am I correct that it was John
20    Maybee that made you feel threatened during your
21    internship?
22          A.    Unfortunately yes, yeah.
23          Q.    Did any of the other interns,
24    Aaron Carr or I think it's Aurora --
25          A.    Aparna.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

**A00096**

111

1                        EDEN ANTALIK

2           Q.     Sorry, or Dan or Lisa, did they

3    ever feel threatened, as far as you knew, by

4    John Maybee?

5           A.     I know that -- and I never really

6    talked about it with Aaron or Dan or Lisa, but I

7    do know that Aparna was treated really poorly

8    and it was just witnessing and walk-bys, I can't

9    give any specific situations because I can't

10   remember, but I just remember just actually

11   feeling bad for the girl, just --

12          Q.     Do you know whether she felt

13   unprofessionally treated?

14          A.     You know what?  I never actually

15   approached the conversation.

16          Q.     Why not?

17          A.     Because I didn't want to start any

18   bad blood between anybody.  I just keep things

19   to myself.  There is no reason to run my mouth.

20          Q.     Other than the, you know, two

21   discussions that you mentioned in the conference

22   rooms, is there anything else during the

23   internship that you felt was -- was hostile?

24          A.     No.

25          Q.     Anything else that you felt --

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

**A00097**

112

```
 1                    EDEN ANTALIK
 2   that made you feel threatened as you've defined
 3   the term?
 4           A.    Not that's coming in my mind right
 5   now.
 6           Q.    Earlier, I believe when we first
 7   started the deposition, you mentioned that your
 8   experience during the Fox Searchlight internship
 9   was -- I think you said horrifying?
10           A.    Yes.
11           Q.    Is there anything -- withdrawn.
12                 Were you counting the two
13   conversations you've recounted here in the
14   conference room with John Maybee as being
15   responsible for making the experience
16   horrifying?
17           A.    Yeah.  And there was additional
18   things, just small things like getting yelled at
19   for, you know, work not being done perfectly or
20   doing all these expense reports and then having
21   your own expenses on getting them coffee or
22   drinks or something and then not getting
23   reimbursed for that.  It's just a bunch of
24   little things.  Running around, go run this film
25   to this screening and go do this here, go do
```

**A00098**

113

```
 1                    EDEN ANTALIK
 2   that there.  That's fine, that's learning,
 3   whatever, it's my job.  But it was just the way
 4   a lot of things were approached.  There was no
 5   signs, there was no clear outline of what was
 6   expected of me.
 7         Q.    Did you ever ask for a clear
 8   outline of what was expected of you?
 9         A.    Multiple times I would say what
10   are we looking for here, and nothing was ever
11   really responsive.
12         Q.    And who would you ask?
13         A.    I'm almost positive it was John
14   Maybee.  That was via e-mail and that would have
15   been on the internnypub e-mail.  I'm not sure we
16   have that.
17         Q.    Anything else that went into your
18   description of the experience as horrifying?
19         A.    I would say just not having any
20   clear outline and things being so important and
21   I -- I -- we had been putting together a book
22   for Amelia.  And I'm not sure if you saw the
23   movie or anything of the sort, but Hilary Swank
24   played Amelia and they were putting together --
25   the director was putting together a book of
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

142

```
 1                    EDEN ANTALIK

 2          A.    Put into Microsoft Word.  A lot of

 3    big words for the tasks.

 4          Q.    Does it refer to anything more

 5    than the breaks?

 6          A.    I'm sure there were other things

 7    that I had to do electronically, but I don't

 8    remember.  I remember whenever we had to do

 9    itineraries we had to type them up and make them

10    all pretty to give them to the stars and e-mail

11    them to their agents or whatever.  So I'm sure I

12    did other things.  But that's the biggest thing

13    that stands out for me, is breaks.

14          Q.    How much time would you spend

15    working on breaks on a day when you were in the

16    Searchlight office?

17          A.    We had to have it done before we

18    got started with our daily -- daily duties.  So

19    I would say a solid half hour, 40 minutes that

20    we would have to arrive before we got everything

21    ready for the day.

22          Q.    What was the purpose of doing the

23    breaks?

24          A.    To find out what kind of publicity

25    each movie, each star in a movie was getting, to
```

**A00100**

143

EDEN ANTALIK

1

2    see where we could focus our efforts on as a

3    team to attract media outlets to talk more about

4    what we were doing.

5         Q.    And did you feel that you learned

6    or gained anything from work on the breaks?

7         A.    I mean, the prior intern showed me

8    how to set it up, but I had to skim magazines

9    and newspapers in a really quick amount of time

10   and I had to type a sentence that had to be

11   perfect to give to a VP.  Did I learn something?

12   I wouldn't really go there.  I didn't learn

13   anything whatsoever.  I learned that I needed to

14   be fast on doing it because I had other things

15   and duties that needed to be completed.  You

16   know what I mean?

17        Q.    When you talk about "responsible

18   for starting and conducting journalism and

19   critic screenings," what does that mean?

20        A.    Whenever we had to do a

21   screening -- so you had all these journalists

22   come into the News Corp. building.  We had to

23   direct the journalists to the proper screening

24   rooms, set them up, make sure they were

25   comfortable, get the screening started.  If they

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

**A00101**

144

                              EDEN ANTALIK

1

2    had any questions during the screening, we had

3    to answer them.  And then once the screening was

4    over, we had to thank them for their time and

5    take down any comments or questions or concerns

6    and follow up with them after the screening and

7    that was it.

8         Q.    When you say "we," who are you

9    referring to?

10        A.    The -- my other associates that

11   worked with me, Aaron, I know Aaron Carr did

12   a lot.  We kind of paired up a lot together when

13   we were doing it, so...

14        Q.    Anyone else?

15        A.    The receptionist, Jess Banks and

16   Dana, they always came with us, or at least

17   advised us on what to do so...

18        Q.    Would they be present throughout

19   the screening?

20        A.    Not all the time.  They were

21   sometimes but not all time.

22        Q.    Do you know if any of the other

23   interns other than Aaron worked on all these

24   types of projects?

25        A.    Yeah, we all did that, yeah.


           Elisa Dreier Reporting Corp.  (212) 557-5558
             950 Third Avenue, New York, NY 10022


                              **A00102**

145

```
 1                    EDEN ANTALIK

 2          Q.    You mentioned "acted as bicoastal

 3    liaison for research with East and West coast

 4    published work."

 5          A.    Uh-huh.

 6          Q.    What does that mean?

 7          A.    Well, I love how I put "bicoastal

 8    liaison."  That's, you know, working with the LA

 9    office, okay?  And we had to -- again, this goes

10    back to Amelia.  This also can coordinate with

11    500 Days of Summer.  Whenever we were looking

12    for published works, anything that anybody wrote

13    about 500 Days of Summer, Adam or Amelia or all

14    of the movies that we were working on, we had to

15    document those as well, print them out, show

16    them to any other publicists so they were aware

17    of what was good and what was bad.

18          Q.    And how did you know what to do

19    with respect to this responsibility?

20          A.    You know what?  Once the people in

21    LA got in touch with us and they were just

22    telling us, you know, this is what we need, we

23    just started looking.  I went online.  I went on

24    Rotten Tomatoes a lot.  That was a great site to

25    use whenever -- because you had a lot of critic
```

A00103

146

EDEN ANTALIK

1

2  reviews there.  And it kind of leads you into

3  the next critic's website or page.  It was kind

4  of like a treasure hunt, that's good.

5      Q.    And did anyone in the New York

6  office ever explain kind of what you were

7  looking for or what the purpose of this was?

8      A.    Sometimes.  It was hit -- it was

9  hit or miss really.  Sometimes -- if you had --

10  if you had questions, I definitely would, like,

11  bug them a lot because I wanted to make sure I

12  was getting the right information.

13      Q.    And would people answer your

14  questions?

15      A.    Yeah, yeah.

16      Q.    There is mentioned "scheduled

17  flights and itineraries for all talent and

18  directors in all of the major films being

19  released"?

20      A.    Yes, ma'am.

21      Q.    What does that relate to?

22      A.    Whenever we had press junkets and

23  press tours that would go all over the country

24  that the stars on the films would be discussing,

25  they would have to -- we would have to schedule

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

**A00104**

```
 1                    EDEN ANTALIK
 2    their flights and which car was going to pick
 3    them up and what they needed and whatnot.
 4           Q.    And were you the only one doing
 5    that responsibility?
 6           A.    No.  All of us were doing it.  And
 7    I know Jess Banks, who was also the secretary,
 8    she was the one who was showing me how to do it
 9    and everything and Dana, too.
10           Q.    Those were -- both Dana and Jess
11    Banks were both Searchlight employees?
12           A.    Yes, ma'am.
13           Q.    And what films are you referring
14    to when -- for that responsibility?
15           A.    I know we did it for Adam for
16    sure.  We started doing it for 500 Days of
17    Summer.  There was -- there was one other one
18    that I'm forgetting, a movie.  I specifically
19    remember doing it for Adam, though, because the
20    main lady in it, I'm drawing a blank on her
21    name, but she had allergies and I had to make
22    sure that wherever she was at, they didn't have
23    certain peanuts and stuff like that, so...
24           Q.    I see there is a reference for --
25    to "all talent and directors."
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

148

1                    EDEN ANTALIK

2         A.    Yeah.

3         Q.    And how many -- how many people

4   are you referring to with that statement?

5         A.    I mean, it was whoever -- the main

6   people -- did you see Adam?

7         Q.    Just --

8         A.    There was two -- there were two

9   main leads, a male and a female.  Them and

10  whoever was traveling with them and their agents

11  and the directors that were going with them to

12  the press junkets.

13        Q.    So how many schedules were you

14  coordinating, was it more than ten?

15        A.    No, no.  It was probably right

16  around ten, but I wouldn't -- wouldn't go as far

17  and say it was more than ten at all.

18        Q.    And there were people working with

19  you to coordinate?

20        A.    Yes.

21        Q.    "Scheduled on-ground

22  transportation and arrangements accommodating

23  all directors, stars and assistants," what does

24  that refer to?

25        A.    Getting taxis or limos to and from

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

**A00106**

149

```
 1                    EDEN ANTALIK
 2   the airport, to the junket, to their hotel, to
 3   back to the junket.
 4          Q.     Were you the only one working on
 5   that responsibility?
 6          A.     No, it was all of us as well.
 7          Q.     When you say "us"?
 8          A.     I'm sorry.  That was Jess, Dana,
 9   then the other interns and everything else.
10          Q.     So you're referring to just more
11   than interns?
12          A.     Oh, yeah, yes.
13          Q.     To other people in the Searchlight
14   office?
15          A.     Yes, ma'am.
16          Q.     Were people -- when you were
17   coordinating the itineraries and the schedules,
18   were employees at Fox Searchlight providing you
19   with feedback?
20          A.     Not -- not that I remember.  I
21   mean, they were asking me if it was done, but
22   that was about it.  Like I never got "good job"
23   or "you should have done this" or "this could
24   have been better."  I never got anything like
25   that.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022


A00107

150

                    EDEN ANTALIK

 1

 2        Q.    Did you ever get guidance, though,

 3   such as if we have a group of people traveling

 4   together, we need to think about having an SUV

 5   or larger vehicle as opposed to if they're

 6   traveling alone, they can use a sedan?  Were

 7   those types of --

 8        A.    I wouldn't say, like, anybody in

 9   the office gave it.  Their agents or their

10   assistants would e-mail with what their requests

11   were and then we had to do it.  Do you know what

12   I mean?  Sorry I keep asking you.

13        Q.    Was anyone in the office reviewing

14   the schedules or itineraries as you were putting

15   them together or the other interns were working

16   on them?

17        A.    I'm sure they did review them.

18   They never reviewed them in front of me or

19   confirm it was reviewed.  It was just "Is it

20   done, did you complete it," so...

21        Q.    So what would you do with them,

22   the schedules, once you figured out a schedule?

23        A.    Once the tickets were booked and

24   the cars were scheduled and hotel arrangements

25   were scheduled, basically you e-mailed it back

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022


A00108

151

```
 1                    EDEN ANTALIK
 2   to the directors or their assistants to let them
 3   know that it was all taken care of.  And I would
 4   CC Michelle or John so that they could see it
 5   was done and everything.
 6            Q.    Would anyone at Searchlight in the
 7   New York office see the schedule or the tickets
 8   that you were booking or know what they were
 9   before you went and booked them?
10            A.    I believe they would have.  I
11   would CC and make sure is this all okay and as
12   long as it was completed, so...
13            Q.    There is a reference to planning
14   -- "planned, coordinated all catered events,
15   press junkets, meetings."
16            A.    Yes.
17            Q.    What does that mean?
18            A.    Well, the press junkets we had
19   food.  It was kind of a very similar setup here,
20   but we had hoagies and all kinds of stuff for
21   each person from the movies so that they were
22   comfortable in their rooms for the interviews.
23   So we had to plan picking all of that up.
24   Excuse me.  And then whenever we had meetings
25   for the office itself, we would set up meetings,
```

**A00109**

152

                         EDEN ANTALIK

1

2    order the food for everybody within the

3    meetings, get drinks, make the proper -- the

4    agenda for the meetings.  One of us would do

5    minutes.

6            Q.    How often were the meetings in the

7    office that you're referring to?

8            A.    I know there were at least five

9    while I was there.  So I don't know, I can't

10   give you like how often it really was, but I

11   know there was at least five.

12           Q.    And you had the same role with all

13   five?

14           A.    Yeah, yes.

15           Q.    Did anyone else have a role with

16   respect to any of the five meetings?

17           A.    They all helped us again, and when

18   I say "they," I mean Jess Banks helped a lot,

19   Dana helped a lot and then all of the interns in

20   the same position were all doing kind of the

21   same thing there.

22           Q.    So all the interns, the five

23   interns, and the two -- Jess Banks and Dana,

24   were all working to schedule the meetings and

25   coordinate the food and do the minutes and the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022


A00110

153

1                      EDEN ANTALIK

2    agendas?

3              A.    Yeah.  It was kind of designating

4    at a time where we needed -- if I was working on

5    finding those pictures of Amelia, then Aaron

6    would step in and start ordering the food for

7    the meetings.  And Dana would tell Dan to get

8    ready and start doing the minutes and prepare

9    that while -- it was very team-oriented, so we

10   could all get everything done that needed done.

11             Q.    And who was, if you will, the team

12   leader, if there was such a person?

13             A.    I don't know.  I felt like there

14   wasn't a team leader.  I felt like we -- we

15   looked to Jess and Dana a lot if there was any

16   confusion or anything.  But we had e-mails.  We

17   would get in and there would be e-mails of

18   to-dos, what we all needed to get done.  And we

19   just went to town and "I got this, I got that."

20   You know what I mean?

21             Q.    Were Jess and Dana -- did they

22   provide guidance if you needed it?

23             A.    Yeah.  I would definitely say that

24   they did.

25             Q.    Were you making decisions about

        Elisa Dreier Reporting Corp.  (212) 557-5558
          950 Third Avenue, New York, NY 10022

                      **A00111**

154

1                    EDEN ANTALIK
2    who would be catering the event or what types of
3    food would be ordered?
4              A.    As a group we were, yes.
5              Q.    How about you in particularly?
6              A.    I don't want to take all the
7    responsibility because I felt like it was more
8    of a team effort when we were making decisions
9    for the caterers and stuff, but I definitely had
10   a large say in it and making the phone calls and
11   whatnot.
12             Q.    So when you say it was a team
13   effort to decide where the food was going to
14   come from, what was the process for deciding
15   that?
16             A.    How much money do we have to
17   budget with and what would be the most
18   sufficient thing to provide a professional
19   meeting with food.
20             Q.    And that was done in a group
21   context, those discussions?
22             A.    I felt like it was, yes.
23             Q.    And was John Maybee ever part of
24   those discussions?
25             A.    I don't remember, I don't think

                Elisa Dreier Reporting Corp.  (212) 557-5558
                  950 Third Avenue, New York, NY 10022

**A00112**

155

1                    EDEN ANTALIK

2    so.

3          Q.    There is a reference to "shipping

4    crucial documents."

5          A.    Uh-huh.

6          Q.    What does that refer to?

7          A.    Anything -- any unreleased films

8    for screenings and stuff that needed to go all

9    over the country, we would have to ship them and

10   get them, like, perfectly presented and make

11   sure it has security and insurance on it and

12   whatnot.

13         Q.    Anything else that entry refers

14   to?

15         A.    I know we shipped scripts.  I know

16   we shipped -- there was a lot of things we

17   shipped that was really high importance, so.

18         Q.    I know you're using the word "we."

19   Who are you referring to?

20         A.    The interns, Jess and Dana, for

21   sure.

22         Q.    What specifically do you remember

23   shipping?

24         A.    I remember shipping a couple films

25   and I know one was for 500 Days of Summer

156

                    EDEN ANTALIK

1

2    because I hadn't seen it and I was like, "Oh

3    they're going to see it before me and whatever."

4    And then I remember shipping a script before --

5    I remember shipping some of the pictures that we

6    had printed out of Amelia, I remember shipping

7    these.  I'm sure there were other things I

8    shipped, but I, like, remember I probably did

9    ten shipments a day.  So it was a lot of stuff.

10         Q.     And what was involved in doing a

11   shipment?

12         A.     A shipment, what you had to do is

13   you had to find out obviously what it was and

14   then you had to go to a certain Web site and

15   document the value of it, the weight of it,

16   where it was going to, who the best contact was

17   at Fox.  You needed to know the address.  There

18   was highly -- whether it was highly important or

19   highly sensitive material.  Then you had to

20   weigh it, you had to literally package it and

21   then drop it in the mailroom and you need to

22   confirm receipt, too.

23         Q.     And how did you know what steps to

24   do?

25         A.     Actually, the intern who was prior

        Elisa Dreier Reporting Corp.  (212) 557-5558
          950 Third Avenue, New York, NY 10022

**A00114**

157

                          EDEN ANTALIK
1
2    to us wrote it down for us to do that.  So...
3           Q.    So were there different processes
4    that you used depending on, you know, the type
5    of document?  For example, for an unreleased
6    film was there one process versus something
7    maybe not so sensitive?
8           A.    You know, I don't remember
9    actually.  I felt like -- I know it was more
10   like highly sensitive material, but I'm not sure
11   if there was any additional stuff that we'd have
12   to do, I forget.
13          Q.    And how would you know the
14   information that you had to use to do the
15   shipment?
16          A.    Looked it up, looked all of it up.
17          Q.    There is a reference to "solely
18   responsible for setting up and breaking down
19   press junket decorations, refreshments, cameras,
20   recorders."
21          A.    Yeah, like tape recorders.  That's
22   exactly what it would -- on a press junket we
23   had to set up a room very similar to something
24   like this.  And then all the refreshments are
25   needed to be -- something for any reporters and

            Elisa Dreier Reporting Corp.  (212) 557-5558
              950 Third Avenue, New York, NY 10022


                          **A00115**

158

                        EDEN ANTALIK

1

2    media outlets.  And then the private rooms for

3    the stars and directors.

4            Q.    And when you say "solely

5    responsible," what does --

6            A.    That was like something I always

7    did myself because I'm very perfectionist on

8    what I did.  So I made sure everything was set

9    up perfect and all the equipment.  I'm really

10   good with setting up technology and computers

11   and stuff.  So I was confident enough to take

12   that on my own, so...

13           Q.    Did anybody ever help you?

14           A.    No.  I had people carry down with

15   me; I remember people carrying stuff for me, but

16   "I got it from here guys, it's cool."

17           Q.    And how many times do you think

18   you set up and helped break down a room?

19           A.    It was, I think, three times.  It

20   could have been two, though.  I know it was for

21   Adam and 500 Days of Summer, but I feel like

22   there was a third one I'm forgetting, but it was

23   at least two times and at the most three.

24           Q.    So were you doing manual labor

25   like moving furniture?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022


A00116

159

1                    EDEN ANTALIK

2          A.    I mean, if you consider like

3    recorders and cameras furniture, then yes.  It

4    depends what you classify furniture as.

5          Q.    So putting aside the cameras and

6    recorders I would not classify as furniture --

7          A.    Okay, I didn't know.

8          Q.    Were you moving furniture?

9          A.    I moved chairs around in

10   preparation for the meetings, but that was about

11   it.  I wasn't, like, throwing a desk on my back

12   and moving it around, so...

13         Q.    And then the last one says

14   "responsible for conducting in-office events for

15   the vice president of publicity."

16         A.    Uh-huh.

17         Q.    What was that?

18         A.    If the VP ever had to have

19   meetings with everybody, we would coordinate and

20   send out e-mails to the each of those people

21   saying, you know, Barry Dale or James needs to

22   speak with you at so-and-so time, are you good

23   for this, are you good for that, so...

24         Q.    And did any of the vice presidents

25   have assistants?

Elisa Dreier Reporting Corp.  (212) 557-5558
      950 Third Avenue, New York, NY 10022

**A00117**

```
 1                    EDEN ANTALIK
 2          A.     You know, I don't recall. I felt
 3   like Dana and Jess both played a part of them.
 4          Q.     And how did your internship at Fox
 5   Searchlight -- how did that compare to other
 6   internships that you had?
 7          A.     In what -- in what reference do
 8   you mean?
 9          Q.     Just in general in terms of the
10   internship experience?
11          A.     I would say that whenever -- when
12   I was at WTAE and WPXI, to give you an idea, I
13   would go out -- like I was always shadowing
14   somebody.  Like if there was a reporter that
15   needed to go out on scene, I just stood there,
16   watched what they did.  They talked to me about,
17   you know, don't wear your hair this way.  Like
18   even if it was menial stuff, I was shadowing
19   them.  And if there was a story that a reporter
20   wouldn't go out and a cameraman was just getting
21   shots of something, I would go out and I would
22   just see how it was going.  I really couldn't --
23   I wasn't allowed to talk to anybody, I wasn't
24   allowed to really do anything.  It was
25   observance, is a good word.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

**A00118**

188

                            EDEN ANTALIK
 1
 2    been so long.  Contact information, very basics.
 3    Like who do you contact if we have a question
 4    concerning this or -- we had their business
 5    cards and all of that stuff and they had our
 6    internnypub e-mail.  It was basics like that
 7    because there wasn't really much I can answer
 8    otherwise, so...
 9          Q.    And were you aware of any
10    restrictions that were placed on the press that
11    were coming for the screenings in terms of what
12    they could say in the reviews or not say?
13          A.    I wasn't aware of any, like,
14    restrictions for the press. I just knew how
15    private and careful -- the handout -- everything
16    was.  There was one time that, I forget which
17    movie it was for, Gentleman Broncos maybe, that
18    one we had to -- they gave me one of the film
19    tapes.  I had to run it over to -- across the
20    city.  I forget where I actually took it to, but
21    I took it to a screening room by myself, gave to
22    the director -- not the director, the guy who is
23    running the actual projector.  And I just had to
24    sit there and I had never seen it.  I had never
25    known anybody, I had no guidance or anything.

A00119

```
 1                    EDEN ANTALIK

 2          Q.    Did you ever ask to sit in on any

 3  meetings that they were having or to sit in

 4  their office while they did their job?

 5          A.    No, because when we had the group

 6  meetings we were there for those and we prepped

 7  for those.  And then they didn't necessary --

 8  Casey was the only one who did have an office.

 9  She was -- she was the one that was kind of

10  really busy all the time.  So I never wanted to

11  really bother her.  But John and Michelle had

12  cubicles, so I didn't -- I never really thought

13  that approaching them to sit and watch what they

14  were doing was the right idea.

15          Q.    And how far away from where they

16  sat did you sit when you were in the internship?

17          A.    Oh, we were in completely

18  different sections of the office.

19          Q.    With respect to the research that

20  you were doing, how did you -- how did you know

21  what type of research you were looking for, say,

22  for example for the Amelia photo that you were

23  looking for?

24          A.    Well, what happened there, like I

25  said, they had these lookalike pictures of
```

194

```
 1                    EDEN ANTALIK
 2   Hilary Swank and they had mimicked Amelia
 3   Earhart and they literally said, see these
 4   pictures, find the originals of Amelia Earhart.
 5   I just went to town.  I mean, I used every
 6   research outlet I could even think of that -- I
 7   was contacting professors, "Where would you get
 8   pictures, where would you find pictures?"  So
 9   like I said, it was a treasure hunt, it really
10   was.  Kind of exciting.
11         Q.    How did you end up finding them?
12         A.    You know what?  I found
13   Amelia's -- we found all the other ones.  They
14   were easy.  They were on, like, on basic
15   dedication sites for her and whatnot.  The one
16   that I found, I'll never forget, she had like a
17   checkered shirt on and a hat.  I found it on a
18   blog somewhere, but it was like a European blog
19   and I just remember e-mailing right away.  I was
20   so proud of myself to, like, look, I am working
21   really, really hard to prove myself.  And I
22   never got any recognition, but it was a blog
23   that I found it on.
24         Q.    And how about -- I think you
25   mentioned something about Rotten Tomatoes?
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

**A00121**

```
 1                    EDEN ANTALIK
 2          A.    Oh, yeah.  Rotten Tomatoes is a
 3   movie review site.  I don't think they review
 4   any other publications or TV shows or anything
 5   like that, but Rotten Tomatoes was a great site
 6   that you would see critics on.  They would have
 7   what their names were and where they were
 8   critiquing for.  So you could use those media
 9   outlets and go to their Web site and dig there
10   and then go to where they may have gotten their
11   referrals for the critics from there.  And you
12   just had, like this chain of sites where you got
13   reviews which you needed for breaks.
14          Q.    How would you know when you're
15   done, like when there were no --
16          A.    You never did, you never did.  A
17   break -- some days, right in the middle of doing
18   research for something, I would see a mention on
19   Yahoo or something and instantly e-mail it to
20   John, update the breaks, print it out, send it
21   over to the VP.  So you were never, ever, ever
22   done, ever.  So that was a daily task.
23          Q.    How would you know how to classify
24   them or what needed to be escalated to John?
25          A.    What do you mean?
```

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/27/13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
XUEDAN WANG, on behalf of herself and all        :
others similarly situated,                                      :
                                                                        :
                          Plaintiff,                             :
                                                                        :
           - against -                                         :
                                                                        :
THE HEARST CORPORATION,                       :
                                                                        :
                          Defendant.                        :
------------------------------------------------------------x

**12 CV 793 (HB)**

<u>**MEMORANDUM ORDER**</u>

**Hon. HAROLD BAER, JR., District Judge:**

Before the Court is Plaintiffs' motion to certify the Court's Opinion & Order of May 8, 2013 for immediate appeal pursuant to 28 U.S.C. § 1292(b). Therein I denied Plaintiffs' motion for partial summary judgment with respect to their "employee" status under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") and denied class certification based on U.S. Supreme Court precedent. *Wang v. Hearst Corp.*, No. 12 Civ. 793, 2013 WL 1903787 (S.D.N.Y. May 8, 2013). Defendant Hearst Corporation ("Hearst") does not oppose the motion. For the reasons set forth below, Plaintiffs' motion is GRANTED.

### Background

Plaintiffs worked at Hearst's various magazines as unpaid interns. On behalf of themselves and those similarly situated, Plaintiffs claim that they were Hearst's "employees" under the FLSA and NYLL and that Hearst denied their minimum, overtime, and spread-of-hour wages by classifying them as unpaid interns. Originally, Plaintiffs proposed two classes: (1) an Intern Class comprised of unpaid and underpaid interns, and (2) a Deductions Class comprised of interns who received college credit amounted to an unlawful deduction from their wages.

I granted conditional certification of the Intern Class pursuant to Section 216(b) of the FLSA, 29 U.S.C. § 216(b), and denied Defendant's motion to strike the class and collective allegations under the FLSA and NYLL, *Wang v. Hearst Corp.*, No. 12 Civ. 793, 2012 WL 2864524 (S.D.N.Y. July 12, 2013), *recons. denied*, 2012 WL 3642410 (S.D.N.Y. Aug. 24, 2012). Defendants subsequently moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12 (c)

1

with respect to Plaintiffs' claim under Section 193 of the NYLL, which prohibits employer's "deduction from the wages of an employee" except under statutorily delineated circumstances. N.Y. Lab. Law § 193. I granted that motion and rejected Plaintiffs' theory that the Hearst took "unlawful deductions" from some of the interns by requiring them to pursue academic credit from an accredited college or university. *Wang v. Hearst Corp.*, No. 12 Civ. 793, 2013 WL 105784 (S.D.N.Y. Jan. 9, 2013).

## Discussion

Shortly before trial, Plaintiffs moved for partial summary judgment under Fed. R. Civ. P. 56(a) and class certification pursuant to Fed. R. Civ. P. 23(a) and b(3). Plaintiffs now move to certify the Court's Opinion & Order denying that motion pursuant to 28 U.S.C. § 1292(b). I denied Plaintiffs' summary judgment motion with respect to their "employee" status under the FLSA and NYLL because I found a genuine issue of material fact under the totality of circumstances test established in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), and the Department of Labor's six-factor test, U.S. Dep't of Labor, "Fact Sheet # 71: Internship Programs Under The Fair Labor Standards Act," available at http://www.dol.gov/whd/regs/compliance/whdfs71odf ("DOL Fact Sheet #71"). *Wang*, 2013 WL 1903787, at *5. I denied certification of a Rule 23 class for Plaintiffs' claims on the ground that the commonality and predominance prongs were not satisfied. The only evidence of Hearst's uniform policy was that Plaintiffs were unpaid interns whereas the nature of their tasks varied broadly amongst the twenty (20) magazines where they interned. *Id.* at *7 (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)). These concerns were exacerbated by the inability to fix damages with a fact pattern such as this. *Id.* at *8 (citing *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013)).

Section 1292(b) provides that a district court may seek an order for an immediate appeal when it is of the opinion that there is a "[1] a controlling question of law [2] there is substantial ground for difference of opinion [3] and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." § 28 U.S.C. 1292(b).

Here, all of the three criteria are satisfied. First, controlling questions of law include whether the facts here support a finding that neither dominance nor commonality were satisfied so that a class might be certified. *See Wal-Mart Stores*, 131 S. Ct. at 2551 ("What matters to class

2

certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (citation omitted); *Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010) ("In possible contrast to a uniform corporate policy detailing employees' job duties, the fact of common exemption does not establish whether all plaintiffs were actually entitled to overtime pay or whether they were covered by the applicable administrative regulations defining FLSA's exemptions."). In *Comcast Corp.*, the Court went on to find that the Circuit Court had erred in its predominance analysis by failing to consider whether "questions of individual damage calculations will inevitably overwhelm questions common to the class." 133 S.Ct. at 1433. Whether in such a case the totality of circumstances is or is not the appropriate legal standard is another controlling question of law. *See Walling*, 330 U.S. at 153. A decision on these questions will significantly affect the conduct of other lawsuits now pending in the district courts which have relied on other legal standards or the same legal standard, but have come out differently. *See, e.g., Glatt v. Fox Searchlight Pictures*, No. 11 Civ. 6784 (WHP), 2013 WL 2495140 (S.D.N.Y. June 11, 2013).

Secondly, as the questions raised by Plaintiffs in this case and in *Glatt* are difficult and one of first impression, they clearly provide fodder for different opinions and have spawned them. Both *Wang* and *Glatt* applied the totality of circumstances test spelled out in *Walling* and the DOL Fact Sheet #71. *See Glatt*, 2013 WL 2495140, at *12; *Wang*, 2013 WL 1903787, at *4. Despite careful analysis provided in each opinion, the District Courts reached very different results. While the Second Circuit confronted a somewhat similar issue in *Velez v. Sanchez*, that case dealt with the status of domestic service workers and not that of unpaid interns, and thus different law was applicable and different policy considerations came into play. 693 F.3d 308 (2d Cir. 2012).

If the Second Circuit provides clarification or a different legal standard, it will guide a resolution of the outstanding issues pending in the Circuit. As the cases suggest, an appeal should be considered if it will advance the ultimate termination of the litigation. *See Transp. Workers Union, Local 100 v. N.Y.C. Transit Auth.*, 358 F. Supp. 2d 347, 350 (S.D.N.Y. 2005).

3

**Conclusion**

For the reasons stated, Plaintiffs' motion is GRANTED.  The Court certifies its Opinion & Order dated May 8, 2013 for interlocutory appeal under § 28 U.S.C. 1292(b).  The underlying case will be stayed during the pendency of this motion and if the appeal is granted the stay will continue to the date of the Circuit's decision.


**SO ORDERED**
June 2?, 2013
New York, New York

_____
Hon. Harold Baer, Jr.
U.S.D.J.

4